**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> SUNG KOOK (BILL) HWANG and PATRICK HALLIGAN, <br><br> Defendants. | 22 Cr. 240 (AKH) |

**DEFENDANT SUNG KOOK (BILL) HWANG'S**
**MOTION FOR THE ISSUANCE OF RULE 17(C) SUBPOENAS**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

THE ALLEGATIONS OF THE INDICTMENT ........................................................... 1

DISCUSSION ......................................................................................................................... 4

     I.     The Court Should Grant Mr. Hwang's Requests Under the Standard
           Articulated in *United States v. Weigand*. .................................................... 4

           A.     Mr. Hwang's Requests Seek Information Material to the Defense. ........... 5

           B.     Mr. Hwang's Requests Are Not Unduly Oppressive. .............................. 11

     II.     Mr. Hwang's Requests Also Satisfy the Standard Articulated in *United
           States v. Nixon* ................................................................................................ 11

           A.     Element One: Relevance and Admissibility ............................................ 12

           B.     Element Two: Not Reasonably Procurable ............................................... 14

           C.     Element Three: Necessity ......................................................................... 15

           D.     Element Four: Specificity ......................................................................... 16

CONCLUSION ................................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)..........................................................................................6

*Health Alliance Network, Inc. v. Continental Cas. Co.*,
  245 F.R.D. 121 (S.D.N.Y. 2007) ...............................................................................13

*Holmes v. South Carolina*,
  547 U.S. 319 (2006) ...................................................................................................15

*Neder v. United States*,
  527 U.S. 1 (1999)..........................................................................................................8

*O'Dell v. Netherland*,
  521 U.S. 151 (1997).....................................................................................................15

*Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*,
  38 F.3d 627 (2d Cir. 1994)..........................................................................................13

*United States v. Bergstein*,
  2018 WL 9539846 (S.D.N.Y. Jan. 24, 2018) .............................................................13

*United States v. Boros*,
  668 F.3d 901 (7th Cir. 2012) ......................................................................................14

*United States v. Carn*,
  2016 WL 128138 (D. Nev. Jan. 11, 2016)..................................................................13

*United States v. Gas Pipe, Inc.*,
  2018 WL 5262361 (N.D. Tex. June 18, 2018) ...........................................................13

*United States v. Ihsaan Al-Amin*,
  2013 WL 3865079 (E.D. Tenn. July 25, 2013) ..........................................................12

*United States v. Johnson*,
  2014 WL 6068089 (N.D. Cal. Nov. 13, 2014) ...........................................................14

*United States v. Maxwell*,
  2021 WL 1625392 (S.D.N.Y. Apr. 27, 2021)........................................................4, 16

*United States v. Nachamie*,
  91 F. Supp. 2d 552 (2000) ......................................................................................5, 10

*United States v. Nixon,*
 418 U.S. 683 (1974) ........................................................................................ *passim*

*United States v. Rajaratnam,*
 753 F. Supp. 2d 317 (S.D.N.Y. 2011) ............................................................. 13, 16

*United States v. Sawinski,*
 2000 WL 1702032 (S.D.N.Y. Nov. 14, 2000) ........................................................ 16

*United States v. Tucker,*
 249 F.R.D. 58 (S.D.N.Y. 2008) ............................................................................ 5

*United States v. Vasquez,*
 258 F.R.D. 68 (E.D.N.Y. 2009) ............................................................................ 4

*United States v. W.R. Grace,*
 434 F. Supp. 2d 869 (D. Mont. 2006) ................................................................. 16

*United States v. Ward,*
 120 F. Supp. 57 (S.D.N.Y. 1954) ......................................................................... 4

*United States v. Weigand,*
 520 F. Supp. 3d 609 (S.D.N.Y. 2021) .......................................................... *passim*

*United States v. Weisberg,*
 2011 WL 1327689 (E.D.N.Y. Apr. 5, 2011) ......................................................... 16

*United States v. Yudong Zhu,*
 2014 WL 5366107 (S.D.N.Y. Oct. 14, 2014) ....................................................... 13

*United States v. Zhiqiang Zhang,*
 2012 WL 195509 (N.D. Cal. Jan. 23, 2012) ........................................................ 13

**Rules**

Fed. R. Crim. P. 17(c) ............................................................................................... *passim*

Fed. R. Evid. 803(6) ..................................................................................................... 13

**Other Authorities**

20 A.L.R. Fed. 3d Art. 10 § 2 (2017) ............................................................................. 3

Br. of Amici Curiae Int'l Swaps and Derivatives Ass'n, Inc. and Sec. Ind. and Fin.
 Mkts. Ass'n, *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) L.L.P.*, No. 08-
 CV-2764 (LAK) (S.D.N.Y. June 2, 2008) [ECF No. 80] .......................................... 3

Gillian Tan, *'The Morgan Stanley Fade': U.S. Probe Dredges Up Years of Animus*, BLOOMBERG (Mar. 27, 2022), https://www.bloomberg.com/news/articles/2022-03-27/-the-morgan-stanley-fade-u-s-probe-dredges-up-years-of-animus.....................................................................9

Hamza Malik, *Goldman Sachs called out Morgan Stanley's block trading to the Hong Kong securities regulator: report*, MARKETS INSIDER (Apr. 21, 2022), https://markets.businessinsider.com/news/stocks/goldman-sachs-flagged-morgan-stanley-block-trading-to-regulator-ft-2022-4 ..............................................9

Katherine Burton & Sridhar Natarajan, *Morgan Stanley's Archegos Unwinding Sped Up Trading Probe*, BLOOMBERG (Feb. 16, 2022), https://www.bloomberg.com/news/articles/2022-02-16/morgan-stanley-s-archegos-unwinding-sped-up-block-trading-probe...........................................1, 10

Matt Levine, *Take the Swaps Off the Balance Sheet*, BLOOMBERG (May 24, 2022), https://www.bloomberg.com/opinion/articles/2022-05-24/take-the-swaps-off-the-balance-sheet#xj4y7vzkg....................................................................................3

Rob Copeland, *UBS Is Fined Nearly $400 Million in Credit Suisse's Archegos Mess,* N.Y. TIMES (July 24, 2023), https://www.nytimes.com/2023/07/24/business/ubs-fined-nearly-400-million-credit-suisse-archegos.html....................................................................................1

Defendant Sung Kook (Bill) Hwang respectfully submits this brief in support of his application for the issuance of subpoenas *duces tecum* pursuant to Federal Rule of Criminal Procedure 17(c).  Mr. Hwang's requests seek specific, relevant materials that are necessary for Mr. Hwang's defense to the unprecedented market manipulation charges brought by the Government, because they will show that Mr. Hwang did not use his lawfully executed swap transactions to artificially impact the prices for the underlying stocks.  The requested materials will also illustrate that Archegos's Counterparties, some of whom have been under investigation themselves,[1] played a pivotal role in the collapse in stock prices that led to the demise of Archegos.  These documents go to the crux of Mr. Hwang's defense and should be presented to the jury.  Accordingly, Mr. Hwang respectfully requests that the Court authorize him to serve upon these respective third-parties the subpoenas provided with this motion as Exhibits A-K so that he may obtain the relevant documents and prepare for trial.

## THE ALLEGATIONS OF THE INDICTMENT

On April 25, 2022, a federal grand jury sitting in the Southern District of New York returned an Indictment against Sung Kook (Bill) Hwang, the founder and principal of Archegos Capital Management, L.P. and affiliated entities (collectively, "Archegos"), and Patrick Halligan, Archegos's Chief Financial Officer.  *See* Indictment [ECF No. 1].  The Indictment alleges that Mr.

---

[1] *See* Katherine Burton & Sridhar Natarajan, *Morgan Stanley's Archegos Unwinding Sped Up Trading Probe*, Bloomberg (Feb. 16, 2022), https://www.bloomberg.com/news/articles/2022-02-16/morgan-stanley-s-archegos-unwinding-sped-up-block-trading-probe ("U.S. authorities ramped up their investigation into whether big banks and their hedge fund clients broke rules when privately negotiating large stock sales after the blowup at Archegos Capital Management ...."); Rob Copeland, *UBS Is Fined Nearly $400 Million in Credit Suisse's Archegos Mess*, N.Y. TIMES (July 24, 2023), https://www.nytimes.com/2023/07/24/business/ubs-fined-nearly-400-million-credit-suisse-archegos.html ("The fines ... are related to Credit Suisse's acknowledged 'fundamental failure of management and controls' in 2020 and 2021, which led to a $5.5 billion loss in the collapse of a single client, the investment firm Archegos Capital Management.").

Hwang engaged in market manipulation by investing in large long positions in certain companies through the use of total return swaps. The Indictment also alleges that certain employees of Archegos made false and misleading statements to Archegos's counterparties in the swap transactions (the "Counterparties"), with Mr. Hwang's "knowledge and approval." *Id.* ¶ 2.

More specifically, the Indictment alleges that, to carry out its trading, Archegos typically established a cash equity position in a company until it approached 5% ownership of the outstanding shares of the issuer's stock. *Id.* ¶ 14. When its holdings neared the 5% threshold, beyond which a regulatory filing obligation would be triggered, Archegos would enter into contract-based "swap" agreements, which increased its economic exposure to the company's stock price without taking a further equity interest in the company. *Id.* ¶¶ 4, 9, 13-14, 27. These swaps were effected pursuant to various contractual agreements between Archegos and its Counterparties, whereby they agreed to exchange payments based on the market price movements of the specified stocks. *Id.* ¶ 15. In general, the swap terms provided that the Counterparty would pay Archegos an amount equal to any increase in the value of the referenced security (*i.e.*, its price), and Archegos would pay the Counterparty a transaction fee, as well as the amount of any decrease in the value of that referenced security. *Id.* ¶¶ 15-16. The swaps, then, were derivative instruments that represented synthetic exposure to an underlying stock; they did not represent actual purchases of shares in the underlying company or direct stock ownership or market activity by Archegos. *Id.* ¶¶ 15, 17.

Archegos's Counterparties were many of the largest and most sophisticated banks in the world, including Credit Suisse, UBS, Mitsubishi UFJ, Goldman Sachs, Jefferies, Deutsche Bank, Macquarie, Nomura, and Morgan Stanley. *Id.* ¶¶ 52, 54, 58.[2] For these Counterparties, Archegos's

---

[2] Other Counterparties at issue include Bank of Montreal and Mizuho.

swap trades were a valuable source of revenue regardless of the price advance or decline of the underlying stock, given the large transaction fees the swap transactions generated. *Id.* ¶ 16.  The Indictment charges that to avoid market exposure created by the swap trades, Counterparties would "typically" hedge against those market risks by purchasing shares of the same stock referenced in the swap. *Id.* ¶¶ 16, 25.[3]  According to the Indictment, the Counterparties' hedges, " in practice," "meant that Archegos could bet on the price of a stock, and dictate trading in the stock, without owning the stock itself."  *Id.* ¶ 17.   The Indictment further alleges that because of the *Counterparties'* stock ownership in hedges, *Archegos* "effectively controlled" the float in the underlying stocks. *Id.* ¶ 26.

The Indictment's allegations illustrate that the Counterparties, and their own trading, played an essential role in the supposed manipulation scheme.  Accordingly, as described in more detail below, documents crucial to Mr. Hwang's defense against the Government's allegations are in the exclusive possession of Archegos's Counterparties.

---

[3] There are, of course, many ways in which a bank can hedge against the market exposure created by a swap other than by purchasing the security itself, including by entering into an offsetting swap with another customer, that would have no impact on the price of the security. *See, e.g.*, Br. of Amici Curiae Int'l Swaps and Derivatives Ass'n, Inc. and Sec. Ind. and Fin. Mkts. Ass'n, *CSX Corp. v. Children's Inv. Fund Mgmt. (UK) L.L.P.*, No. 08-CV-2764 (LAK) (S.D.N.Y. June 2, 2008) [ECF No. 80] (summarizing testimony)); Matt Levine, *Take the Swaps Off the Balance Sheet*, BLOOMBERG (May 24, 2022) at 2-4.  And here, as the Government has acknowledged, whether and how to hedge market risks was left entirely to the Counterparties' discretion; the swap contracts did not require either party to actually purchase the underlying security in the market, or, if the bank did purchase the security, to hold it for any length of time. *See* Indictment [ECF No. 1] ¶ 16 (stating that counterparties would "typically" hedge Archegos's swaps in the market); *see also* March 21, 2023 Transcript of Oral Argument [ECF No. 67] at 25 (conceding that banks hedging Archegos's swaps by buying the underlying was only their "typical practice"); *see also* 20 A.L.R. Fed. 3d Art. 10 § 2 (2017) ("A securities-based swap agreement is a private contract between two parties in which they agree to exchange cash flows that depend on the price of a reference security.   A securities-based swap agreement is a separate and distinct financial instrument from the security it references . . . .   These contracts do not transfer title to the underlying assets or require that either party actually own them.").

## <u>DISCUSSION</u>

Federal Rule of Criminal Procedure 17(c) provides:

> A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

Fed. R. Crim. P. 17(c)(1). Rule 17(c) also provides that courts "may quash or modify [a] subpoena if compliance would be unreasonable or oppressive." *Id.* at 17(c)(2).

The Rule "was designed to permit the examination of voluminous documents before trial to prepare the defense." *United States v. Ward*, 120 F. Supp. 57, 61 (S.D.N.Y. 1954). Although courts have cautioned that a Rule 17(c) subpoena should not be construed as a "broad discovery device," *United States v. Vasquez*, 258 F.R.D. 68, 72 (E.D.N.Y. 2009), they have also held that its purpose is "to facilitate the trial by designating a time and place prior to trial to obtain and inspect evidentiary material." *United States v. Maxwell*, No. 20 Cr. 330 (AJN), 2021 WL 1625392, at *1 (S.D.N.Y. Apr. 27, 2021); *see also Vasquez*, 258 F.R.D. at 72 (Rule 17(c) "permit[s] a defendant to obtain evidentiary material prior to trial").

This Court should grant Mr. Hwang's requests pursuant to the standard described in *United States v. Weigand*, 520 F. Supp. 3d 609 (S.D.N.Y. 2021) (Rakoff, J.), because the requests seek material relevant to his defense and are not unduly oppressive. *See* Section I, *infra*. Mr. Hwang's requests also satisfy the test stemming from *United States v. Nixon*, 418 U.S. 683 (1974), because they seek specific, relevant documents that would be admissible at trial. *See* Section II, *infra*.

## I.  The Court Should Grant Mr. Hwang's Requests Under the Standard Articulated in *United States v. Weigand*.

A defendant's requests for third-party subpoenas under Rule 17(c) should be granted so long as they "(1) [can be] reasonably construed as 'material to the defense'"; and "(2) [are] not

unduly oppressive for the producing party to respond." *Weigand*, 520 F. Supp. 3d at 612, 615; *see also United States v. Tucker*, 249 F.R.D. 58, 66 (S.D.N.Y. 2008); *United States v. Nachamie*, 91 F. Supp. 2d 552, 563 (2000).

###### A.     Mr. Hwang's Requests Seek Information Material to the Defense.

Mr. Hwang's requests can be "reasonably construed as material to the defense." *Weigand*, 520 F. Supp. 3d at 609 (citation omitted).  In considering this element, "[a]ll the Court must [] decide is whether [the] subpoena seeks relevant information."  *Weigand*, 520 F. Supp. 3d at 614; *id.* at 613 ("In assessing whether the subpoena is 'unreasonable,' the Court must first consider whether it seeks relevant information."); *id.* at 614 (granting subpoena because it "seeks relevant materials."); *Tucker*, 249 F.R.D. at 66 (equating materiality with relevance). Mr. Hwang's requests plainly satisfy that standard.

*First*, Requests 1 through 5 seek documents concerning the Counterparties' hedging activity with respect to the Archegos swap transactions.  The Indictment alleges that Mr. Hwang manipulated the prices of specific securities by amassing large long positions in certain companies through total return swaps.  Indictment ¶ 78.  The Indictment alleges that Mr. Hwang knew these swap transactions would affect trading in the underlying securities because he understood the Counterparties would hedge these transactions by purchasing the stock underlying the swap.  *Id.* ¶ 16.[4]  The Indictment further alleges that through these hedges, Archegos affected the percentage of freely traded shares and "dominate[d] the marketplace for these securities."  *Id.* ¶¶ 26-27.  In

---

[4] *See also* Indictment ¶ 25 ("As described above, Archegos's swaps trades typically caused its Counterparties to acquire a share of stock for each one swapped with Archegos, in order to hedge against market risk on the position."); Memorandum of Law of the United States of America in Opposition to Defendants' Omnibus Pre-Trial Motions [ECF No. 53] at 4 ("The Archegos Conspirators treated their swaps as the functional equivalent of purchasing or selling the equity itself.").

other words, Mr. Hwang's purported market manipulation scheme depended on the hedging activities of the Counterparties.

Because the Counterparties' hedging was integral to the purported manipulation scheme, documents and data related to the Counterparties' hedges are critical to determining whether the swap transactions led to hedging that affected the price of the securities in the way the Government claims and, relatedly, whether Mr. Hwang could reasonably have anticipated or expected that result.  For example, evidence that the Counterparties hedged in ways other than purchasing the underlying stock, such as by purchasing an offsetting swap, would undermine the Government's manipulation theory.   Similarly, evidence that the Counterparties lent the hedged shares or unwound the hedged positions would cut against the Government's allegation that Archegos controlled the float of the shares and thus "dominated" the market for these shares.  In addition, given the Government's allegation that Mr. Hwang strategically timed his swap transactions so as to manipulate the market at certain times of the day,[5] it is critical to Mr. Hwang's defense that he be able to ascertain the timing and extent of the Counterparties' hedging activity.  For example, evidence that a Counterparty hedged through multiple transactions over the course of a day, in a manner designed to minimize the price impact of the hedges, would undermine the Government's theory that Mr. Hwang's trades led to the artificial inflation of the stock price.  *See* Omnibus Brief in Support of Defendants' Pretrial Motions [ECF No. 48] at 35-36 (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007)).   Put differently, any disconnect or

---

[5] The Indictment alleges that Mr. Hwang "trad[ed] into the close," that is, he would cause Archegos to engage in "high-volume trading at the end of market hours … to … cause artificially inflated closing prices."  Indictment ¶ 35(c).  It further alleges that "[t]his strategy was intended to create positive momentum for the stock price for the end of the day and into the following day.  . . . [T]his strategy was further intended to enable Archegos to access excess margin from its Counterparties if swap positions had gained value at the close of market hours."  *Id.* ¶ 35(d).

attenuation between Archegos's swaps and its Counterparties' hedges bears directly on the likelihood that Mr. Hwang could have affected, or did affect, the market in the manner alleged in the Indictment.   The documents sought from the Counterparties in this regard are therefore essential to Mr. Hwang's defense.

Next, Requests 6 and 7 seek documents concerning the Counterparties' methodologies for setting Archegos's trading capacity limits and margin requirements.  The Indictment alleges that Mr. Hwang's trading "strategy was further intended to enable Archegos to access excess margin from its Counterparties if swap positions had gained value at the close of market hours." Indictment ¶ 35(d).  That is, the Government's theory of market manipulation—that Archegos artificially raised stock prices at the end of the trading day in order to obtain excess margin— depends upon the theory that the Counterparties set margin requirements based on a stock's daily closing price.  Evidence that this was not the case—that is, that a stock's closing price was not a relevant or the only factor in determining the money Mr. Hwang was entitled to from Counterparties—is not contained in the agreements produced in discovery.  But it is highly relevant to the defense's ability to dispute the existence of the scheme alleged in the Indictment.

Separately, the Indictment claims that Defendants "systematically misled the Counterparties in order to obtain additional trading capacity and margin lending to further support Archegos's inflated positions."  *Id.* ¶ 47.  According to the Indictment, the Counterparties relied on Archegos's alleged misrepresentations "to assess how concentrated Archegos's portfolio was, which would give some indication of market risk, and the number of days it would take Archegos to sell its positions in normal market conditions, which would provide an indication of liquidity risk" and that "[t]he defendants obtained trading capacity, brokerage relationships, and specific

margin rates through false and misleading statements to banks and brokerages." *Id.* ¶¶ 44-45 & 74(b).

The subpoenas requested will enable Mr. Hwang to assess the extent to which Counterparties actually relied on the alleged misrepresentations in setting trading capacity limits and calculating margin. If, for example, a bank's algorithm for setting capacity focused entirely on Archegos's holdings at that bank, without regard for its broader holdings at other banks, that is strong evidence that at least one of the alleged misrepresentations at issue was not, in fact, material to the bank's decision to extend more capacity.

Likewise, Requests 8 through 14 seek documents related to the Counterparties' risk management and customer onboarding procedures. Whether any of Archegos's alleged misrepresentations were material—an essential element of the wire fraud charge, *Neder v. United States*, 527 U.S. 1, 25 (1999) (holding that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes")—turns on the Counterparties' risk management processes, including their onboarding procedures and the due diligence that they performed with respect to Archegos, or failed to perform but should have. *See, e.g.*, *Weigand*, 520 F. Supp. 3d at 613–14 (bank credit approval procedures bore on whether defendants' alleged misrepresentations were material).[6]

_____

[6] A July 29, 2021 report prepared on behalf of the Special Committee of Credit Suisse's Board of Directors in the aftermath of Archegos's collapse, *Credit Suisse Group Special Committee of the Board of Directors report on Archegos Capital Management by Paul, Weiss, Rifkind, Wharton & Garrison LLP*, CREDIT SUISSE (July 29, 2021), https://www.credit-suisse.com/about-us/en/reports-research/archegos-info-kit.html, ties that Counterparty's Archegos-related losses directly to its lax risk management, deficient controls, incompetence, and willful blindness. Beyond obtaining the facts underlying that report, Mr. Hwang is entitled to know if other Counterparties were similarly derelict in carrying out their risk management function.

Requests 15 through 20 seek documents concerning the revenues and fees that the Counterparties earned through their swap transactions.  Again, the Government's case rests in part on the allegation that Archegos's alleged misrepresentations facilitated its market manipulation scheme, but Mr. Hwang seeks to obtain information that would demonstrate that, in fact, it was the lucrative fees earned by the Counterparties, and not the alleged misrepresentations, that induced their trading and extension of credit to Archegos.  Mr. Hwang also seeks to obtain information concerning the volume of Counterparties' overall swap business, which is relevant to the Government's allegations that Mr. Hwang conducted trading through swaps "[a]t least in part to hide the extent of his market power."  Indictment ¶ 4.

Request 21, which is only in the proposed subpoenas for Goldman Sachs (Ex. D) and Morgan Stanley (Ex. H), seeks documents concerning block trades of the securities at issue in the Indictment.  Both of these Counterparties were reportedly subpoenaed by the Securities and Exchange Commission and the Department of Justice as part of an investigation into "whether banks gave hedge fund clients advance notice about big share sales before they were made public." Hamza Malik, *Goldman Sachs called out Morgan Stanley's block trading to the Hong Kong securities regulator: report*, MARKETS INSIDER (Apr. 21, 2022).[7]  Industry participants allege that Morgan Stanley tipped off hedge funds about block sales, leading the funds to sell or short the stocks, causing stock prices to plummet.  *See* Gillian Tan, *'The Morgan Stanley Fade': U.S. Probe Dredges Up Years of Animus*, BLOOMBERG (Mar. 27, 2022).[8]  Multiple reports connect Morgan

---

[7] https://markets.businessinsider.com/news/stocks/goldman-sachs-flagged-morgan-stanley-block-trading-to-regulator-ft-2022-4.

[8] https://www.bloomberg.com/news/articles/2022-03-27/-the-morgan-stanley-fade-u-s-probe-dredges-up-years-of-animus.

Stanley's block sales to the decline of the price of securities at issue in the Indictment.  *See id.*;

Katherine Burton & Sridhar Natarajan, *Morgan Stanley's Archegos Unwinding Sped Up Trading Probe*, BLOOMBERG (Feb. 16, 2022).[9]  Evidence supporting that the depressed price of the stocks or the collapse in prices was due, even in part, to improper conduct of the Counterparties and short sellers is directly relevant to Mr. Hwang's defense to the Government's allegation that the relevant stock prices "were the artificial product of HWANG's manipulative trading and deceptive conduct," Indictment ¶ 2, and that the purported market manipulation scheme caused "billions of dollars in losses."  *Id.* ¶ 7.

Finally, Request 22, which is only in the proposed subpoena for Morgan Stanley (Ex. H), seeks documents and communications related to the secondary offering of Viacom in March 2021, for which Morgan Stanley was a book-running manager.  As reflected in the Indictment, the Viacom secondary offering on March 22, 2021 led to a decline in Viacom's stock price, which ultimately led to Archegos's collapse.  *Id.* ¶¶ 60-67.  Evidence showing Morgan Stanley's views on the Viacom stock price and its expectations for the secondary offering is also relevant to Mr. Hwang's defense to the Government's allegation that Archegos's trading created an artificial price in the Viacom stock.

In sum, the documents requested are highly relevant to defending against significant allegations in the Indictment to which Mr. Hwang must have the opportunity to access in order to prepare his trial defense.  *See, e.g.*, *Nachamie*, 91 F. Supp. at 563 (subpoena for pre-trial evidence appropriate when evidence sought went to knowledge and intent).  His requests easily satisfy the relevance element.

---

[9] https://www.bloomberg.com/news/articles/2022-02-16/morgan-stanley-s-archegos-unwinding-sped-up-block-trading-probe.

### B.  Mr. Hwang's Requests Are Not Unduly Oppressive.

Mr. Hwang's requests also are not "not unduly oppressive for the producing party to respond." *Weigand*, 520 F. Supp. 3d at 612.  Mr. Hwang's requests largely seek Counterparty documents and trading data related to the specific securities at issue in the Indictment, which involve Archegos's swaps with that Counterparty.  These requests are thus narrowly tailored to seek a limited set of relevant materials that are needed to prepare the defense.  Although Request 18 seeks broader information regarding each Counterparty's total numbers of clients and the total notional value of swaps, it seeks only limited documents "sufficient to show" that information, which should not require a burdensome review of communications.  Additionally, Mr. Hwang has carefully narrowed his request to seek only materials that are not already encompassed in the discovery received to date by the Government or otherwise in his possession.  Given that these materials—trading records and related documents and communications, capacity- and margin-setting protocols, counterparty risk management and credit evaluations, and fee tracking reports—are both specifically described and are the kinds of materials that are generated in the ordinary course of business, the requests are not unduly oppressive.  Moreover, with respect to the requests to Morgan Stanley and Goldman Sachs regarding block trading, it is likely that the Counterparties have already gathered some of these documents in connection with the related investigations, thereby alleviating any burden in responding to the subpoenas.

Because Mr. Hwang's requests seek relevant documents and are not unduly oppressive, his motion should be granted.

## II.  Mr. Hwang's Requests Also Satisfy the Standard Articulated in *United States v. Nixon*.

Although this Court should apply the *Weigand* standard, other courts have chosen to evaluate defendants' third-party Rule 17(c) subpoenas under the test set out in *United States v.*

*Nixon*, 418 U.S. 683 (1974) instead.   Under *Nixon*, the issuance of a pretrial subpoena under

Rule 17(c) is proper when a moving party establishes the following four elements:

> (1)     that the documents [requested] are evidentiary and relevant;
> (2)     that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence;
> (3)     that the [moving] party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and
> (4)     that the application is made in good faith and is not intended as a general "fishing expedition."

*Nixon*, 418 U.S. at 699–700.   Based on these elements, the proponent of a subpoena must, in

essence, clear "three hurdles":  "(1) relevancy; (2) admissibility; and (3) specificity." *Nixon*, 418

U.S. at 700.   As these elements reflect, the main difference between these tests is that the *Nixon*

standard requires showing the requested materials will, or may be, admissible. *Id. Nixon* also

requires a showing that the documents are not "reasonably procurable" from other sources and that

their acquisition is "necessary." *Id.* Mr. Hwang's requests easily clear these additional hurdles.

### A.     Element One: Relevance and Admissibility

As discussed in Section I.A., *supra*, Mr. Hwang's requests, which relate to both the

elements of the charged offense and his affirmative defenses to them, seek relevant documents.

Mr. Hwang's requests also satisfy the requirement, inapplicable under the *Weigand* test,

that the documents sought be "evidentiary" (*i.e.*, admissible).   Like relevance, this requirement

imposes a low burden.   While the party "must demonstrate that the subpoenaed materials 'contain

evidence admissible with respect to the offenses charged in the indictment,'" *United States v.*

*Ihsaan Al-Amin*, No. 12 Cr. 50, 2013 WL 3865079, at *7 (E.D. Tenn. July 25, 2013) (quoting

*Nixon*, 418 U.S. at 700), courts recognize that "[b]ecause it is often difficult at the pretrial stage to

determine with precision the admissibility of certain documents," this evidentiary requirement is

"likely satisfied" even when the documents sought are only "arguably relevant." *United States v.*

*Zhiqiang Zhang*, No. 10 Cr. 827 (LHK)(HRL), 2012 WL 195509, at *2 (N.D. Cal. Jan. 23, 2012);

*see also United States v. Bergstein*, No. 16 Cr. 746 (PKC), 2018 WL 9539846, at *2 (S.D.N.Y.

Jan. 24, 2018) ("Although the Court has doubts that the materials requested by the P2 Subpoena

are relevant (and, by extension, admissible), the burden of a Rule 17(c) subpoena proponent is not

designed to be insurmountable."); *United States v. Rajaratnam*, 753 F. Supp. 2d 317, 320 n.1

(S.D.N.Y. 2011) (Rule 17 allows "a defendant to examine documents he believes to exist that

would be relevant to, and therefore presumptively admissible in, his defense.  The 'admissibility'

prong of the *Nixon* test seems consistent with that interpretation, since the *Nixon* court referred to

'potential evidentiary uses' in applying the 'admissibility' requirement.") (internal citation

omitted); *United States v. Gas Pipe, Inc.*, No. 14 Cr. 298-M, 2018 WL 5262361, at *3 (N.D. Tex.

June 18, 2018) ("Defendants have adequately explained how these materials are relevant and *may*

*be* admissible." (emphasis added)); *United States v. Carn*, No. 13 Cr. 346 (APG)(GWF), 2016 WL

128138, at *2 (D. Nev. Jan. 11, 2016) (finding that "[t]he documents Defendant seeks [pursuant

to a Rule 17 subpoena] are relevant to the charges against him and . . . may contain evidence

rebutting the allegations" in the indictment).  For the reasons explained in Section I.A, *supra*, Mr.

Hwang's requests satisfy this requirement as well.[10]

---

[10] It should be noted that all of the documents sought would very likely be admissible as business records under Fed. R. Evid. 803(6).  Counterparty hedging data, margin records, capacity extensions, and fees earned will all have been logged by Counterparties contemporaneously and in accordance with their regular business practice.  *See, e.g.*, *Potamkin Cadillac Corp. v. B.R.I. Coverage Corp.*, 38 F.3d 627, 632–33 (2d Cir. 1994) (original computer data compiled in accordance with regular business practice constitutes admissible business record); *United States v. Yudong Zhu*, No. 13 Cr. 761, 2014 WL 5366107, at *3 (S.D.N.Y. Oct. 14, 2014) (denying motion to quash subpoena for college's "management plan" because, if created during the ordinary course of business, the plan would constitute admissible business records); *Health Alliance Network, Inc. v. Continental Cas. Co.*, 245 F.R.D. 121, 129 (S.D.N.Y. 2007) (data produced from an underlying database maintained in the ordinary course of business constitutes admissible business record).

**B.      Element Two: Not Reasonably Procurable**

Mr. Hwang satisfies the second *Nixon* element that the documents requested "are not otherwise procurable reasonably in advance of trial by exercise of due diligence" as well.  *Nixon*, 418 U.S. at 699–700.

Here, the documents sought in the subpoenas are solely in the possession of the parties to whom the subpoenas are addressed, *i.e.*, the Counterparties.  They were not provided in discovery, presumably because they are not in the Government's possession.  Accordingly, reliance on the Government's production alone would paint an unfairly one-sided picture and leave a "conceptual void in the story."  *United States v. Boros*, 668 F.3d 901, 908 (7th Cir. 2012); *United States v. Johnson*, No. 14 Cr. 412 (TEH), 2014 WL 6068089, at *6 (N.D. Cal. Nov. 13, 2014) (a defendant "*must* use a Rule 17(c) subpoena" where the discovery is "not in the possession of the Government").

To be clear, the subpoenas are not seeking documents from any Counterparty that the Counterparty has already produced to the United States Attorney's Office for the Southern District of New York.  Mr. Hwang has, or presumably will, obtain all documents relevant to these topics that the Government has in its possession, including all such documents it has obtained from the Counterparties.  But that said, with respect to the categories of documents that Mr. Hwang seeks from the Counterparties, it is clear that all relevant documents have not, in fact, been included in the Government's productions so far, presumably because the Government does not have them either.  For example, while it appears that certain Counterparties produced a limited amount of hedging data, others have not.  Nor has the Government produced documents concerning the Counterparties' methodologies for setting Archegos's trading capacity limits and calculating margin requirements, also documents for which the Counterparties are the only source.  And with respect to the documents sought from Morgan Stanley and Goldman Sachs only, the Government

does not appear to have produced the Counterparties' documents or communications with *non-Archegos* parties with respect to block sales of the at-issue securities.[11]   Because the requested documents are solely in the hands of the Counterparties, the second *Nixon* element is satisfied.

### C.      Element Three: Necessity

Mr. Hwang also satisfies the third *Nixon* element (which, again, is not required under the *Weigand* test) because he "cannot properly prepare for trial without such production and inspection in advance of trial and . . . the failure to obtain such inspection may tend unreasonably to delay the trial." *Nixon*, 418 U.S. at 699–700.   As set forth in Section I.A, *supra*, the documents sought in the subpoenas are essential to Mr. Hwang's preparation of his trial defense.   Without them, Mr. Hwang will be deprived of the opportunity to meaningfully contest the manipulation allegations or the materiality of the alleged misrepresentations.

Thus, immediate access to the materials sought by way of the accompanying subpoenas is necessary in order for Mr. Hwang to adequately prepare for trial—and thus to assure him that his constitutional right to present a defense will be preserved.  *See Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'") (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)); *O'Dell v. Netherland*, 521 U.S. 151, 171 (1997) ("When a defendant is denied the ability to respond to the [Government's] case against him, he is deprived of 'his fundamental constitutional right to a fair opportunity to present a defense.'" (quoting *Crane*, 476 U.S. at 687)).

---

[11] Mr. Hwang has separately submitted a *Brady* request to the Government for additional materials related to its investigation of Morgan Stanley and Goldman Sachs.

Moreover, while Mr. Hwang does not expect these documents to be particularly voluminous, they will be sufficiently technical so that they will certainly require analysis, including by experts.  Requiring Archegos's Counterparties to produce these documents before trial will ensure that sufficient time is provided for that necessary analysis to occur.  If, on the other hand, these documents were produced on the eve of trial, they could result in delays in order to assure that the defense will be able to make use of them at trial.  *See, e.g.*, *Maxwell*, 2021 WL 1625392, at *1 ("The purpose of Rule 17(c) is to facilitate the trial by designating a time and place prior to trial to obtain and inspect evidentiary material.").

### D.    Element Four: Specificity

Finally, in order to satisfy the fourth element under *Nixon*, requests in a pretrial subpoena must describe what is being sought with specificity.  This standard, too, is a low one.  A defendant can satisfy this requirement by, among other things, "specif[ying] what he believes to be contained in the documents he seeks."  *United States v. Sawinski*, No. 00 Cr. 499 (RPP), 2000 WL 1702032, at *2 (S.D.N.Y. Nov. 14, 2000) (noting that courts should not require an unreasonable level of specificity where defendant's "specific knowledge of the contents of the file requested is necessarily limited").  "[R]equiring the defendant to specify precisely the documents he wants without knowing what they are borders on rendering Rule 17 a nullity."  *Rajaratnam*, 753 F. Supp. 2d at 321 n.1.  "A defendant need not have prior knowledge of specific documents to meet the specificity requirement of Rule 17(c)."  *United States v. Weisberg*, No. 08 Cr. 347 (NGG)(RML), 2011 WL 1327689, at *7 (E.D.N.Y. Apr. 5, 2011); *see also United States v. W.R. Grace*, 434 F. Supp. 2d 869, 873 (D. Mont. 2006) (specificity requirement has been met "where the movant knows that the material sought exists and can identify it with specificity, even if he is ignorant of the exact content of the material").  For the reasons stated in Section I.B, *supra*, Mr. Hwang's requests satisfy *Nixon*'s specificity requirement.

## CONCLUSION

For the above-stated reasons, Mr. Hwang respectfully requests that the Court issue the subpoenas provided herewith and require the covered documents to be produced before trial.

Dated:     July 27, 2023

Respectfully submitted,

KRAMER LEVIN NAFTALIS &
FRANKEL LLP

By:     */s/ Barry H. Berke*
        Barry H. Berke
        Dani R. James
        Jordan Estes
        1177 Avenue of the Americas
        New York, New York 10036
        (212) 715-9100
        bberke@kramerlevin.com

*Attorneys for Defendant Sung Kook (Bill) Hwang*