UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| - v. - | : | **SUPERSEDING INDICTMENT** |
| | : | |
| SUNG KOOK (BILL) HWANG and | : | S1 22 Cr. 240 (AKH) |
| PATRICK HALLIGAN, | : | |
| | : | |
| Defendants. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COUNT ONE
### (Racketeering Conspiracy)

The Grand Jury charges:

### Overview

1.     From in or about 2020, up to and including in or about March 2021, SUNG KOOK (BILL) HWANG ("BILL HWANG") and PATRICK HALLIGAN, the defendants, and others known and unknown, corrupted the operations and activities of the family office known as Archegos Capital Management and its related corporate entities and employees (collectively, "Archegos" or the "Archegos Enterprise," as defined below). The defendants and their co-conspirators used Archegos, a family office that invested HWANG's personal fortune, as an instrument of market manipulation and fraud, with far-reaching consequences for other participants in the United States securities markets, companies whose stock prices they manipulated, innocent employees of Archegos whose savings they gambled, and the financial institutions left holding billions of dollars in losses.

2.     BILL HWANG, the founder and co-Chief Executive Officer of Archegos Capital Management ("ACM"), and PATRICK HALLIGAN, ACM's Chief Financial Officer, the defendants, along with William Tomita, ACM's Head Trader, and Scott Becker, ACM's Director

1

of Risk Management, and others known and unknown (collectively, the "Archegos Conspirators"), used Archegos to perpetrate two interrelated criminal schemes. First, HWANG, with Tomita's assistance, schemed to defraud market participants by manipulating, controlling, and artificially affecting the market for certain securities in Archegos's portfolio. HWANG led market participants to believe that the prices of those stocks were the product of natural forces of supply and demand when, in truth, they were the artificial product of HWANG's manipulative trading and deceptive conduct that caused others to trade. Second, with HWANG's knowledge and approval, HALLIGAN, Tomita, Becker, and others repeatedly made materially false and misleading statements about Archegos's portfolio of securities to numerous leading global investment banks and brokerages (collectively, the "Counterparties"). These false and misleading statements were designed to fraudulently induce the Counterparties into trading with and extending credit to Archegos, enabling and facilitating the market manipulation scheme, and to hide the true risk of doing business with Archegos.

3.      The criminal conduct of the defendants and others transformed BILL HWANG, the defendant, and Archegos into significant economic forces in the United States securities markets. Between in or about March 2020 and the week of March 22, 2021, Archegos's capital — essentially HWANG's personal fortune — increased from approximately $1.5 billion to more than $35 billion. Archegos's positions, including indirectly through derivative securities positions discussed below, were larger than any of the disclosed shareholders of multiple public companies. The total size of Archegos's market positions, including investments made with money borrowed from the Counterparties, grew from approximately $10 billion to more than $160 billion.

4.      At least in part to hide the extent of his market power from other investors, BILL HWANG, the defendant, conducted most of his trading through derivative securities that

2

had no public disclosure requirement. As a result, despite the size of Archegos's positions, the investing public did not know that Archegos had come to dominate the trading and stock ownership of multiple companies.

5.      The Archegos Conspirators' manipulative and fraudulent schemes left Archegos's portfolio highly vulnerable to price fluctuations in a handful of stocks. In late March 2021, that risk materialized: a decline in the prices of certain stocks in Archegos's portfolio prompted margin calls; that is, Counterparties required Archegos to provide more cash to support its trading. Because selling Archegos's positions to raise cash could further deflate the artificial prices of those securities, leading to a downward spiral, BILL HWANG, the defendant, instead directed Archegos's traders to engage in a desperate buying spree in an attempt to reverse the price declines of stocks underlying Archegos's core positions. Acting at HWANG's direction, the traders used Archegos's remaining cash and credit, including funds borrowed based on lies and misrepresentations to the Counterparties, to pay for billions of dollars in trades over just a few days.

6.      The buying spree failed, and Archegos was unable to pay the additional cash demanded by its Counterparties. As a result, the Counterparties sold Archegos's positions, and the prices that had been artificially supported by the trading directed by BILL HWANG, the defendant, collapsed. More than $100 billion in apparent market value for nearly a dozen companies disappeared within days.

7.      Ultimately, the market manipulation and fraud schemes, and the billions of dollars in losses that they caused, victimized an array of market participants, including (a) banks and prime brokers that engaged in loans and securities trading with Archegos based on lies and deceit; (b) ordinary investors who purchased and sold the relevant securities at artificial prices;

3

and (c) securities issuers who made business decisions based on the artificial prices of their stocks. The schemes also caused millions of dollars of losses to innocent Archegos employees who had been required to allocate to Archegos a substantial amount of their pay as deferred compensation.

## The Creation of Archegos

8.      In or about 2001, BILL HWANG, the defendant, founded a hedge fund, Tiger Asia Management ("Tiger Asia"), that operated as an investment adviser. In 2013, Tiger Asia faced regulatory and criminal sanctions relating to Tiger Asia and HWANG's trading. Specifically, and among other things, the Securities and Exchange Commission ("SEC") alleged in a civil complaint that, at HWANG's direction, Tiger Asia engaged in open-market manipulation of the prices of certain stocks listed on the Hong Kong Stock Exchange. In response to this complaint, HWANG consented to an order enjoining him and his employees, among others, from violating Section 10(b) of the Securities Exchange Act of 1934, relating to securities fraud. HWANG also returned all outside investor capital and deregistered the fund as an investment adviser. HWANG then rebranded Tiger Asia as Archegos. Archegos subsequently managed HWANG's wealth and the compensation of certain employees.

9.      Because Archegos was owned and controlled by BILL HWANG, the defendant; because it only invested the personal wealth of HWANG, his family, and the deferred compensation of employees; and because it did not hold itself out as an investment adviser, Archegos operated as a "family office" under the Family Office Rule of the SEC. The SEC's Family Office Rule effectively exempts "family office" investment funds from regulatory oversight pursuant to the Investment Advisers Act of 1940 on the theory that a "family office" manages its own wealth and thus the investor protections of the Investment Advisers Act are unnecessary. For Archegos, this exemption meant that, unlike typical hedge funds, it was not

4

subject to examination or inspection by the SEC and was not required to report information regarding its holdings and borrowing to the SEC and the Financial Stability Oversight Council.

10.    Notwithstanding its technical classification as a "family office," Archegos operated as a sophisticated investment firm. By in or about 2021, Archegos employed more than fifty employees and paid consultants, engaged various outside vendors, and held numerous banking and brokerages accounts. Archegos employees received compliance trainings and Archegos maintained a compliance manual, that, among other things, warned that "[i]t is essential that no employee or principal of Archegos engages in any activity the purpose of which is to interfere with the integrity of the marketplace" and that "intentionally manipulating the market . . . is a violation of the securities laws and of Archegos' policies and standards of conduct."

11.    The Archegos Enterprise constituted an enterprise as defined in Title 18, United States Code, Section 1961(4); that is, a group of entities and individuals associated in fact, consisting of BILL HWANG and PATRICK HALLIGAN, the defendants; William Tomita; Scott Becker; Archegos Fund, LP; Archegos Capital Partners, LLC; Archegos Capital Management, LP, and its employees; and Archegos Capital, LLC; and others known and unknown. The Archegos Enterprise constituted an ongoing organization whose members functioned as a continuing unit for the common purpose of achieving the objectives of the Enterprise. The Archegos Enterprise operated in the Southern District of New York and elsewhere. The Archegos Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

### The Archegos Conspirators

12.    At all times relevant to this Indictment, BILL HWANG and PATRICK HALLIGAN, the defendants, William Tomita, and Scott Becker, collectively the Archegos Conspirators, were leaders of the Archegos Enterprise.

a.      HWANG owned, ran, and provided substantially all financial backing for Archegos. HWANG personally made all investment and trading decisions, and he directed the Archegos Enterprise research analysts as well as the Archegos Enterprise traders in carrying out his decisions. In practice, HWANG made every significant trading and investment decision within the Archegos Enterprise.

b.      HALLIGAN was at all times relevant to this Indictment the Chief Financial Officer of ACM. In that role, HALLIGAN reported to HWANG and oversaw the accounting, cash management, and operations functions of the Archegos Enterprise.

c.      Tomita was at all times relevant to this Indictment the Head Trader of ACM. In that role, Tomita reported to HWANG, who directed Tomita's trading during the relevant time period. Tomita also supervised a trading team, which included one other senior trader and two junior traders, and he was a primary point of contact for certain Counterparty personnel, including regarding trading.

d.      Becker was at all times relevant to this Indictment the Director of Risk Management of ACM. Becker served as the primary point of contact within the Archegos Enterprise for the Counterparties' credit risk personnel, who would assess the risk associated with their business relationship with the Archegos Enterprise. In this role, Becker reported directly to HALLIGAN. Becker also oversaw an operations team that booked trades and interacted with the Archegos Enterprise's fund administrator and auditors.

**Archegos's Trading and Counterparties**

13.     In or about 2020 and 2021, Archegos's largest trading positions related to common stocks and American Depositary Receipts, also known as "ADRs,"[1] traded on United States securities exchanges, including the New York Stock Exchange and NASDAQ. In order to engage in this trading, Archegos entered into various contractual agreements with its Counterparties. Although the terms of those agreements varied, in general, each Counterparty facilitated trading and provided Archegos with access to credit to enable Archegos to trade using leverage — that is, to invest not only its own cash, but also money functionally loaned to it by the Counterparty, as further described below.

14.     Typically, Archegos would initially establish its investments in cash equities, until it approached 5% ownership of all outstanding stock of the security. The Archegos Conspirators understood that ownership in excess of that amount could trigger certain public disclosure requirements. Accordingly, in order to avoid public disclosure of its positions, once Archegos neared 5% ownership of the outstanding shares of a stock, BILL HWANG, the defendant, required that any additional exposure be through a financial agreement known as a total return swap.

15.     A total return swap, or "swap," is a contract in which one party makes payments based on a set rate while the other party makes payments based on the return of an underlying asset, in this case, stocks. A party that purchases a total return swap is, in effect, making a bet on whether the underlying asset — again, here, a particular stock — will increase or decrease in value by the end of the term of the swap. Thus, if someone purchases a total return swap taking

---

[1] ADR refers to a negotiable certificate issued by a U.S. bank representing a specified number of shares of a foreign company's stock. An ADR trades on U.S. securities exchanges as though it were stock.

a long position on a particular stock, the counterparty to the swap will pay that person the amount of the increase in the price of the stock during the life of the swap contract if the price goes up, and the purchaser will pay the counterparty the amount of the decrease in the price of the stock during the life of the swap contract if the price goes down. Conversely, if someone purchases a total return swap taking a short position on a particular stock, the counterparty to the swap will pay that person the amount of the decrease in the price of the stock during the life of the swap contract if the price goes down, and the purchaser will pay the counterparty the amount of the increase in the price of the stock during the life of the swap contract if the price goes up.

16.    Furthermore, as BILL HWANG, the defendant, and other Archegos Conspirators understood, the Counterparties generally did not enter into swap contracts with Archegos in order to bet on the increase or decrease of the stock price. Rather, the Counterparties did so to profit from the financing fees charged on the transaction. Accordingly, in order to avoid market exposure on a swap contract, the Counterparties themselves purchased the stock underlying the swap. For example, if Archegos entered into a swap agreement to gain economic exposure to one share of ViacomCBS, the swap Counterparty typically would purchase one share of ViacomCBS stock. That way, if the price of the ViacomCBS share went up $1, the swap counterparty would have to pay Archegos $1 — but, its own share of ViacomCBS would have also increased by $1, so it would not have lost any money. Indeed, certain Counterparties would finalize and price swap contracts with Archegos only after first purchasing an equivalent number of shares or ADRs of the underlying securities.

17.    For this reason, in practice, trading using swap contracts instead of purchasing actual shares meant that Archegos could bet on the price of a stock, and dictate trading in the stock, without owning the stock itself. Archegos therefore would not have to disclose its

positions even if it effectively exceeded the 5% ownership threshold that ordinarily would require public disclosure. Instead, the swap Counterparty would appear as the owner of the shares, even though it only purchased the stock to offset its swap contract with Archegos. The Archegos Conspirators understood these swaps-trading mechanics and treated their swaps as the functional equivalent of purchasing or selling the stock or ADR itself.

18.     Archegos's Counterparties also permitted trading "on margin," meaning, in substance, that the Counterparty let Archegos transact on credit. In practice, Archegos put up a certain amount of its capital ("margin") as collateral for a trade and then received loans from the Counterparty for the balance. At various times, Archegos's margining agreements required the deposit of additional cash collateral if the swap's underlying securities depreciated in value. That is, if a stock decreased in value during the day, and Archegos had a long swap position, Archegos might owe money to the swap Counterparty. Conversely, when its positions rose in price, certain of Archegos's margining agreements provided it the right to withdraw existing collateral, or "excess margin," or amounts based on the appreciation itself. For example, if the price of ViacomCBS stock rose during the day, and Archegos had a long swap position, a swap counterparty could owe Archegos money at the end of the day, reflecting a portion of the increase in the price. For this reason, under certain of Archegos's agreements, if the stock price of one of its long positions appreciated, Archegos could obtain as cash portions of the gain without needing to exit its position.

19.     Because the Counterparties were functionally lending money to Archegos, they were taking on risk in entering into the swap contracts. If the stock prices associated with Archegos's long positions dropped, for example, a Counterparty would be faced with the risk that

Archegos could not or would not make good on what it owed the Counterparty — and even if the Counterparty sold the shares it held as a hedge, it could face losses because the price had dropped.

### The Archegos Conspirators Corrupted the Archegos Enterprise

20.     By at least in or about 2020, BILL HWANG and PATRICK HALLIGAN, the defendants, and William Tomita and Scott Becker corrupted the Archegos Enterprise. At HWANG's implicit and at times explicit direction, and using Archegos Enterprise's infrastructure and reputation, the defendants and their co-conspirators engaged in numerous acts of securities fraud and wire fraud.

21.     The central aim of BILL HWANG, the defendant, who employed and directed the Archegos Conspirators, was to control the price and artificially increase the value of securities in Archegos's portfolio. To this end, HWANG employed various strategies to manipulate the markets for securities in Archegos's portfolio. These securities included the following stocks then trading on United States securities exchanges:

| Company | Ticker | Archegos Position |
|---|---|---|
| ViacomCBS | VIAC | Long |
| Discovery Communications, Inc. | DISCA | Long |
| Discovery Communications, Inc. | DISCK | Long |
| GSX Techedu Inc. | GSX | Long |
| iQIYI, Inc. | IQ | Long |
| Tencent Music Group | TME | Long |
| Vipshop Holdings Ltd | VIPS | Long |
| Baidu | BIDU | Long |
| Farfetch | FTCH | Long |
| Texas Capital Bancshares Inc. | TCBI | Long |
| Futu Holdings | FUTU | Short |
| Rocket Companies, Inc. | RKT | Short |

a.    The majority of Archegos's positions were "long," meaning the value of Archegos's portfolio would increase if the prices of the stock underlying its swaps increased. To drive up the prices, HWANG amassed extraordinary exposure to those stocks through billions of dollars in purchases made with money borrowed from Counterparties based on lies and misrepresentations. The increased demand for these stocks, and the dwindling supply of freely trading shares, led to significant artificial appreciation in the price of each stock. This manipulative strategy harnessed the margin frameworks of Archegos's Counterparties by recycling "excess" margin into further buying. In turn, the strategy generated additional price inflation and, thus, still more "excess" margin.

b.    HWANG also used his market power to "support" or "defend" the prices of stocks underlying Archegos's positions through a variety of manipulative short-term trading techniques, as further described below, including by engaging in trades at certain times, or

trading in certain dollar amounts or volumes of shares, in ways designed and intended to artificially affect stock prices.

            c.      Finally, in order to obtain the near-limitless capacity for trading that his scheme required and that he demanded, HWANG, as well as PATRICK HALLIGAN, the defendant, and Tomita and Becker, engaged in schemes to defraud Archegos's Counterparties. Specifically, the conspirators repeatedly made materially false and misleading statements to Counterparties about Archegos's financial portfolio and positions in order for HWANG to obtain billions of dollars of credit, or "trading capacity." These lies and misrepresentations disguised the true — and grave — risks associated with Archegos's portfolio and were integral to the conspiracy's success.

### HWANG Established Significant Market Influence in Certain Securities

        22.      Between founding Archegos in or about 2013 and early 2020, BILL HWANG, the defendant, took positions predominantly in large companies with highly liquid stock, especially technology companies. HWANG also occasionally took a significant short position. During that period, HWANG generally did not engage heavily in day-trading strategies.

        23.      In or about spring 2020, COVID-related restrictions caused Archegos to move to a remote work environment. BILL HWANG, the defendant, began working from an apartment in Manhattan, New York. He communicated with Archegos employees both within and outside the Southern District of New York by phone, email, Bloomberg message, and video conferencing software. Around that time, COVID-related market losses also prompted HWANG to reduce or sell many of Archegos's previous investment positions.

        24.      Subsequently, in or about spring 2020, BILL HWANG, the defendant, began to build extraordinarily large positions in a handful of securities. By in or about mid-July

2020, HWANG amassed economic exposure in excess of $1 billion to BIDU, GSX, IQ, and VIAC; by the end of 2020, HWANG had more than $1 billion of exposure to each of those four stocks as well as DISCA, FTCH, TME, and VIPS. Between mid-November 2020 and late March 2021, HWANG established positions exceeding $5 billion in eight different stocks, including more than $10 billion in GSX, BIDU, and TME, respectively, and more than $20 billion in VIAC.

25.    As BILL HWANG, the defendant, well knew, Archegos's positions became so large that they significantly altered the shareholder composition of the companies in which it most heavily invested. As described above, Archegos's swaps trades typically caused its Counterparties to acquire a share of stock for each one swapped with Archegos, in order to hedge against market risk on the position. Thus, as Archegos's swap positions grew, so too did the Counterparties' purchases of the corresponding stock. For many positions, multiple Archegos Counterparties held, respectively, more than 5% of the publicly trading shares of the issuer's stock. Those Counterparties therefore were required to, and did, file corresponding public disclosures of such ownership.

26.    By in or about 2021, Archegos's total position in the securities of certain companies equated to more than approximately 30%, 40%, and 50% of the freely traded stock shares, or "float," of those companies. For example, by in or about February 2021, Archegos held a position equal to more than 50% of the float of GSX. Similarly, by on or about March 24, 2021, Archegos held a position equal to more than 50% of the float of VIAC, as reflected in the following chart depicting approximate float percentages of VIAC effectively controlled by Archegos:



Additionally, the size and significance to the market of Archegos's positions were magnified by the fact that for certain stocks, substantial portions of the float were held by index funds. By design, those funds would not sell holdings of stocks included in the relevant index, regardless of market performance. Accordingly, accounting for index fund holders, Archegos's positions affected even larger percentages of the freely trading shares.

27.     Ordinary market participants had no way to know that Archegos had come to dominate the marketplace for these securities. As its positions grew increasingly large, Archegos did not report them publicly because it avoided crossing the 5% ownership threshold for its stock purchases. Instead, Archegos established and maintained most of its positions on swap. And Archegos placed its orders through a growing number of counterparties and brokerages, making it appear that different parties were buying the companies' stock when, in fact, that buying was all

14

dictated by Archegos. As described further below, the Archegos Conspirators engaged in an extensive pattern of fraud and deceit to prevent the Counterparties from knowing and understanding the extent of Archegos's positions.

## HWANG Utilized Trading Strategies to Affect Market Prices

28.     BILL HWANG, the defendant, repeatedly traded in ways that were not motivated by any business interest other than the desire to manipulate the prices of certain securities in which Archegos held long positions. For example:

a.     During the course of the scheme, HWANG traded in the same stocks in large quantities day after day, and he commonly directed traders consistently to raise limit prices, or the highest price they would pay for the stock, as the prices of the stocks rose. HWANG intended these transactions to drive up the price of the stocks.

b.     Similarly, HWANG would buy heavily to "defend" the price of securities facing negative press or market movements. This happened frequently, but not exclusively, with respect to GSX, which was especially volatile due in part to active short sellers, regulatory inquiries, and public accusations of fraud. As the portfolio became more concentrated, HWANG traded with the further purpose of propping up the stock price to avoid margin calls — which, due to the extraordinary concentration of Archegos's portfolio, might trigger the collapse of its positions.

c.     HWANG also traded the relevant securities in amounts far exceeding volumes known within the securities industry and to HWANG to affect market prices. Specifically, HWANG, Tomita, and others working at Archegos understood that buying or selling more than approximately 10-15% of a day's total trading volume of a given stock would likely

15

affect the market price in the stock. HWANG routinely directed trading in excess of these volumes. For example:

       i.     In DISCA, between November 2020 and March 2021, Archegos routinely accounted for more than 20% of the entire volume of the stock traded on the given day. In December 2020, Archegos averaged more than 20% of the trading volume on a daily basis. Between early November and early January 2021, Archegos exceeded 30% of daily volume on approximately nine days, and exceeded 35% on approximately four days.

      ii.     In VIAC, between October 2020 and March 2021, Archegos routinely accounted for more than 10% of the entire daily traded volume of the stock. Indeed, in February and March 2021, Archegos averaged more than 10% of the trading volume on a daily basis. In that period, Archegos exceeded 15% of daily volume on approximately 10 of 40 trading days, and exceeded 25% on approximately four days.

      iii.     In GSX, between December 2020 and March 2021, Archegos averaged more than 15% of the trading volume on a daily basis. During that period, Archegos exceeded 30% of daily volume on approximately 11 days, and exceeded 35% on approximately five days.

      iv.     In TME, Archegos averaged more than 10% of the trading volume on a daily basis between November 2020 and March 2021. Between on or about February 22 and March 26, 2021, Archegos exceeded 15% of daily trading volume on approximately 19 of 25 trading days, and exceeded 20% on approximately 14 days. Between October 2020 and March 2021, Archegos trading exceeded 35% of trading volume on approximately eight days.

      29.     BILL HWANG, the defendant, understood and intended his trading to affect the prices of securities he traded. For example, on or about June 11, 2020, in an effort to "defend"

VIAC against downward market pressure, HWANG serially raised his limit price between 11:00 a.m. and the close of the market at 4:00 p.m. During that time, HWANG went from a $25 million order for ViacomCBS with a "[$]22.40 limit without impacting," meaning without causing price disruption, to a limit of $22.60, to a limit of $22.70, to a limit of $23.00, to a limit of $23.50, to a final limit of $23.60 at 3:55 p.m., five minutes before the market close. By the end of the day, Archegos had purchased approximately 82.1 million shares of VIAC, which represented approximately more than 17% of the day's trading volume. Although VIAC still closed down on the day, it avoided the kind of major sell-off experienced by others in the market, including comparable peer companies.

30.     BILL HWANG, the defendant, acknowledged his influence over the market prices expressly and contemporaneously. For example, on the day described immediately above, an analyst texted HWANG: "VIAC held up pretty well today relative to market [. . .] Would you say that is a sign of strength?" HWANG responded: "No. It is a sign of me buying," followed by an emoji.

31.     The trading by BILL HWANG, the defendant, had a stark impact upon market prices. For example, in just two of Archegos's positions, VIAC and DISCA, the stock prices rose more than 250%, respectively, between on or about October 1, 2020, and March 23, 2021 — as compared to the Nasdaq-100 index (represented in the below chart with the ticker name QQQ), which appreciated approximately 20% during the same period. Following the collapse of Archegos, and the sale of its positions, the stock prices fell precipitously:



32.     As it became increasingly important for BILL HWANG, the defendant, to continue to grow his largest positions, to prevent the artificial prices from collapsing, he pursued that goal at increasing economic cost. For example, many Counterparties increased margin requirements as Archegos's positions grew, including up to 100% collateral for certain swaps. That made it far more expensive for HWANG to add to those positions. Nevertheless, and notwithstanding his own prior focus on low-cost margining, HWANG continued to trade in the same securities.

33.     BILL HWANG, the defendant, also increasingly ignored internal Archegos analyst research throughout 2020 and 2021. Prior to 2020, HWANG commonly spent significant

time with Archegos analysts, evaluating potential investments and holding weekly investment strategy meetings where analysts presented their recommendations. Beginning in or about March 2020 and accelerating in or about fall 2020, however, HWANG frequently spent almost all of his workday with the traders, primarily via all-day, open-line video-conferences, or, when the Archegos offices were open, with them in a trading room. HWANG all but stopped holding investment strategy meetings and essentially ignored analyst recommendations about purchasing new, different stocks in any significant size.

### HWANG Employed Manipulative Strategies to Maximize Price Impact and Market Power

34.     As Archegos's positions grew exponentially, Counterparties began to impose increasing costs and restrictions on further enlargement of Archegos's concentrated holdings. Sporadically throughout 2020, and increasing in late 2020 and 2021, Counterparty limitations constrained the ability of BILL HWANG, the defendant, to further rapidly grow Archegos's positions. As that occurred, HWANG began to engage in various types of manipulative open-market trading to further influence the prices of the top stocks in his portfolio and to maximize his capacity to conduct further trading.

35.     In particular, BILL HWANG, the defendant, influenced the prices of stocks by utilizing manipulative and deceptive trading techniques such as purchasing or selling securities at particular, strategic times of day; transacting in certain securities in large amounts or high volume; and timing or coordinating certain transactions to maximize impact on the market. For example:

### Setting the Tone

a.      Regular trading hours in the United States securities markets are 9:30 a.m. to 4:00 p.m. Eastern time, on weekdays. After-hours trading can occur after 4:00 p.m., and pre-market trading can occur before 9:30 a.m., separate from the use of a traditional stock exchange. The "closing price" of a stock is its price when formal trading hours end. That price is often used as an indicator of the market for a stock, and the closing price also is often used as a relevant factor in financial agreements and contracts. For example, a margin call might be made following a calculation based on a stock's closing price.

b.      On numerous occasions during the course of the scheme, and with increasing frequency in February and March 2021, HWANG instructed his traders to trade in certain stocks before the market opened, when liquidity was low and, at times, when prices were comparatively poor, in an effort to have a greater impact on the price of the stock than at times of day when more of the stock was being bought and sold. In some instances, HWANG would further instruct the traders to purchase the same stock after the market opened, to firm up the now-inflated price. HWANG referred to this practice as "setting the tone" for the day and intended, through Archegos's buying, to both artificially inflate the prices of stocks Archegos owned and to induce unsuspecting third parties to buy at those inflated prices. Archegos engaged in this type of premarket trading in a number of its largest positions, including GSX, DISCA, VIAC, VIPS, TME, BIDU, and FUTU.

### Trading Into the Close

c.      Similarly, during the course of the scheme, HWANG undertook securities transactions at particular times, and in particular sizes or volume, to affect the closing price of the relevant stocks. In some instances, these trades involved the purchases of hundreds of

thousands of shares in those short periods of time. Archegos's high-volume trading at the end of market hours was designed to, and did, cause artificially inflated closing prices.

        d.      At times, HWANG also directed traders to use limit order prices above the prevailing market prices in the final minutes of the trading day. In other words, HWANG established orders for stocks that could be filled automatically up to the above-market prices he set, and which caused purchases of the stocks at prices that increased into the close of the market. This strategy was intended to create positive momentum for the stock price for the end of the day and into the following day. Additionally, this strategy was further intended to enable Archegos to access excess margin from its Counterparties if swap positions had gained value at the close of market hours.

        36.      BILL HWANG, the defendant, also used certain trading techniques to preserve and increase the fund's trading capacity and, therefore, its market influence.

        a.      In particular, HWANG sometimes would direct the execution of trades that would generate capacity at a broker — including through the sale or short sale of a stock — in order to enable later trading in the same name in the opposite direction. In other words, HWANG wanted to "make room" for later trades, when they would be most likely to create the desired impact on the securities price.

        b.      For example, for a stock in which Archegos held an existing long position, HWANG might direct traders to enter a sale or short sale of the stock in the morning. That had the effect of reducing the capacity utilized by Archegos in that stock, for its long position, at a particular counterparty. Later, when Archegos wanted to inflate the price through additional purchases, it would have the trading capacity to do so.

c.      HWANG referred to this practice as using "bullets," and in particular as creating or saving "bullets" for use in the course of trading. HWANG directed the traders to use the "bullets," or trading capacity, at opportune moments that would create upward pressure on the stock price. HWANG employed this strategy with increasing frequency as Counterparties began to curtail or restrict his access to additional trading capacity.

37.     In a similar effort to maximize trading capacity and market impact, BILL HWANG, the defendant, coordinated certain trades with a close friend and former colleague ("Adviser-1"), who founded a certain hedge fund ("Fund-1") and controlled Fund-1 during the relevant time period. In or about 2021, on certain occasions, HWANG confronted a cap in the total amount of GSX stock a Counterparty would hold — that is, a maximum amount of swap positions that a Counterparty would make available to all its customers in aggregate. In certain instances, HWANG was aware that Fund-1 also held a position at the same Counterparty in GSX. At times, without the Counterparty's knowledge, HWANG caused Adviser-1 to move the Fund-1 position to a different financial institution. Archegos then attempted to, and at times did, purchase a similarly sized GSX position at that same Counterparty. These coordinated trades allowed HWANG and Archegos to create and use additional capacity at the Counterparty, which allowed for additional purchases of GSX without onboarding new counterparties.

38.     Additionally, and as discussed further below, the Archegos Conspirators pursued relationships with additional counterparties. By in or about January 2021, Archegos had established swap counterparty or brokerage relationships with at least nine financial institutions, and it was exploring the possibility of opening up accounts with at least three more.

## The Market Manipulation Scheme Distorted the Market

39.     As BILL HWANG, the defendant, intended, at various times between in or about June 2020 and March 2021, Archegos's trading caused and established certain stock prices that were not set by ordinary market forces of supply and demand. For example, at times, Archegos's substantial and well-timed purchases caused daily price inflation for its long positions. At other times, Archegos's purchasing counteracted negative market events that would have otherwise decreased the stock prices.

40.     Moreover, and in addition to specific days of price manipulation, by design, the cumulative effect of the Archegos Conspirators' schemes over the course of 2020, and particularly in or about fall 2020 and through March 2021, contributed to significant artificial increases in the prices of the securities underlying Archegos's long swaps. Thus, in or about late March 2021, when BILL HWANG, the defendant, could no longer maintain the manipulative schemes, virtually all of Archegos's largest stock positions saw their prices collapse.

## The Archegos Conspirators Defrauded Counterparties

41.     From in or about 2020, up to and including in or about March 2021, BILL HWANG and PATRICK HALLIGAN, the defendants, engaged in a scheme to defraud Archegos's Counterparties regarding significant aspects of Archegos's portfolio. Specifically, HALLIGAN, William Tomita, and Scott Becker, with the implicit and at times explicit permission and direction of HWANG, provided false and misleading information to Counterparties in an effort to conduct swap transactions and obtain margin lending, all to facilitate the manipulative trading scheme.

42.     As described above, Archegos's trading occurred through prime brokers and swap Counterparties. In order to manage their own risk from exposure to client trading, the Counterparties imposed certain restrictions on positions clients could take. As to Archegos, those

23

restrictions varied by Counterparty, and took various forms, including (i) limits on the total dollar amount of Archegos's positions with the Counterparty, (ii) limits based on the percentage amount of company stock a bank was willing to hold as a hedge, which therefore limited the amounts Archegos could buy on swap, and (iii) limits based on individual stocks, or on the amount of economic exposure to certain business sectors or geographic areas. The Counterparties also used margin rates to reduce risk, increasing the amount of collateral a client like Archegos was required to post in order to trade. Such margin requirements functionally reduced the capital the Counterparty would lend the client.

43.     Archegos's Counterparties made risk assessments in order to determine whether to transact with Archegos, whether to continue transacting with Archegos, whether to impose or raise limits on trading with Archegos, and whether to raise or lower their margin lending rates. The Counterparties conducted due diligence about Archegos before onboarding it as a client, engaged in periodic credit reviews with Archegos personnel to track its risk profile, and sought additional information from Archegos on an ad hoc basis. Such ad hoc instances included responses to shifts in Archegos's positions at that Counterparty or to requests by Archegos to engage in additional trading.

44.     Any given Counterparty had full visibility only into the portion of Archegos's portfolio that was held through that Counterparty. Accordingly, because Archegos's overall portfolio was significant to its creditworthiness, the Counterparties frequently sought information from Archegos regarding positions that it held through other banks or institutions. Certain information, such as the names or precise sizes of its overall portfolio, Archegos declined to provide. However, PATRICK HALLIGAN, the defendant, William Tomita, and Scott Becker

did provide quantitative information, including the relative size of Archegos's largest positions and the time it would take to liquidate portions of the portfolio.

45.     The Counterparties relied upon this information to assess how concentrated Archegos's portfolio was, which would give some indication of market risk, and the number of days it would take Archegos to sell its positions in normal market conditions, which would provide an indication of liquidity risk. PATRICK HALLIGAN, the defendant, Tomita, and Becker also provided certain qualitative descriptions, including some that gave Counterparties indications about the Archegos portfolio across all Counterparties. As described further below, much of the information provided by HALLIGAN, Tomita, and Becker was deceptive, false, and misleading.

46.     In or about late 2020 and into 2021, certain Counterparty trading limits began to constrain Archegos's ability to increase the size of its positions. These limits threatened to hamper the constant buying that was necessary to facilitate the market manipulation scheme described above. In response, BILL HWANG, the defendant, directed his subordinates to obtain more trading capacity from existing and prospective Counterparties.

47.     The Archegos Conspirators knew that if the Counterparties were told the truth about Archegos's portfolio, they would not supply the trading capacity demanded by BILL HWANG, the defendant. The Archegos Conspirators also knew that if the Counterparties learned the truth about the concentration of Archegos's positions and their liquidity, the Counterparties might require Archegos to reduce its positions, to lower the associated risk, or even to cease trading altogether. Accordingly, with HWANG's implicit and, at times, explicit approval, PATRICK HALLIGAN, the defendant, William Tomita, and Scott Becker systematically misled the Counterparties in order to obtain additional trading capacity and margin lending to further support Archegos's inflated positions.

48.     Those misrepresentations generally fell into three categories: (i) misrepresentations regarding the concentration of Archegos's positions; (ii) misrepresentations regarding the liquidity of Archegos's positions; and (iii) misrepresentations regarding the composition of Archegos's portfolio. Additionally, during the final week of Archegos's trading, as its positions collapsed, the Archegos Conspirators made false representations to Counterparties regarding Archegos's cash position and financial condition, in an effort to withdraw excess margin.

49.     These representations were directly relevant to the Counterparties' evaluation of the risk that ultimately materialized: an unexpected decrease in the value of Archegos's positions could quickly cause it to default on its margin loans and swap guarantees to its Counterparties, which would then be forced to sell their hedges at significantly reduced and declining prices, causing substantial losses. When that scenario in fact occurred, across numerous brokers at the same time, the Archegos Conspirators' lies caused billions of dollars in losses.

<u>Misrepresentations Regarding Concentration</u>

50.     Archegos's Counterparties routinely sought to understand the concentration of Archegos's overall portfolio, including, for example, the relative size of its largest position, and how much of its portfolio consisted of exposure to a small number of stocks. Metrics reflecting concentration were important to Counterparty decision-making because a more concentrated portfolio generally is more susceptible to a market downturn than a diversified portfolio. From a credit perspective, a highly concentrated portfolio therefore can be a greater risk.

51.     The Counterparties knew what positions Archegos held at their own institutions. Because Archegos's positions at each Counterparty were concentrated, including in some particularly volatile stocks, the Counterparties were aware of concentration risk associated with Archegos. If it turned out — as was in fact the case — that Archegos's portfolio was similarly

concentrated everywhere, then if its positions fell in value, all the Counterparties would be looking to sell the same stocks, causing the prices to further deteriorate.

        52.    Accordingly, some Counterparties attempted to learn more information about whether Archegos's positions at other banks and brokers were similar to those they held, or were instead more diversified and liquid. Among other things, certain Counterparties asked Archegos to provide information regarding the concentration of its overall portfolio. Those requests typically occurred during calls, meetings, or other communications between Archegos personnel and a Counterparty's credit risk team. PATRICK HALLIGAN, the defendant, typically represented Archegos on communications with credit risk teams until in or about 2018, when Scott Becker, whom HALLIGAN had trained, and to whom Becker reported, took over the lead role. HALLIGAN and Becker maintained a practice of consistently representing that Archegos's largest position represented 35% of its capital, even when that figure was inaccurate and misleading, and of otherwise falsely minimizing the size of Archegos's largest positions. Examples of deceptive, false, and misleading statements regarding position concentration include the following:

        a.    In or about January 2021, at the direction of HALLIGAN, Becker claimed to representatives of Credit Suisse, in substance, that as of November 30, 2020, the largest gross position in Archegos's portfolio — including money loaned from its Counterparties for leveraged positions — totaled 35% of Archegos's capital. That was false. In truth, as of November 30, 2020, Archegos's largest long position (VIAC) constituted approximately 96% of Archegos's capital. Indeed, as of that date, Archegos had six positions that were greater than 35% of capital, including VIAC at approximately 96%, BIDU at approximately 67%, GSX at approximately 55%, TME at approximately 48%, IQ at approximately 45%, and VIPS at approximately 43%. Additionally, at the time of the representation in January 2021, Archegos had

four positions greater than 35% of capital, ranging from 39% to 60%.

          b.        Similarly, in or about February 2021, Becker misrepresented Archegos's position concentrations to UBS. At that time, UBS had imposed an absolute limit on the total value of Archegos's positions with UBS. BILL HWANG, the defendant, wanted to increase that limit in order to further his market manipulation scheme. Accordingly, Becker falsely claimed to representatives of UBS, in substance, that the ten largest investments in Archegos's overall portfolio were generally evenly weighted at approximately 30-35% of capital each, with Archegos's largest single position representing approximately 35% of capital. In fact, at the time of the call, Archegos's position in VIAC was approximately 67% of capital, BIDU approximately 56%, and GSX approximately 41% — all in excess of the 35% represented by Becker. The ninth and tenth largest positions in the fund were just approximately 6.4% and 5.6% of capital, respectively. Based in part on these misrepresentations, as well as statements described below, UBS approved an increase in Archegos's total trading limit in excess of $1.5 billion, including with revised margin rules. Archegos quickly used up the additional capacity, including by entering new, leveraged swap positions.

          c.        In or about March 2021, at the direction of HWANG, Archegos sought an additional increase in the UBS gross trading limit. In furtherance of that request, during a call in or about March 2021, Becker again assured representatives of UBS that the ten positions in Archegos's overall portfolio each represented approximately 35% of capital, ranging between 25% of capital and 35% of capital. That was also false. In fact, as of the most recent trading day, Archegos's VIAC position constituted approximately 78% of capital, and BIDU constituted approximately 50%. Additionally, the three smallest positions of Archegos's top ten were each less than 15%, including the smallest being just 5.2% of capital. Based in part on these

misrepresentations, as well as statements described below, UBS approved an increase in Archegos's total trading limit of approximately $2 billion. Within days, Archegos had used up the entirety of that additional capacity, including by entering into new, leveraged swap positions.

            d.      The Archegos Conspirators made similar deceptive, false, and misleading statements regarding the size of Archegos's largest positions on additional occasions and to additional Counterparties, including in or about October 2020 and January 2021 to representatives of Mitsubishi UFJ Financial Group; in or about December 2020, January 2021, and February 2021 to representatives of Goldman Sachs; in or about December 2020 and March 2021 to representatives of Credit Suisse; in or about January 2021 and March 2021 to representatives of Nomura; in or about January 2021 and February 2021 to representatives of Deutsche Bank; and in or about February 2021 and March 2021 to representatives of Macquarie.

Misrepresentations Regarding Liquidity

            53.      Archegos's Counterparties often sought to understand the liquidity of Archegos's overall portfolio, meaning how quickly the positions in Archegos's portfolio could be sold in the market. Metrics reflecting liquidity were important to Counterparty decision-making because if Archegos's positions decreased in value by a certain amount, the underlying stocks would have to be sold in order for Archegos to pay its Counterparties what they were owed under the swap agreements. If Archegos's positions were illiquid, it would be difficult or impossible to sell the shares in a way — and at a volume — that avoided further depressing the share prices.

            54.      For these reasons, among others, Counterparties asked Archegos to provide information regarding the liquidity of its overall portfolio. In response, certain of the Archegos Conspirators provided information that fraudulently overstated the liquidity of Archegos's positions. Examples of these deceptive, false, and misleading statements include the following:

a.     In or about February 2021, Archegos sought to raise its existing trading limit at UBS. In discussions about an increase, Becker told UBS, in substance, that Archegos could liquidate its entire portfolio in approximately two weeks, or ten trading days, selling at approximately 15% of average daily trading volume ("ATV"), measuring from the prior 20 days. The metric of 15% of ATV was significant because, as described above, selling or buying at volumes exceeding this amount would be expected to impact the price of the security. Becker's claim grossly and fraudulently overstated the actual liquidity of Archegos's positions. In fact, to liquidate at 15% of ATV at that time, it would have taken, for example, approximately 134 trading days to liquidate Archegos's position in VIPS and approximately 78 trading days to liquidate its position in VIAC. Even had Archegos sold its positions at 100% of ATV, which would have severely impacted the prices of the stocks, it would have taken approximately 20 trading days to liquidate VIPS, approximately 16 days to liquidate IQ, and approximately 12 days to liquidate VIAC. As discussed above, based in part on these misrepresentations, UBS approved an increase in Archegos's total trading limit in excess of $1.5 billion, including with revised margin rules.

b.     In or about March 2021, as part of the request for an increase of the UBS cap for Archegos's positions, PATRICK HALLIGAN, the defendant, William Tomita, and Scott Becker again misled UBS regarding Archegos's liquidity profile.

i.     First, Becker told UBS, in substance, that the portion of Archegos's portfolio at UBS was not representative of its portfolio with other counterparties, and that Archegos's largest positions overall were in large, liquid technology stocks, such as Amazon, Google, Microsoft, and Apple. In truth, none of Amazon, Google, Apple, or Microsoft ranked in the top ten of Archegos's positions. And despite the claim that Archegos's trades at UBS were

dissimilar to its bets through other counterparties, its positions at UBS largely overlapped with its positions at other brokers.

           ii.     Second, following a request by UBS's representatives for Becker to confirm the liquidity profile of Archegos's overall portfolio, HALLIGAN, Tomita, and Becker convened to discuss how to respond to UBS, and agreed to provide deceptive, false, and misleading information in response. Specifically, they agreed that Becker would falsely state, as he later did, that Archegos could unwind half its overall portfolio in 10 trading days, 75% in 20 days, and the entire portfolio in approximately one month, all at between 10% to 15% of daily traded volume. In fact, it would have taken well over 100 days to liquidate Archegos's largest positions at 15% of daily trading volume. As discussed above, based in part on these misrepresentations, UBS approved an increase in Archegos's total trading limit of approximately $2 billion.

           c.     The Archegos Conspirators made similar deceptive, false, and misleading statements regarding the liquidity of Archegos's positions in or about December 2020 and March 2021 to representatives of Credit Suisse; in or about January 2021 and February 2021 to representatives of Goldman Sachs; in or about March 2021 to representatives of Jefferies; in or about March 2021 to representatives of Deutsche Bank; and in or about March 2021 to representatives of Macquarie.

<u>Representations Regarding Archegos's Portfolio</u>

           55.     Archegos's Counterparties asked questions relating to the contents of Archegos's portfolio. As described above, Archegos ordinarily did not provide explicit information to Counterparties regarding particular companies in which it invested. However, Counterparties frequently sought information that would provide some insight into Archegos's

positions. Such information would assist the Counterparties in understanding, or making inferences about, the concentration, liquidity, and general risk profile associated with Archegos's positions. Archegos's Counterparties generally became particularly concerned with Archegos's portfolio as its positions became dramatically larger and more concentrated at each Counterparty — and as Archegos expanded its exposure to GSX, which was an especially volatile stock.

56.     The Archegos Conspirators' efforts to mislead its Counterparties regarding the contents of its portfolio began as early as before it entered into the counterparty relationship. When considering such a relationship with Goldman Sachs, for example, BILL HWANG, the defendant, instructed William Tomita and others to determine whether Goldman Sachs had capacity for Archegos to invest in GSX, but not to disclose Archegos's true interest in the stock. Accordingly, at HWANG's direction, Tomita provided "dummy" or "decoy" names when discussing Archegos's portfolio and investment interests with Goldman Sachs to camouflage Archegos's primary interest in GSX. Tomita further represented, in substance, that Archegos's primary investments were in large, liquid technology stocks, which, as discussed above, was not accurate. Once Archegos began investing with Goldman Sachs, Tomita suggested that Archegos was trying to pursue new investment opportunities through Goldman Sachs. In fact, the companies in which Archegos invested through Goldman Sachs consisted of the same ones in which it invested through other Counterparties, including GSX, VIAC, DISC, and IQ.

57.     Certain of the Archegos Conspirators made similar deceptive, false, and misleading statements about Archegos's portfolio to other Counterparties. For example, during the onboarding process with UBS in spring and summer 2020, Tomita and Becker falsely implied that Archegos was establishing new positions with UBS, when in fact Archegos was building the same concentrated positions at UBS as elsewhere. Further, as noted above, Becker falsely represented

to UBS in March 2021, that Archegos's largest positions overall were in large, liquid technology stocks, such as Amazon, Google, Microsoft, and Apple.

58.     In or around the end of November 2020, William Tomita, in consultation with BILL HWANG, the defendant, made analogous misleading statements to representatives of Morgan Stanley. In particular, as with other Counterparties, Morgan Stanley had grown concerned about the concentration of Archegos's portfolio in general and its position in GSX in particular, with respect to Archegos's trades at Morgan Stanley. Representatives of Morgan Stanley asked Tomita if Archegos could transfer some of its position in GSX to another counterparty and replace it with the more diversified and liquid stocks, such as Apple and Amazon, that Morgan Stanley believed Archegos had invested in through other financial institutions. Tomita told Morgan Stanley, in substance, that Archegos's margin was optimized at the time, and that HWANG did not want to make any changes to it before the year's end. In truth, however, HWANG and Tomita knew that in fact Archegos could not move its GSX position elsewhere because Archegos lacked capacity to add additional GSX investment at its other Counterparties at the current margin rates; moreover, the large holdings of liquid stocks Morgan Stanley believed Archegos held at other financial institutions did not in fact exist.

59.     Additionally, certain Counterparties required Archegos to certify that its exposure to individual positions was below particular thresholds. BILL HWANG and PATRICK HALLIGAN, the defendants, each falsely signed these certifications knowing that, in fact, Archegos's positions exceeded the warranted thresholds.

a.     On or about December 15, 2020, HWANG signed an ISDA agreement with Credit Suisse. The ISDA agreement contained a provision representing that Archegos beneficially owned less than 20% of the outstanding shares of any issuer's stock,

33

including both cash and swap positions. However, the day HWANG signed the certification, Archegos owned equities and swaps equivalent to more than 25% of the float of DISCA, a $1.2 billion position at the time; more than 30% of the float of VIAC, a $6 billion position; and more than 35% of the float of GSX, a $3.5 billion position. Additionally, Archegos owned equities and swaps constituting more than 18% of the float of IQ, and topped 20% approximately two weeks later.

        b.      Similarly, on multiple occasions, HALLIGAN signed swap transaction confirmations with Mitsubishi UFJ Financial Group, representing that Archegos's stock and derivative positions together represented less than 5% of the outstanding shares of the issuer's stock. HALLIGAN's representations were inconsistent with Archegos's securities holdings, including, at times, its positions in IQ, TME, VIAC, GSX, and DISCA.

### The Schemes Collapsed

        60.      After the trading day on or about March 22, 2021, ViacomCBS announced a secondary stock offering. When markets reopened on March 23, 2021, VIAC stock began to decline, and, with it, the value of Archegos's portfolio. In response, BILL HWANG, the defendant, attempted to defend the price of VIAC by initiating an extraordinary amount of trading. HWANG's strategy amounted to an attempt to overpower the market, to prevent the collapse of artificial stock prices and thereby to avoid margin calls. Because this trading consumed a significant amount of Archegos's free cash, if HWANG's ploy were to fail, Archegos would be left with margin calls across its Counterparties and insufficient funds to meet them.

        61.      PATRICK HALLIGAN, the defendant, recognized the peril of the trading by BILL HWANG, the defendant — much of which was occurring at 100% margin. During that day, HALLIGAN asked, "Are we going to be able to pay for these trades today? I don't see how

we can[.]" Later, William Tomita attempted to raise the issue to HWANG, reporting back to others within Archegos that HWANG would not relent: "I spoke to Bill and he said to just keep work[ing] the orders."

62.     The trading gambit failed. VIAC's price declined, and Archegos's portfolio suffered billions of dollars in market losses. Moreover, BILL HWANG, the defendant, had spent more than approximately $2 billion on additional buying — including more than approximately $900 million in VIAC alone — and in doing so had critically depleted Archegos's available cash. Later that evening, William Tomita circulated an internal message to HWANG, PATRICK HALLIGAN, the defendant, and others forecasting margin calls for the following day, predicting "cash shortfalls for after tomorrow," and identifying particular sets of swaps that could be unwound to generate cash.

63.     On or about March 24, 2021, however, BILL HWANG, the defendant, did not unwind his concentrated positions to generate cash. Instead, HWANG once again directed hundreds of millions of dollars of additional trading in those positions, and directed and encouraged the trading team to use various manipulative techniques in a last-ditch effort to prevent the scheme's collapse.

64.     At the same time, PATRICK HALLIGAN, the defendant, Scott Becker, and the operations group worked to respond to margin calls. Because Archegos did not have sufficient cash on hand to cover its margin calls, the operations team, with HALLIGAN's assistance, worked to withdraw excess margin from any Counterparty at which Archegos could obtain it. On various calls with Counterparties about the request, Becker lied about the purpose of the withdrawals and, on at least one occasion, falsely asserted that Archegos still had $9 billion in excess cash when it did not.

65.     By the end of the day, on or about March 24, 2021, many of Archegos's largest positions had experienced price declines, the portfolio losses had deepened, and it became obvious within Archegos that it would be unable to meet the following day's margin calls. Because unwinding its positions would, in effect, flood the market with the stock it had amassed and reverse months of price manipulation, the Archegos Conspirators opted to try to stall the Counterparties insisting that Archegos sell some of its positions to generate cash.

66.     During a series of calls beginning on or about March 24, 2021, and continuing the following day, various Archegos personnel, including PATRICK HALLIGAN, the defendant, William Tomita, and Scott Becker attempted to lull Counterparties into believing that Archegos had experienced an unexpected liquidity event and that it just needed time to orderly unwind some of its positions. Various of these calls included misleading statements and characterizations and some included outright false statements.

67.     Beginning on or around March 26, 2021, after BILL HWANG, the defendant, failed to timely reduce his positions, generate sufficient cash, or meet outstanding margin calls, Archegos's Counterparties began to unwind Archegos's swaps directly. In a matter of days, the companies at the center of Archegos's trading scheme lost more than $100 billion in market capitalization, Archegos owed billions of dollars more than it had on hand, and Archegos collapsed. Market participants who purchased the relevant stocks at artificial prices lost the value they believed their investments held, the Counterparties lost billions of dollars, and Archegos employees, many of whom were required to invest 25% or more of their bonuses with Archegos as deferred compensation, lost millions of dollars.

## Statutory Allegations

### The Racketeering Conspiracy

68.     From at least in or about 2020, up to and including in or about March 2021, in the Southern District of New York and elsewhere, BILL HWANG and PATRICK HALLIGAN, the defendants, and others known and unknown, being persons employed by and associated with the enterprise described above, namely, the Archegos Enterprise, which was engaged in, and the activities of which affected, interstate and foreign commerce, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate the racketeering laws of the United States, to wit, Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the Archegos Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of multiple:

a.     Offenses involving fraud in the sale of securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5;

b.     Offenses involving fraud in the sale of securities, in violation of Title 18, United States Code, Section 1348; and

c.     Acts indictable under Title 18, United States Code, Section 1343 (relating to wire fraud).

69.     It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

### Purposes of the Racketeering Conspiracy

70.     The principal purpose of the racketeering conspiracy was to manipulate the prevailing prices of certain securities held in the Archegos Enterprise's investment portfolio.

71.     A further purpose of the racketeering conspiracy was to obtain trading capacity, brokerage relationships, and specific margin rates through false and misleading statements to banks and brokerages.

72.     A further purpose of the racketeering conspiracy was to maintain and increase the industry standing, public reputation, and wealth of the Enterprise, generally, and its leader, BILL HWANG, the defendant, specifically.

73.     A further purpose of the racketeering conspiracy was to conceal the defendants' criminal conduct from the marketplace and from counterparties.

### Means and Methods of the Racketeering Conspiracy

74.     BILL HWANG and PATRICK HALLIGAN, the defendants, William Tomita, and Scott Becker sought to advance the purposes of the racketeering conspiracy, and to conduct and participate, directly and indirectly, in the conduct of the affairs of the Archegos Enterprise, through various unlawful means and methods, including:

a.      The defendants caused the Archegos Enterprise to amass significant market power in certain publicly traded securities and deployed that market power using assorted trading techniques intended to increase the prevailing prices of those securities.

b.      The defendants obtained trading capacity, brokerage relationships, and specific margin rates through false and misleading statements to banks and brokerages.

(Title 18, United States Code, Section 1962(d).)

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

75.     The allegations contained in paragraphs 1 through 67 of this Indictment are repeated and realleged as if fully set forth herein.

76.     From at least in or about 2020, up to and including at least in or about March 2021, in the Southern District of New York and elsewhere, BILL HWANG, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, HWANG engaged in a scheme to secretly amass market power in numerous securities traded on United States securities exchanges and use that market power through manipulative and abusive trading techniques for the purpose of fraudulently altering the prices of those securities.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNTS THREE THROUGH NINE
### (Market Manipulation)

The Grand Jury further charges:

77.     The allegations contained in paragraphs 1 through 67 of this Indictment are

repeated and realleged as if fully set forth herein.

78.      From at least in or about 2020, up to and including at least in or about March 2021, in the Southern District of New York and elsewhere, BILL HWANG, the defendant, willfully and knowingly, directly and indirectly, by the use of the mails and means and instrumentalities of interstate commerce, and of the facilities of national securities exchanges, and being a member of national securities exchanges, effected, alone and with one and more other persons, a series of transactions in securities registered on national securities exchanges, securities not so registered, and in connection with security-based swaps and security-based swap agreements with respect to such securities creating actual and apparent active trading in such securities, and raising and depressing the price of such securities, for the purpose of inducing the purchase and sale of such securities by others, to wit, HWANG engaged in a series of transactions in securities and securities-based swaps relating to the following tickers in order to raise or depress the price of and induce others to purchase those securities:

| Count | Company | Ticker |
|-------|---------|--------|
| THREE | ViacomCBS | VIAC |
| FOUR | Discovery Communications, Inc. | DISCA |
| FIVE | Discovery Communications, Inc. | DISCK |
| SIX | GSX Techedu Inc. | GSX |
| SEVEN | iQIYI, Inc. | IQ |
| EIGHT | Tencent Music Group | TME |
| NINE | Vipshop Holdings Ltd | VIPS |

(Title 15, United States Code, Sections 78i(a)(2) and 78ff; and Title 18, United State Code, Section 2.)

## COUNT TEN
### (Securities Fraud – Counterparties)

The Grand Jury further charges:

79.     The allegations contained in paragraphs 1 through 67 of this Indictment are repeated and realleged as if fully set forth herein.

80.     From at least in or about 2020, up to and including at least in or about March 2021, in the Southern District of New York and elsewhere, BILL HWANG and PATRICK HALLIGAN, the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails and of the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, HWANG and HALLIGAN engaged in a scheme to defraud Archegos's counterparties through false and misleading statements regarding Archegos's business, portfolio, and assets.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT ELEVEN
### (Wire Fraud - Counterparties)

The Grand Jury further charges:

81.     The allegations contained in paragraphs 1 through 67 of this Indictment are repeated and realleged as if fully set forth herein.

82. From in or about 2020, up to and including in or about March 2021, in the Southern District of New York and elsewhere, BILL HWANG and PATRICK HALLIGAN, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire and radio communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, HWANG, HALLIGAN, and others at Archegos engaged in a scheme to defraud Archegos's trading counterparties by means of false and misleading statements regarding Archegos's business, portfolio, and assets, including through interstate wires.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATIONS AND SUBSTITUTE ASSET PROVISIONS

### FORFEITURE ALLEGATION AS TO COUNT ONE

83. As a result of committing the offense alleged in Count One of this Indictment, BILL HWANG and PATRICK HALLIGAN, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 1963,

a. any interest acquired or maintained in violation of Section 1962;

b. any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, the enterprise named and described herein, which the defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of Section 1962; and

c. any property constituting, or derived from, any proceeds obtained, directly or indirectly, from the racketeering activity charged in Count One, including but not

42

limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

## FORFEITURE ALLEGATIONS AS TO COUNTS TWO THROUGH ELEVEN

84.     As a result of committing one or more of the offenses alleged in Counts Two through Eleven of this Indictment, BILL HWANG, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

85.     As a result of committing one or more of the offenses alleged in Counts Ten and Eleven of this Indictment, PATRICK HALLIGAN, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

## SUBSTITUTE ASSETS PROVISION

86.     If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

        a.     cannot be located upon the exercise of due diligence;

        b.     has been transferred or sold to, or deposited with, a third person;

        c.     has been placed beyond the jurisdiction of the Court;

        d.     has been substantially diminished in value; or

    e.  has been commingled with other property which cannot be

subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m),

Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461, to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property

described above.

(Title 18, United States Code, Sections 981 and 1963; Title 21, United States Code, Section 853;
and Title 28, United States Code, Section 2461.)


_____

FOREPERSON


D. William
_____

DAMIAN WILLIAMS
United States Attorney

44