O5D6HWA1

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x
   UNITED STATES OF AMERICA,
3
                v.                        22 CR 240(AKH)
4
   SUNG KOOK HWANG and PATRICK
5  HALLIGAN,
                   Defendants.
6  ------------------------------x
                                          New York, N.Y.
7                                         May 13, 2024
                                          10:15 a.m.
8  Before:

9                  HON. ALVIN K. HELLERSTEIN,

10                                        District Judge
                                          -and a jury-
11                          APPEARANCES

12 DAMIAN WILLIAMS,
        United States Attorney for the
13      Southern District of New York
   BY:  MATTHEW D. PODOLSKY
14      ANDREW M. THOMAS
        ALEXANDRA ROTHMAN
15      SAMUEL ROTHSCHILD
        Assistant United States Attorneys
16
   FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
17      Attorneys for Defendant Halligan
   BY:  MARY MULLIGAN
18      TIMOTHY HAGGERTY
        BONNIE BAKER
19      ANIL VASSANJI
        RUPITA CHAKRABORTY
20
   KRAMER LEVIN NAFTALIS & FRANKEL LLP
21      Attorneys for Defendant Hwang
   BY:  BARRY H. BERKE
22      DANI R. JAMES
        JORDAN L. ESTES
23      MICHAEL MARTINEZ
        MICHELLE BEN-DAVID
24      SHAKED SIVAN
        DAYNA CHIKAMOTO
25

O5D6HWA1

1                        APPEARANCES (Continued)

2

   ALSO PRESENT:
3  Anna Gamboa, USAO Paralegal
   Arjun Ahuja, USAO Paralegal
4  Madeline Sonderby, USAO Paralegal
   Raymond McLeod, Defense Trial Consultant
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5D6HWA1

1              (Trial resumed; jury not present)

2              THE COURT:  There are two items to take up before we

3       call on the jury.  One is the letter from Juror Number 1.  Does

4       either side of any party -- any party have any objection?

5              MR. PODOLSKY:  No, your Honor.

6              MR. BERKE:  No objection on behalf of Mr. Hwang, your

7       Honor.

8              MS. MULLIGAN:  Good morning, your Honor.  No objection

9       on behalf of Mr. Halligan.

10              THE COURT:  Good.  Thank you.  With regard to the

11      letters I received from Mr. Berke, to which Ms. Mulligan joins,

12      and from the government, I think what we have now is the

13      necessity for a government motion to add this

14      misrepresentation, if it is one, to the statement of

15      misrepresentations made in its letter of March 21, 2023.

16              MR. PODOLSKY:  Yes, your Honor.  We believe that --

17              THE COURT:  You so move.

18              MR. PODOLSKY:  Correct.

19              THE COURT:  Tell me why I should allow it.

20              MR. PODOLSKY:  Yes, your Honor.

21              THE COURT:  Podium, please.

22              MR. PODOLSKY:  Podium?

23              THE COURT:  Yes.  Otherwise, you block people.

24              MR. PODOLSKY:  Better, your Honor?

25              THE COURT:  Yeah.

O5D6HWA1

1    MR. PODOLSKY:  Yes, your Honor, as we stated

2    previously, we have continued to investigate and prepare for

3    trial, and update the defense as we've identified additional

4    evidence in the material that's already been produced to the

5    defense.  This is a particular statement in a recorded phone

6    call, a recording of the defendant, Mr. Hwang himself.  It's

7    about a paragraph or two.  And it contains some particular

8    statements that the government recently identified based on

9    meeting with some witnesses.

10    THE COURT:  Did you know about this when you issued

11    your letter of March 21, 2023?

12    MR. PODOLSKY:  We knew there was a call, we did not

13    know about the nature of the statements and the fact that they

14    were misleading.  As soon as we identified that, we produced

15    the material noting as much to the defense.

16    THE COURT:  When did you learn that?

17    MR. PODOLSKY:  I believe we put this in our letter,

18    but we first spoke to the witness about this I believe it was

19    April 26.  We produced that on Friday, on the 29th, we produced

20    the material about the witness's statements.  We then provided

21    that witness so that he could essentially refresh his

22    recollection on the call with a transcript from the call.

23    We met with him I believe it was May 6.  He further

24    explained his understanding of why certain of these statements

25    were misleading.  We produced further material and notice to

O5D6HWA1

1    the defense that day.  And I believe the following day met with

2    another witness to the call who also explained why he thought

3    the statement was misleading.  And the same day produced

4    material again to the defense saying that witness would testify

5    as much.

6         So we provided notice to the defense, as soon as it

7    was identified by the government beginning approximately two

8    weeks ago.

9         THE COURT:  The defense also argues that the statement

10    insofar as it makes comment and expresses an opinion as to the

11    plausibility of the estimate or implausibility of the estimate,

12    is an opinion and should not be admitted.  What do you say to

13    that?

14         MR. PODOLSKY:  Well, your Honor, I think that the

15    witnesses can -- I want to make two comments to that, your

16    Honor.

17         First of all in direct response, I think witnesses

18    will explain why that opinion could not have been truthfully

19    conveyed.  But second, there are additional specific factual

20    representations that the defense hasn't focused on in the

21    recording about the liquidity of the defendant's top positions.

22    Those are just facts, knowable facts, and those were false and

23    misleading.

24         THE COURT:  Well, why does a witness to facts have the

25    ability to express an opinion as to the reliability or

O5D6HWA1

1    plausibility of an opinion?  Or an estimate?

2              MR. PODOLSKY:  Well, I think the witness, today's

3    witness, if we're focused on that, your Honor, first we'll play

4    the recording, the statements themselves will be in evidence.

5    The witness will explain, because these statements are made in

6    a way that are using industry speak and terms that I think

7    aren't obvious to somebody who has never been involved in the

8    industry.  He'll simply explain his reaction to and

9    understanding of those statements.

10             THE COURT:  I don't think so.

11             MR. PODOLSKY:  I'm sorry, your Honor?

12             THE COURT:  I don't think so.

13             MR. PODOLSKY:  Well, what I'm trying to get at, your

14   Honor, is we need to show these statements were material in

15   some way.  And so the witness can explain why it mattered to

16   him.

17             THE COURT:  You can say why it's important, but you

18   can't say anything -- the witness can say why he regarded that

19   as important, but he has to act on it in some fashion.  But he

20   can't say it's not plausible.

21             MR. PODOLSKY:  Very well, your Honor, I don't think

22   that's actually what we intended to elicit from this witness.

23             THE COURT:  It's what they say here.

24             MR. PODOLSKY:  Yeah.  All right.

25             THE COURT:  I want to hear from the defense before I

O5D6HWA1

```
 1   rule.  Mr. Berke?

 2              MR. BERKE:  Thank you, your Honor, good morning.

 3              Your Honor, what strikes us here, if I could -- just a

 4   couple facts.  The prosecution has had the recording of this

 5   call for nearly three years.  It's a critical call in this

 6   case.  It is the only recording of Mr. Hwang speaking to the

 7   counterparties.  It happened on March 25, 2021, during this

 8   critical time.

 9              The prosecution now says he made statements that are

10   factually untrue, and it's fact.  They've had this recording.

11   They've been focused on this recording.

12              THE COURT:  So have you, right?

13              MR. BERKE:  So have we.  We don't think it's a

14   misrepresentation at all.  We don't understand that claim.  And

15   we were relying on the prosecution never identifying it.  We

16   think it's accurate, but it's confusing to the jury.  And, your

17   Honor, if I could make one other point.  I don't want to

18   interrupt your Honor.

19              THE COURT:  No.  Go ahead.  Make the point.

20              MR. BERKE:  The prosecution spoke to Mr. Fairbanks in

21   June of 2021, mere months after the call.  He didn't need a

22   recording to know whether he believed he was misled in any way.

23   He didn't claim that.  Again, they met repeatedly --

24              THE COURT:  He's not going to be able to testify to

25   that today.
```

1              MR. BERKE:  Your Honor, so we believe that this is not

2      proper.  It's happening on the eve of trial.  We believe it's

3      being made because they don't otherwise have any claim that

4      Mr. Hwang made any other misreps.  While they point to a

5      document, I think they now realize based on defense exhibits

6      that Mr. Hwang did not make a misrepresentation in connection

7      with that document.

8              So this would be the only statement that they allege

9      is made by Mr. Hwang in actuality.  They have other arguments

10     about various statements, but the only actual misrepresentation

11     is this one, we believe.  The prosecution may take a different

12     view, but we believe.  And we think the fact that for a tape

13     they had for three years, that they do it within literally

14     weeks of trial, even less than that, to claim that statements

15     they knew about, they had access to all the Archegos documents

16     and materials for years to prepare whether the statements he

17     said about liquidity or "time to unwind," whether it was true

18     or not.

19             They didn't need Mr. Fairbanks, a witness at UBS, who

20     is no longer there, who doesn't have access to Archegos

21     material, to tell them whether it's true or not.

22             So it's the prosecution who is now going to argue that

23     ambiguous statements about an estimate, about how long it could

24     probably take to unwind to meet a margin call, they could

25     evaluate that.  They evaluated that to be truthful.  We relied

O5D6HWA1

1   on that, and now, two weeks before trial, they want to claim

2   they're doing it without facing the heavy only --

3          THE COURT:  Mr. Berke, I said that the opinions of

4   this witness will not be admissible.

5          MR. BERKE:  Thank you, Judge.  We may have an

6   application.

7          THE COURT:  I think I have your points.

8          Ms.  Mulligan, anything else?

9          MS. MULLIGAN:  No, your Honor.  I believe Mr. Berke

10  has covered the issue.

11         THE COURT:  Okay.  I hold that the government can add

12  the misrepresentation, if it is such, to the list it specified

13  on March 21, 2023.

14         Shall we call in the jury?

15         MR. THOMAS:  Yes, your Honor.

16         THE COURT:  You'll mark the letter from the jurors

17  Court Exhibit 1.  No, not 1, it's 3.

18         I'll be back in a minute.

19         (Recess)

20

21

22

23

24

25

1          (Jury present)

2          THE COURT:  Good morning, members of the jury.  Please

3     be seated, everyone.

4          I want to start by rereading the indictment, because

5     those are the charges which the government must prove.  You

6     will remember that the indictment has no value, whatever, as

7     evidence.  It only sets out the charges.  So I want to read it

8     to you so you become familiar with it.

9          The indictment alleges that the defendants engaged in

10    racketeering, market manipulation, and fraud as executives of

11    Archegos Capital Management, an investment fund in New York.

12         The indictment alleges that the defendants engaged in

13    a scheme that involved manipulative trading in the marketplace,

14    and using false and misleading statements to defraud investment

15    banks and brokerages doing business with Archegos.

16         The indictment further alleges that the trading scheme

17    was aimed to manipulate, control, and artificially affect the

18    market for several securities in Archegos' portfolio,

19    ViacomCBS, Discovery Communications, Inc., Share Class A and

20    Share Class K, GSX Techedu Inc., iQIYI Inc., Tencent Music

21    Group Inc., Futu Holdings, and Rocket Companies, Inc.

22         The charges are made in 12 counts:

23         Count One charges the defendants with conspiring, that

24    is, agreeing with each other and with others, to violate the

25    racketeering statute, the federal racketeering statute.

O5D6HWA1

1    Specifically, that between 2020 and March 2021, the defendants

2    agreed with others to participate in the affairs of an

3    organized criminal enterprise named in the indictment as

4    Archegos Capital Management, or the Archegos Enterprise, and

5    that they and other members of the enterprise agreed to commit

6    various crimes, including fraud in the sale of securities and

7    wire fraud.

8          Count Two charges Mr. Hwang with securities fraud in

9    connection with the purchase or sale of securities.

10    Specifically, in 2020 through March 2021, it is alleged that

11    Mr. Hwang engaged in a scheme to secretly amass market power in

12    numerous securities traded on United States securities

13    exchanges, and used that market power through manipulative and

14    abusive trading practices for the purpose of fraudulently

15    altering the prices of those securities.

16          Counts Three through Nine contain the specific

17    allegations for specific securities, one count for each

18    particular security affected.  They affect transactions in

19    securities and securities-based swaps.

20          Count Three alleges Mr. Hwang did market manipulation

21    with respect to ViacomCBS;

22          Count Four, with Discovery Communications Share

23    Class A;

24          Count Five, with Discovery Communications Share

25    Class K;

O5D6HWA1

1          Count Six, with GSX Techedu Inc.;

2          Count Seven, with iQIYI Inc.;

3          Count Eight, with market manipulation with respect to

4    Tencent Music Group;

5          Count Nine, with respect to Vipshop Holdings LTD.

6          Count Ten charges both Mr. Hwang and Mr. Halligan with

7    securities fraud in connection with the purchase and sale of

8    securities, specifically between 2020 and March 2021, Hwang and

9    Halligan engaged in a scheme to defraud Archegos'

10   counterparties through false and misleading statements

11   regarding Archego's business portfolio and assets.

12          A counterparty is a party on the other side of the

13   deal.

14          Count Eleven charges Mr. Hwang and Mr. Halligan with

15   wire fraud, specifically, that between 2020 and March 2021,

16   they engaged in a scheme to defraud Archegos' trading

17   counterparties by making false and misleading statements

18   regarding Archegos' business portfolio and assets, including

19   through interstate wires.

20          I said 12 counts.  There are 11 counts.  Those are the

21   11 counts.

22          Defendant has pleaded not guilty with respect to each

23   of those counts.  Defendant is presumed innocent.  It is the

24   government's job to prove the allegations, and respect the

25   allegations are not evidentiary at all.

O5D6HWA1                    Opening - Rothman

1           So you will be examining at the end of the case after

2    you hear all the lawyers and my legal instructions to deliver a

3    verdict whether the government has proved or not proved each of

4    the material allegations of each of the 11 counts.  That

5    finishes what I have to say about the case.

6           It will now be the time for the lawyers to address you

7    with their opening statements.  An opening statement is not an

8    argument, why one party is right and the other party is wrong.

9    A good opening statement lays out the structure of what the

10   attorney intends to do throughout the trial.  So it's going to

11   give you context as you listen to all the pieces of evidence

12   that will be coming in during this trial.

13          Who is going to be addressing?

14          MS. ROTHMAN:  I am.

15          THE COURT:  Ms. Rothman will speak for the government.

16   Mr. Berke is going to speak for Mr. Hwang.  Ms. Mulligan is

17   going to speak for Mr. Halligan.

18          At the end of those three talks, you'll probably have

19   a recess, and then we'll start with the first witness.  Thank

20   you for your attention.

21          Ms. Rothman, the podium is yours.

22          MS. ROTHMAN:  Thank you, your Honor.

23          In the world of Wall Street, money is power.  But when

24   people become blinded by greed for that money, or when they

25   become consumed by desire for that power, when they are willing

O5D6HWA1                        Opening - Rothman

1    to lie and cheat to get it, that can lead to fraud and that can

2    lead to crime.

3             The defendant Bill Hwang was a billionaire.  Yet he

4    risked nearly everything because he wanted more.  More money,

5    more success, more power.

6             He ran an investment business named Archegos right

7    here in New York.  He had dozens of employees to help him

8    manage his personal wealth.  To those in the know, he was a

9    great investor.  He had it all.  But it wasn't enough.  And so

10   in 2020, after COVID hit, the defendant started using his

11   business and his billions to create a massive fraud.  The

12   defendant started manipulating the stock market.  Pushing the

13   prices up when he wanted them up.  Pushing the prices down,

14   when he wanted them down.  Rigging the game to keep winning on

15   Wall Street.

16            Ladies and gentlemen, you are going to learn that it

17   worked.  In less than a year, the defendant grew his business

18   by tens of billions of dollars.  Now, to pull it all off, he

19   and the defendant, Patrick Halligan, were lying.  Lying to

20   dozens of banks to borrow billions of dollars.  Lying to get

21   more money from the banks, lying to stop the banks from taking

22   their money back.  Even lying to their own employees.

23            From the inside, these two men turned an investment

24   business into a crime business.  All because the defendant,

25   Bill Hwang, wanted to be a legend of Wall Street.

O5D6HWA1                     Opening - Rothman

1              And then, in March 2021, in the span of a week, it all

2    collapsed.  The stock prices that Hwang had pushed up started

3    to fall.  When it looked to be hundreds of billions of dollars

4    in the stock market, collapsed practically overnight.  Few

5    could figure out how everything had gone so wrong.  And then

6    the truth started to come out.  The prices went back to where

7    they belonged.  And Hwang's trading, once hidden in the dark,

8    came into the light.

9              And when the curtain was pulled back, his business was

10   revealed for what it had become.  A house of cards built on

11   manipulation and lies.  And that is why we are here today, we

12   are here because these two men tricked a dozen banks and tried

13   to trick all of Wall Street for their own greed and for their

14   own gain.

15             We are here today because these two men made fraud

16   their business until the truth came out and they got caught.

17   That is what this case is about.

18             This morning, I'm going to take some time to talk

19   about what I expect the evidence in this trial will show.

20   First, I am going to talk in more detail about that evidence

21   and then I'm going to explain the different types of evidence

22   that you'll hear and see at this trial.  So let's start with

23   what the evidence will show.

24             You will learn that Hwang ran an investment business

25   named Archegos.  Now, businesses like Archegos make money from

O5D6HWA1                    Opening - Rothman

1    the rise and fall of stock prices in the stock market.  At its

2    simplest, if you buy a stock you make money when the price goes

3    up.  But when the price goes down, you can lose money.  But

4    Hwang, he didn't want to leave his fortune to chance.  So he

5    turned to a trick.  A cheat.  He manipulated the stock prices

6    to make himself a legend.  And he enlisted his right-hand man

7    and the chief financial officer of Archegos, Patrick Halligan,

8    to help him do it.

9            As you'll learn, this criminal scheme had two parts,

10    manipulating the market, and lying to the banks.  And as you'll

11    see at this trial, these two parts went hand in hand.

12            Beginning in 2020, Hwang and others were manipulating

13    the prices of about a dozen stocks in the stock market.  For

14    most, his goal was to make the prices go up.  To make the

15    companies look more valuable than they were.  The reason for

16    this was simple.  The higher the price, the more money Hwang

17    got from the banks and the bigger Archegos grew.  And that's

18    exactly how it worked.

19            Each day, Hwang traded in ways designed to move the

20    stock prices, to inflate the prices above where they really

21    belonged.  He then used the money he got to inflate the prices

22    even more.  More cash meant more manipulation.  And more

23    manipulation meant more cash.  It was a never-ending cycle of

24    money making and it was also a crime.  It's called securities

25    fraud.  And that's the first part of the scheme.

1              Now, to keep this criminal scheme going, he needed to

2        hide what he was doing from the market.  But, he also needed to

3        borrow money from the banks.  You see, once this scheme really

4        got started, Hwang needed big loans from the banks to pay for

5        the inflated prices of those stocks that he had pushed up.  And

6        that's where the second part of the scheme comes in.  The lies.

7              Over and over, the defendants and others lied to the

8        banks.  They lied about how much trading Hwang was doing.  They

9        lied about his trading at other banks.  They even lied about

10       how the business was run.  Lying to banks to get money is also

11       a crime, and that's the second part of the scheme.

12             Now, before I go into more detail about how this

13       criminal scheme worked, I want to say a few things about the

14       business, Archegos itself.

15             So first, the business was dedicated solely to Bill

16       Hwang.  There were no outside investors, no clients.  It was

17       his money and his profits.

18             Second, like other investment businesses, Archegos

19       used banks to trade in the market.  Now, these banks gave the

20       defendant two very important things:  Leverage and swaps.

21             Let me explain them to you.

22             Leverage is just a loan for investing.  It allowed

23       Hwang to put down a small amount for each trade and the bank

24       would chip in the rest.  With leverage, when the stock prices

25       went up, Hwang could borrow even more money from the banks.

O5D6HWA1                    Opening - Rothman

1     But, this is important, when the stock price went down, Hwang

2     had to pay the banks back.  Let me say something about swaps.

3            Swaps were a tool that let Hwang trade in the market,

4     make money when the stock price went up and down without

5     actually owning the stock itself.  In a swap, as you'll learn,

6     the bank bought the security, not Archegos.  But for all

7     practical purposes, it was as if Archegos was doing the

8     trading.

9            As you'll learn, these swaps gave Hwang the secrecy he

10    needed.  They made it look to the market that there were a lot

11    of people who wanted these stocks.  They hid the fact that it

12    was really one man, Bill Hwang, driving the demand.

13           Now, there's one final thing I want to say about the

14    Archegos business, and this is important too.  You're going to

15    learn that Archegos looked like an ordinary investment

16    business.  At least from the outside.  It had an office in

17    midtown, there was artwork on the wall, there were dozens of

18    employees, compliance, traders, even an HR person.

19           But Archegos also had something else.  Inside was a

20    corrupt core.  A small group of people who did whatever Hwang

21    wanted including lie and cheat.  A group who was loyal to Hwang

22    above all else.  A group who helped him misuse those tools I

23    just mentioned, banks, leverage, and swaps, to commit a massive

24    multibillion dollar fraud.

25           The defendant, Patrick Halligan, he was the CFO of

O5D6HWA1                    Opening - Rothman

Archegos and he was part of that corrupt core.  He had worked
for Hwang for decades.  He would do whatever it took to get the
job done, including lying to the banks and directing others to
lie.

Archegos also had a head trader and a director of risk
management and both of these men were part of that corrupt
core.  You'll learn the head trader had worked for Hwang for
more than a decade.  Hwang taught him how to trade, how to lie
to the banks, and how to manipulate the market.  He understood
that his job was to follow Hwang's orders, even when that meant
breaking the law.

The director of risk management had worked at Archegos
for more than a decade too.  He was Patrick Halligan's top
deputy.  He reported directly to him, and from the beginning,
Halligan taught him to lie, to mislead the banks, to say
whatever he needed to to keep Hwang trading.

These three men, Halligan, the head trader, and the
director of risk management were Hwang's partners in crime.
And beginning in 2020, at Hwang's command, they took part in a
brazen fraud.  You will learn at this trial that Hwang figured
out a simple way to rig the market.

Typically, if you buy stock and the price goes up, you
have to sell that stock to get your money out.  But the swaps
that Hwang bought, as you'll learn, were different.  At the end
of each day, if the stocks were up, Hwang could take out some

1    of his winnings and use that to put it back into the market to

2    make more money.  He wouldn't have to sell a single thing.  So

3    here was the trick.

4          If Hwang could find a way to make sure his stocks were

5    up at the end of each day, he could get paid.  And if he could

6    keep doing that day after day, he could keep getting paid day

7    after day for however long as he wanted.  And that's exactly

8    what he did.

9          So how did he do it?  Well, as you'll learn, some of

10   it was simple.  He kept buying securities he already owned over

11   and over again at higher and higher prices.  He did this to

12   keep moving the stock price up or to stop it from falling.  He

13   made the market think there were a lot of people who wanted

14   these names, but in secret, hidden behind the swaps, it was a

15   lot of Hwang.

16         Think about this, most people want to buy low and sell

17   high.  But not Hwang.  He was happy to buy and then buy higher

18   and then buy even higher.  In fact, he wanted to buy high,

19   because that would get the prices up, which is what he needed.

20         But that wasn't all.  As the scheme wore on, Hwang

21   directed his traders to do other things designed to get the

22   prices up too.  He had them trade early in the morning before

23   the market even opened.  Why do this?  Because he thought that

24   would trick others into thinking there was a lot of interest in

25   these names and to get people to buy them too.

1          He also had his traders use their bullets and their

2     cannons, his words for trading, at the end of the day, another

3     way to get the price up.  You'll learn at this trial that as

4     Hwang was doing all of this, he was hiding it from the banks.

5          Remember, Hwang was using swaps, he was also trading

6     through a dozen different banks.  Because each bank could only

7     see what Hwang was trading at their bank, that one slice of his

8     trading, none of the banks knew that so much of this buying

9     across Wall Street traced back to one man, Bill Hwang.

10         You will learn the defendant spent all day on a Zoom

11    call with his traders telling them what to buy, at what price,

12    and when.  Most days, Hwang ditched the Archegos office and

13    worked instead from a corporate apartment overlooking

14    Central Park.  There, he would stare at his computer all day,

15    watching a spreadsheet that turned bright green when his

16    traders had moved up the price enough so the banks could have

17    to pay him the next day.

18         He would send trade orders by nonstop instant message

19    and e-mail to his head trader and to the others, all with the

20    goal of getting that green light.

21         As these stock prices went up, so did Hwang's

22    borrowing from the banks, and so did the amount he was piling

23    into each of the names.  At its peak, Hwang had put nearly

24    $30 billion into a single company through swaps with billions

25    more in other names too.

O5D6HWA1                    Opening - Rothman

1          These sizes became so huge that Hwang found himself in

2     a corner.  He needed the prices to keep going up to avoid

3     collapse.  If the prices went down, Hwang would have to pay

4     back the banks in the morning and his sizes and these

5     securities were so big, that even small drops in the price

6     would mean big bills from the banks.  And that's when Hwang and

7     his corrupt core, that's when they passed the point of no

8     return.

9          They had made big trades before.  They had told lies

10    before.  But by late 2020, their manipulation and lies topped

11    anything from the past.  You will learn at this trial that

12    everyday, Hwang was fighting to get the prices up, to get the

13    green light on his computer screen.  And with every day that

14    passed, Archegos grew bigger and the scheme continued.

15          But, ladies and gentlemen, as you might imagine,

16    keeping stock prices up isn't easy.  Normally, one person can't

17    move the price of a stock.  Not even a billionaire.  To try and

18    overpower the market, Hwang needed a lot of money.  More money

19    than even he had.  And that's where the second part of the

20    scheme comes in.  And that brings us to the lies to the bank.

21    And that brings us to the defendant, Patrick Halligan.

22          You're going to learn at this trial that Halligan had

23    worked for Hwang for more than 20 years.  He was as loyal as

24    they come.  He had a simple rule:  Tell the banks as little as

25    possible and lie when you need to.  Remember, the banks could

O5D6HWA1                         Opening - Rothman

1    only see the slice of Hwang's trading at that bank.  For them

2    to find out the full picture, they needed to ask questions.

3    And when they did, Halligan had his top deputy, the director of

4    risk management, lie.

5             The banks wanted to know how much of each security

6    Hwang was holding all across Wall Street, you'll learn that

7    Archegos had dozens of internal reports that showed the true

8    and enormous numbers.  But Halligan's top deputy, the director

9    of risk management, he lied.  He lied to hide the truth about

10   the fraud.

11            The banks wanted to know how long it would take for

12   Archegos to sell its securities if it had to pay back the

13   banks.  Hwang got reports every single day that showed it would

14   take months for Archegos to get out of these securities.  But

15   following orders, Halligan's top deputy and Hwang's head trader

16   lied.  Telling the banks that Hwang could get out in a matter

17   of days.

18            The banks wanted to know who at Archegos was looking

19   over Hwang's shoulder.  The answer was nobody.  But the banks

20   lied.  They put together a letter that falsely claimed all

21   trades were reviewed daily.  Another lie.

22            The banks asked these questions because they were

23   trying to figure out the risks of lending to Archegos.  If any

24   of the banks knew what Hwang was really up to, if they knew how

25   much Hwang had in all of these names, they would have stopped

O5D6HWA1                    Opening - Rothman

1   lending him money and the scheme would have collapsed.

2              As you'll learn, the defendants didn't only lie to the

3   banks.  They lied to their own employees too.  To the people at

4   Archegos who were outside of that corrupt core, even some

5   people who were high up in the business, they didn't really

6   know what was going on.

7              Now, by this point, Hwang had manipulated the stock

8   prices to incredible heights.  He kept going back to the banks

9   to ask for more money, to keep buying at higher and higher

10  prices.  The high prices that he had set because of his

11  manipulation.

12             Over time, certain banks wouldn't lend him anymore.

13  They were maxed out in the names he wanted.  And so when Hwang

14  struck out at one bank, he would try his luck at the next.  To

15  keep the scheme going, Hwang looked to start trading with brand

16  new banks to get brand new loans.

17             For a while, it looked like Hwang couldn't lose.  He

18  got cash each day without selling any stock, and Archegos sword

19  to more than $36 billion.  It looked like a perpetual money

20  machine.  Hwang planned for ways to cash out, to walk away with

21  billions.  But he still wanted more, and that's where all the

22  lies and all the greed caught up with him.  And as you'll

23  learn, it all collapsed.

24             So here's what happened.  By March 2021, Hwang had

25  pushed the stock prices of one of the companies so high, that

O5D6HWA1                         Opening - Rothman

1    the company decided to issue more stock.  That decision caused

2    the stock price to go down because there was more of it to go

3    around.  That was a problem for Hwang and he knew it.  He

4    couldn't afford to buy all those new shares, and he couldn't

5    afford for the stock price to drop either.  If it went down,

6    he'd have to pay the bank back the next morning.  And Hwang

7    couldn't just sell the securities he had either because the

8    prices were too high.  He knew they only got that high because

9    he had pushed them up.

10          So what did he do?  Well, he went right back to the

11   cheat that got him there in the first place.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O5DVHWA2                    Opening - Ms. Rothman

1          MS. ROTHMAN:  He tried to manipulate the stock price

2     back up; and, ladies and gentlemen, he went big.  In a span of

3     one day, the defendant bought nearly one billion dollars of

4     that company's stocks on swap.  Let me say that again.  Hwang

5     spent nearly one billion dollars in a single day to try and

6     keep this fraud going.  He poured a billion dollars into the

7     market even when he knew that he owed money to the banks and

8     even when he knew that if he couldn't pay it off, the banks

9     would be left holding the bag.

10          The very next day, the prices of a few other

11    securities also dropped.  Hwang and the others in Archegos's

12    corrupt core tried to manipulate those prices back up, but they

13    were running out of cash and running out of time.  Banks

14    started to ask for Archegos to pay up, and Hwang knew the next

15    day would be even worse.

16          So that night, the defendants and their corrupt core

17    gathered together.  It was time to get their message straight.

18    They would spin a tale that Archegos was facing a short-term

19    liquidity issue.  They would give the banks no details.  They

20    would blame it all on the market, hiding the fact of all of the

21    manipulation and all of the lies.

22          The defendants worked from morning to night trying to

23    keep the scheme going, lying to the banks till the very end;

24    but in the end, they failed.  The prices they manipulated for

25    months came crashing down, and so did Archegos.

O5DVHWA2                        Opening - Ms. Rothman

1              In the end, the defendants' manipulation and lies left
2      a path of destruction.  The banks who had lent Archegos money
3      lost billions.  Archegos's own employees, who had no idea what
4      was going on, lost their jobs and lost millions of dollars too.
5      In other words, while the defendants' success had been fake all
6      along, the harm from their crimes was very real.  That is what
7      the evidence in this trial will show.

8              Now, let me take a few minutes to talk about the
9      different types of evidence that you'll see in this case.  And
10     as you'll learn, the evidence of the manipulation and the lies
11     goes hand-in-hand.

12             You will hear at this trial from Hwang's head trader.
13     He was a member of the Archegos corrupt core.  He will give you
14     an insider's view of the manipulation.  He will tell you that
15     he and Hwang worked together to manipulate those prices.  And
16     he will show you how they did.  He will show you how his
17     trading at Archegos was designed to push up the prices to get
18     that green light on the defendants' computer screen.

19             Now, as you can tell, Archegos's head trader committed
20     crimes during his time at Archegos.  But he has accepted
21     responsibility for his actions.  He has pled guilty and agreed
22     to testify at this trial in the hope of receiving a shorter
23     sentence.  You should scrutinize his testimony.  And when you
24     do, you will see that it is backed up by all the other evidence
25     in this case.

O5DVHWA2                    Opening - Ms. Rothman

1          So what is some of that evidence?

2          Well, you're going to see the actual trading data that

3    proves Hwang was manipulating those stock prices.  This data

4    will show you that Hwang and his corrupt core traded in

5    astonishingly high volumes; traded before the market even

6    opened, and traded at the end of the day using those bullets

7    and those canons — Hwang's words — to push up the price.

8          You'll hear from a member of Archegos's investment

9    team.  His job was to research one of the companies that Hwang

10   was buying a lot of.  He was on the outside.  He wasn't in the

11   corrupt core.  And he will tell you that Hwang's buying of that

12   company's security at higher and higher prices just didn't add

13   up.

14         You'll also see Hwang's words in black and white.

15   You'll see a text message Hwang sent where he admitted that the

16   jump in the price of a stock was because of his buying and not

17   the value of the company.  You'll see hundreds of instant

18   messages that Hwang sent to the traders every day telling them

19   to manipulate those stock prices, to use those bullets and

20   those canons to push up the prices.

21         You'll hear from experts in finance and the stock

22   market.  They have studied the trading data in this case, and

23   they will show you how Archegos's buying altered the stock

24   prices in Hwang's favor; how his trades made the stocks look

25   even more valuable than they were; and how, when Archegos

O5DVHWA2                    Opening - Ms. Rothman

1  collapsed, those prices went back down to where they were

2  before, before Hwang ever got started.  That is just some of

3  the evidence of manipulation that you will see and hear at this

4  trial.

5          You will also see evidence of lies that fueled this

6  scheme.  You will hear from another member of Archegos's

7  corrupt core, the director of risk management.  He will tell

8  you that Halligan told him to lie to the banks, including

9  during that final week before the collapse.  He will tell you

10  that he lied so Hwang could keep trading.  That was the point.

11          Now, like the head trader, the director of risk

12  management committed crimes during his time at Archegos.  But

13  he has pled guilty to those crimes and agreed to testify in the

14  hope of receiving a reduced sentence.  Like the head trader,

15  you will see that his testimony is backed up by all of the

16  other evidence in this case.

17          Let me tell you about some of that evidence.

18          You will see emails, spreadsheets and other documents

19  from inside of Archegos.  These records will show you the

20  defendants knew just how big and risky Archegos had become, and

21  how they lied and hid that from the banks.  You'll see emails

22  where Hwang is pushing to sign up new banks to start trading

23  with them because he needs those banks to keep the scheme

24  going.  You'll see the letter Archegos drafted that falsely

25  claimed all trades were reviewed daily, a lie to make it seem

O5DVHWA2                          Opening - Ms. Rothman

1   like someone was looking over Hwang's shoulder.

2           You'll see instant messages and notes that show

3   Halligan told the director of risk management to lie to the

4   banks, especially in that final week; no different than he had

5   told him during his entire time at Archegos.  This evidence

6   will make clear that Halligan knew Archegos was out of cash;

7   that he knew the walls were closing in; and that he tried to

8   cover it up, lying that Archegos only had a liquidity issue, as

9   if it had money, when it didn't.

10          And finally, you will hear from the folks who worked

11  at the banks, who were lied to by the defendants and their

12  corrupt core.  They will tell you that they wouldn't have done

13  business with Archegos if they had known the truth.  They will

14  tell you they only found out the truth after Archegos collapsed

15  and they lost billions.

16          Now, all of this evidence is not going to come in all

17  at once.  You will see it witness by witness, document by

18  document, one piece at a time.  But by the end of this trial,

19  after you have heard the testimony and seen the evidence, you

20  will see the full picture.  You will see that this combination

21  of manipulation and lies was no accident.  It was deliberate.

22  It was repeated.  It was downright fraud.

23          Ladies and gentlemen, this is an important case.  It's

24  important to the defendants for obvious reasons.  But it's

25  important to the government too.  Because it is a crime when

O5DVHWA2                        Opening - Mr. Berke

 1   people with great money and great power lie and cheat for their

 2   own selfish gain.

 3        At the end of this trial, when all the evidence is in,

 4   you will see that there is only one verdict consistent with the

 5   evidence, the law, and your common sense:  That the defendants,

 6   Bill Hwang and Patrick Halligan, are guilty.

 7        THE COURT:  Thank you, Ms. Rothman.

 8        Mr. Berke.

 9        MR. BERKE:  Thank you, your Honor.

10        Good morning.

11        In ancient Greek mythology, there was a river that ran

12   between the mythical land of the living and the land of the

13   dead.  The guardian of that river was Charon.  And in the myth,

14   when families brought the deceased to Charon to ferry across

15   the river, they had to put a coin in the mouth of the deceased

16   as payment to Charon to ferry the deceased across from the land

17   of the living to the land of the dead.

18        Many people attribute this myth as the source of the

19   famous saying "put your money where your mouth is."  This

20   saying, "put your money where your mouth is," became famous and

21   well-known in the United States and Britain after World War II.

22   In England, they wanted to encourage people to show their

23   support for their country and put their money in the national

24   savings bank.  So they said, Put your money where your mouth

25   is.  Show by your actions that your words are true, that you

1    support the country.  And this phrase, of course, has become

2    well-known for that.

3            Mr. Hwang, as you'll hear from the evidence, most

4    certainly put his money where his mouth is.  He had well over

5    $30 billion of his own money invested in the companies we're

6    talking about.  And he didn't put that money in his pocket; he

7    let it ride in these investments.  And you're going to hear the

8    reason he did it is because he had the courage of his

9    convictions.  He believed in these companies, he believed in

10   these investments; and this is how he always invested long

11   before this.  He kept his positions long and he had believed in

12   what he did.  And that's what you're going to see in this case.

13           Members of the jury, my name is Barry Berke, with my

14   partners Dani James and Jordan Estes, we have the honor of

15   representing Bill Hwang.

16           I begin with that well-known expression:  put your

17   money where your mouth is.  Because you're going to see so much

18   of the evidence in this case, so much of what you're going to

19   see relates to this; the questions the evidence puts in there:

20   Why did Mr. Hwang leave all his money, over $30 billion —

21   really nearly 36 billion — in these companies?  How?  How did

22   Mr. Hwang lose all his money?  And how did he lose it in a

23   matter of days?

24           And why?  Why are we here?  Why are there allegations

25   if it was all his money to trade?

O5DVHWA2                          Opening - Mr. Berke

1              Well, members of the jury, again, you're going to see

2     that Mr. Hwang always invested in a concentrated small number

3     of companies; he took a lot of risk in his money when he was at

4     Archegos; and he could, and he did that again and again.

5              You're also going to see what Mr. Hwang did.  I submit

6     to you, the prosecution claimed this was all a house of cards.

7     That's their theory, it's a house of cards.  Well, as you see

8     the evidence, you'll ask yourself the evidence:  If it's a

9     house of cards, why didn't Mr. Hwang take out $10 billion?  Why

10    didn't he take out 500 or five billion?  Why didn't he take out

11    a billion, couple 100 million?  He didn't.  He didn't do that

12    at all.  The opposite of that.

13             And I submit to you, you will see from the evidence

14    that the reason of that is because he invested in these

15    companies because he believed in them.  And you're going to see

16    the evidence of that is overwhelming, overwhelming.  Although

17    Mr. Hwang and the defense doesn't have to prove anything, you

18    will have no doubt at the end of this case that Mr. Hwang

19    believed in these companies that he invested in, we'll show you

20    why, we'll show you his own words written at the time, and

21    that's why he wanted to invest.

22             And you'll also see, members of the jury, quite

23    clearly that Mr. Hwang made no misrepresentations to any bank

24    at all.  You'll see that the prosecution's own witnesses, they

25    can't say they were told by Mr. Hwang to make

O5DVHWA2                          Opening - Mr. Berke

1    misrepresentations to the bank; that when they did say things

2    that weren't true, that they ever told him; or that Mr. Hwang

3    himself made any misrepresentations.  And I submit to you and

4    ask you as you hear the evidence that the prosecution tries to

5    present suggesting Mr. Hwang was being untruthful, you ask

6    yourself the quality of that evidence.  And I submit to you,

7    you may conclude that's a tell as to how weak this case is.

8    Because you won't be persuaded by those arguments, I submit,

9    because they are not true and the government certainly can't

10   prove it for that reason.

11          Members of the jury, I submit to you when the trial is

12   over, you will see there's only one verdict to all these

13   charges, and that is not proven, not guilty.  And the evidence

14   of that is overwhelming, and the lack of evidence as well.

15          Let's begin talking about who we're talking about:

16   Archegos, right.  Archegos is known as a family office, which

17   is a term of art you'll hear a lot.  And that just means it's

18   Bill Hwang's money; he is investing his money.  And you're

19   going to hear a lot, what that did is it gave him a lot of

20   flexibility.  He had no outside investors.  So he could take as

21   much risk as he wanted to take in his investments.  He could

22   show his support for these companies as much as he wanted to by

23   investing in them.  And that's how he always invested.  And he

24   defied the skeptics who always thought long before this period,

25   that how could he invest in that company so much?  Why would he

1    do it?  And then turned out to be winners, winners, winners at

2    Archegos.  Not all of them.  There are also losers, because

3    that happens.  That's the market.  You win some, you lose some.

4    When we talk about that, you'll see the evidence of it.

5         Mr. Hwang, you'll hear that people at Archegos talked

6    about "he was a great investor."  He was known for being able

7    to value companies and see things that the marketplace didn't

8    see.  You'll hear evidence before this period of his investment

9    in Amazon; that when he saw these analysts outside who were

10   evaluating Amazon based on its profits, he thought that was the

11   wrong way to look at them; that they were putting so much money

12   into their technology and their business, that they were

13   building something that would be so easy for customers, that

14   this was going to be a great company.  So he invested heavily.

15   And that turned out to be a great investment for Archegos.

16        And again, as Mr. Hwang would often say, he viewed it

17   to be an art, not a science, what he did.  It wasn't the bean

18   counters looking at numbers; it was understanding the companies

19   out in the field of how people might like that company at that

20   specific time.  You'll hear even these investment banks that

21   were falling over themselves to get all the fees they got by

22   having Archegos as a client.  You'll hear how they talked about

23   Mr. Hwang as an investor.  You'll hear at Goldman Sachs, a

24   senior office who wanted to do business with Archegos, when

25   meeting him for the first time, they said, It's hard to believe

1    he didn't trade his first stock until he was 35.  You

2    definitely feel in the presence of greatness.  That was his

3    skill.

4            You're going to hear how even at Archegos people

5    talked about how Mr. Hwang would hold on to a position well

6    before this period, for longer than anybody else.  And they

7    said he traded in these companies like he was prepared to lose

8    it all.  And they said that was because it wouldn't affect his

9    lifestyle.  And they talked about how Mr. Hwang lived a modest

10   lifestyle.  He lived in the same house in Tenafly, New Jersey

11   with his family --

12            MS. ROTHMAN:  Objection, your Honor.

13            MR. BERKE:  Goes to his trading strategy.

14            THE COURT:  Just a minute.  Just a minute.

15            Overruled.

16            MR. BERKE:  And so they said he traded like he was

17   prepared to lose it all, because it wouldn't affect his

18   lifestyle.  He didn't live the life of a billionaire; he lived

19   a very, very modest life, with a few minor exceptions, that are

20   anything but the life of a millionaire.  Same house, same

21   everything.

22            You'll also hear how these same employees and others

23   talked about how he traded, like he was prepared to lose it all

24   because of where he came from.  You'll hear that he talked

25   about his trading strategy was impacted by the fact that he

1   came here from Korea as a teenager.  And promptly after that,

2   his father died and he had to support his family and put

3   himself through college --

4                MS. ROTHMAN:  Objection.

5                THE COURT:  You're going a little too far.

6                MR. BERKE:  Okay, Judge.  Thank you, your Honor.

7                THE COURT:  The focus, of course, is always on the

8   evidence of the trading and not the background of an

9   individual.

10               Go ahead, Mr. Berke.

11               MR. BERKE:  Thank you, Judge.

12               What you're going to hear, they talked about the risk

13  that he was prepared to take in his trading, and how all the

14  time before this period they thought he should sell, and he

15  wouldn't sell.  And you'll hear all sorts of lines, like he was

16  holding positions longer than anyone thought, and so often he

17  was proven right.  And he could take that risk again because it

18  was his own money.

19               And you'll hear he didn't trade any other monies other

20  than -- the only other monies that were traded was for

21  something called the Grace & Mercy Foundation.  And the people

22  at Archegos also traded that money.  But that foundation was

23  started by Mr. Hwang and his wife, Becky, with all their money;

24  and that money was part of the foundation.  It was controlled

25  and owned by the foundation, but that money was traded

O5DVHWA2                        Opening - Mr. Berke

1    separately, although by the same team, and also Mr. Hwang made

2    trading decisions about how --

3              THE COURT:  Mr. Berke, stick to the case please.

4              MR. BERKE:  Yes, your Honor.

5              Let's turn to the allegations.  And you heard Judge

6    Hellerstein say that's what they are, allegations.  And I would

7    submit to you they are a theory.  It's the prosecution's theory

8    about what happened here.  And I submit to you that theory is

9    wrong, it doesn't make any sense, and you will find that, let

10   alone whether they can prove it beyond a reasonable doubt.

11             And I may surprise you, but I'm going to agree with

12   one thing the prosecution said in this case, and that is that

13   something changed at Archegos in March of 2020 for certain.  It

14   is what changed for every business in America and across the

15   world.  And, of course, that is the worst pandemic that we've

16   all experienced for over 100 years.  And I'm sure we all

17   remember that -- I remember coming out of the subway in Times

18   Square on my way to work and seeing coronavirus for the first

19   time.  And then we all knew too well what it was.  And it had

20   tragic and horrible consequences for so many people.  That's

21   the worst pandemic for certain.

22             But it also had lesser, but also had impacts on

23   everybody in some way, and businesses.  Some businesses were

24   put out of business tragically, horribly.  Couldn't do it.

25   Other businesses could adapt.  Some of you may have

1    participated in more than your fair share of Zoom meetings,

2    Google meetings, all the things that happened with technology.

3         And you'll see that so much of what the prosecution

4    points to as being somehow a changed evidence of something

5    improper was, in fact, cause and a product of that horrible,

6    horrible pandemic that we all experienced.  And we can show it

7    through documents.  You don't have to take my word for it

8    because you can take Mr. Hwang's word.  Because he wrote to the

9    entire team right when it hit and told them how they were going

10   to -- they were going to still have the same investment

11   strategy they've always had, but they were going to pick

12   investments in a way because of the pandemic.

13        And some of you may remember — if not, you're going to

14   hear — that in addition to the horrific effect the pandemic had

15   on so many people, it also rocked the stock market.  And from

16   March of 2020, when the pandemic really hit here in the United

17   States, the market had fallen more than 35 percent from the

18   prior month.  So everybody, every investor, was impacted

19   significantly, as some of you may know.

20        And Mr. Hwang responded to it by sending an email to

21   his team.  And I'm going to show it to you on the screen.

22        Thank you, Mr. McLeod.  Can we blow up the first page.

23        You see this is Bill Hwang.  And you're going to hear

24   a lot and see these emails.  This is April 23rd.  So we're the

25   following month after the pandemic.  The effects of it are

1    really felt.  As you'll see, it's being sent to Archegos

2    Invest.  That's a lot of people at Archegos, traders and the

3    like.  You'll see analysts, outside people.  You'll also see

4    Grace & Mercy, because again, as I mentioned, that's the

5    foundation that was also involved in the trading, but

6    separately.

7            And the subject is:  Lessons relearned from common

8    stocks and uncommon profits book.

9            Let me first tell you what that is.  You're going to

10   hear a lot about this book.  This is the book, it's *Common*

11   *Stocks and Uncommon Profits*.  It's written by Philip Fisher,

12   who was a famous investment guru and who had a philosophy, and

13   Mr. Hwang agreed with much of what he said.  Not all of it, but

14   much of it, and would talk about it.

15           And one of the things that Dr. Fisher said, the late

16   Dr. Fisher, is he said, I don't want a lot of good investments,

17   I want a few outstanding ones.  In other words -- and that was

18   Mr. Hwang's philosophy; he always had a very concentrated

19   portfolio where he put all his money in a few stocks that he

20   really believed in.  And that was a secret to his success in a

21   lot of ways.

22           You'll also hear about this book because it will come

23   up quite a bit at this trial.  Here it is.  It will be in

24   evidence.  But Mr. Hwang also would have things called "Just

25   Show Up Book Clubs," something he started.  He would have it

O5DVHWA2                          Opening - Mr. Berke

1    outside Archegos and inside Archegos.  He had this idea that

2    people didn't go to book clubs and they didn't read enough

3    because it was too much pressure, because they had to read

4    before they got to the book clubs.

5           So as you'll hear, he started something called Just

6    Show Up Book Clubs, where you do all the reading at the club,

7    so no one has to do anything other than show up.  And they did

8    a lot of books.

9           And one of the books that was often at Archegos, the

10   subject of the Just Show Up Book Club, was Dr. Fisher's book.

11   So when Mr. Hwang sends this email, as you'll hear, the team

12   knew who Dr. Fisher was and knew why he says rewrite it.

13          Let's go back to the email.

14          So what Mr. Hwang says:  Here are a few key lessons

15   from some part of the book that I reread last few days.  I am

16   applying these key lessons to our portfolio now.  Okay.  So

17   these are the changes he's talking about.  He goes on to say:

18   As a reminder, this book is the best book in long-term stock

19   investing, in my view.  And then he says:  When there is some

20   sort of big market moving event, I find it very helpful.  And

21   as I mentioned, of course, the pandemic had a horrible impact

22   on so many things, but it also impacted the stock market.

23          Mr. Hwang then goes on:  Perhaps the biggest

24   relearning for me — because obviously he knew this book — he

25   said, Don't be afraid of buying on a war scare, quoting Dr.

1    Fisher.  He then says, he goes on:  COVID-19 is like a war that
2    we know we're going to win.  He said:  The only difference is
3    that in major wars, the outcome is not certain; but in this
4    situation, the winning outcome is almost certain, God willing,
5    of course, so that we can imagine and focus on the
6    reconstruction reopening of the economy.

7            In other words, Mr. Hwang believed even in April there
8    would be a vaccine and we would get over this, and drew
9    analogies between how Dr. Fisher said you should invest in a
10   war that could impact the economy and the market in ways, and
11   you'll hear more about this.  But one of the things he said is
12   cash during these times becomes less valuable and stocks become
13   much more valuable.

14           And you will hear that the team who received this,
15   they liked what they heard.  And you'll see analysis about what
16   he was saying, that don't hold cash; put as much of it as you
17   can in the market, as Dr. Fisher instructed about war with
18   Mr. Hwang, so an analogy.

19           He then says -- he signed off, he says:  Happy
20   learning, doing, and sharing.  And again, you'll see
21   expressions like this:  learning, doing, and teaching is
22   something Mr. Hwang would often say, or sharing.  Trying to
23   figure it out and learn from it.  So that is the instruction,
24   right.  That is the idea.

25           And Mr. Hwang, it was his money, and he certainly

1    decided stocks, had input from others, but he decided the

2    stocks.  So he said, I want to pick stocks that I think are

3    going to do well during COVID-19 and after, and I'm going to

4    look at that.  And that's exactly what he did.

5         So let's look at the stock that you heard from Judge

6    Hellerstein at the beginning, you're going to hear a lot about

7    and learn a lot about; some of them, of course, may be very

8    familiar as well.

9         The evidence will show that Mr. Hwang really believed

10   in these investments, and that's critical in this case.

11   Because if Mr. Hwang is investing in these investments because

12   he believed, that goes directly to the manipulation theory as

13   you'll hear, and it's a defense to manipulation.

14        So let me show you what I'm talking about.

15        The first group of companies were companies that

16   Mr. Hwang felt would do really well in COVID and thereafter:

17   streaming and entertainment.  And you all -- I probably even

18   don't have to say this.  We all remember during COVID we were

19   home.  Couldn't go to movies; couldn't go out anywhere.  So

20   streaming companies were of great interest.  They became

21   very -- people were home, they became very popular.

22        Mr. Hwang looked at two, Viacom in particular and

23   Discovery.  Now, for Viacom, it was right before the pandemic

24   hit, Viacom merged with CBS, so it was Viacom CBS, which

25   brought a lot of content and also a lot of technology to the

O5DVHWA2                    Opening - Mr. Berke

1    company.  They also just prior to the pandemic, they bought a

2    large movie company that had a lot of famous movies that you

3    guys would, I think, know very well.

4           And then during the pandemic this period, they

5    launched their -- they launched their streaming service,

6    Paramount Plus, as some of you may be familiar with.  So they

7    were doing a lot of things.  And their stock was very low as

8    well at this time, as you'll hear about, because people thought

9    they would be impacted so much by COVID.

10          And Mr. Hwang also believed that content is king.  You

11   will see him saying that all the time in a lot of contexts;

12   that people, customers, like good content, and that's great for

13   companies.

14          Now, I will tell you there was a little bit of dispute

15   among the team about which shows to highlight.  And I know all

16   of you have different interests in TV:  reality shows and the

17   like.  So I took from my son's desk index cards --

18          MS. ROTHMAN:  Objection, your Honor.

19          THE COURT:  Not yet.  Maybe next sentence.

20          MR. BERKE:  Thank you, Judge.

21          To make sure I got the right ones, we thought you

22   might -- some of you might recognize.

23          So Mr. Hwang himself — and you'll see this in

24   documents — he loves *Star Trek*.  And Viacom CBS controlled the

25   whole *Star Trek* franchise.  We've seen that; I have an endless

1   number of movies in shelves.  Thought that was very kind, as an

2   example.  *Mission:  Impossible* franchise, they owned that.  He

3   thought that was very valuable.  They had channels, all sorts,

4   like the Comedy Channel, Nickelodeon, TV Land.  They had

5   popular shows like *Yellowstone, The Daily Show, NCIS*.  For

6   those with kids, you might hate this, but it's very popular,

7   *SpongeBob Square Pants*, as well as sports, including the

8   Superbowl and the NCA tournament.

9         And the sports is important because, if you remember,

10  one of the early impacts of the pandemic is they canceled a lot

11  of sports.  So, for example, the NCA basketball tournament was

12  canceled.  And CBS stock went even lower because they lost a

13  lot of advertising revenue through the impact of the company.

14  You'll hear about that.

15        For Discovery, you'll hear about their own streaming

16  and what they did, and they have their own shows:  The

17  Discovery Channel, Animal Planet, Food Network, Travel Channel,

18  the Oprah Winfrey Network*.  And they had shows*, like this is

19  one that's a hard choice*:  Shark Week*, *Myth Busters, Say Yes to

20  the Dress*, and a lot of other reality shows that were very

21  popular, especially during COVID, before and beyond.

22        So Mr. Hwang liked that.  And you'll hear that this

23  wasn't just new for Mr. Hwang.  One of Mr. Hwang's best

24  investments ever, as you'll hear about, was Netflix.  He was an

25  early, early investor in Netflix; he saw its potential before

O5DVHWA2                          Opening - Mr. Berke

1    others, and made billions of dollars of profits in his own

2    money.  And he saw Viacom and Discovery like the next Netflix.

3    They were low, but they had the potential.  And you'll hear and

4    see that was a strategy that he had.

5         The next companies you're going to hear about are

6    Chinese companies trading on U.S. stock exchange.  They were

7    all referred to as ADRs, American Depository Receipts.  And

8    just to tell you about this, so prior to this time, a lot of

9    investors were interested in trading in Chinese companies.  So

10   the U.S. stock exchanges allow Chinese and other foreign

11   companies to trade on the New York Stock Exchange.  You can

12   actually trade them on the New York Stock Exchange through

13   something called ADRs.

14        And you'll hear that there was a lot of -- during this

15   time, a lot of interest in these companies because, again,

16   during that time, China's population was close to 1.5 billion

17   people or customers, because compared to the U.S., which is

18   around 330 million at the time, so they had a customer base

19   that was almost five times the U.S.  And some of their

20   industries and the like were not as developed as the U.S.  So

21   there was great interest in these stocks, not just by Mr. Hwang

22   and Archegos, but by a lot of other investors that you'll hear

23   about.

24        Now, these stocks, one you're going to hear a lot

25   about is GSX.  GSX was important because it was viewed by

1    Mr. Hwang and others at Archegos as the best online educator in

2    China.  And, of course, during COVID, for those of you who had

3    children at home or for those of you who may have been in

4    school, you know, I don't need to say a lot about Zoom

5    learning, that was it.  And you'll see that their analysis show

6    that in China, wealthy Chinese citizens spent over 30 percent

7    of their income, disposable income, on education.  So they

8    thought this would be a great investment, GSX.

9           You'll see another one was BIDU, that's a big company.

10   And one way of thinking of it, they referred to it as the

11   Google of China.  It's a big search engine again, something

12   that was thought to be very popular or would be during

13   streaming and beyond.

14          The next was IQ, which, again, Netflix of China;

15   movies, TV, and the like.  And then TME, which is the Spotify

16   of China.  I don't want to offend anyone.  It could also be the

17   Pandora of China, if that's your preference, but that's it.

18   Your music.  And then VIPS, which was the TJ Maxx of China,

19   discount clothing, but at home.  So again, thought during

20   COVID, at-home shopping for discount clothes would be popular.

21   And those were, sort of, a significant part of the portfolio as

22   well, these ADRs.

23          And I will tell you, you heard something -- a little

24   bit about something called short selling, or you may have.  And

25   some of you may know a lot about short selling.  And short

1   selling, in and of itself, is perfectly fine.  Short selling a

2   stock is just expressing the belief that the stock is

3   overvalued.  So it gives you a way to invest that you think its

4   overvalue will come down.  And it's called short selling.  It's

5   highly appropriate.  It's all over Wall Street.  Mr. Hwang

6   sometimes short -- nothing wrong with short selling, as you'll

7   hear.

8           But you will also hear that there was a segment of

9   short sellers who was believed to do something that is not

10  allowed, and that is to put out false and misleading

11  information about companies in order to drive their price down

12  so they would make more money, because that's what the short

13  selling is a bet that it will go down.  And you'll hear that

14  for a bunch of these Chinese ADR, GSX, BIDU, and others, there

15  were short sellers who were putting out all sorts of false --

16  all sorts of information that was negative --

17          MS. ROTHMAN:  Objection, your Honor.

18          THE COURT:  I can't tell the relevance of this yet, so

19  I'm going to deny the objection.

20          MR. BERKE:  Thank you, Judge.

21          All sorts of information --

22          THE COURT:  The point is that the short selling itself

23  lent an opportunity to invest, all right.  So let's get to the

24  point.

25          MR. BERKE:  And they were putting out this

1    information, was very negative about these companies.  And

2    you'll see that Mr. Hwang and Archegos believed that

3    information was false; believed it was false and misleading.

4    And you'll see documents that show it.  So they thought the

5    prices of these companies was pushed artificially down by these

6    false reports that they didn't believe.  They believed in these

7    companies, supported these companies, and they invested heavily

8    when they thought the price was below the value.  And you'll

9    see a lot of evidence about that.  And these companies were --

10   like Mr. Hwang and Archegos was an early investor of Alibaba.

11   Some of way may know that was the Amazon of China.

12            THE COURT:  But that's not one of the stocks at issue.

13            MR. BERKE:  Not one of the stocks.

14            And he had a lot of success, made billions in those

15   investments, well before this period.

16            THE COURT:  It's not an issue.  It's not an issue.

17            MR. BERKE:  Thank you, Judge.

18            You'll also hear another company Farfetch, it was a

19   retail platform, European, that sold at-home luxury shopping

20   again.

21            THE COURT:  Mr. Berke, I don't want to interrupt, but

22   I am.  I think you're going far afield.  This is an opening

23   statement.  You want to give the structure.  And it's not a

24   closing statement.  So let's try to stick to it as an opening

25   statement.

1           MR. BERKE:  Understood, your Honor.

2           You'll see evidence about this.  You'll also see

3    evidence how Mr. Hwang would compare stocks to the purchase of

4    clothing.  And he would say a stock can be like going to a

5    Woodbury Commons, as he would say to his team, as you'll hear

6    about.  And when you see a jacket you might like that you think

7    is usually valued in retail for 1,000, but you could buy it for

8    300, that's a good buy.  But you also might think it's a good

9    buy at 600, because that's below the value.  And he drew these

10   comparisons to explain how buying these luxury items at a

11   discount is how he viewed stocks too.

12          You'll hear about other companies, that they were

13   long, but you'll hear less of them.

14          The other one is he did have a big short position that

15   you'll hear about, FUTU.  FUTU was the Robinhood or E*TRADE of

16   China.  And you'll hear that Mr. Hwang had a negative view of

17   FUTU because he thought the Chinese government would stop

18   online investing in stocks, so he took a short position.

19          And you're also going to hear and see in FUTU, which

20   is one of the stocks here, that Mr. Hwang's conviction was the

21   same for those companies that he felt were overpriced as for

22   underpriced.  And he continued to invest in FUTU even as he was

23   proven wrong, the stock had gone up, and Mr. Hwang lost close

24   $5 billion in FUTU.  But he still believed it was overvalued

25   and held his position even as he lost billions and billions.

O5DVHWA2                    Opening - Mr. Berke

1    That's how Mr. Hwang invested.  You'll hear he did the same

2    thing with Tesla, which he didn't believe in, and lost billions

3    on that too.

4           So it's not the situation where there's manipulation

5    so he's a winner.  He traded in the same way for the winners

6    and the losers.  He held his position for a long time and had a

7    lot of conviction and didn't believe it if he had a different

8    valuation of the company than was shown in the market.  That's

9    how he always traded.  He traded liked he was prepared to lose

10   it all, as his team often said, and that's how he traded.

11          So let me show you something else the evidence is

12   going to show.  It's going to show that Archegos was just

13   trading in connection with these investments.  There will be

14   evidence throughout this trial about various ways of trading.

15   And you're going to hear and find out there are common,

16   ordinary ways of trading that sophisticated big investors —

17   those investing other people's money or their own, there's

18   Warren Buffett or Bill Hwang — often traded in that are

19   entirely appropriate, and that Mr. Hwang did well before this

20   period.  That's how he traded.

21          Let me go through some examples.

22          A concentrated portfolio, I can be quick, we talked

23   about that.  He always made big investments in a few companies

24   at Archegos.  That's how he traded at Archegos, that's how he

25   did it.

1             Two.  Holding investments for an extended period of

2    time, I've said enough.  At Archegos, Mr. Hwang always held his

3    positions.  You'll see his people said, Can't we sell and take

4    our profits?  He held the positions if he believed in the

5    companies.  And again, I come back to you, the fact that he did

6    it here makes no sense, I would submit to you, as you see the

7    evidence, if he believed it was a house of cards can fall down

8    any minute.

9             Three.  Trading in total return swaps.  You're going

10   to hear evidence that the swap business, as it's called, is a

11   multi-trillion -- was at the time a multi-trillion-dollar

12   business that sophisticated investors of all types traded in

13   swaps; that these big banks had swap desks just in swaps.  It's

14   just a contract with the bank about the up and down of the

15   stocks.

16            For most of these, Mr. Hwang has a contract where the

17   value goes up with the stock.  The banks are on the other side.

18   They can hedge that investment initially by buying the stock,

19   they can sell that stock, they can do whatever they want.  They

20   can hedge it by having a swap on the other side with a

21   different investor.  They are as common as can be.

22            And the Securities and Exchange Commission, as you'll

23   hear, determined that swap positions don't need to be

24   disclosed.  You're going to hear a lot that there's a

25   regulation that if you own shares of a company and you acquire

more than five percent of those shares, you have to disclose

it. Because with those shares comes voting rights. So if you

can vote more than five percent, the determination was made

that should be made public, because you can affect the course

of the company.

Same measure the Securities and Exchange Commission

said for swaps. No matter how big that investment may be, you

don't have to disclose it because you don't have any voting

rights; so you can't impact -- that's just an investment. You

can't impact the company.

So Mr. Hwang, one advantage for big investors like

Mr. Hwang, was they wouldn't have to disclose their positions.

And you'll see why that's so important during this very period.

Because what it is to make sure that other players in the

market, including big sophisticated banks and the like, that

they can't front run his position, meaning known that he really

liked the stock and was going to invest in it, try to trade

ahead of it, it also means that people couldn't try to

undermine his position.

And you're going to see that Mr. Hwang was very smart,

and smarter than some other investors during this period. And

the evidence will show, because during COVID — some of you may

remember, may have experienced yourself — there were a lot of

new investors who were sitting at home looking at the screen,

and they were investing in a lot of different stocks. There

O5DVHWA2                    Opening - Mr. Berke

1   are also stocks that became known as meme stocks, like

2   GameStop.  And that got rivet up.  And you'll hear, there's a

3   lot of talk at Archegos about one investor who wasn't as

4   careful as Mr. Hwang, his positions became known.  And he was

5   driven out of business when people traded in a way that was

6   publicly reported that was against his position.  It was such a

7   big deal, there was a recent movie about it, that to highlight

8   it.  And you're going to hear that the team at Archegos talked

9   a lot about that and the value, and being a big investor in a

10  few companies to make sure people can't undermine your

11  position.

12          The next thing you're going to see is relying on

13  numerous counterparty investment banks for swaps and leverage.

14  You're going to see, yes, Mr. Hwang did want to work with a lot

15  of investment banks — better, again, to have different banks —

16  but also these banks wanted to do business with Mr. Hwang.

17  They made enormous fees.  They were prepared to leverage, loan

18  him money.  Each bank knew the positions he had with that bank.

19  He traded with them as he traded.  And you're going to see not

20  one of these banks said, We're not trading the way you're

21  trading.  We're not comfortable that you're trading in a

22  certain way.  They put the trades in, and they didn't say

23  anything to Mr. Hwang about the trading they did at -- that

24  were Archegos, at that bank.

25          The next thing you're going to hear is aggressive and

1    opportunistic investing.  Mr. Hwang traded when he saw there

2    was an opportunity to buy stock.  So, for example, the

3    prosecutor said -- excuse me.  So, for example, you'll see

4    claims that are made at trial about Mr. Hwang trading at the

5    close.  You're going to see that's just trading.  The greatest

6    volume that there is on any given day is typically at the

7    close.  You'll hear about institutional investors like Fidelity

8    and the like do most of their trading at the close.  There's

9    nothing wrong with that.

10           You'll also hear that premarket trading is common if

11   you think there's opportunities for stocks, particularly those

12   that have markets elsewhere.  You'll hear that these banks,

13   they offered ways of trading algorithms that allow for

14   premarket trading; that allow for trading at the close; that

15   allowed for all this trading.  It's just trading.  And the

16   prosecution points to it in their opening as something that is

17   unusual.  You'll see by the evidence that, in fact, that's how

18   Mr. -- that that trading was perfectly appropriate often by the

19   banks and by sophisticated investors.

20           Now, I will say, one thing changed during COVID, and

21   it changed because of COVID.  Mr. Hwang and his team traded a

22   lot more.  They did, without question.  And you're going to see

23   there are a couple of reasons:

24           One, the pandemic brought a ton of volatility to the

25   mark, certainly at the beginning.  Because some companies were

affected differently, and there was expectations the market
price went up and down.  Viacom, for example, when they
canceled sports, down.  So there was a lot of different changes
and a lot of different decisions that could be made about
what's the value.  And Mr. Hwang can do that.

         And again, there were times when it was less volatile.
But if you remember, during COVID, there were some stops and
starts.  There were times when people thought of the COVID
rates were going down, the market is coming back -- I mean the
economy is coming back, and the market would go up.  And it was
like, Nope, the rates are back up.  And oftentimes the market
would go back down because of uncertainty.  So there was a ton
of volatility.  So for a trader like Mr. Hwang, who had his own
views about how to price and value these stocks different from
the market price, the more changes, the more opportunities to
see if he agrees or disagrees.  And again, you will see there's
no question, Mr. Hwang had the courage of his conviction.  And
if he thought something was mispriced, he wanted to invest, he
wanted to invest right there.  That's how he did it.

         And you'll also see something real.  During the prior
period, you'll hear that Mr. Hwang wasn't spending his time
looking at the trading screens.  He was traveling a lot for
Archegos business, he was traveling a lot for Grace & Mercy
business, and he wasn't there.  During COVID -- now, Mr. Hwang
was one of the lucky few.  He had a corporate apartment that he

1    was able to work at.  Very lucky.  He had a nice corporate

2    apartment.  He came in every day from his home, and he had two

3    other employees there, and he had his own Zoom hookup with the

4    traders who were doing the trading.  And again, a lot of this

5    happened with other investors, but Mr. Hwang was sitting there,

6    he was able to look at the screen and look at the prices of the

7    stocks, see how they moved, and watched it because he had

8    nothing else to do.  Some people were baking bread.  He was

9    watching the stocks.

10              MS. ROTHMAN:  Objection.

11              THE COURT:  Mr. Berke, let's wind it up.

12              MR. BERKE:  I will, Judge.  Yup.

13              And you'll see, he traded a lot.  But, again, you will

14    see by the evidence that all of those trades, as he said it,

15    were trades that he believed in.  He said in his words, he

16    talked about how they were cheap, he talked about why he

17    thought the market had it wrong or overreacting, underreacting.

18    And he put his money where his mouth is, because he put his

19    money in and didn't take it out.

20              Archegos experienced a black swan event.  So I said

21    you'll see the evidence.  The question is how did he lose it

22    all?  Let me tell you -- preview for you what you'll see the

23    evidence to be.

24              So first, this is in March of 2025.  So on Monday,

25    March 22nd, in the morning, Archegos had over $35 billion of

O5DVHWA2                         Opening - Mr. Berke

1    capital.  That's net capital.  So that is what it's worth,

2    that's Mr. Hwang's money, his own money, and he has $35 billion

3    in net capital.

4              At the end of the trading day, so when trading is

5    over, Viacom, remember, his largest position, they announce

6    something called a secondary offer.  And for them, this is a

7    way of raising more money to build out Paramount and all the

8    rest.  But it also can dilute the shares that are out there.

9    And the market reacted very negatively to this news the next

10   day.  And you'll see Viacom went down.  And Discovery, which --

11   because it's in the same space, often trades at times up and

12   down with Viacom, it goes down too.  And again, this is, as you

13   remember, a significant portion of the small number of

14   companies.

15             But let me just say — thank you, Mr. McLeod.  One

16   second.  Let me just say, he began the day with 36.27 billion,

17   the most he ever had.  Now, if we go to Wednesday a.m., even

18   though there was this bad news, Mr. Hwang still has over $32

19   billion of capital.  That's his money.  He still has plenty.

20             And this is important during this time period.  I

21   don't want to get into it, because the prosecution argued in

22   opening statement, you'll see evidence that he made a big trade

23   in Viacom.  And you'll hear he did when he had plenty of

24   capital.  And he made this trade because he believed the market

25   was overreacting; that he liked Paramount Plus, the streaming.

O5DVHWA2                    Opening - Mr. Berke

1    And he thought the offering would bring in more capital, so

2    they'd get it out more quickly and compete with Netflix.  And

3    it would be like his investment.  He thought the market was

4    overreacting, and they figured out -- so he wanted to invest as

5    much as he could to show that.  Because the price really came

6    down, and he thought it came down too far.

7          And you'll also see all the events having nothing to

8    do with Mr. Hwang that caused Viacom to go low.  And all the

9    people, reason why they liked it, having nothing to do with

10   Mr. Hwang, you'll have no doubt, of that you will see

11   overwhelming evidence that shows without question — you'll hear

12   it, you'll see it — that the price was going up and a lot of

13   people thought it was correctly guided, having nothing to do

14   with Mr. Hwang's trading.

15         So then, on March 24th, the morning, there was more

16   negative news.  First on the Viacom offering, they priced the

17   offering, how much they'd sell shares for people who wanted to

18   participate.  It was below the then-current trading which the

19   market reacted by saying that should be the value.  The stock

20   price went down further.

21         But — and this is the part that gets unusual —

22   something happened that was totally and completely unrelated to

23   Viacom or Discovery.  You'll see that the Securities and

24   Exchange Commission announced new regulations on Chinese ADRs;

25   again, an event that has nothing to do with Viacom, nothing to

 1    do with Discovery, completely unrelated.  And you'll remember

 2    Mr. Hwang had these big positions those ADRs.  And you'll see

 3    after that announcement, so the Viacom announcement came before

 4    the market opened, and then that morning, somewhere maybe

 5    around 10:30, the new SEC argument announcement comes out,

 6    every ADR went down a lot.  GSX, TME, VIPS, IQ, BIDU.  These

 7    are separate complete statements on his concentrated portfolio

 8    went down a lot.

 9              But that's not all.  Because you'll hear that what

10    Archegos had -- because sometimes the market can go down,

11    especially we were seeing during the pandemic.  He had

12    something in place called hedges, which are protections, as

13    you'll hear about, or insurance policies.  And what they would

14    do is they would say that if the market goes down a lot, they

15    are essentially short positions, and they could be in indexes

16    or other things.  But it says if the market goes down a lot —

17    so you're going to lose a lot of value in your holdings —

18    you'll make money on your hedges, your short positions, so that

19    will protect you.

20              And you'll hear the bank and the counterparty banks

21    also were very interested that Archegos had these protections

22    in place.  And Archegos on this day, March 24th, had nearly $50

23    billion in short hedges to protect that if the market went

24    down.

25              So the third thing that happened that was so rare and

1    unusual is that while much of Mr. Hwang's portfolio went down

2    dramatically, the market as a whole did not.  The market as a

3    whole went down just a tiny bit.  And it did not trigger his

4    insurance policy, his protections, his hedges.  So what he had

5    in place to account for bad news — because he had big

6    positions, and they were in a few number of companies — didn't

7    work.  That's why we call it, if we can, black swan event.  And

8    I will show you that, a black swan.

9            Now, you'll hear people called it a black swan.  A

10   black swan could also be called a perfect storm.  But black

11   swans was a phrase that you heard people at the time say

12   because a black swan is supposed to be very rare.  White swans

13   are very common.

14           THE COURT:  The case is not about swans.

15           MR. BERKE:  It's not, Judge?  Okay.

16           So you get the point.  And that, I would submit to

17   you, you will see the evidence shows what happened and why

18   Mr. Hwang, despite having these investments, despite having his

19   belief in these investments, he lost that.

20           So you might say, What else?  So I will tell you what

21   else.

22           You're going to hear what happened to the head trader

23   at Archegos, William Tomita.  William Tomita had a visit from

24   the FBI, as did Scott Becker, the head of risk, at different

25   times.  And they were told, We have evidence that you answered

O5DVHWA2                        Opening - Mr. Berke

1    questions and made false statements to some counterparty banks

2    that were untrue.  They learned that they could be prosecuted.

3    They could face jail sentences of, you know, many, many years,

4    spending the rest of their life in jail -- not the rest of

5    their life, but the best years of their life in jail, excuse

6    me.  And but they could maybe avoid all of that if they made a

7    deal.

8            MS. ROTHMAN:  Objection, your Honor.

9            THE COURT:  Overruled.

10           MR. BERKE:  And you'll hear that Mr. Tomita, the

11   trader, was prepared to come in and make a deal and say he did

12   make misrepresentations.  And you'll hear that Mr. Tomita will

13   not say on the stand and did not say that he -- that there was

14   ever any evidence that Mr. Hwang told him to make those

15   misrepresentations or that he told Mr. Hwang.

16           And so you'll hear Mr. Tomita say that the only way

17   you can get a deal is if he, himself, said the theory — a

18   theory — that Mr. Hwang was manipulating the stocks was true,

19   and then he could get a deal.

20           Now, you're not going to be surprised that Tomita said

21   that, as you'll hear the evidence.  Lock, stock, and barrel,

22   that's what he said.  And you'll hear that Mr. Tomita now

23   expects to not spend a day in jail.

24           MS. ROTHMAN:  Objection, your Honor.

25           THE COURT:  Sustained.

O5DVHWA2                        Opening - Mr. Berke

1          MR. BERKE:  But you will see from the evidence that

2    there could be no question that at the time we're talking

3    about, this COVID period, March '20 through March 2021,

4    Mr. Tomita did not believe he was doing anything improper in

5    his trading, did not believe he was manipulating the market,

6    his own words and actions at the time.  So that he knew

7    Mr. Hwang believed in these stocks; he knew that he was holding

8    his positions; he knew he was doing exactly what he always did,

9    and did it successfully.  And you'll see that Mr. Tomita, what

10   he is saying now, is not true; and you will have no doubt

11   because you'll see it in his own words and actions and common

12   sense, I submit to you.

13          Now, at the end of this trial, the judge will tell you

14   what the law is and neither the lawyers can say anything about

15   the law.  But you will see overwhelming evidence that Mr. Hwang

16   made each of these investments, how he made them, when he made

17   them, because he believed in these stocks, he thought they were

18   misvalued, and he made those investments at that time.

19          Now, let me tell you something else you'll hear about

20   some other evidence in the case.  You're going to hear -- you

21   know, the prosecution said in their opening that this was a

22   racketeering enterprise.  You're going to see evidence that

23   shows anything but, I submit to you.  You're going to hear from

24   people like Andy Mills, who was the co -- you'll hear all about

25   Andy Mills, who was the co-CEO of Archegos.  He was someone who

1    was a business leader, he was a Harvard Business School

2    graduate, he was a popular speaker, and he was co-CEO.  And

3    you'll hear people talk a lot about him.

4           You'll hear about other professionals at Archegos.

5    You'll hear about outside professionals, none of them were

6    alleged in the part of the racketeering enterprise.  And you'll

7    see for yourself when you see the evidence.

8           You'll hear from some other witnesses, and you may ask

9    yourself, I submit, Why are they here?  Why you'll see some

10   witnesses were upset because of the dislocation that COVID

11   caused.  Even some analysts who felt like, We're stuck in our

12   homes.  Bill Hwang isn't listening to us as much.

13           THE COURT:  Mr. Berke, please move ahead.

14           MR. BERKE:  I will, Judge.

15           THE COURT:  And wrap it up.

16           MR. BERKE:  I will, Judge.

17           What you'll hear is that the target prices that

18   Mr. Hwang had that, you know, those were his views, and that's

19   how he invested.  And while the analysts could have their say,

20   they didn't get their way.  Mr. Hwang had the final decision.

21           You'll also hear some witnesses who were upset that

22   their deferred bonuses were lost when the firm collapsed.

23           You'll also hear witnesses testify to try to support a

24   theory that makes sense of what was going on here.  And I heard

25   the prosecution describe it as Mr. Hwang was trying to get more

O5DVHWA2                    Opening - Mr. Berke

1    capacity to buy more stocks that he also would not sell.  And I

2    submit to you, you may ask yourself when you hear this, is that

3    like a pie eating contest where the prize is more pie.

4         Now, you heard the prosecution mention experts.  And

5    they will call experts who will present some analysis they did

6    to show that at times when Mr. Hwang bought a lot of the stock,

7    the prices had gone up briefly.  And again, I submit to you, as

8    you'll hear, the stock market is a marketplace.  If there's a

9    large buyer of stock, there has to be a seller, and it could

10   affect the price of the stock.  And you'll see that the banks

11   themselves offered ways of trading algorithms that reflect that

12   some big traders sometimes want the stock now because they

13   think it's the right price, even if it may cause the price to

14   go up; and other traders are prepared to be patient and wait,

15   even if that might mean they can never buy the stock because

16   the stock will keep going up.  That's a way of trading.

17        You'll hear from the defense experts who are going to

18   show all the things that cause the stock prices to go up from

19   other buyers who are interested because of the quality of these

20   companies and their own theories.  They're going to show,

21   you'll hear, how what the prosecution's experts are trying to

22   do doesn't make sense, and that the actual facts support the

23   defense.

24        Members of the jury, I submit to you that at the end

25   of this case, you will have no doubt that the evidence shows

O5DVHWA2                    Opening - Mr. Berke

1    Mr. Hwang had the courage of his convictions; that he put his

2    money where his mouth is because he didn't think this was a

3    house of cards.  He believed he had good investments.  And as

4    it always worked for him at Archegos in the past that it would

5    be a good investment that would be profitable.  And if it

6    wasn't, that was the risk he was prepared to take with his own

7    money.

8            I also submit you will see that the evidence and lack

9    of evidence will absolutely show you Mr. Hwang did not make any

10   misrepresentations to anyone or direct anyone else to do, as

11   you will see.  But, as the judge said at the beginning of the

12   case, we, the defense, obviously don't have to prove anything.

13   It's the prosecution who has the burden, and they have to prove

14   every element of the charge beyond a reasonable doubt.

15           And Mr. Hwang himself, as you also heard Judge

16   Hellerstein say, is presumed innocent.  Now, I appreciate

17   presumption of innocence.  That's not a concept we use in our

18   everyday life.  And all of you may have come in here on

19   Thursday, when you came into the courthouse and saw Mr. Hwang

20   and said, What's that about?  Ask questions.  That's human

21   nature.

22           But the great thing about our criminal justice system

23   is the prosecution can have their theory that they have to

24   prove beyond a reasonable doubt, and Mr. Hwang is presumed

25   innocent.  So we begin with a clean slate.  And you can

1    consider nothing I said -- and I didn't say anything that's

2    evidence; prosecution didn't say anything that's evidence.  The

3    evidence is it up there, and then you'll consider Judge

4    Hellerstein's direction on the law.  And throughout this whole

5    trial, Mr. Hwang is presumed innocent.  And that presumption

6    lasts through the whole trial, into deliberations.  It is only

7    overcome if you determine that the prosecution has proved every

8    element of the charge beyond a reasonable doubt.

9            And I submit to you, members of the jury, when this

10    case is over and you see the evidence and the lack of evidence,

11    you will have no doubt that the only just and fair verdict in

12    this case is to find Mr. Hwang not guilty of every charge

13    against him.  Thank you.

14            THE COURT:  Thank you, Mr. Berke.

15            Ms. Mulligan.

16            MS. MULLIGAN:  Good morning.

17            You've heard a lot about Bill Hwang today.  You've

18    heard that Bill Hwang was the founder and portfolio manager of

19    Archegos.  You've heard that Bill Hwang is a maverick investor.

20    Bill Hwang has made billions and he has lost billions.  Bill

21    Hwang is a risk taker.  He's an eccentric genius.

22            My client, our client, is Patrick Halligan.  Patrick

23    Halligan is none of those things.  Patrick Halligan is an

24    accountant who lives with his family on Long Island and who

25    takes the train into the city every day to work.  He is a bean

O5DVHWA2                    Opening - Ms. Mulligan

1    counter.  Patrick Halligan is not an investor.  He is not a

2    risk taker.  The prosecutor would have you believe that Bill

3    Hwang and Patrick Halligan were like this.  They were not.

4    They were worlds apart.

5        I'm going to tell you a little bit about Mr. Hwang's

6    role at Archegos.  Mr. Hwang made all of the investment

7    decisions at Archegos and, as Mr. Berke pointed out, there was

8    a very good reason for that:  It was his money.  Bill Hwang had

9    a team of traders.  He had a team of analysts.  And I expect

10   that you'll learn during the trial that Bill Hwang invested in

11   the companies that he liked and he knew very well.  And Bill

12   Hwang had an advantage especially with Chinese companies.  You

13   will learn that he had Chinese analysts and he knew those

14   companies nearly better than anyone.

15       Now, you'll also learn at Archegos that there was a

16   compliance department; and there were two experienced

17   compliance professionals in that department.  The evidence will

18   show that Patrick Halligan understood the role of the

19   compliance department at Archegos.  You will learn that Patrick

20   Halligan believes that the compliance department was reviewing

21   the trades.  Patrick Halligan had every reason to believe that

22   the compliance people were doing their jobs.

23       You'll also learn, as Mr. Berke pointed out, that Andy

24   Mills was the CEO of Archegos.  Andy Mills was Patrick

25   Halligan's boss.  The evidence will show that Andy Mills

1    regularly communicated with the top executives of the banks.

2                  Now, I'd like to take a few minutes and talk about

3    Patrick Halligan's role at Archegos.

4                  The evidence will show that Patrick Halligan is not a

5    trader.  He did not set up the swaps that Archegos entered into

6    with the counterparties.  He did not negotiate the swaps.  The

7    evidence will show that Patrick Halligan had a back-office job.

8    He wasn't out front making the money or losing the money.  He

9    was at the back end dealing with the results of the trades.

10                 The evidence will show that he was an accountant.  He

11   was the head bean counter.  He didn't invest the money; he

12   followed the money.

13                 Now, like many taxes -- like many accountants, Patrick

14   Halligan spent his time and energy figuring out Archegos's very

15   complicated tax situation.  And that's because buying and

16   selling anything means gains and losses.  And the tax

17   consequences at Archegos was in a very important part of

18   Patrick Halligan's job.

19                 (Continued on next page)

20

21

22

23

24

25

O5D6HWA1                    Opening - Mulligan

1          MS. MULLIGAN:  You will also learn that Mr. Halligan

2    called himself the "no" guy.  He called himself that because he

3    was not a risk taker.  And you'll learn that many times, his

4    first reaction to somebody's new proposal was to say, no, we

5    can't do that.  In fact, you'll learn that he was criticized in

6    his 2020 employee evaluation, an evaluation made in 2020

7    because he was so negative, and that evaluation covers the time

8    period in this case.

9          Mr. Halligan's role was to oversee the operations

10   department, and that was a team of four people.  And the risk

11   director, Scott Becker, was the head of that team.  The

12   operations people were the hands-on people, the nuts-and-bolts

13   people dealing with the back-office functions every day.  They

14   managed all the paperwork needed to trade.  And you'll learn

15   about that paperwork and the contracts called the ISDAS.  The

16   operations department kept track of the margin rates that the

17   traders negotiated.  The operations department sent margin call

18   notices and received margin call notices, and that had been

19   going on for years and years and years.

20        Now, you'll learn that the operations team worked

21   closely with the trading team every day.  The evidence will

22   show that the director of risk, Scott Becker, and the head

23   trader, Will Tomita, were in almost constant communication.

24   You'll learn that Scott Becker called them a tag team.  They

25   were a tag team of two, Scott Becker and Will Tomita.  They

O5D6HWA1                    Opening - Mulligan

1    both dealt with the counterparties, and you will hear that they

2    both lied to the counterparties.

3          I expect in the coming weeks, you will hear recorded

4    calls of Will Tomita and Scott Becker lying to counterparties.

5    Spoiler alert, Patrick Halligan is not a participant in those

6    recorded calls.  Scott Becker, as the director of risk, had a

7    role in onboarding new clients when they came into the bank,

8    and you'll learn he also had a role in follow-up phone calls

9    with those counterparties.  The evidence will show that during

10   2020 and 2021, Patrick Halligan was not responsible for

11   onboarding Archegos' new counterparties, nor did

12   Patrick Halligan participate with Scott Becker in those

13   follow-up due diligence calls where lies were told in 2020 and

14   2021.

15         You will learn that Scott Becker, the director of

16   risk, handled those calls.  And here is a little context to

17   keep in mind during the trial:  As it has been mentioned, these

18   events happened during the pandemic.  You will learn that

19   Patrick Halligan and Scott Becker were each working from home

20   during most of the pandemic; Mr. Halligan, from his home in

21   Long Island; Scott Becker, from his home in Upstate New York.

22   That means Patrick Halligan wasn't dropping by Scott Becker's

23   office or overhearing what Scott Becker was saying on those

24   calls with the counterparties.

25         In fact, you'll hear that Scott Becker was very happy

O5D6HWA1                    Opening - Mulligan

1    not to be working in the office.  Scott Becker was very happy

2    to be away from Patrick Halligan.  The prosecutors told you

3    that the evidence will show that Patrick Halligan knew about

4    the lies Scott Becker was telling, supposedly approved those

5    lies and sometimes even instructed Scott Becker to tell those

6    lies.

7         Well, keep this in mind, ladies and gentlemen:  The

8    prosecutor's job when making her opening statement is to make

9    everything look simple and straightforward.  And the evidence

10   will show that there is nothing simple or straightforward when

11   it comes to Scott Becker as a witness.  In fact, the evidence

12   will show that there isn't anything simple or straightforward

13   about most of what the prosecution will try to prove in this

14   case.

15        Now, I would like to spend a few minutes sharing with

16   you some of what the prosecutor did not mention.  The

17   prosecutor did tell you that Scott Becker pleaded guilty to

18   several crimes, that he is facing prison time, and that he is

19   hoping that by providing testimony in this courtroom against

20   others, he will be treated more leniently when it comes time

21   for him to be sentenced.  But that is only part of what you

22   need to consider.  I want to mention a few more things about

23   Scott Becker that you will learn in this trial:

24        Number one, Scott Becker is manipulative.  The

25   evidence will show that Scott Becker is a very, very convincing

O5D6HWA1                         Opening - Mulligan

1   liar.  I expect him to come across to you at first as nice,
2   maybe even pleasant.  But you will see a different side of him
3   when you read some of his texts and chats.  He'll probably also
4   come across to you as smart, and that's because he is very
5   smart.  You will learn that he is very clever and very
6   manipulative.  The evidence will show that Scott Becker figures
7   out what he needs to say to get what he wants, and that is what
8   he says.  The evidence will show that Scott Becker is very
9   skilled at figuring out what he can get away with.  Make no
10   mistake, he will bring every bit of that skill into this
11   courtroom when he sits on that stand.

12         Number two, Scott Becker's motivation.  The second
13   thing to consider is what Scott Becker hopes to accomplish
14   here.  You will learn that Scott Becker first met with these
15   prosecutors several months after Archegos collapsed.  How did
16   that happen?  Well, you will learn that the FBI showed up at
17   Scott Becker's house with a search warrant, and an FBI agent
18   told him the prosecutors would be interested in his help.  And
19   the evidence will show that the very next day, Scott Becker
20   hightailed it from Upstate New York down to New York City to
21   meet with these prosecutors.  And you will learn that in the
22   first meeting, the prosecutors did all the talking, and
23   Scott Becker did all the listening, and the evidence will show
24   that Scott Becker listened up good.

25         You will learn that the prosecutors had Scott Becker

O5D6HWA1                         Opening - Mulligan

1   between a rock and hard place, as the expression goes.  And the

2   evidence will show that they had him in a box, and they offered

3   him a way out.  And what did Scott Becker do?  You will learn

4   that Scott Becker grabbed that deal.  And just like a young

5   child who gets caught misbehaving and points to someone else,

6   you will learn that Scott Becker pointed to Patrick Halligan

7   and said, it's his fault.  He told me to do it.  So what will

8   Scott Becker's motivation be when he comes in here and takes

9   the stand?

10          You will learn that Scott Becker's motivation will be

11   to get what he wants.  And what Scott Becker wants is to give

12   the prosecutors what they want.  I ask you to keep that in mind

13   so you can consider exactly who you are dealing with when you

14   meet Scott Becker during this trial.

15          The evidence will show that Scott Becker fooled

16   Patrick Halligan.  The evidence will show that Scott Becker is

17   very manipulative, and you will learn that he is motivated to

18   help himself.  So we are asking you now, at the very outset of

19   the trial, to do what Judge Hellerstein will instruct you to do

20   when the trial is over:  We are asking you to scrutinize

21   Scott Becker's testimony very carefully in light of his

22   motivations.

23          Now, the third thing about Mr. Becker, there is no

24   real corroboration.  The prosecutor told you that

25   Scott Becker's testimony will be corroborated or supported by

O5D6HWA1                        Opening - Mulligan

1    the other evidence.  But you will learn that a lot of what

2    Scott Becker has to say will not be corroborated, and what some

3    of what the prosecutor says is corroboration, it will not stand

4    up under strict -- under scrutiny.

5          Now, let me just address one specific incident the

6    prosecutor mentioned in her opening.  The prosecutor told you

7    about a Zoom call in March of 2021 when that risk director,

8    Scott Becker, and Will Tomita and Patrick Halligan got on a

9    Zoom call together to discuss how to answer a question posed by

10   UBS.  According to the prosecutor, the three of them used that

11   call to cook up a lie.  You will hear more about this Zoom call

12   during the trial.  But let me he note what the prosecutor did

13   not mention.  What she did not mention is that the evidence

14   will show that Scott Becker and Will Tomita had given

15   conflicting stories of what happened on that call, and they

16   can't both be telling the truth.

17         Now, I'm going to talk briefly about the events of the

18   final week.  The prosecutor emphasized a number of events that

19   took place at Archegos during that chaotic final week in

20   March 2021, and I'd like to address them.

21         You'll learn that a number of unrelated, unprecedented

22   and unpredictable events combined that week in a way that

23   caused Archegos' value to drop substantially in the space of

24   just a few days.  The events sent everyone scrambling that

25   week.  There was complete and utter chaos.  Circumstances were

O5D6HWA1                    Opening - Mulligan

1   changing every minute.

2          As Mr. Berke just pointed out, you'll learn on Tuesday

3   morning of last week, the value of Archegos was just north of

4   36 billion.  Think about that.  Just north of 36 billion.

5   You'll learn that there was active trading at Archegos that

6   day.  You'll also learn that Patrick Halligan had to step away

7   on that Tuesday.  He had to get his COVID vaccine.  And when he

8   got back home, Archegos was chaotic.  And you'll learn that

9   Patrick Halligan went into full accountant mode that day.

10         The evidence will show that Patrick Halligan was the

11  "no" guy on that Tuesday.  And you'll learn that on Wednesday

12  morning of the final week, Archegos' portfolio had a value of

13  around $32 billion, and the evidence will show, however, that

14  during that Wednesday, the situation worsened, and you will

15  learn that it was the perfect storm.

16         Now, the prosecutor told you that that

17  Patrick Halligan came up with the phrase about liquidity and

18  shared that phrase with his Archegos colleagues.  Well, ladies

19  and gentlemen, the evidence will show that Patrick Halligan had

20  every reason to believe that Archegos would survive a liquidity

21  crisis.  You'll learn that Archegos had withstood other storms.

22  In fact, you will learn in the midst of all that chaos the

23  final week, Patrick Halligan was thinking about Archegos' tax

24  considerations.  Ask yourselves, who thinks about next year's

25  taxes if your company is in the midst of going under?

1          Now, I'd like to take a few minutes to talk about
2   counterparties.  These are the banks and the brokers.  First,
3   you will learn that the counterparties received audited
4   financial statements from Archegos in monthly financial
5   reports.  And the evidence will show that the counterparties
6   knew that Archegos' portfolio was highly leveraged, highly
7   concentrated in a limited number of stocks.

8          What else did the counterparties know about Archegos?
9   They knew that it was extremely volatile.  There were huge
10  gains and huge losses.  For example, you'll learn in 2018,
11  Archegos lost nearly 50 percent of its portfolio.  In 2019, it
12  came roaring back.  In 2020, it suffered another steep downturn
13  in the early months of the pandemic.  It was a rollercoaster.
14  That was Bill Hwang's story as an aggressive investor.

15         And you will learn that even when those losses were so
16  big that the counterparties had the option to terminate their
17  relationship with Archegos, the counterparties readily waived
18  that option.

19         You will also learn that the banks made sizable fees
20  from doing business with Archegos.  The evidence will show that
21  the counterparties wanted to beat out their competitors for
22  Archegos' business.  The evidence will show that everyone
23  wanted a big slice of the Archegos pie.  What motivated the
24  counterparties?  The evidence will show that it was all about
25  the Benjamins.  It was all about money.

O5D6HWA1

1          As the prosecutor told you this morning, the evidence

2    will show that people are blinded by money.  And you will learn

3    that the people blinded by money were the counterparties who

4    wanted Archegos' business.

5          Now, I'm going to wrap up so we can all have lunch.

6    The prosecutors' evidence will only give you part of the

7    picture.  We're going to put the e-mails and chats in context

8    for you so that you have the full picture so you can really

9    understand what Patrick Halligan knew and didn't know.

10   Patrick Halligan needs your patience, and he needs you to have

11   an open mind.

12         Now, if you remain patient and stick with us, if you

13   keep an open mind, if you hold the prosecutors to their burden

14   of proof, if you use the good judgment and common sense you use

15   every day in matters that are important to you, your verdict

16   will be that Patrick Halligan is not guilty.

17         THE COURT:  Thank you, Ms. Mulligan.

18         (Pause)

19         THE COURT:  Members of the jury, usually our lunch

20   hour is 1:00 to 2:15, but this might be a good time to break

21   for lunch and come back at 1:30.  All right?  Close your books.

22   Ms. Jones will take them from you as you enter the jury room.

23   And don't discuss the case.  You have not heard any evidence

24   whatsoever.  You just heard the openings of the lawyers.  And

25   we'll see you at 1:30, and that will be our first witness.

O5D6HWA1

1          (Jury not present)

2          THE COURT:  Anything for me?

3          MR. ROTHSCHILD:  We discussed with the defense, we

4     prepared binders with the transcripts of some of the calls that

5     we intend to play today.  With the Court's permission, we'd

6     place the transcripts underneath the seats of the jurors so

7     when they return, they will already be there, and we'll let

8     them know when it's time.

9          THE COURT:  Good idea.  The transcripts will be marked

10    for identification.  The exhibits will be the primary source of

11    the evidence, that is, the transcriptions themselves.  If the

12    jury wants a rereading after it deliberates, the procedure will

13    be that we will again distribute the books, and during the

14    rereading or rehearing, they can see the books, and then we'll

15    take them away from them again.  They can't bring them into the

16    jury room.

17         MR. ROTHSCHILD:  Understood, your Honor.  Thank you.

18         THE COURT:  Have a good lunch.

19         Oh, one of the jurors, Number 9, Mr. Hassell, reports

20    that he has a doctor's point on 2:30 on Wednesday, which can't

21    be moved.  I think we then should work from 10:00 to 1:00, and

22    then suspend for that day.  Tomorrow, we'll go until 4:15 and

23    break at that time.  Have a good lunch.

24         (Luncheon recess)

25

O5D6HWA1

                            AFTERNOON SESSION

                               1:40 p.m.

 1          THE COURT:  Ms. Jones is going to report to us an

 2   issue with Juror Number 9, Mr. Hassell.

 3          DEPUTY CLERK:  So Mr. Hassell reported to me at first

 4   he needed to go to a doctor, the VA doctor on Wednesday.  He

 5   told me initially that the appointment was at 2:30.  And when I

 6   went back to tell him that it was okay, that he could go and we

 7   break at 1:00, he told me, no, it was the entire day.  So he

 8   did show me two slips, appointment slips from the VA, and one

 9   is for 11:00 a.m. and the other one is for I believe

10   2:00 o'clock.

11          THE COURT:  Did he tell us about this when we examined

12   him Wednesday?

13          DEPUTY CLERK:  (Nods head)

14          THE COURT:  Well, we can either excuse him or not

15   proceed on Wednesday.  What's the government's view?

16          MR. THOMAS:  One moment, your Honor.

17          (Counsel confer)

18          THE COURT:  Would you like to know what I favor?

19          MR. THOMAS:  Of course, your Honor.

20          THE COURT:  I favor excusing him and proceeding a full

21   day Wednesday.

22          MR. THOMAS:  That's acceptable to the government, your

23   Honor.

O5D6HWA1

1          THE COURT:  Pardon?

2          DEPUTY CLERK:  Speak into the microphone.

3          MR. THOMAS:  That's acceptable to the government, your

4    Honor.

5          MR. BERKE:  Your Honor, may we have a moment, please?

6          THE COURT:  Yes.

7          MR. BERKE:  Thanks, Judge.

8          (Counsel confer)

9          MR. BERKE:  Judge, we don't want to overstep our

10   place, but would your Honor consider whether a call from your

11   chambers to the VA Hospital may help him get an appointment on

12   Friday instead of Wednesday, recognizing it may not be so easy?

13         THE COURT:  You know whom I should call?

14         DEPUTY CLERK:  The problem is his son took off from

15   work to take him, and he needs his son there with him.

16         MR. BERKE:  Ms. Jones, you obviously spoke to him, but

17   do we know -- is it worth at least exploring whether his son

18   could do it on Friday, if it was possible to move, just so we

19   don't lose the day if he remains?

20         THE COURT:  I didn't hear.

21         (Pause)

22         THE COURT:  I'm going to ask Ms. Jones to explore it

23   with him.

24         MR. BERKE:  Thank you, your Honor.  Thank you,

25   Ms. Jones.

O5D6HWA1

1            THE COURT:  We'll wait.

2            DEPUTY CLERK:  Want me to bring them out, Judge?

3            THE COURT:  No.

4            (Pause)

5            DEPUTY CLERK:  He said no, that's not possible because

6    his appointment has been pending for, like, two months.

7            MR. BERKE:  Your Honor, just so we don't delay

8    matters, would it be possible for us to consult during the

9    break, and we'll report back to your Honor on the question your

10   Honor raised?

11           THE COURT:  I'm not sure we'll have a break this

12   afternoon.  Why don't you do it now?

13           MR. BERKE:  Thank you, Judge.

14           DEPUTY CLERK:  Bring in the jury?

15           THE COURT:  No, they're consulting.

16           MR. BERKE:  Thank you, your Honor.  The defense, both

17   for Mr. Hwang and Mr. Halligan, would be comfortable excusing

18   the juror in light of the conflict.

19           THE COURT:  All right.  You can excuse the juror, and

20   bring the rest out.  Seat them in their regular seats.  Leave

21   that one empty.

22           (Pause)

23

24

25

O5D6HWA1

```
1              (Jury present)
2              THE COURT:  Good afternoon, members of the jury.
3     Please be seated.
4              I like to keep a cold courtroom.  It may be too cold.
5     You let me know.
6              I said I like to keep a cold courtroom, but perhaps
7     it's too cold, judging by everybody's scarves and sweaters.  Is
8     it okay like this?
9              DEPUTY CLERK:  Speak up.  Y'all was complaining.
10             JUROR:  It's too cold.
11             THE COURT:  It's too cold.  That's what Ms. Jones was
12    saying.  We'll try to get the courtroom temperature elevated a
13    few degrees.
14             Government, call its first witness.
15             MR. ROTHSCHILD:  The United States calls
16    Bryan Fairbanks.
17    BRYAN FAIRBANKS,
18         called as a witness by the Government,
19         having been duly sworn, testified as follows:
20             THE COURT:  Let's pay attention to the oath, please.
21    No moving around.  Pay attention.
22             DEPUTY CLERK:  Please state your full name and spell
23    your last name slowly for the record.
24             THE WITNESS:  Bryan Fairbanks.  F-A-I-R-B-A-N-K-S.
25             DEPUTY CLERK:  You see those people back there, they
```

O586HWA3                         Fairbanks - Direct

1    need to hear you.

2              THE COURT:  Can you all hear him in the back of the

3    room?

4              Proceed.

5              MR. ROTHSCHILD:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MR. ROTHSCHILD:

8    Q.  Good afternoon, Mr. Fairbanks.

9    A.  Good afternoon.

10   Q.  Mr. Fairbanks, where were you employed during 2020 and

11   2021?

12   A.  UBS.

13   Q.  What's UBS?

14   A.  UBS is a Swiss financial firm, investment bank, and wealth

15   manager.

16   Q.  In the course of your employment at UBS, did you interact

17   with a client of UBS's called Archegos?

18   A.  I did.

19   Q.  Approximately when was the last time you interacted with

20   anyone at Archegos?

21   A.  March 2021.  The end of the month.

22   Q.  How did UBS's relationship with Archegos come to an end?

23   A.  We lost a little more than $860 million through the

24   default.

25   Q.  Mr. Fairbanks, during the final week that you interacted

1   with Archegos, what, if anything, did you come to understand

2   about information that Archegos had previously provided to you?

3   A.  That the information was lies, that all the information

4   that they had shared with us was made up.

5   Q.  Okay.  Let's back up.

6           Mr. Fairbanks, where do you work presently?

7   A.  Bank of Montreal.

8   Q.  What do you do at Bank of Montreal?

9   A.  I'm the head of prime brokerage risk management.

10  Q.  And how long have you worked at Bank of Montreal?

11  A.  Just short of two years.

12  Q.  Where did you work before that?

13  A.  UBS.

14  Q.  And how long did you work at UBS?

15  A.  Almost 17 years.

16  Q.  What was your job at UBS?

17  A.  My last job was the Americas head of prime brokerage risk.

18  Q.  Is that effectively the same job that you do now at Bank of

19  Montreal?

20  A.  Yes.

21  Q.  You said you worked in prime brokerage at UBS?

22  A.  I did.

23  Q.  What does prime brokerage mean?

24  A.  Prime brokerage is just a group within a bank that allows,

25  for the most part, hedge funds, family offices, asset managers

1    to trade seamlessly to allow them to take leverage.  Similar,

2    if you had an E-Trade account, you're able to buy stock and

3    only put up some of the money, but a prime brokerage allows you

4    to trade with E-Trade, Charles Schwab, any other firm on the

5    street.  But we would end up taking all the trades and holding

6    them.

7    Q.  Now, we'll come back to a lot of those concepts later.

8          As it relates to the prime brokerage business, what

9    purpose does the risk function serve?

10   A.  My team's job is responsible, frankly, just to make sure we

11   don't take a loss dealing with our clients.

12   Q.  What do you mean by "take a loss"?

13   A.  As I mentioned earlier, we lost $860-plus million.  My team

14   is to build mathematical models, to build a lot of formulas, to

15   analyze a lot of data, to predict what could happen in a very

16   bad market, and make sure that we end up not taking a loss if

17   those bad markets occur.

18   Q.  So what sorts of products or services does prime brokerage

19   offer its clients?

20   A.  So UBS, we covered stocks, bonds, commodities, so gold,

21   oil, so futures, we did options.  You can do currencies,

22   foreign currencies.  There are yen, the British sterling,

23   pounds.

24   Q.  What's a stock?

25   A.  A stock is ownership of -- owning a stock allows you to own

O586HWA3                        Fairbanks - Direct

1   a piece of a company, so it's --

2   Q.  And you mentioned options, is an option a type of

3   derivative?

4   A.  It is.

5   Q.  And what's a derivative?

6   A.  A derivative is -- it's a financial instrument that derives

7   its value from a physical value.  So you could buy gold, for

8   example, or you can have an option on gold.  You don't own the

9   gold, but you have the right to buy the gold later, and the

10  price of the option is dependent upon the value of the gold

11  itself.

12  Q.  Now, are there other types of derivatives beyond options?

13  A.  Yes.  You can trade swaps, among other things, as well as

14  swaptions, credit default swaps.

15  Q.  What's a swap?

16  A.  A swap is an agreement to kind of swap P&L, or profit and

17  loss.  So if you were to buy Tesla in stock at your Schwab

18  account, you own one X, you know, share of Tesla.  Or you could

19  write a swap on it whereby the client owns the right to if the

20  value of the swap goes up, they make money; if the value of the

21  swap goes down, they lose money.  Similar to a stock, but they

22  don't actually own the stock, they just have the rights to the

23  gains and losses of a stock.

24          THE COURT:  How is that different from an option?

25          THE WITNESS:  An option isn't a one-to-one ratio.  In

1   a swap contract, for every 1 dollar Tesla goes up, you

2   effectively make 1 dollar; if it goes down 1 dollar, you lose a

3   dollar.  An option has a -- without getting too mathematical

4   with this, you don't generally get dollar for dollar.  So if

5   you buy a 50-cent option or a 50 -- an option to get 50 cents

6   if you go up, or lose 50 cents of the dollar, if it goes up one

7   or down one.

8   Q.  So, Mr. Fairbanks, at a high level, what are the mechanics

9   of a swap transaction?

10  A.  High level, you would have a legal agreement that documents

11  the relationship.  You have another legal agreement that

12  documents if you're trading swaps with a client.  And then the

13  client would go in, buy swaps, and we would report the trades

14  in like a blotter or like a trade reporting system, and the

15  client would see every day what trades they have, and we would

16  just call them swaps or cash.  Cash being the physical.

17  Q.  Mr. Fairbanks, are you familiar with the concept of

18  hedging?

19  A.  Yes.

20  Q.  What does hedging mean in the swap context?

21  A.  So banks generally do -- so we don't get paid -- we're not

22  making the investment decisions.  We're not betting if Tesla is

23  going up or down, the client is.  And so to ensure that we're

24  not taking -- we're not losing or making money, we go and buy

25  the actual physical.

O586HWA3                          Fairbanks - Direct

1              So if the client puts on a swap where they want to be
2    long on Tesla, we will physically buy Tesla and pass along --
3    so if Tesla goes up, the swap goes up.  So we just -- the bank
4    just sits in the middle making sure we're not taking any gains
5    or losses from trades.
6    Q.  What do you mean by going long?
7    A.  Sorry.  Going long, meaning buying Tesla.  Going short
8    means we've sold Tesla, or the client has sold Tesla.
9    Q.  How would UBS hedge when it would enter into a swap
10   transaction with a client?
11   A.  Generally, or 99-plus percent of the time or something,
12   they buy the underlying asset.  So if the client buys Amazon on
13   swap, we go buy Amazon in physical.  If the client goes and
14   buys Walmart, we go buy shares of Walmart.
15   Q.  And when you say "buy Amazon in physical," what do you mean
16   by "physical"?
17   A.  We buy the stock.
18   Q.  Now, as a matter of sequencing, what happens first, getting
19   the hedge or finalizing the swap transaction?
20   A.  I would say it depends on how big the trade is.  So if they
21   were to buy one share, you could probably do it simultaneously.
22   I can go and buy one share of Tesla.  If you buy a million
23   shares, you may buy a little bit throughout the whole day, and
24   at the end of the day, you write the swap and you say this is
25   what the average price was.

1           So I bought a million shares of Amazon or Tesla

2   throughout the day, and my average price of all the shares was

3   $200.  So you write the swap on $200.

4   Q.  And at what point was the price of the swap determined?

5   A.  Generally, at the time the -- you've legged into all the

6   trades.

7   Q.  What do you mean by "legged into" the trades?

8   A.  Bought each of those little bits throughout the day.

9   Q.  When UBS would enter into a swap transaction with a client,

10  was UBS taking a position on whether the price of the

11  underlying stock would go up or down?

12  A.  No.

13  Q.  Why not?

14  A.  It's not what we -- it's not what the group is designed to

15  do.  Our job -- the firm is not trying to make a gain if the

16  stock goes up.  They are just trying to allow the client to put

17  the trade on swap.  And that's why we go out and hedge it.

18  Q.  How did UBS make money on the swap business?

19  A.  Similar to a bank that writes a mortgage.  We charge a fee

20  to borrow the money we lend the client to buy the stock.

21  Q.  Mr. Fairbanks, when UBS would enter into a swap with a

22  client, would UBS typically make the client pay the full amount

23  of the transaction?

24  A.  No.

25  Q.  Why not?

1    A.   Generally, most of the clients we deal with use leverage.

2    By leverage, meaning they borrow money or stock from us to buy

3    the stock in the market on swap or cash, or sell.  And so, for

4    example, if you were to buy a house, you'd put down 20 percent.

5    You're borrowing $80 from the bank, it's very similar to what

6    we do, that we're lending money to -- for these companies to

7    borrow or to lever up their gains and losses.

8    Q.   And you referred to trading on swap or cash.  Could you

9    explain what you mean by trading cash?

10   A.   Cash being the physical shares, buying, you know, Apple or

11   Tesla with your E-Trade or Schwab.

12   Q.   So would UBS typically make the client put down some of the

13   money toward the transaction?

14   A.   Yes.  So we would evaluate every client based on how risky

15   they were.  We had our own internal FICO type score to say if

16   someone is an 800 credit or a 600 credit or a 400 credit, and

17   that would help determine how much money they would need to

18   give us to do these trades.

19   Q.   And if the client was typically putting down some of the

20   money toward the transaction, who was paying the rest?

21   A.   UBS.

22   Q.   So what does it mean to trade on leverage, you used the

23   phrase "leverage" before.

24   A.   So when you bought your house, and you put down 20 percent

25   and you borrowed 80 from the bank, you now have a $100,000

1    house.  And so you have five times the leverage.  100 divided

2    by 20.

3              When you buy a house at $100 and you put down 20, you

4    borrow $80 from the bank.  And so the way we define leverage is

5    the value of the house divided by the equity you put into it.

6    So 100 divided by 20 is 5.  500, 500 percent, or five.

7              And so when trading on swap or physical cash, we would

8    lend the clients money or stock to buy or sell, in which case

9    we would -- they would run up leverage.  The leverage allows

10   them to either make more money faster, or conversely, lose

11   money faster.

12             THE COURT:  What's the difference between that

13   leverage and margin?

14             THE WITNESS:  The $20 you put into the bank to buy

15   your house is the margin.

16   BY MR. ROTHSCHILD:

17   Q.  And is that phrase "margin" used in the swap context as

18   well?

19   A.  Unfortunately for everyone here, it's -- we use about four

20   different words to mean roughly the same.  So you'll hear me

21   say independent amount, you'll hear me say initial margin,

22   margin, they all roughly mean the same.  There's a small legal

23   nuance.

24             THE COURT:  I'll try to clear it up as we go along.

25             THE WITNESS:  I apologize.

O586HWA3                          Fairbanks - Direct

1           THE COURT:  Don't worry about it.

2   BY MR. ROTHSCHILD:

3   Q.  How are the concepts of leverage and margin related to one

4   other?

5           THE COURT:  How do leverage and margin relate to each

6   other.

7           THE WITNESS:  Inverse.  Mathematically, they are

8   inverse.  So the higher the margin, the lower the leverage; the

9   lower the margin, the higher the leverage.

10          THE COURT:  The margin is what you put into a house;

11  leverage is what you are buying.  The difference between,

12  right, what you put in and the face value of what you buy.

13          THE WITNESS:  Right.

14  BY MR. ROTHSCHILD:

15  Q.  So, Mr. Fairbanks --

16          THE COURT:  The mortgage would be the leverage.

17  You're buying a house for a thousand dollars and you pay two

18  hundred, that's the margin.  $800, the leverage; is that right?

19          THE WITNESS:  The 800 would be the loan we gave them.

20  The leverage would be the thousand divided by the 200.

21          THE COURT:  Okay.

22  BY MR. ROTHSCHILD:

23  Q.  So, Mr. Fairbanks, what would happen if there were an

24  increase in the price of the stock underlying a swap

25  transaction?

O586HWA3                              Fairbanks - Direct

1    A.   Sure.   So in your example earlier, sir, your thousand

2    dollar house, now someone wants to come and buy it for 1,100.

3    Your $200 that you have in the account if you were to sell the

4    house is now worth 300.   So you made 50 percent.   You made

5    $100 -- you made $100 off your 200-dollar equity that you put

6    into the house.

7    Q.   And in the swap context, how, if at all, could the client

8    access that gain?

9    A.   So unlike your house, you can't go and take the money out

10   every day.   But in the swap world, if you were to make money

11   every day, you're allowed to take some of it out.   And if you

12   were to lose every day, you'd have to put more in.

13   Q.   And the amount that you're allowed to take out, is that

14   sometimes referred to as excess or excess cash?

15   A.   Yes.

16   Q.   What would happen if there were a decrease in the price of

17   the stock underlying a swap transaction?

18   A.   The client would have to put in more money.   So the

19   thousand dollar house you go to sell is -- someone only offers

20   you 900, your equity went down to 100.   But imagine the bank

21   said, hey, you always have to have 20 percent.   So now the $900

22   house, you have to have $180 in the bank account, so you'd have

23   to put up the $80.

24         So we do that calculation every day, our system does

25   that.   And so it would call the client for the $80 in that

O586HWA3                         Fairbanks - Direct

1   example.

2   Q.  So is it possible then that on one day, the client might

3   owe UBS money on a swap transaction, and the next day the

4   client might make money on that same swap transaction?

5   A.  Very common.

6   Q.  Mr. Fairbanks, could a client enter into more than one swap

7   transaction at a time with UBS?

8   A.  Yes.  You could put swap on any and all of the stocks that

9   you wanted.

10  Q.  So it would be possible for a single client to have swap

11  transactions in multiple different stocks?

12  A.  Very common.

13  Q.  And in that scenario, how would the payment obligations

14  work if the price of one stock went up but the price of another

15  stock went down?

16  A.  We would net the payment.  So if you were to make $20 in

17  one trade and lose $5 on the other, the client could

18  potentially take $15 out, and vice versa.  If they were to lose

19  20 but make 5, we would call them for the 15.

20  Q.  You used the phrase "call them for the 15."  What do you

21  mean by that?

22  A.  We would call them in the morning and say, hey, you owe us

23  $15, and they would have to pay that.

24  Q.  Are you familiar with the term "portfolio"?

25  A.  Yes.

1   Q.  What does portfolio mean in this context?

2   A.  In this context, we generally call the -- all the trades,

3   so if they have Tesla and Apple and IBM, we call that a

4   portfolio.  So we would margin the client, we'd calculate the

5   $200 based on these mathematical formulas on the whole

6   portfolio of stocks.

7   Q.  And just to be clear, the whole portfolio of stocks you're

8   talking about, what is at UBS, right?

9   A.  Correct.

10  Q.  Now, you mentioned you worked in a risk function, right?

11  A.  Yes.

12  Q.  What's the primary purpose of the risk function at a place

13  like UBS?

14  A.  To analyze what the market has done over the last, 20, 30,

15  40 years.  To build mathematical models trying to calculate the

16  risk of what could occur tomorrow.

17  Q.  Toward what end?

18  A.  We use those models to figure out how much the client

19  should post in margin.  So my earlier example of the house, if

20  you were to buy a house in the best neighborhood with the best

21  school districts and everyone wants that house, the bank knows

22  they can sell that house pretty quickly with a small loss if

23  they had to sell it fast.  And so they might only require you

24  to put ten percent down.

25              Conversely, if you bought a house that was a

1    fixer-upper, not the best school district, the bank may think

2    that it may take more time or more money to sell that house,

3    and so they might require you to put 30 percent down.  And

4    that's how we try to think about the risk.

5    Q.  And what's the ultimate goal of the risk function?

6    A.  To make sure we don't take a loss.

7    Q.  Now, in a swap relationship, how might UBS lose money?

8    A.  So if the value of the house went from 1,000 down to 700,

9    the 300-dollar loss on selling that house ate up your $200 of

10   equity, and it would eat up $100 of our money as well.  And so

11   if a client were to lose money, more money than they have, the

12   banks take the loss.

13   Q.  When you were working in prime brokerage risk at UBS, what

14   did your day-to-day job entail?

15   A.  We looked at a lot of reports on what our clients were

16   doing the previous day.  How much risk was in every account.

17   How much margin was in every account.  And how those two

18   numbers compared to each other, and we set limits on all our

19   clients to make sure that we stayed within those boundaries.

20        We would have phone calls with clients getting updates

21   from them on what they're doing, how they're doing, just to

22   kind of check in and make sure everything was okay.

23   Q.  What types of clients did you have?

24   A.  Predominantly hedge funds, family offices, a handful of

25   large asset managers, pensions, those type of clients.

1    Q.  What's a hedge fund at a high level?

2    A.   Hedge fund is a private investment group that buys and

3    sells stocks, bonds, and other things using various investment

4    strategies.

5    Q.  And you used the phrase "family office," what's a family

6    office in this context?

7    A.   Usually, a family office is either a rich individual who

8    has an investment vehicle looking after their own money,

9    whereas a hedge fund has outside investors.

10   Q.  Now, at what stage in the relationship between UBS and the

11   client would you perform your risk evaluation?

12   A.   Before they came in the door.  So we would always evaluate

13   our clients and meet with them and talk to them to understand

14   what they do.

15   Q.  And why, if at all, would you continue to evaluate a client

16   after they had already become a client of UBS?

17   A.   Make sure they kind of stay in our good graces.  Make sure

18   they stay a good client.  And if we have concerns with the

19   client, we'll ask them to leave.

20   Q.  Now, are there different types of risk that you think about

21   when you're evaluating clients?

22   A.   Yes.  So you have the risk of the stocks themselves.  Are

23   they trading Teslas, Apple, names everyone knows, or are they

24   trading you know, small illiquid names, can't think of any.

25   But we think about the type of trades they are doing, the size

O586HWA3                        Fairbanks - Direct

1    of the companies they are trading.  We think about the

2    volatility, so Walmart, you know, stock moves like this,

3    whereas a biotech might move like this.

4            We'll also think about the liquidity.  If you have

5    $10 million worth of Apple, no one cares.  If you have

6    $10 million worth of, you know, I don't know, Bryan and Co

7    company, you know, people are probably going to be concerned.

8    Q.  So let's unpack some of those concepts.  Liquidity, what do

9    you mean by "liquidity"?

10   A.  Liquidity in terms of stocks is how much it trades every

11   day.  So, for example, an Apple, an Amazon, Tesla probably

12   trades 5, 10, 20 billion dollars every single day, whereas a

13   small, small company with 20 employees might trade $1 million

14   worth a day.  And so what we always think about is, how much

15   can you buy or sell in a single day.

16   Q.  And when you evaluate the riskiness of a client, in what

17   ways is liquidity important?

18   A.  It's quite, quite important.  Again, going back to that

19   house example, the house in the really good neighborhood with

20   the really good school district, if you need to sell it,

21   chances are you get ten bids.  Someone wants that house.

22   Whereas the house in the not-the-good-school district or the

23   fixer-upper, if you go to sell the house, you may have one bid

24   or maybe no bids.

25   Q.  What are the implications for UBS, then, as the

O586HWA3                        Fairbanks - Direct

1    counterparty?

2    A.  When we think about liquidity, the less liquid a name is,

3    the higher the margin.  Because we know if we have to sell a

4    position, we know it's going to take more time.  And so we want

5    to protect ourselves by charging a higher margin.

6    Q.  Now why would UBS have to sell the position as you just

7    said?

8    A.  If the client defaults and runs out of money, we are left

9    having to unwind, what we call unwind a swap, which is

10   terminating the swap, but then we have the hedge, the physical

11   shares we actually have to go and sell into the market.  And

12   that's where the loss comes into play.  So we're unwinding that

13   hedge, we're selling the stock to get out of the swap, the

14   contract we wrote.

15   Q.  You also used the phrase "volatility."  What did you mean

16   by that?

17   A.  Yes.  So the more volatile a stock, the more it either goes

18   up or down and how quickly it goes up and down.  So that also

19   increases the riskiness of a trade.

20   Q.  Was concentration something you focused on in your risk

21   analysis?

22   A.  Yes.  So if you were to own ten stocks or ten houses, if

23   one of those houses were to catch on fire and burn and you

24   don't have insurance, you lose one tenth of your value.  But if

25   that's your only house, you lose everything.

O586HWA3                         Fairbanks - Direct

And so the more stocks a client has, the more
diversified the portfolio is; the less stocks they have, the
more concentrated.  And the margin would reflect that.  More
stocks, we lend more; fewer stocks, we lend less.

Q.  When you were at UBS, how would you gather the information
you needed to evaluate the riskiness of your clients?

A.  Twofold.  We would ask clients for a sample portfolio.  And
we would go and meet them and talk to them and ask them
questions.  The sample portfolio is hey, client, what stocks
are you going to buy and sell.  And we would ask them to give
us a list of stocks they buy and sell, sizes, quantity, et
cetera, trying to give us an idea that we can run the portfolio
through our mathematical models to see how risky it is.

Q.  Why a sample portfolio, why not ask for the real portfolio?

A.  Most clients are secretive, and they would generally not
give the actual portfolio as of that day.  Usually, what they
would do is they'd give you a portfolio from three months ago
or six months ago, just to give you an idea of what it could
look like in the future.

Q.  In what ways, if any, were you dependent on the client to
provide you with the information you needed to evaluate the
riskiness of the client?

A.  Exclusively.  There's no Google website that I can go to to
look up what does Client ABC buy and sell.  And so we are
totally at the mercy of the clients to tell us what they are

O586HWA3                        Fairbanks - Direct

 1    doing.

 2              THE COURT:  Well, you see that in your portfolio,

 3    don't you?

 4              THE WITNESS:  I only see my portfolio.  Most clients

 5    have what we call a multi-prime brokerage relationship, meaning

 6    they deal with other banks.  And so I could only see the

 7    portfolio I have, but I have to ask them what are they doing

 8    away, so that I get that full picture.

 9    BY MR. ROTHSCHILD:

10    Q.  When you say "what they are doing away," what do you mean

11    by that?

12    A.  What stocks they are trading away from us.  So are they

13    trading the same stocks away or are they trading something

14    different?

15    Q.  In what ways, if any, was it important that the client

16    provide you with accurate information?

17    A.  I mean, very important.  It's -- it allows us to make a

18    determination about how much risk we have -- UBS had in total.

19    Q.  What types of questions would you ask clients to evaluate

20    their riskiness?

21    A.  So when we go meet the clients, we call it a due diligence,

22    we'd ask them -- we always start off with tell us about

23    yourself, how do you think about the markets, what sort of

24    stocks you're looking to buy and sell, what sort of leverage

25    you're going to be running, are you going to run two times

 1    leverage?  So $100 in capital and you borrow 100 from me.  Or
 2    are you going to run five times or ten times leverage?  We'd
 3    ask them how they think about liquidity both in the stocks that
 4    they have, but also we want to understand the liquidity of how
 5    much cash do you have on the side to pay us.  So if you lose
 6    money, can you pay us?

 7            And so we'll go through about an hour of conversation
 8    asking them lots of questions about the risk, how they think
 9    about risk, the portfolio, how they think about cash, we call
10    free cash, how they can pay us.

11            THE COURT:  Can you get this information from
12    financial statements?

13            THE WITNESS:  One day a year if they have a financial
14    audit, will give some degree of this information.  The problem
15    with financial audits, the way they look at swap transactions
16    is they look at what is the gain or loss on the swap, not the
17    value of the swap.

18            So, you know, if you have a million dollar swap and
19    you made 1 dollar, your financial statement will show 1 dollar.
20    What I care about is how big is the swap, 1 million.  So a
21    financial statement wouldn't have it.  Plus, it's only usually
22    12/31, December 31, and we don't get that until March or April.
23    BY MR. ROTHSCHILD:
24    Q.  What sorts of --

25            THE COURT:  When people talk to you, they talk about

1   generalities, and you're trying to gauge feelings and

2   attitudes, or are they hard promises?

3           THE WITNESS:  It's going to a range.  I typically will

4   ask people the same question maybe two, three, or four times,

5   slightly different ways.  And I will try to triangulate what I

6   would say is the right answer.  Most of the time, clients are

7   pretty forthcoming and will tell you I do X, I do Y, I do Zed.

8   So I would say most clients give a decent picture.

9           Some clients will actually mail you with a piece of

10  paper that says hey, here's my performance for the month,

11  here's how much capital I have as of today.  This is what

12  stocks I've traded.  You know, this is what made me money, this

13  is what lost me money, this is how much free cash I have, this

14  is how much leverage I have.  It really depends on the client

15  to how much they provide.  But we always, if we don't feel like

16  they're giving us enough, we'll reach out to them and ask them

17  to kind of fill in the blank.

18  BY MR. ROTHSCHILD:

19  Q.  What sorts of actions, if any, could UBS take to try to

20  reduce the risk of doing business with a client?

21  A.  The -- I would say the first is to raise margins, ask the

22  client to deposit more cash with us.  We could ask the client

23  to reduce the portfolio with us, either through, they could

24  sell the position or they could transfer them to another firm.

25  And, you know, in a more extreme example, we may ask the client

1    to leave and ask them to just go away.

2    Q.  And how do those actions reduce risk for UBS?

3    A.  The more money we hold, the less risk it is because we've

4    effectively reduced the leverage.  And it gives us more cash to

5    protect us in a potential bad market.  Smaller portfolio makes

6    it easier to liquidate because it's more liquid.  And then,

7    obviously, asking them to leave eliminates all the risk.

8    Q.  How did UBS decide what margin rates to use?

9    A.  Based on the information the client shared with us, based

10   on the sample portfolio, the due diligence, as well as looking

11   at the portfolio itself.

12            MR. ROTHSCHILD:  Your Honor, with the Court's

13   permission, at this time, I'd like to read into the record a

14   small part of a stipulation between the parties.

15            THE COURT:  You may.  Just read the substance of it.

16            (Government's Exhibit 8004 received in evidence)

17            MR. ROTHSCHILD:  Yes, your Honor.

18            Ms. Gamboa, if you could please pull up Government

19   Exhibit 8004, and scroll to Page 2, where we can find

20   Paragraph 11.

21            The parties hereby stipulate and agree that the

22   documents marked for identification as Government Exhibits

23   listed on Exhibit K to this stipulation, and their subparts,

24   consist of authentic copies of records of UBS.

25            Thank you, Ms. Gamboa.  You can take that down.

O586HWA3                    Fairbanks - Direct

1   BY MR. ROTHSCHILD:

2   Q.  Mr. Fairbanks, did there come a time when you learned of a

3   fund called Archegos?

4   A.  Yes.

5   Q.  Roughly when was that?

6   A.  Near the end of 2019, 2019.

7   Q.  What type of entity did you understand Archegos to be?

8   A.  A family office.

9   Q.  Were you asked to address the risk of UBS's doing business

10  with Archegos?

11  A.  I was.

12  Q.  What initial steps did you take to evaluate Archegos as a

13  potential client?

14  A.  Similar to every other client, I asked for a sample

15  portfolio and a meeting.

16  Q.  Did you, in fact, have a meeting?

17  A.  I did.

18  Q.  Roughly when was that meeting?

19  A.  Near the end of 2019.

20  Q.  What did you understand the purpose of that meeting to be?

21  A.  A due diligence whereby the risk teams would be able to ask

22  their questions about the portfolio and the riskiness of

23  trading with them.

24  Q.  Where was that meeting?

25  A.  It was at Archegos' offices.

O586HWA3                    Fairbanks - Direct

1   Q.  Could you describe Archegos' offices?

2   A.  Really, really nice office, nicer than most of my clients,

3   I would say.  Very, very spacious.  Lots of art and paintings

4   on the wall.  A really nice executive room overlooking

5   Central Park, a little library off to the left that I recall.

6   Q.  Mr. Fairbanks, in general, when you would meet with

7   potential clients, what type of people would you meet with in

8   terms of their role at the client?

9   A.  Occasionally, you would meet with the founder, the CEO, the

10  chief executive officer.  Usually, you would meet with the

11  chief risk officer, maybe the head of trading, maybe a chief

12  operating officer, but usually, someone -- someone in that kind

13  of level.

14  Q.  With respect to the meeting at Archegos, who attended that

15  meeting from UBS?

16  A.  So you had Scotty Alpaugh, Brad Lutzer, Chris Salcedo,

17  Yifei Cheng, and myself.

18  Q.  Could you just briefly describe what each of those people

19  did?

20  A.  Scotty Alpaugh was -- worked in our wealth management group

21  looking after family offices.  Brad Lutzer was prime brokerage

22  sales.  Chris Salcedo was credit risk control, so independent

23  risk function.  Yifei Cheng worked for me.

24  Q.  To the best of your recollection, who attended the meeting

25  from Archegos?

1    A.  Pat Halligan and --

2              MR. HAGGERTY:  Objection, your Honor.

3              THE COURT:  Overruled.

4              THE WITNESS:  Pat Halligan and Will Tomita.

5    BY MR. ROTHSCHILD:

6    Q.  What did you understand Mr. Halligan's role to be?

7    A.  I believe he was chief financial officer.

8    Q.  What did you understand Mr. Tomita's role to be?

9    A.  Head of trading.

10   Q.  And to the best of your recollection, what happened during

11   the meeting at Archegos?

12             THE COURT:  Who said what, you mean?

13             MR. ROTHSCHILD:  Yes, your Honor.

14             THE WITNESS:  We asked our questions, the client

15   answered them.  Pretty typical.

16   BY MR. ROTHSCHILD:

17   Q.  What did you learn about Archegos during that meeting?

18   A.  We learned about how much leverage they used, how much free

19   cash they have on hand, how liquid their portfolio was.

20   Q.  And what did you learn, if anything, about who at Archegos

21   was responsible for picking the investments?

22   A.  I don't know that we asked that particular question, but

23   Bill Hwang was kind of the head guy, the name on the door.

24             THE COURT:  He was not at the meeting, though?

25             THE WITNESS:  No, he was not.

 1              MR. ROTHSCHILD:  Ms. Gamboa, could you please display

 2       for only Mr. Fairbanks what's been marked for identification as

 3       Government Exhibit 2104?

 4       BY MR. ROTHSCHILD:

 5       Q.  Mr. Fairbanks, do you recognize this?

 6       A.  I do.

 7       Q.  What is it?

 8       A.  It's an e-mail.

 9       Q.  Are you on the e-mail?

10       A.  I sent it.

11              MR. ROTHSCHILD:  The government offers Government

12       Exhibit 2104.

13              MS. ESTES:  No objection.

14              MR. HAGGERTY:  No objection.

15              THE COURT:  Received.

16              (Government's Exhibit 2104 received in evidence)

17              MR. ROTHSCHILD:  Your Honor, I'm just pausing to see

18       if it's up for the jury.  I'm not sure that it is.

19              THE COURT:  Jury sees it.

20              MR. ROTHSCHILD:  Thank you.

21       BY MR. ROTHSCHILD:

22       Q.  Mr. Fairbanks, who is this e-mail to?

23       A.  This is to Ashley McLucas, my boss, global head of risk for

24       prime brokerage.

25       Q.  When did you send this?

O586HWA3                          Fairbanks - Direct

1    A.  November 20, 2019.

2    Q.  Was this after the meeting at Archegos that we were just

3    discussing?

4    A.  It was.

5    Q.  And what was the purpose of this e-mail?

6    A.  To give my boss a heads up on a new client that was -- that

7    had a lot of senior level people interested in.

8    Q.  Where did you get the information that you included in this

9    e-mail?

10   A.  From the client directly.

11   Q.  Directing your attention to the part called

12   "client/strategy" and the subpart called "background."

13   A.  Yep.

14   Q.  Can you please read that?

15   A.  Bill Hwang, formerly Tiger Asia, created GFO

16   post-Tiger Asia's closing with 2.65 billion assets under

17   management with a long-term buy-and-hold strategy with long

18   bias, focused in tech and APAC.

19   Q.  What does the acronym "GFO" stand for?

20   A.  Global family office.

21   Q.  And you referred to 2.65 billion assets under management.

22   What do you mean by that?

23   A.  Equity, how much money he had in the account.

24   Q.  Now, what is a long-term-buy-and-hold strategy?

25   A.  So you can buy a stock, and you hold it for a year,

1    two years, five years, that would be considered a buy-and-hold

2    strategy, or you can buy a stock that you intend to sell

3    tomorrow if it goes up, that would be kind of a short-term

4    trade.

5    Q.  What does "long bias" mean?

6    A.  So generally, hedge funds are long and short the market

7    simultaneously.  Meaning they are long, Apple, and they can be

8    short, Tesla.  And so if they were long $100 of Apple and short

9    $100 of Tesla, you could say they were market neutral in that

10   the longs offsets perfectly with the shorts in terms of dollar

11   amount.  The long bias just meant he would be long more than he

12   would be short.  So if he's long 200 of Apple, and short $100

13   of Tesla, he would be deemed long bias.

14   Q.  And what does "focus in tech and APAC" mean?

15   A.  Just what we expected the companies who we would invest in,

16   is technology companies as well as APAC, which is just

17   Asia Pacific region, so Chinese, Japan, Hong Kong companies.

18   Q.  Directing your attention to the next part under "risk" and

19   to the subpart called "liquidity," could you please read just

20   the first sentence there?

21   A.  Client indicated they are supercritical on liquidity, felt

22   they could close their whole book in one day.

23   Q.  How, if at all, does liquidity impact your risk assessment?

24   A.  The more liquid the portfolio, the less risky it is.  So in

25   this case, he's saying he could sell his whole portfolio and

O586HWA3                          Fairbanks - Direct

1     turn everything into cash, so you'd have no positions left,

2     within one day.

3     Q.   Could you please read what it says next to "key risk"?

4     A.   Concentrated portfolio but liquid.   Less than 1DTV.

5     Volatile performance, minus 22 percent, October 2018.

6     Q.   That's okay, Mr. Fairbanks.   You can stop.   Thank you.

7              Why did you write concentrated but liquid?

8     A.   So even a client that is concentrated as long as it is

9     appropriately risk managed, and through that could be very

10    liquid, or very little leverage, it's okay to be concentrated.

11    So I'm just highlighting to my boss that we expect a

12    concentrated portfolio but that it would be very liquid.

13    Q.   And what does volatile performance mean in this context?

14    A.   The client made and lost a good amount of money in a month.

15    Whereas your typical, you know, asset manager or something

16    could make 1 or 2 percent in a month, or maybe in a good month

17    make you 5 percent, but in a bad month, lose you 3 percent.

18    He's making and losing down 27 percent and up 53 percent in

19    single months.

20    Q.   And why is that information --

21             THE COURT:   That's the rate at which you could make or

22    lose money?

23             THE WITNESS:   Correct.   So if he had $100 on January

24    1st, he had $153 at the end of January.

25             THE COURT:   When you say securities volatile means

O586HWA3                    Fairbanks - Direct

1    that it turns over many, many times?

2           THE WITNESS:  No, I just mean it goes up and down very

3    quickly.

4           THE COURT:  Okay.

5    BY MR. ROTHSCHILD:

6    Q.  And why is volatility important for your risk analysis?

7    A.  With leverage, you can make and lose more money than you

8    have.  And so when you trade volatile stocks, your up and down

9    starts doing one of these, so it's a lot -- you either make a

10   lot more money, or you lose a lot more money, potentially

11   losing my firm money.

12          THE COURT:  In a short time?

13          THE WITNESS:  In a short time, yes.

14   BY MR. ROTHSCHILD:

15   Q.  At the outset of UBS's relationship with Archegos, what was

16   your understanding, if any, about whether Archegos did business

17   with other prime brokers?

18   A.  They told us at the meeting that they had a couple other

19   relationships.

20   Q.  Why was that relevant, if at all, to your analysis of

21   Archegos?

22   A.  Because previously with Tiger Asia, the fact that the

23   client had some security violations, I highlighted it under

24   background so that my boss would know.  UBS had done business

25   with Tiger Asia, and exited the relationship in 2010.

1           MR. HAGGERTY:  Objection, your Honor.

2           THE COURT:  Overruled.

3           THE WITNESS:  I know that because I was hired in 2010,

4   and it was my first account to close.  And so I'm highlighting

5   to my boss that it's volatile, and there's what we call "hair

6   on it," meaning it's not -- it may not be an easy client to

7   onboard because of the past.

8           MR. ROTHSCHILD:  You can take that down.

9   BY MR. ROTHSCHILD:

10  Q.  Mr. Fairbanks, did UBS eventually take on Archegos as a

11  client who would trade in swap transactions?

12  A.  They did.

13  Q.  When UBS enters into a swap trading relationship with a

14  client, what types of documents, if any, are typically

15  involved.

16  A.  So, there's something callid an ISDA and a SCA agreement,

17  there is -- and then at UBS we had a kind of a portfolio swap

18  agreement.  And then there's potentially a couple other

19  agreements that go with them.

20  Q.  What's an ISDA?

21  A.  It's a standard agreement in Wall Street that allows a

22  client to trade a derivative.  A swap, specifically, because it

23  stands for International Swap Dealer Association.

24          MR. ROTHSCHILD:  Ms. Gamboa, could you show only

25  Mr. Fairbanks what's been marked for identification as

O586HWA3                         Fairbanks - Direct

1    Government Exhibit 325.

2    BY MR. ROTHSCHILD:

3    Q.  Mr. Fairbanks, do you recognize that?

4    A.  I do.

5    Q.  What is it?

6    A.  It's a 2002 master ISDA agreement.

7              MR. ROTHSCHILD:  Government offers Government

8    Exhibit 325.

9              MS. ESTES:  No objection.

10             MR. HAGGERTY:  No objection.

11             THE COURT:  Received.

12             (Government's Exhibit 325 received in evidence)

13   BY MR. ROTHSCHILD:

14   Q.  Mr. Fairbanks, at a high level, what is the jury looking at

15   here?

16   A.  It's a fairly long legal agreement that basically lays out

17   what is the rights of UBS and kind of what the -- what is

18   governed, what types of trades are governed by this agreement.

19   So in this case, swaps.  But generally the ISDA hey, if you

20   don't pay us, I can terminate you.

21             (Continued on next page)

22

23

24

25

O5DVHWA4                        Fairbanks - Direct

1   BY MR. ROTHSCHILD:

2   Q.  Now, you referred --

3           THE COURT:  You can do what?

4           THE WITNESS:  Terminate them, meaning I can sell the

5   positions and try to pay myself back.  Like a bank -- like a

6   bank foreclosing on your house.

7   Q.  Now, Mr. Fairbanks, when you say try to pay yourself back,

8   you mean pay the bank back, right?

9   A.  Sorry, the collective "we" the bank.

10  Q.  Mr. Fairbanks, you referred to this as the 2002 master

11  agreement.  What was the "dated as of" on the document?

12  A.  February 4th, 2020.

13  Q.  And would there typically be additional documents related

14  to or accompanying an ISDA for a client?

15  A.  Yeah.  All clients would have something called a CSA or a

16  credit support annex.

17          MR. ROTHSCHILD:  Ms. Gamboa, could you show

18  Mr. Fairbanks only what's been marked for identification as

19  Government Exhibit 328.

20  Q.  Do you recognize that, Mr. Fairbanks?

21  A.  I do.

22  Q.  What is it?

23  A.  It's the credit support annex.

24          MR. ROTHSCHILD:  Government offers Government Exhibit

25  328.

1              MS. ESTES:  No objection.

2              MR. HAGGERTY:  No objection.

3              THE COURT:  Received.

4              (Government's Exhibit 328 received in evidence)

5    Q.  So, Mr. Fairbanks, again, at a high level, what is the

6    function of this document?

7    A.  So the ISDA kind of governs the trade; the credit support

8    annex governs the margin.  So it governs both kind of the

9    initial margin or the margin they have to pay us for the trade,

10   but also kind of explains how we're going to pay them every day

11   and how they are going to pay us every day for the gains and

12   losses.

13             THE COURT:  It's called variation margin.

14             THE WITNESS:  Variation margin; correct.

15             THE COURT:  So the initial margin is the initial

16   deposit when you want to do a transaction or series of

17   transactions?  And the various -- and variation margin depends

18   on the fluctuation of the security that you purchase; it goes

19   up, you put in less, take out money.

20             THE WITNESS:  For the most part.

21             Initial margin implies you pay $20 today, and it's --

22   you owe the $20 forever.  This is why I said earlier that we

23   interchangeably use independent amount, initial margin, margin

24   interchangeably.  In this case it was independent amount and it

25   was a mathematical formula.  And every single day it would

1    recalculate how much margin you owed me.  So if I said it was

2    20 percent today, it could be 21 percent tomorrow or it could

3    be 19 percent tomorrow based on certain factors.  But if the

4    value of the stock went up or down and my percentage equally

5    went up and down every day, I'm telling you you owe me 20

6    today, but tomorrow could be $24, the next day it could be $17.

7              THE COURT:  Is that variation margin?

8              THE WITNESS:  That would be independent amount.

9              THE COURT:  What's variation margin?

10             THE WITNESS:  Variation margin is if the client made

11   money or lost money.  So if they made $10 and I had charged $20

12   on the trade, I would hold 20 percent of the gain back.  So

13   they made $10, and I said I want 20 percent of that, so I would

14   hold two and I would get -- the client could take back eight

15   and vice-versa.  If they were to lose money, they would have to

16   pay me.

17             MR. ROTHSCHILD:  Ms. Gamboa, if you could show

18   Mr. Fairbanks only what's been marked for Government Exhibit

19   331.

20   BY MR. ROTHSCHILD:

21   Q.  Mr. Fairbanks, do you recognize that?

22   A.  I do.

23   Q.  What is it?

24   A.  It's a portfolio swap master confirmation.

25             MR. ROTHSCHILD:  The government offers Government

O5DVHWA4                          Fairbanks - Direct

1    Exhibit 331.

2              MS. ESTES:  No objection.

3              MR. HAGGERTY:  No objection.

4              THE COURT:  Received.

5              (Government's Exhibit 331 received in evidence)

6    Q.  Again, Mr. Fairbanks, at a high level, what is the function

7    of this document?

8    A.  Simply put, every trade you do we write a legal contract

9    called a confirmation.  And so it will say what's the trade,

10   what's the price, and it goes through, you know, maybe 15, 20

11   pages.

12             The way the industry simplified things, instead of

13   having to send you every single day a 20-page document on every

14   single trade — imagine you did 100 trades today, you're going

15   to get 2,000 pages of documentation every day — we created

16   something called a master confirmation.  And so it simplifies

17   all of the like terms, and this way every day we can just send

18   you what trades you did and a few details.

19             And so this agreement basically says that, hey, these

20   are the terms we're going to trade equity swaps with you, and

21   then every day we're going to send you a simplified report just

22   saying what did you buy and sell that day.

23   Q.  Now, you just used the term "equity swaps."  Can you

24   explain what you meant by that?

25   A.  In this place "equity" means an equity stock, equity

1    security, and it's a swap on an equity.  So I'm calling it an

2    equity swap.

3              MR. ROTHSCHILD:  We can take that down.

4    Q.  Mr. Fairbanks, after Archegos was onboarded as a client,

5    did you continue to assess their riskiness on an ongoing basis?

6    A.  Yes, we did.

7    Q.  Why?

8    A.  We did that with all our clients through some level of

9    communication with them, just to make sure that, as I said

10   earlier, they were still in good standing, they were still a

11   good client.

12   Q.  What steps did UBS take, if any, to limit the risk of doing

13   business with Archegos?

14   A.  So we would -- so in this particular case, we set a limit

15   of how big the book could be, a gross.  We called it a gross

16   limit; so just how much trades we would allow the client to do

17   with UBS.

18   Q.  And when you say how big the book could be, what do you

19   mean by "book"?

20   A.  So if they were long $100 of Apple and short $100 of Tesla,

21   that's 200.  And so we said, Hey, you could only do X billion

22   with UBS.

23   Q.  Now, how does limiting the size of the book reduce the risk

24   to UBS?

25   A.  It allows -- it creates a smaller portfolio.  And so if the

1    client were to default, we would be able to sell the book

2    quicker into the market.  And so it somewhat improves UBS's

3    liquidity, but doesn't change their total liquidity, just

4    changes our portfolio.

5    Q.  After Archegos was onboarded as a client, did you continue

6    to have contact with representatives of Archegos?

7    A.  We did.

8    Q.  Who were your primary points of contact?

9    A.  Scott Becker and Will Tomita.

10   Q.  What did you understand Mr. Becker's position at Archegos

11   to be?

12   A.  He was head of risk.

13   Q.  What were the primary ways in which you communicated with

14   Mr. Becker and Mr. Tomita?

15   A.  Phone calls and emails.

16          MR. ROTHSCHILD:  Ms. Gamboa, can you show only

17   Mr. Fairbanks what's been marked for identification as

18   Government Exhibit 2123.

19   Q.  Mr. Fairbanks, do you recognize that?

20   A.  I do.

21   Q.  What is it?

22   A.  It's an email.

23   Q.  Are you on it?

24   A.  I wrote it.  I guess I'm on it, yes.

25          MR. ROTHSCHILD:  Government offers Government Exhibit

1    2123.

2                MS. ESTES:  No objection.

3                MR. HAGGERTY:  No objection.

4                THE COURT:  Received.

5                (Government's Exhibit 2123 received in evidence)

6    Q.  Mr. Fairbanks, directing your attention to the final page

7    of the document, which is page 4, do you see the email that you

8    sent on June 30th, 2020, at 5:18 p.m.?

9    A.  I do.

10   Q.  Who did you send that email to?

11   A.  I sent it to myself and Yifei Cheng, somebody who works for

12   me.

13   Q.  What was the purpose for which you sent this email?

14   A.  I had a phone call with the client to get an update on

15   what -- how they traded their book during COVID.

16   Q.  And could you summarize what happened in that call?

17   A.  Are you asking did I or can I?

18   Q.  Can you?

19   A.  Yes.  Sorry.

20                He said that they brought down their risk very

21   quickly; they sold and closed out a lot of positions.  And they

22   talked about, kind of, how much gross portfolio they were in.

23   Q.  And who at Archegos were you speaking with for this call?

24   A.  Will Tomita.

25   Q.  Directing your attention to the final bullet of the email

O5DVHWA4                              Fairbanks - Direct

1   that says "Adding more," could you please read that?

2   A.  Adding more U.S. liquid names in portfolio, but sees

3   opportunity in some China ADRs.

4           ADRs stand for American deposit receipt.  So these are

5   just Chinese companies that trade on the New York Stock

6   Exchange or NASDAQ.

7   Q.  And what was the significance, if any, of this information

8   in this bullet?

9   A.  Just we expected potentially more liquid U.S. names to be

10  put on with UBS, to trade it with UBS.

11  Q.  And directing your attention underneath the bullets where

12  it says "free cash," could you please read that?

13  A.  Says:  Substantial, but need to follow up with Scott.

14  Q.  What did you mean by that?

15  A.  Will said it was substantial.  I suspect that was the word

16  he used, since I wrote it; but that I would have to call Scott

17  to get the actual figure there.

18  Q.  And who did you understand "Scott" to mean?

19  A.  Scott Becker.

20  Q.  And what is free cash in this context?

21  A.  So remember when I mentioned earlier when you buy a house,

22  the bank wants to know how much cash -- they always ask about

23  your income just to make sure that you can pay your mortgage

24  the next month.  We do something similar.  We ask about how

25  much free cash you have just to make sure that, you know, they

1   can pay us if they were to take losses.  So if they lose money

2   and they owe me $10 million, I want to make sure they have 100

3   million in the account so that I know they can pay me the $10.

4   Q.  Now, scrolling up to page 3 of this document, do you see an

5   email that you sent to Mr. Cheng on July 1st, 2020 at 10:29

6   a.m.?

7   A.  I do.

8   Q.  And what was the purpose of sending this email?

9   A.  This was a summary of my phone call with Scott Becker.

10  Q.  Do you see the bullet that says "Unencumbered"?

11  A.  I do.

12  Q.  What does "unencumbered" mean in this context?

13  A.  Unencumbered is free cash.  So it's cash that's not pledged

14  to another bank.

15  Q.  Why is that relevant from your perspective?

16  A.  So if the client takes losses, they can pledge it to me;

17  they can send it to UBS.

18  Q.  Could you please read the first sub-bullet under

19  "unencumbered"?

20  A.  Target, 30 percent.  As of this morning, 40 percent.

21  Focuses on this very key.

22  Q.  What did you intend to convey there?

23  A.  That they tried to maintain about 30 percent of their

24  equity as free cash or unencumbered cash.  But as of that

25  morning, they had 40 percent; so more is better.

O5DVHWA4                        Fairbanks - Direct

1   Q.  Could you please read the final sub-bullet under

2   "unencumbered"?

3   A.  Send out hourly rates to Bill, that focused on free cash.

4   Q.  What did you intend to convey there?

5   A.  That Bill was very focused on how much free cash, and that

6   his employees needed to give him an update hourly on how much

7   he had.

8   Q.  And who did you mean by "Bill"?

9   A.  Bill Hwang.

10  Q.  Now, from a risk perspective, what was the relevance, if

11  any, about all this information about unencumbered cash?

12  A.  It was good they focused on it because obviously it's a

13  large risk mitigating factor, meaning the more free cash you

14  have, the more you can pay UBS if you were to take losses.  And

15  the fact that the founder of the family office was that focused

16  on it meant was good.

17          MR. ROTHSCHILD:  We can take that down.

18  Q.  Mr. Fairbanks, did there come a time when you started to

19  develop concerns about the composition of Archegos's book at

20  UBS?

21  A.  Yes.

22  Q.  Roughly when was that?

23  A.  Sometime in the summer of 2020.

24  Q.  What was the cause of your concern?

25  A.  They had a particular company called GSX.  It was a Chinese

1    educational company that was very, very volatile.  The stock

2    would go up and down a lot every single day, and the client had

3    a large position in it.

4    Q.  In swap?

5    A.  In swap.

6    Q.  Mr. Fairbanks, when you were at UBS, were your phone calls

7    with outside parties recorded?

8    A.  Always.

9    Q.  Why?

10   A.  UBS and regulators deemed I should have all my

11   communications recorded.

12   Q.  What, if any, discretion did you have to record calls with

13   outsiders or not?

14   A.  None.

15   Q.  So were your calls with Archegos recorded?

16   A.  They were.

17        MR. ROTHSCHILD:  Your Honor, at this time the

18   government would offer Government Exhibit 2533, which is an

19   audio file whose authenticity was addressed by the stipulation.

20        MS. ESTES:  No objection.

21        MR. HAGGERTY:  No objection.

22        THE COURT:  Received.

23        (Government's Exhibit 2533 received in evidence)

24        MR. ROTHSCHILD:  And, your Honor, I'll note that the

25   jurors, the witness, and the Court have been provided with

1    binders, with transcripts of this recording and others.  And

2    the parties have agreed upon the accuracy of those transcripts.

3              THE COURT:  So noted.

4              MR. ROTHSCHILD:  So we can pull up the audio file

5    marked government Exhibit 2533.  And the transcript is at

6    Government Exhibit 2533-T.

7    Q.  And before we start playing, let's just look at the first

8    page of the transcript.  What's the date and time of the call?

9    A.  October 21st, 2020, 1:51 p.m.

10   Q.  And who are the participants on the call?

11   A.  Myself and Scott Becker.

12             MR. ROTHSCHILD:  So we'll start playing at the

13   six-minute, 12-second marker.  And folks can follow along in

14   the transcripts on page 8, line 5.

15             (Audio played)

16             MR. ROTHSCHILD:  Maybe we can back up a little bit.

17             (Audio played)

18             MR. ROTHSCHILD:  We can pause that.

19             May I have one moment, your Honor?

20             THE COURT:  Yes.

21             MR. ROTHSCHILD:  Your Honor, if I can just explain

22   what's happening.  It seems like the audio is only coming out

23   of one channel when it's being played through the Trial

24   Director program.  So we're only hearing one half of the

25   conversation.  The government is endeavoring to play it outside

1   the Trial Director program, which should give us the full

2   audio, both sides of the conversation.

3           THE COURT:  I'm very happy to hear that.

4           THE WITNESS:  UBS would record two channels, one is

5   always my voice and the other channel is everyone else.  All of

6   UBS calls you would hear myself out of one ear and everyone

7   else out of the other.

8           MR. ROTHSCHILD:  Thank you, your Honor.  So the time

9   stamp is six minutes, 12 seconds.

10          THE COURT:  In the book, page?

11          MR. ROTHSCHILD:  Page 8, line 5.

12          That does not appear to have addressed the issue.

13          I apologize, your Honor.  We're going to try one more

14   fix.

15          THE COURT:  I don't think we're getting very much out

16   of this transcript substantively.  Maybe we can skip -- why

17   don't you elicit the information from Mr. Fairbanks directly?

18          (Audio played)

19          THE COURT:  Is that your voice?  Whose voice is it?

20          THE WITNESS:  Scott Becker.

21          MR. ROTHSCHILD:  Your Honor, with apologies, we have a

22   number of recordings that we intend to play with this witness.

23   If we could just have maybe a few minutes to work with the tech

24   folks to see if we can get this resolved.  I apologize for

25   the --

1          THE COURT:  I think you can elicit the information

2    without going through this elaborate play and replay.

3          MR. ROTHSCHILD:  My fear is only, your Honor, it's not

4    just this one call.

5          THE COURT:  Meanwhile, you can sort of get it to work.

6          Do you need a break?

7          MR. THOMAS:  Yes, your Honor.

8          THE COURT:  There's not much in here in this

9    particular one.  You can elicit from Mr. Fairbanks the same

10   information with less time.

11         MR. THOMAS:  Understood, your Honor.

12         I think there are a series of recordings that will

13   have the same tech issue.  We want to make sure the jury can

14   hear both sides of that information.  So if you just -- perhaps

15   we can consult with the Court's IT staff.

16         THE COURT:  It's going to take a half hour or so.  I'd

17   rather you went along, moved along.  This information you can

18   elicit directly from the witness.  We don't need to play.  We

19   don't need to hear this.

20         Brigitte thinks it's a court-wide problem.

21         THE DEPUTY CLERK:  I was out, too.  We're not getting

22   any service.

23         MR. ROTHSCHILD:  So, your Honor, we've confirmed it

24   does play properly when it's playing just out of the laptop.

25   So if there were a way to amplify the laptop by, for instance,

1   plugging a speaker directly into the laptop rather than going

2   through the court audio, that would address the issue.  I don't

3   know if there's a speaker.

4           THE DEPUTY CLERK:  We're back online.  See if it works

5   now because we're back online.

6           Do you guys want a microphone to play with the laptop?

7           MR. ROTHSCHILD:  Better would be a speaker to plug

8   into the laptop.

9           THE DEPUTY CLERK:  Grab the microphone over there.

10          THE COURT:  It's working now.

11          MR. ROTHSCHILD:  It seems like that will work, your

12  Honor.  Apologies again for the delay.

13          Okay.  So we're at Government Exhibit 2533, minute

14  marker 6:12, and page 8, line 5 of the transcript.

15          (Audio played)

16          MR. ROTHSCHILD:  We can stop it there.  I'm not sure

17  if that was audible or not.

18  BY MR. ROTHSCHILD:

19  Q.  Mr. Fairbanks, let me direct you to some parts of what we

20  just heard and ask you some questions.

21          Now, having listened to that, do you recall what this

22  phone call was about with Mr. Becker?

23  A.  I do.

24  Q.  And what was it about?

25  A.  Their position that I mentioned earlier, GSX, the Chinese

1  educational company, had just taken a large loss, and the

2  client owed us a large amount of money.  And so I was calling

3  Scott Becker just to understand -- to kind of hear from him

4  about how they think about these large losses and to make sure

5  that they were okay.

6            THE COURT:  This is around October 21, 2020?

7            THE WITNESS:  Yes, sir.

8            THE COURT:  1:51 in the afternoon?

9            THE WITNESS:  Yes, sir.

10  BY MR. ROTHSCHILD:

11  Q.  Now, directing your attention to page 8, line 6 of the

12  transcript, what were you conveying when you said:  The GSX

13  trade, that is either all with us or mostly with us, is that a

14  fair statement?

15  A.  The client had --

16            MS. ESTES:  Objection.

17            THE COURT:  Overruled.  You may answer.

18  A.  The position was concentrated, more concentrated than they

19  were expecting.  And part of that is because the stock had gone

20  up in value.  And so it became a larger portion of our

21  portfolio.  The only reason UBS did that large of a trade with

22  this client is we understood that this trade was exclusively or

23  almost exclusively done with UBS.

24            And so the question I'm asking Scott is the GSX trade,

25  that is either all with us or mostly with us.  I'm just trying

1    to get the client to confirm that we still saw most or all of

2    the trade so that he didn't have that position with anyone

3    else, any of his other prime brokers.

4    Q.  And directing your attention to page 8, line 8, what did

5    you understand Mr. Becker to mean when he responded:  A large

6    portion of it is, yes?

7    A.  At least more than 50 percent, just because previously we

8    understood it was almost all with UBS.

9    Q.  And from a risk perspective, what was the significance, if

10   any, of the fact that Archegos had a large portion of its GSX

11   position with UBS?

12   A.  So the name was not very liquid.  And so if the client were

13   to default and I had to sell the position in the market, I

14   wanted to make sure that there wasn't ten other banks selling

15   the same name.  Because if you have a lot of people selling one

16   particular stock, the stock is going to fall in value.

17             MR. ROTHSCHILD:  We can take that down.

18   Q.  Mr. Fairbanks, earlier you discussed that UBS imposed some

19   restrictions on the size of the book at Archegos, right?

20   A.  Correct.

21   Q.  Now, what steps, if any, did Archegos take to increase that

22   size?

23   A.  They called us a few times throughout the year-plus

24   relationship asking to grow the book with UBS.

25   Q.  And how, if at all, was your team involved when Archegos

O5DVHWA4                         Fairbanks - Direct

1  wanted to increase the size of the book?

2  A.  Every time we had a phone call with the client to get

3  updated information on how liquid they were, any information

4  around concentration, how big they were, how the performance

5  was doing.

6          MR. ROTHSCHILD:  Ms. Gamboa, could you please pull up

7  for only Mr. Fairbanks what's been marked for identification as

8  Government Exhibit 2131.

9  Q.  Mr. Fairbanks, do you recognize this?

10  A.  Yes.

11          MS. ESTES:  Your Honor, one moment.  Our screens.

12          MR. HAGGERTY:  We don't have it here.

13          THE COURT:  What's going on, Mr. Rothschild?

14          MR. ROTHSCHILD:  Your Honor, I believe it's just

15  Mr. Halligan's team's screen is not displaying this particular

16  exhibit for some reason.  I think everybody else has it up.

17  I'm prepared to give them my hard copy of it.

18          MR. HAGGERTY:  We're prepared to proceed with a paper

19  copy.

20          THE COURT:  What document?

21          MR. ROTHSCHILD:  This is Government Exhibit 2131.

22  It's not yet been received into evidence.

23  Q.  Mr. Fairbanks, do you recognize this document?

24  A.  I do.

25  Q.  What is it?

O5DVHWA4                          Fairbanks - Direct

1    A.  It's an email.

2    Q.  And are you on it?

3    A.  I am.

4              MR. ROTHSCHILD:  The government offers Government

5    Exhibit 2131.

6              MS. ESTES:  No objection.

7              MR. HAGGERTY:  Objection, your Honor.

8              THE COURT:  Did you receive this document,

9    Mr. Fairbanks?

10             THE WITNESS:  So sorry, sir.

11             THE COURT:  Did you receive this document?

12             THE WITNESS:  Yes, I did.  Originally it was an email

13   from Yifei Cheng to myself.  And he and I went back and forth

14   over email.

15             THE COURT:  On or about February 8, 2021?

16             THE WITNESS:  Yes, sir.

17             THE COURT:  In the evening around 6 o'clock, 6:30?  It

18   starts at noon.

19             THE WITNESS:  Yes, sir.

20             THE COURT:  You received it from whom?

21             THE WITNESS:  Yifei.  He worked for me.

22             THE COURT:  He works for you?  He works for you?

23             THE WITNESS:  He worked for me.

24             THE COURT:  So this is your internal email?

25             THE WITNESS:  Correct.  He was my employee.

1            THE COURT:  Why should I admit it?

2            MR. ROTHSCHILD:  I'm sorry, your Honor?

3            THE COURT:  Why should I admit it?

4            MR. ROTHSCHILD:  So, your Honor, if you look at the

5    earliest-in-time email in the thread, so if we could scroll

6    down, Ms. Gamboa, so that the Court can see the

7    earliest-in-time email.

8            There's a summary of a due diligence call that

9    Mr. Cheng, who, as Mr. Fairbanks just described, was his

10   employee, had with Archegos.  And he's providing Mr. Fairbanks

11   the summary of that call to permit Mr. Fairbanks and his team

12   to conduct their due diligence evaluation.

13           MR. HAGGERTY:  This is the message we object to, your

14   Honor.

15           THE COURT:  I know that.

16           Are you trying to get this in as a business record?

17           MR. ROTHSCHILD:  No, your Honor.  We're not offering

18   it for its truth.

19           THE COURT:  Then it's hearsay.

20           MR. ROTHSCHILD:  I'm sorry, your Honor?

21           THE COURT:  It's hearsay.  Objection sustained.

22           MS. MULLIGAN:  Thank you, your Honor.

23   BY MR. ROTHSCHILD:

24   Q.  So, Mr. Fairbanks, do you recall whether Mr. Cheng

25   participated in a due diligence call with Archegos in February

O5DVHWA4                      Fairbanks - Direct

1    of 2021?

2    A.  Yes.

3    Q.  And do you remember what led to that due diligence call?

4    A.  The client asking for -- to increase the book with UBS.

5           THE COURT:  So give us what happened in the course of

6    time.  Who called you, how did it come about, how did you

7    respond and so on.

8           THE WITNESS:  Typically, what would occur is the

9    salesperson would reach out saying, Hey, client wants to do

10   more business with UBS.  Myself --

11          THE COURT:  UBS salesperson?

12          THE WITNESS:  Correct.  Myself or someone on the team

13   would have a call with the client to get updated information.

14   In this case Yifei Cheng covered this account and so he had a

15   call with the client.

16          THE COURT:  What was the purpose of your call?

17          THE WITNESS:  To get update on liquidity,

18   concentration, how much equity they had, how big they were, how

19   big was their book across all of Wall Street, how much free

20   cash they had.

21          THE COURT:  And based on this information, what did

22   you do?

23          THE WITNESS:  We would either accept or reject the

24   client's ask for to do more business with UBS.

25          THE COURT:  So this memorandum that Mr. Rothschild

O5DVHWA4                          Fairbanks - Direct

1   asked you to look at was something that was done in accordance

2   with this procedure you just outlined?

3           THE WITNESS:  Correct.  It is a very common email.

4           THE COURT:  So it starts out with a request by your

5   trader.

6           THE WITNESS:  Or salesperson, yes.

7           THE COURT:  Passing on a request from the client.

8           THE WITNESS:  Or the client could have reached out to

9   us directly, but usually it would go through the salesperson.

10          THE COURT:  And he comes to you because you are the

11  boss?

12          THE WITNESS:  Sure, yes.

13          THE COURT:  And the boss of this particular function?

14          THE WITNESS:  Correct.

15          THE COURT:  Risk management?

16          THE WITNESS:  For the Americas, yes.

17          THE COURT:  And you respond?

18          THE WITNESS:  I do.

19          THE COURT:  You can admit it.  I admit it.

20          MR. ROTHSCHILD:  I can publish the document?

21          THE COURT:  Elicit it through testimony.  Just elicit

22  it through testimony.

23  BY MR. ROTHSCHILD:

24  Q.  Mr. Fairbanks, did Archegos make any representations during

25  that call to the best of your recollection?

1            MR. HAGGERTY:  Objection.

2            THE COURT:  Why don't you ask what was said -- what

3    was reported to you and how did you respond in respect to

4    Archegos's request for what?  What request?

5            THE WITNESS:  I think the request was to go to eight

6    billion or ten billion of exposure.

7            MR. HAGGERTY:  Your Honor, we object to the testimony.

8            THE COURT:  Overruled.  Go ahead.

9            MR. ROTHSCHILD:  Thank you, your Honor.

10   BY MR. ROTHSCHILD:

11   Q.  Mr. Fairbanks, were you given information about Archegos's

12   free cash amount?

13   A.  Yes.

14   Q.  And what, if any, information did you receive about

15   Archegos's free cash to the best of your recollection?

16   A.  That it was probably within 30 to 40 percent, which is what

17   it had been historically over the relationship to that point.

18   Q.  And what was the significance of that, if any, to your risk

19   analysis?

20   A.  We wanted to make sure that they still had a lot of cash to

21   pay us if they took losses.

22   Q.  Were you provided information about the concentration of

23   Archegos's portfolio?

24   A.  We were.

25   Q.  And what information were you provided about the

1    concentration?

2                  MS. ESTES:  Objection.

3                  THE COURT:  Overruled.

4    A.  Typically, what we understood is their largest holdings

5    were 30, 35 percent of their equity.  So if they have $100 of

6    equity, they -- largest position was $35.

7    Q.  So what does that percentage represent, 35 percent, can you

8    explain what that is?

9    A.  Relative to the equity.  So in this case, at that point, I

10   don't remember their equity in the account, but let's assume it

11   was ten billion, he's saying he's holding three and a half

12   billion dollars worth of Apple, Amazon, Google, Facebook,

13   Alibaba.

14   Q.  And how many positions were you told were at that 35

15   percent level?

16   A.  They gave us indication of like the top ten holdings were,

17   I think, between 25 and 35 percent, so they were all around the

18   same level.

19                  THE COURT:  Could you extract the same information

20   from your own books and records?

21                  THE WITNESS:  We understood that our portfolio was

22   unique and different; and so we understood that our names

23   weren't necessarily the same names the client had across the

24   street.

25                  You had asked earlier if we could look at audited

1    financials.  And the audited financials we had show that the

2    client had large positions in Amazon, Apple, Facebook, I

3    believe --

4              THE COURT:  And are these positions with brokerage

5    companies in addition to yours?

6              THE WITNESS:  In the financial reports, yes.

7              THE COURT:  So you're asking the client for a total

8    portfolio regardless of which broker it was placed with.

9              THE WITNESS:  Correct.  We're always asking --

10             THE COURT:  And as a result of this information that

11   you received, what did you do?

12             THE WITNESS:  In this case we approved the increase in

13   capacity.

14             THE COURT:  Now you can elicit what was the request

15   for increase and what was approved.

16             MR. ROTHSCHILD:  Thank you, your Honor.

17             One more question on the concentration point, to the

18   extent Mr. Fairbanks is able to testify about it.

19   BY MR. ROTHSCHILD:

20   Q.  Mr. Fairbanks, how can it be that ten names are each, as

21   you said, 25 to 35 percent?  Doesn't that equal more than 100

22   percent?

23   A.  It is.  And that's how we think of the leverage we talked

24   about earlier.  So when you bought your house at 100 and you

25   put down 20, I said that your leverage was 500, the 100 divided

O5DVHWA4                          Fairbanks - Direct

1    by 20.  In this case he's saying that each of his names is $35

2    and --

3              MS. ESTES:  Objection.  Who's the "he"?

4              THE COURT:  Overruled.  This is --

5    A.  Sorry.  The collective "we" and "he."  I'm sorry about

6    that.

7              MS. ESTES:  Objection.

8              THE COURT:  Overruled.

9              Go ahead.  Continue.

10   A.  When we think about leverage, so if every ten positions are

11   each 30 percent of equity and he has $10 billion, each of his

12   ten positions are worth three billion.  And when you sum that

13   up, you get 30 billion divided by the ten, and that would be

14   300 percent leverage.

15             In this case, the client had indicated that they were

16   running four or 500 percent leverage, sometimes 600 percent

17   leverage.  And that's because he's looking at both the longs

18   and the short positions.  So in this case the client was

19   shorting, you know, the generic stock market, the S&P, or the

20   Chinese market, or an emerging market market.  And so you add

21   the longs and the shorts, divide that by the equity, and you

22   get the leverage.

23   Q.  Mr. Fairbanks, from a risk perspective, what was the

24   significance, if any, of the fact that the top ten names were

25   roughly 25 to 35 percent concentrated?

1   A.   I mean, it implies he's running a lot of risk.  But we also

2   asked about the liquidity of the portfolio, how quickly he

3   could sell his book.  In this case I think the client indicated

4   they could sell the whole book over a couple of weeks.  So it

5   gave us some comfort that, yes it's levered; yes, it's

6   concentrated; but it's liquid.  He could exit his portfolio

7   quickly if he had to.

8            THE COURT:  That's really an opinion, isn't it?

9            THE WITNESS:  No.  Well, when you build mathematical

10  models on the equity market, you assume that you can sell, call

11  it, 10 to 15 percent of the daily volume.  So if a stock trades

12  a million shares a day, you as an individual could buy or sell

13  150,000 shares without moving the market too much.

14           And so when we quote each other, Hey, I can sell -- my

15  portfolio takes a week to sell, he's generally implying that

16  every day I'm selling 10 to 15 percent of the day's volume.

17  And after a week, I will have gotten out of my whole position.

18           MS. ESTES:  Your Honor, can we clarify who the "he"

19  is?

20           THE COURT:  This is a general --

21           THE WITNESS:  It's a general statement.  "He" could be

22  "she"; it could be "they."

23           THE COURT:  It could be anybody.  It's a general --

24           THE WITNESS:  It's not a particular client.  This is

25  just anyone in their industry.  A doctor uses doctor speak; a

1    lawyer uses legalese.  In a mathematical world of risk, we have

2    our own language.  And so when I am speaking to someone who

3    also knows financial risk management, we tend to use our own

4    language and there is generally agreed terms.

5    Q.  Mr. Fairbanks, how, if at all, would it have mattered to

6    you if it turned out that Archegos's top name around this time

7    was roughly 67 percent of its capital rather than 35 percent?

8             MR. HAGGERTY:  Objection.

9             THE COURT:  Overruled.

10   A.  We would have been very concerned.  We would have rejected

11   the increase because that would be too much risk.

12            THE COURT:  Is there a bright line?

13            THE WITNESS:  The way we were margining the portfolio,

14   there is no bright line, your Honor.

15            So imagine you had $100 and you went to a casino and

16   you bet on black 17 at the roulette table, and you lose the

17   100.  That's okay, it's your money.  But imagine I lent you my

18   money and you lose it, and now you can't pay me.  That's a

19   problem.

20            But if you were to say, I'll bet $10 on this number,

21   $10 on that number, $10 on that number, that may be a little --

22   a little less risky because you have a higher chance of winning

23   one of those numbers.  And that's how we think of these things.

24            So 67 percent, if that company was committing fraud

25   and turns out the company was worthless, they lose 67 percent

1    of their money instantly, one second, gone.  $20 million is now

2    worth six, seven.  That would be just absolutely horrifying to

3    us, that it would be too much risk he's running a lot of

4    leverage and he's too concentrated.

5              THE COURT:  So a certain amount of leverage is an

6    acceptable risk to you; and an excess of that by a wide margin

7    is unsatisfactory to you.

8              THE WITNESS:  Correct.

9              THE COURT:  And when a party tells you that I can

10   liquidate my position within a week, you're taking this as an

11   opinion or as a statement of relationships, mathematical

12   relationships?

13             THE WITNESS:  I'm taking it as a statement of fact

14   based on the math.

15             MR. ROTHSCHILD:  Thank you, your Honor.

16   BY MR. ROTHSCHILD:

17   Q.  Mr. Fairbanks, do you know whether UBS granted Archegos's

18   request to increase capacity at this time?

19   A.  We did.

20   Q.  Now, directing your attention to March of 2021 --

21             THE COURT:  Before we get there, shall we continue,

22   members of the jury, or shall we take a break?  You want a

23   break?  Sorry?

24             JUROR:  Bathroom break, please.

25             THE COURT:  Great.  Okay.  Try to do it -- limit it to

O5DVHWA4                        Fairbanks - Direct

1    ten minutes, if you can.

2              Leave your books closed on your chairs.  Don't bring

3    them out.  Don't discuss the case.  Keep an open mind.

4              (Jury not present)

5              MS. ESTES:  Your Honor, may we take up one thing

6    quickly?

7              THE COURT:  You may.

8              We don't need Mr. Fairbanks, right?

9              Sit down, please.  Leave Mr. Fairbanks alone, please.

10   Nobody could talk to him.  Nobody.

11             MR. ROTHSCHILD:  Your Honor, I think the agent was

12   going to show him where the rest room is.  Is that okay?

13             THE COURT:  Nobody can talk to him.

14             MR. ROTHSCHILD:  Thank you.

15             THE COURT:  There's a court security officer in the

16   back who can do all that.

17             Who wants to bring something up?

18             Yes, go ahead.

19             MS. ESTES:  So, your Honor, one thing with this

20   witness, he keeps using the term "he" or "they" without

21   explaining who from Archegos is telling him anything.  And it

22   seems a little purposeful because he is talking to the

23   cooperating witnesses.

24             THE COURT:  My perception is he was not talking about

25   anybody from Archegos; he was explaining a difficult concept

O5DVHWA4                           Fairbanks - Direct

1   and using a personal pronoun.

2              MS. ESTES:  Your Honor, I hear you.  But this was a

3   little bit in the context of the call.  But we would just ask

4   the prosecutors clarify -- when they are asking about what

5   Archegos conveyed on a call, that they clarify who at Archegos

6   conveyed that --

7              (Indiscernible crosstalk)

8              MS. ESTES:  -- Mr. Becker.

9              THE COURT:  He was answering a question that I began.

10             Have a break.  Enjoy yourself.

11             (Recess)

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

O5D6HWA5                          Fairbanks - Direct

```
 1              (Jury present)
 2              THE COURT:  Come up, Mr. Fairbanks.  You remain under
 3   oath.
 4              Everyone be seated, please.
 5              Mr. Rothschild will continue his direct examination.
 6              MR. ROTHSCHILD:  Thank you, your Honor.
 7   BY MR. ROTHSCHILD:
 8   Q.  Mr. Fairbanks, directing your attention to March 2021, are
 9   you aware whether Archegos sought to increase its book size at
10   UBS again?
11   A.  They did.
12              MR. ROTHSCHILD:  Ms. Gamboa, could you please pull up
13   for only Mr. Fairbanks what's been marked for identification as
14   Government Exhibit 2142?
15   BY MR. ROTHSCHILD:
16   Q.  Mr. Fairbanks, do you recognize this?
17   A.  I do.
18   Q.  What is it?
19   A.  It's an e-mail.
20   Q.  Are you on the e-mail?
21   A.  I am.
22              MR. ROTHSCHILD:  The government offers Government
23   Exhibit 2142.
24              MS. ESTES:  Your Honor, may we have one moment?  Our
25   screen is not working.
```

1          (Pause)

2               MS. ESTES:  No objection, your Honor.

3               MR. HAGGERTY:  No objection, your Honor.

4               THE COURT:  Received.

5               (Government's Exhibit 2142 received in evidence)

6               MR. ROTHSCHILD:  Let's scroll to Page 6.

7    BY MR. ROTHSCHILD:

8    Q.  Mr. Fairbanks, do you see the e-mail on the top of Page 6?

9    A.  Yes.

10   Q.  Who sent that e-mail?

11   A.  At the very top?

12   Q.  Yes.

13   A.  I did.

14   Q.  When did you send it?

15   A.  March 5, 2021.

16   Q.  Whom did you send it to?

17   A.  Yifei Cheng and Ashley McLucas, my boss.

18   Q.  Could you read the body of the e-mail?

19   A.  As Yifei points out, the book is big, and they are looking

20   to grow.  Having a call with client on Monday to get fresh

21   info, so we'll put time in your calendar on Tuesday to discuss.

22   But as Yifei has outlined, we would be charging 40 percent

23   margin on the incremental names, which helps our overall SeCT

24   profile.  But, again, 10 billion is a big number, so want to

25   flash due to their historical volatile performance.

O5D6HWA5                        Fairbanks - Direct

1   Q.  What did you mean by "the book is big"?

2   A.  10 billion is a pretty sizable portfolio.

3   Q.  What did you mean by "they are looking to grow"?

4   A.  They wanted to increase the exposure.  I think we were

5   9 billion or so, and they were looking to grow to 10 billion.

6   Q.  What did you mean by "having a call with client on Monday

7   to get fresh info"?

8   A.  Just again, to have a call with the client to do another

9   due diligence to get updated information on performance,

10  equity, liquidity, concentration.

11  Q.  From a risk perspective, why, if at all, would you want

12  fresh info, if a client was looking to grow?

13  A.  Just to make sure that they were still a good client and

14  healthy.

15  Q.  Did you, in fact, have a call with someone from Archegos

16  the following Monday to get fresh info?

17  A.  Yes.

18          MR. ROTHSCHILD:  Your Honor, at this time, the

19  Government would offer another recorded call, Government

20  Exhibit 2544.

21          THE COURT:  Before you leave this, put it back up,

22  please.  One minute.  Stop.

23          It talks about 40 percent margin on incremental names.

24  What do you mean by "incremental names"?

25          THE WITNESS:  So we were going to charge higher

O5D6HWA5                          Fairbanks - Direct

1    margins on the new portfolio that they were bringing in.  So,

2    for example, if we were charging 30 percent before, we were

3    going to charge 40 percent.  So it would protect us if the

4    market decreased or declined by 40 percent, giving ourselves

5    more money.

6              THE COURT:  Proceed, Mr. Rothschild.

7              MR. ROTHSCHILD:  Thank you, your Honor.

8              As I was saying, the Government would offer Government

9    Exhibit 2544, which is another recorded call.

10             MS. ESTES:  No objection.

11             MR. HAGGERTY:  No objection.

12             THE COURT:  Received.

13             (Government's Exhibit 2544 received in evidence)

14             THE COURT:  Go ahead.

15             MR. ROTHSCHILD:  The corresponding transcript is

16   2544-T.

17   BY MR. ROTHSCHILD:

18   Q.  So before we start playing the audio, looking at the first

19   page of the transcript, Mr. Fairbanks, what is the date and

20   time of the call?

21   A.  March 8, 2021, 5:00 p.m.

22   Q.  And who participated in this call?

23   A.  Myself, Yifei Cheng, Chris Salcedo, and Scott Becker.

24   Q.  What did you understand the purpose of this call to be?

25   A.  Just to get the fresh information from the client, and

O5D6HWA5                        Fairbanks - Direct

1    update all their portfolio and risk.

2    Q.  So we are going to start at the 8 minute, 50-second marker,

3    which is at Page 9, Line 11 of the transcript.

4              (Audio played)

5              MR. ROTHSCHILD:  Okay, we can stop it there.

6    BY MR. ROTHSCHILD:

7    Q.  Mr. Fairbanks, what were you getting at with the questions

8    you were asking in that part of the call?

9    A.  The bigger the portfolio, the more impact it would have in

10   the market if the client were to sell it.  And so what I'm

11   focusing on is liquidity; how quickly can the client sell out

12   of his portfolio?  We saw March 2020, when COVID first hit, the

13   stock market fell 18 percent in a single week.  And so it's

14   important to know from my seat the client is able to sell down

15   his portfolio during an event like that and not run out of

16   money.  And so the focus is really on is how liquid is his

17   book.  And the bigger the book, the bigger the concern.

18   Q.  Directing your attention to Page 9, Line 15, and then you

19   say -- you use the phrase "4 yards," and then on Page 10,

20   Line 1, you used phrase "23 yards."  What were you referring to

21   there?

22   A.  Yards in our language means billions.  So I'm just saying

23   4 billion and now it's 23 billion.

24   Q.  And what's the relevance of that difference to you from a

25   risk perspective?

1  A.  The difference really was the fact that he had 20 billion

2  of exposure when it was worth 4 billion of equity.  And now the

3  client has 100 billion of exposure at 23.  And that hundred

4  billion is a very, very large number.

5  Q.  Explain what you mean by "exposure"?

6  A.  The market value of his portfolio, so the value of the

7  stocks is the exposure.

8  Q.  So now, I'm sorry?

9  A.  I said sorry.

10  Q.  On Page 10, Lines 9 through 10, what did you understand

11  Mr. Becker to mean when he said "they could liquidate almost

12  all the portfolio in about two weeks"?

13  A.  This is the comment I made to your Honor when I said in our

14  language and kind of financial risk, we always use kind of a

15  standard mathematical formula.  So he's telling me that his

16  formula, he's using 10 to 20 percent of the daily volume, so if

17  the stock trades a million a day, he can sell 100,000 to

18  200,000 of it.

19       And using that metrics, he can sell out of his whole

20  portfolio, he can exit his whole portfolio in about two weeks.

21  And that's -- for that big of a book, that's a very quick time.

22  Q.  Directing your attention to Page 11, Lines 4 through 6.

23  What did you mean when you said that Viacom was up 200 percent

24  in the last four months?

25  A.  It was a very volatile stock, and the stock had rallied up

1    200 percent.  So effectively went from $10 to $30 in

2    four months, which is very, very quick.

3    Q.  How did Mr. Becker respond?

4    A.  Chuckled-ish.  He said yeah, that's an extreme, but a lot

5    of our core positions have moved.

6    Q.  Were you keeping track of the price of Viacom during the

7    period from late 2020 into early 2021?

8    A.  We were.

9    Q.  Why?

10   A.  It was a large portion of his portfolio with UBS.  So we

11   tracked that name, we tracked GSX, which is another name we

12   talked about earlier.  So we did track some of his bigger

13   positions closely.

14   Q.  And what happened to the price of Viacom stock during that

15   time period?

16   A.  It -- it went up, starting, I want to say, December.  It

17   went up a little.  But January, February, it went up a lot,

18   very, very quickly.

19   Q.  And then?

20   A.  It collapsed in March, end of March.

21   Q.  What was the pace at which the price of Viacom stock rose

22   during that period?

23   A.  If I could -- something like this.  I don't know how to

24   describe that.  It went up, you know, not quite a rocket ship,

25   but it went up very, very quickly.

O5D6HWA5                      Fairbanks - Direct

1    Q.  After the price of Viacom stock fell, did it ever recover

2    to its high point from the early 2021 period?

3              MS. ESTES:  Objection.

4              THE COURT:  Overruled.

5              THE WITNESS:  No, not even close.

6    BY MR. ROTHSCHILD:

7    Q.  Have you ever seen anything like that movement in the

8    Viacom stock, whether before or after?

9    A.  No, never.

10   Q.  From a risk perspective, what was significant, if anything,

11   about the rise in Viacom stock price?

12   A.  It increased the concentration with UBS.  Because as that

13   name moved up faster than his other names, it became a larger

14   portion or the higher risk that we faced.

15   Q.  And why -- I'm sorry?

16   A.  If the stock were to fall, it meant UBS ran more risk of

17   likely losing money.

18   Q.  And from a risk perspective, what is significant, if

19   anything, about a rise in price in a stock for which UBS had

20   put on a swap trade with a client?

21   A.  Sorry.  Could you ask that again?

22   Q.  As a general matter, from a risk perspective, what is

23   significant, if anything, about a rise in the price of a stock

24   for which UBS had put on a swap trade with a client?

25   A.  I mean, our concern is always the stock goes back to the

1    lower value.  In which case, the client would have taken a

2    large loss and would have owed UBS a lot of money.

3    Q.  Okay.  Let's keep listening to this call from where we left

4    off, which is the 11 minute, 26 second marker.  And you can

5    follow along starting on Page 11, Line 17.  Page 11, Line 17.

6              (Audio played)

7              MR. ROTHSCHILD:  Okay.  We can pause there.

8    BY MR. ROTHSCHILD:

9    Q.  Mr. Fairbanks, directing your attention to Page 12, Lines 4

10   through 5, what did you understand Mr. Becker to mean when he

11   said that "the largest position was 35 percent of capital"?

12   A.  Going back to my earlier example, if they had 10 billion of

13   equity but his largest position was three and a half billion,

14   so that would be 35 percent of his capital.  So he's kind of

15   talking or describing how big his top holdings are.

16   Q.  And directing your attention to Page 12, Lines 5 through 9,

17   what did you understand Mr. Becker to mean when he said that

18   "the top ten positions in aggregate were around 300 percent"?

19   A.  If you sum up the value of his top ten positions in my

20   example of 10 billion of equity, he had $30 billion of market

21   value or a value of stocks versus the 10 billion of equity in

22   my example.

23   Q.  And from a risk perspective, what was the significance, if

24   any, of Mr. Becker's statements about the sizes of Archegos'

25   positions?

1  A.  I mean, these were -- these were pretty big.  But by

2  itself, you know, as long as the portfolio was liquid, it would

3  be okay.

4  Q.  So we can keep playing from there, which was the 12 minute,

5  37-second marker, and you can follow along Page 12, Line 13.

6           (Audio played)

7           MR. ROTHSCHILD:  Okay.  We can stop there.

8  BY MR. ROTHSCHILD:

9  Q.  Mr. Fairbanks, what were you driving at with the questions

10 you were asking in that section?

11 A.  Trying to understand is -- if our book was similar to other

12 firms' books.  Meaning do we have the same names, because we

13 understood -- we believed that our portfolio was unique and

14 different, meaning we had different names than other firms.

15 Q.  And from a risk perspective, what's the significance of

16 what Archegos' books at other brokers look like?

17 A.  It's important to understand the full picture to understand

18 how likely they could pay us, basically.  So if you knew that

19 you had -- so we talk about GSX, and he said it was "much

20 larger with you guys than we have with anybody else," that was

21 important to us because we wanted to make sure that if the

22 client defaulted, we would be the only one selling the name out

23 in the street, and so you didn't have ten people piling on and

24 pushing the price down.

25           And so one of the questions I asked him is, they all

1    have similar looking books in terms of directionality, but that
2    they had different names.
3    Q.  And what would happen if, you said, there were ten people
4    selling in the market at the same time, could you explain that?
5    A.  Yeah.  So imagine I'm selling a million dollar --
6    $100 million worth of Apple, the stock is going to move because
7    that's a lot of market value being sold.  But if I knew that I
8    was selling 100 and 20 other people were selling 100 million
9    and now we're selling $2 billion of Apple, the stock price will
10   go down because that's a lot of people selling a large volume.
11   Q.  Okay.  Directing your attention to Page 13, Lines 9 through
12   13, what did you understand Mr. Becker to mean when he said
13   that "part of the reason Archegos was willing to add to the GSX
14   position at UBS at such high margin rates was because Archegos
15   had had a really hard time getting capacity at other brokers"?
16   A.  So earlier I said that when a client enters a swap, the
17   bank go -- and the client buys a stock on swap, the bank goes
18   and buys the physical.  Banks can only hold so much of
19   companies before they have to report ownership.  And so every
20   bank has a limit of how much stock they can go buy.
21          So, for example, maybe they can have 5 percent of a
22   company, but they won't buy any more.  In which case, they
23   won't write a swap on it because they've reached capacity.  UBS
24   had the capacity and so we agreed to trade GSX with this
25   client, but because the name was volatile and risky, we kept

1    charging higher and higher margins every time he traded more of

2    it.

3    Q.   And directing your attention to Page 13, Lines 15 through

4    17, what did you understand Mr. Becker to mean when he said,

5    "it's much larger with you guys than we have it with anybody

6    else"?

7    A.   Reiterating the fact that we had the bulk of his position

8    in GSX.

9    Q.   Why did it matter if Archegos' GSX position at UBS was much

10   larger than Archegos' GSX position at other brokers?

11            (Clarification by the court reporter)

12            THE WITNESS:   Again, in case the client were to fail

13   to pay us, we would have wanted to make sure that we would be

14   one of the only ones selling the name in the market to -- so

15   that it wasn't a lot of people piling on and hurting the price.

16   Q.   Okay.   Directing your attention to Page 14, Lines 5 through

17   7.   How did Mr. Becker respond when you said "I would assume

18   brokers have similar looking books, just different names"?

19   A.   "They are pretty similar, yeah, exactly." I took that to

20   mean that they had different names.

21            MR. ROTHSCHILD:   Okay.   We can skip ahead.   We're

22   going to play a clip that starts at 18 minutes, 54 seconds.

23   And you can follow along on Page 17, Line 7.

24            (Audio played)

25            MR. ROTHSCHILD:   Okay.   We can stop there.

O5D6HWA5                        Fairbanks - Direct

1    BY MR. ROTHSCHILD:

2    Q.  Mr. Fairbanks can you explain what was going on in that

3    exchange?

4    A.  Going back and forth with Scott Becker trying to understand

5    kind of what overlap we had with other brokers, so of the names

6    that I had on with the client, did we have those names away,

7    trying to understand kind of what were his biggest positions

8    could be.  Client kind of led us to believe that, you know, the

9    Amazon, the Apples were still the big positions, and that our

10   portfolio was different than others.

11   Q.  So let's look at Page 17, Lines 7 through 11.

12          What did you mean when you said, "At some point,

13   you're going to become the market mover as you move in and out

14   of these positions"?

15   A.  If you own 1 percent of Apple, that's a pretty big

16   position.  But if you own 10 percent of the company, that's a

17   huge position.  And so the bigger your ownership of a company,

18   if you own 20 percent and you try to sell 20 percent of a

19   company, the bigger you are of a company, the more you're going

20   to move the market when you go to sell.

21   Q.  Why is that?

22   A.  Because you effectively are selling 5, 10, 20, 50 days of

23   volume to exit, and people will know quickly that you're

24   selling a large position of a company, and the stock price will

25   fall.

1    Q.  What do you mean by selling days of volume?

2    A.  So earlier, I can't remember if this was this call or

3    earlier in this call, Scott said looking at 10 to 15 percent of

4    the volume, he could sell in two weeks.  So two weeks is

5    ten days.  Ten percent means he holds one day of volume.  One

6    tenth per day.  But if you're selling every single day for

7    weeks and months on end, the stock has a constant pressure

8    pushing the price down.  And when you have 20, 30, 40 percent

9    of a company, you could have 100 days, 200 days.  I mean, you

10   could be selling 10 to 15 percent of the company -- of the

11   daily volume every single day for the whole year and that stock

12   is going to naturally fall just because of the sheer pressure

13   of someone selling a lot, every day.

14   Q.  Now, directing your attention to the same page, Lines 18

15   through 20, what did you mean when you said, "at what point do

16   you say it is too much capital to move into this type of

17   concentrated strategy"?

18   A.  The bigger the positions, the less liquid they become.  And

19   so at this point, he's, you know, 20-something billion dollars.

20   At some point, he has to add new names to his book just to

21   diversify because otherwise the concern is he owns 5,

22   10 percent of the companies, and getting out of positions that

23   big is really hard --

24   Q.  Now --

25   A.  -- without taking a loss or without taking -- without

1    pushing the price down.

2    Q.   Directing your attention to Page 20, Lines 5 through 6.

3             What did you mean when you said, "At 35 percent of AUM

4    for your top position, we're talking 7 yards for a name"?

5    A.   So, at that point, roughly 20 billion of equity, so

6    35 percent of that implies he's holding 7 billion of market

7    value of these companies.  So I'm just highlighting that these

8    are big -- pretty big positions.

9    Q.   And then looking at Line 8 through 12 of this page, what

10   did you mean when you said, "I'm hoping, it's Amazon, Google,

11   Microsoft, Apple, like big stupidly liquid type names, whereby

12   even at that size, it doesn't really matter, can you dump that

13   and not move the market?"

14   A.   I mean, each of those companies are 500 billion, a trillion

15   dollars of market cap.  And so even if you held $7 billion of

16   one of those companies, it's a very small portion of the

17   company.  And because they trade large, large volumes — 10, 20,

18   $30 billion a day, you could sell that very quickly and not

19   move the market, not push the price down.

20   Q.   You used the term "market cap," what do you mean by that?

21   A.   The value of all the shares outstanding times the price is

22   the market cap.  So when you see, you know, the news at night

23   they may say hey, Apple is a 1 trillion-dollar company, that's

24   the market cap.

25   Q.   Now, by giving the examples of Amazon, Google, Microsoft,

O5D6HWA5                        Fairbanks - Direct

1    Apple, what names, if any, were you trying to draw a contrast

2    against?

3    A.  The names actually in his book, GSX, iQIYI, Discovery.

4    Q.  And what was the contrast there?

5    A.  That Amazon, Google were big stupidly liquid companies, and

6    iQIYI was not a big or stupidly liquid company.

7    Q.  Now, directing your attention to Lines 14 through 17 on

8    this page.

9         What did you mean when you said that those are the

10   names that you recall from a year ago that were some of

11   Archegos' bigger names?

12   A.  Either through -- both through possibly through

13   conversations with the client, as well as what was reported in

14   their annual financial report that they had sent us.

15   Q.  That you recall what?

16   A.  That he had those names.

17   Q.  Which names?

18   A.  Apple, Google, Microsoft, and Amazon type names.

19   Q.  And directing --

20        THE COURT:  Why couldn't you just simply ask him for a

21   statement of what he held at a particular point in time?

22        THE WITNESS:  We did.  They said no, thank you.  There

23   is no obligations or regulatory requirement for them to provide

24   it.

25        THE COURT:  But you were providing money?

1              THE WITNESS:  Correct.

2              THE COURT:  So you could have done whatever you wanted

3     to do.

4              THE WITNESS:  Sorry, say that again, please, sir.

5              THE COURT:  You could have done whatever you wanted to

6     do.

7              THE WITNESS:  Correct.  There's some level of, this is

8     somewhat the kind of market standard at that time.

9              THE COURT:  The client sounds like it's dancing all

10    over the place without asking a direct question.

11             THE WITNESS:  We knew the client wasn't willing to

12    share their actual names, and so I am asking different ways or

13    trying to get different answers to measure the riskiness of the

14    book.  I go back to, you know, asking about the top holdings

15    and how liquid they are and how exactly he can sell his

16    portfolio, because based on that information, I can go out and

17    kind of model what I think his portfolio is by looking at the

18    stocks in the market and try to back into what I think he held.

19             THE COURT:  But if you don't ask a direct question,

20    you can't get a direct answer.

21             THE WITNESS:  We did.

22             THE COURT:  Did you ask -- what?

23             THE WITNESS:  We did ask for a direct question.

24    Chris Salcedo did.  He asked explicitly, please show us your

25    top ten and how big they are.  The client said no.

1  Unfortunately, that's not uncommon with a lot of these clients.

2  They don't want people knowing what they have because they view

3  it as their proprietary information, that that's the secret to

4  making them more money.

5  BY MR. ROTHSCHILD:

6  Q.  Directing your attention to Line 18 on this page, how did

7  Mr. Becker respond when you said that you recalled from a year

8  ago that those were some of the bigger names?

9  A.  They still are.  They still are.

10  Q.  Directing your attention to Page 21, Lines 11 through 13,

11  what did you mean when you said you have a lot of

12  big-conviction names, but as long as the market is deep enough,

13  it doesn't really matter how big you get?

14  A.  Big conviction just means concentration.  And as long as

15  the market is deep enough, meaning he's in those really, really

16  ultra large companies like Apple, he can get very big and still

17  not move the market.

18  Q.  And going on from there, what did you mean when you said:

19  But when you're not playing in the 100 billion,

20  500 billion-type market cap games, then the liquidity under the

21  surface can be less than what you're seeing if the market

22  turns?

23  A.  If you're selling a large position in a company and it was

24  a smaller company, you may find out that the billion would

25  start -- the price of the stock would fall faster than you

1    would think it would.

2    Q.  Now directing your attention to Page 22, Lines 16 through

3    17, what did you mean when you said, I would think we don't

4    have a ton of your top tens because we don't have those names?

5    A.  We did not have all the Amazon, Apples, Googles in our

6    portfolio.

7    Q.  And how did Mr. Becker respond to that?

8    A.  Yeah, it's not fully representative.

9    Q.  Directing your attention to Page 23, Lines 13 through 15,

10   what did you understand Mr. Becker to mean when he said:  I

11   wouldn't say if you took our top ten positions at UBS, that

12   those are our top ten positions overall?

13   A.  I took that to mean the names he had with UBS were

14   different than he had at the other providers, the other banks.

15   Q.  Now, directing your attention to Page 24, Lines 4 through

16   5, what did you mean when you said, my expectation is my book

17   is different than your others?

18   A.  Again, that the names in my book or portfolio were

19   different than what he had with his other providers at the

20   other banks.

21   Q.  How did Mr. Becker respond?

22   A.  Yeah, it is.  Confirming my suspicions.

23   Q.  Now, Mr. Fairbanks, from a risk perspective, what was the

24   significance of whether Archegos' book at UBS was different

25   than Archegos' books at other brokers?

O5D6HWA5                           Fairbanks - Direct

1    A.  So at that point we -- I mean, he could have, you know,

2    couple percent to 5 percent of a company with UBS in some of

3    these names, but if he had those sized positions with everyone

4    else on the street, it would imply he had 20 to 50 percent

5    ownership of a lot of these companies.

6    Q.  What do you mean by "everyone else on the street"?

7    A.  If he had these positions with his other providers, his

8    other banks.

9    Q.  Why would that be significant if he did?

10   A.  You can't get out of a position that big.

11   Q.  Why not?

12   A.  Not too many people are willing to write a check for

13   $50 billion to buy half a company.  It's just too big.

14   Q.  Now, we heard in that call that Mr. Becker told you that

15   Archegos' top position was 35 percent of capital.  Right?

16   A.  Yes.

17   Q.  And we heard in that call that based on the information --

18          THE COURT:  35 percent of capital means 35 percent of

19   what?

20          THE WITNESS:  Equity.

21          THE COURT:  Of equity of one place or total?

22          THE WITNESS:  Total.

23          MR. ROTHSCHILD:  Thank you, your Honor.

24   BY MR. ROTHSCHILD:

25   Q.  And we heard in that call that based on the information

O5D6HWA5                          Fairbanks - Direct

1   Mr. Becker provided you, you calculated that Archegos' top

2   position was about $7 billion, and you believed it was not a

3   name that UBS held.  Right?

4   A.  Other than Viacom, correct.

5   Q.  Mr. Fairbanks, how would it have mattered from a risk

6   perspective, if at all, if Mr. Becker had told you that

7   Archegos' top position at that time was actually more than

8   75 percent of capital rather than 35 percent?

9   A.  We probably would have hit the panic button, reached out to

10  senior management to alert them of the -- how much risk -- how

11  much more risk we were taking than we thought.  We would raise

12  margins on the client and potentially ask them to leave, and

13  we'd fire the client.

14  Q.  And how would it have been relevant from a risk perspective

15  if Mr. Becker had told you that on March 8, 2021, Archegos held

16  the equivalent of over $19 billion worth of Viacom?

17  A.  We would have been horrified because that would have been,

18  I don't know, 40 percent of the company.  I mean a big position

19  of owning a company is 5.  So to own 40 percent of a company is

20  monstrous.  And you're taking leverage.  Like most companies

21  that buy other companies, they don't use a lot of leverage to

22  do it, maybe ten percent, 20 percent, not 500 percent.

23          MR. ROTHSCHILD:  Ms. Gamboa, can you please pull up

24  only for Mr. Fairbanks what's been marked for identification as

25  Government Exhibit 2139?

O5D6HWA5                    Fairbanks - Direct

```
1   BY MR. ROTHSCHILD:
2   Q.  Mr. Fairbanks, do you recognize that?
3   A.  I do.
4   Q.  What is it?
5   A.  It's an e-mail.
6   Q.  Are you on it?
7   A.  I am.
8           MR. ROTHSCHILD:  The Government offers Government
9   Exhibit 2139.
10          MR. HAGGERTY:  No objection.
11          MS. ESTES:  No objection.
12          THE COURT:  Received.
13          (Government's Exhibit 2139 received in evidence)
14  BY MR. ROTHSCHILD:
15  Q.  And directing your attention to the earliest-in-time e-mail
16  in the thread which starts on Page 2, who sent that e-mail?
17  It's at the bottom of the page there.
18  A.  I did.
19  Q.  When did you send it?
20  A.  March 8, 2021.
21  Q.  And who did you send it to?
22  A.  Yifei Cheng, Chris Salcedo, and myself.
23  Q.  Remind us, who is Chris Salcedo?
24  A.  Chris Salcedo is -- worked at UBS in the credit risk --
25  credit risk control.
```

O5D6HWA5                          Fairbanks - Direct

1   Q.  So is this the call we just listened to, March 8?

2   A.  Yes, it is.

3   Q.  What was the purpose for which you sent this e-mail?

4   A.  Summarizing my -- the quick bullets or quick information

5   from the call that we had had.

6   Q.  And directing your attention to the third line of the body

7   of your e-mail, free cash.  Could you please read that?

8   A.  Free cash, approximately 30 percent, right now 34 percent.

9   Q.  And what were you conveying there?

10  A.  Just the fact that the client still had a lot of cash, free

11  cash available to pay us in case of a bad day.

12  Q.  Now, turning to the final page of this document, could you

13  please read what you wrote under liquidity?

14  A.  Ten to 20 percent of the volume, could liquidate the whole

15  book in two weeks.

16  Q.  What did you mean by that?

17  A.  This was the comment Scott said where they could liquidate

18  the whole book in two weeks, assuming 10 to 20 percent of the

19  daily market.

20  Q.  And by Scott, Scott Becker?

21  A.  Scott Becker, correct.

22  Q.  Could you please read what you wrote next to "largest

23  position" on the next two lines?

24  A.  Largest position, 35 percent of capital, top 10, 35 to 25

25  of capital, top ten names, 300 percent.

1    Q.  What did you mean by that?

2    A.  Just summarizing what Scott had said, where saying his top

3    ten names were about 300 percent of his equity, and that they

4    ranged between 25 and 35 percent of his capital.  So they

5    ranged between 5 and 7 billion of market value.

6    Q.  Mr. Fairbanks, are you aware of whether after your March 8,

7    2021, call with Mr. Becker, others from UBS sought from

8    Mr. Becker additional information about Archegos' portfolio?

9    A.  Yes.  Chris Salcedo did.

10   Q.  Were you aware whether Mr. Becker was able to provide the

11   requested information?

12   A.  He was not.

13   Q.  Let's scroll up to the first page of this document.

14             Do you see the second-to-last e-mail in the thread?

15   A.  Starting hmm?

16   Q.  Starting hmm.

17   A.  Yes.

18   Q.  Who sent that?

19   A.  I did.

20   Q.  And who did you send it to?

21   A.  Chris Salcedo, Yifei Cheng, and Mihail Nikolov.

22   Q.  Can you read what you wrote in the body of your e-mail?

23   A.  Hmm.  Would have been nice if they would share it, but he

24   did state it would take two weeks to liquidate their full book

25   using 10 percent of daily trade volume, so somewhat implies one

1  daily traded volume on a weighted basis.

2  Q.  What were you trying to convey?

3  A.  That the book is pretty liquid.

4  Q.  What did you mean when you said, "he did state it would

5  take two weeks to liquidate their full book using 10 percent

6  DTV"?

7  A.  If he were to sell their whole portfolio -- I would imagine

8  it's $100 million he can send -- he can sell 10 million every

9  day.  At the end of two weeks, he would have no stocks left.

10  Q.  Where did you get the information that it would take

11  two weeks to liquidate the full book using 10 percent of DTV?

12  A.  From Scott Becker.

13         MR. ROTHSCHILD:  We can take that down.

14  Q.  From a risk perspective, how, if at all, would it have

15  mattered if it turned out that at that time, it would have

16  taken longer than two weeks to liquidate Archegos' full book

17  using 10 percent of DTV?

18  A.  I mean, it would depend.  If it was two weeks and a day, we

19  probably wouldn't have been too concerned.  If it was a month,

20  two months, six months, the longer that period, the more

21  concern we would have.

22  Q.  What about if it had turned out that it would have taken

23  more than 100 days to liquidate Archegos' top position using

24  10 percent of DTV?

25  A.  We wouldn't have -- you wouldn't generally offer --

1            MR. HAGGERTY:  Objection, your Honor.

2            THE COURT:  Sustained.

3   BY MR. ROTHSCHILD:

4   Q.  Mr. Fairbanks, did you take steps to confirm whether --

5   with Mr. Becker, the liquidation numbers he had provided?

6   A.  Yes.

7   Q.  Ms. Gamboa, can you please pull up only for Mr. Fairbanks

8   what's been marked for identification Government Exhibit 2140?

9            Mr. Fairbanks, do you recognize that?

10  A.  Yes.

11  Q.  What is it?

12  A.  It's an e-mail.

13  Q.  Are you on it?

14  A.  I am.

15            MR. ROTHSCHILD:  Government offers Government

16  Exhibit 2140.

17            MS. ESTES:  No objection.

18            MR. HAGGERTY:  No objection.

19            THE COURT:  Received.

20            (Government's Exhibit 2140 received in evidence)

21            MR. ROTHSCHILD:  Sorry, your Honor.

22  BY MR. ROTHSCHILD:

23  Q.  Let's stay on Page 1 but focus on the second-to-last e-mail

24  in the thread.

25            Mr. Fairbanks, do you see Chris Salcedo's e-mail to

1    Scott Becker sent on March 9, 2021, at 5:16 p.m.?

2    A.   Yes.

3    Q.   Could you please read the body of that e-mail?

4    A.   Scott, to confirm our conversation, am I correct that you

5    stated it would take two weeks to liquidate the entire book

6    using 10 percent of daily trading volume?  Thanks.

7    Q.   Directing your attention to the top e-mail in the thread,

8    did Mr. Becker loop you into this conversation, this e-mail

9    conversation?

10   A.   He did.

11   Q.   Could you please read the part of the body of the e-mail

12   that starts with "apologies"?

13   A.   Apologies.  I got pulled into a late call and could not

14   respond to either of you.  If you have some time tomorrow

15   morning, I'd be happy to speak.  Please let me know what works

16   for you.  If you have time premarket, it would be really

17   helpful.

18            MR. ROTHSCHILD:  Your Honor, at this time, the

19   Government would offer our next audio file, Government

20   Exhibit 2536.

21            MS. ESTES:  No objection.

22            MR. HAGGERTY:  No objection.

23            THE COURT:  Received.

24            (Government's Exhibit 2536 received in evidence)

25            MR. ROTHSCHILD:  And the corresponding transcript is

O5D6HWA5                         Fairbanks - Direct

1    2536-T.

2    BY MR. ROTHSCHILD:

3    Q.  So before we start playing, if you could look at the first

4    page of the transcript, Mr. Fairbanks?

5    A.  Yep.

6    Q.  What was the date and time of the call?

7    A.  March 10, 2021, 10:13 a.m.

8    Q.  So is that the day after the e-mail we were just looking

9    at?

10   A.  It was.

11   Q.  And who are the participants on this call?

12   A.  Myself and Scott Becker.

13   Q.  So we'll start playing from the beginning, and we'll play

14   about five minutes of the call.

15           (Audio played)

16           MR. ROTHSCHILD:  We can stop there.

17   BY MR. ROTHSCHILD:

18   Q.  So, Mr. Fairbanks, what was going on in that call?

19   A.  We had asked the client for more information around the

20   liquidity of the portfolio, and Scott called me that morning to

21   kind of give me a bit more around the math of how they're

22   calculating their liquidity.

23   Q.  So directing your attention to Page 2, Lines 3 through 5,

24   what did you mean when you said that you were on the phone with

25   your boss going through Will's ask for 12 billion?

1    A.  Will had asked UBS to increase the capacity from 10 billion

2    to 12 billion, so I was talking to my boss about the ask.

3    Q.  This was yet another request for an increase?

4    A.  It was.

5    Q.  And who is Will?

6    A.  Will Tomita.

7    Q.  Now, directing your attention to Page 2, Lines 19 through

8    20, what did you mean when you said that portfolio liquidity at

9    that size is probably the biggest item?

10   A.  As mentioned earlier, the bigger the book, the more you're

11   going to focus on liquidity.  And so, he's now -- has 100,

12   120 billion of balances across all of the firms in Wall Street,

13   and so I wanted to just get a better understanding to make sure

14   they are still liquid portfolios.

15   Q.  Now, directing your attention to Page 3, this starts at the

16   bottom and carries on to the next page, what did you understand

17   Mr. Becker to mean when he said that Archegos could close out

18   half the book in 10 days, 75 percent of the book in 20 days,

19   and the entire book in about a month at 10 to 15 percent of

20   volume?

21   A.  Going back to my example earlier, he has $100 billion, and

22   every day he can sell 10 billion.  After 10 days, he would have

23   exited his whole book.  And that would be the 10 days using

24   10 percent of volume.  So in this case, he's saying

25   50 million -- or 50 billion could be sold in the first two

O5D6HWA5                        Fairbanks - Direct

1    weeks, 25 billion would take the three weeks, and the last

2    25 billion would take -- sorry, 25 percent would take 20 days,

3    and the last 25 percent would take 30 days or six weeks.

4              MR. ROTHSCHILD:  Ms. Gamboa, could you please pull up

5    only for Mr. Fairbanks what's been marked for identification as

6    Government Exhibit 2141?

7              THE COURT:  Another ten minutes.

8              MR. ROTHSCHILD:  Thank you, your Honor.

9              THE COURT:  Mr. Rothschild, and then we'll quit for

10   the day.

11             MR. ROTHSCHILD:  Thank you.

12   BY MR. ROTHSCHILD:

13   Q.  Mr. Fairbanks, do you recognize this?

14   A.  I do.

15   Q.  What is it?

16   A.  It's an e-mail.

17             THE COURT:  How are you, members of the jury?  I mean,

18   this is a lot of stuff that we took in today.  Are you

19   absorbing information, or is it sort of a hazy cloud?

20             JUROR:  It's getting a bit hazy.

21             MR. THOMAS:  We're happy to call it a day, your Honor.

22             THE COURT:  Yeah.  Let me ask the jury, we want to be

23   efficient, get as much as we can each day, but we can't go

24   longer than you can absorb.

25             JUROR:  I think we're well done absorbing.

O5D6HWA5                        Fairbanks - Direct

1          THE COURT:  Break?  Break.  Okay.  We'll break for the

2     day now.

3          MR. ROTHSCHILD:  Thank you, your Honor.

4          THE COURT:  All right.  Members of the jury, close up

5     your books, leave the notebook on your chair, and your notebook

6     that you take notes on, give them to Ms. Jones.  She'll give

7     you them tomorrow.

8          Please do not discuss the case, keep an open mind,

9     don't let anyone discuss the case with you.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

O5D6HWA5

1              (Juror not present)

2              THE COURT:  Be seated.

3              MR. ROTHSCHILD:  May we excuse the witness?

4              THE COURT:  You're excused for the day.  Don't have

5     any conversations about the case with anyone.

6              See you tomorrow at 10:00 o'clock.

7              THE WITNESS:  Thank you.

8              THE COURT:  Tell me your progress with Mr. Fairbanks.

9              MR. ROTHSCHILD:  Your Honor, I think we're about a

10    little more than halfway through the direct.

11             THE COURT:  So he'll occupy our time most of tomorrow,

12    if not all of it.

13             MR. ROTHSCHILD:  Certainly most of tomorrow, your

14    Honor.  I think that's right.

15             THE COURT:  Is that how you planned it?

16             MR. ROTHSCHILD:  Yes, your Honor.

17             THE COURT:  Who is going to be next?

18             MS. ROTHMAN:  Your Honor, we intend to call

19    Jesse Martz after Mr. Fairbanks.

20             THE COURT:  Anything else from me?

21             MS. ESTES:  No, your Honor.

22             THE COURT:  Have a good night.

23             (Adjourned to May 14, 2024, at 10:00 a.m.)

24                              * * *

25

```
 1                          INDEX OF EXAMINATION

 2      Examination of:                            Page

 3      BRIAN FAIRBANKS

 4      Direct By Mr. Rothschild . . . . . . . . . . . 101

 5                          GOVERNMENT EXHIBITS

 6      Exhibit No.                               Received

 7       8004    . . . . . . . . . . . . . . . . . . . 122

 8       2104    . . . . . . . . . . . . . . . . . . . 126

 9       325     . . . . . . . . . . . . . . . . . . . 132

10       328     . . . . . . . . . . . . . . . . . . . 134

11       331     . . . . . . . . . . . . . . . . . . . 136

12       2123    . . . . . . . . . . . . . . . . . . . 139

13       2533    . . . . . . . . . . . . . . . . . . . 143

14       2142    . . . . . . . . . . . . . . . . . . . 165

15       2544    . . . . . . . . . . . . . . . . . . . 167

16       2139    . . . . . . . . . . . . . . . . . . . 185

17       2140    . . . . . . . . . . . . . . . . . . . 189

18       2536    . . . . . . . . . . . . . . . . . . . 190

19

20

21

22

23

24

25
```