UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

v. 22 CR 240(AKH)

SUNG KOOK HWANG and PATRICK HALLIGAN,
Defendants.
------------------------------x

New York, N.Y.
May 20, 2024
10:05 a.m.

Before:

HON. ALVIN K. HELLERSTEIN,

District Judge
-and a jury-

APPEARANCES

DAMIAN WILLIAMS,
United States Attorney for the Southern District of New York
BY: MATTHEW D. PODOLSKY
ANDREW M. THOMAS
ALEXANDRA ROTHMAN
SAMUEL ROTHSCHILD
Assistant United States Attorneys

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
Attorneys for Defendant Halligan
BY: MARY MULLIGAN
TIMOTHY HAGGERTY
BONNIE BAKER
ANIL VASSANJI
RUPITA CHAKRABORTY

KRAMER LEVIN NAFTALIS & FRANKEL LLP
Attorneys for Defendant Hwang
BY: BARRY H. BERKE
DANI R. JAMES
JORDAN L. ESTES
MICHAEL MARTINEZ
MICHELLE BEN-DAVID
SHAKED SIVAN
DAYNA CHIKAMOTO

APPEARANCES (Continued)

ALSO PRESENT:
Anna Gamboa, USAO Paralegal
Arjun Ahuja, USAO Paralegal
Madeline Sonderby, USAO Paralegal
Raymond McLeod, Defense Trial Consultant

(Trial resumed; jury not present)

THE COURT: While we're waiting for the defendants' submission, I have two things I wanted to cover with you. The first thing is, to the government, what's the relevance of the testimony on deferred compensation?

MR. THOMAS: Your Honor, there are a couple of pieces of relevance. First of all, in this case, we've alleged that Mr. Hwang caused losses not just to the market and to counterparties but to his own employees, that's alleged on the face of the indictment, and it the deferred compensation --

THE COURT: That can be covered very easily. You don't have to go into the whole details of the deferred compensation. So this must be of greater relevance here.

MR. THOMAS: Well, the second piece, and this is sort of, I think, part of the core of racketeering proof in a sense is that Mr. Hwang ran Archegos as a personal fiefdom and with respect to deferred compensation in particular, it was mandatory for employees to contribute, put their money into the firm.

THE COURT: That's not uncommon.

MR. THOMAS: That's true, your Honor, but it is uncommon, I think, for it to be used as leverage to obtain the loyalty from employees to --

THE COURT: It's not uncommon. Lots of companies require a portion of deferred compensation to go into stock of

the company, and it's tied up for a certain period of time. And if the company has a debacle before the time, then the employees don't get their deferred compensation. I don't understand the relevance of that testimony.

MR. THOMAS: Well, your Honor, I think what makes it different and relevant here is that Mr. Hwang's company was engaged in systemic fraud. And that in order to disable employees from exercising ordinary caution from raising concerns, from reporting problems, the concept of loyalty and specifically the fact of deferred compensation, was used to ensure that they would stay in line. So we think it, in fact, directly goes to Mr. Hwang's knowledge and to the manner in which he operated the racketeering enterprise.

THE COURT: I think you have to tie it up in some better way than you have it now; otherwise, that testimony will be stricken.

MR. THOMAS: Understood, your Honor. We'll figure out a way to sharpen it for the Court.

THE COURT: Anything -- all of what you told me so far does not make sense. It does not make sense, it does not show a criminal enterprise. It just shows loss. And, of course, showing loss, showing the consequence of the alleged fraud is relevant. To that extent, it's relevant, but we spent too much time on the deferred compensation, raised other possible innuendos, and I may not keep it in the case.

MR. THOMAS: Understood, your Honor. We'll -- I think with respect to the witnesses who are upcoming, there's not going to be much more discussion about the deferred compensation --

THE COURT: Maybe not. Hmm?

MR. THOMAS: Well, we certainly take the Court's observations. Respectfully, we think that by the end of the case, that you and the jury may agree that it, in fact, is relevant to assessing the core issues but we don't intend to belabor the point.

THE COURT: You better show. Second thing I want to bring up.

MR. BERKE: Your Honor, can I mention one thing on the first one, I didn't want to interrupt you on the second.

THE COURT: I thought you'd be satisfied with what I said.

MR. BERKE: I'm very satisfied, your Honor.

THE COURT: Why do you have to make another remark?

MR. BERKE: Well, it was about one in particular question and answer on this topic that has been on our mind.

THE COURT: Yes.

MR. BERKE: And that is at the very end of Mr. Brian Jones' testimony, for the redirect, the government saw to elicit that there was a question of whether Mr. Hwang himself would -- if heed the money to pay for the deferred comp that

was lost, we objected, your Honor overruled it at the time, and the government elicited testimony that he did not pay it himself. We think that, again, for the same reasons but even more so as to that question, was objectionable. We would ask your Honor to consider striking it.

MR. THOMAS: Your Honor, may I respond to that?

THE COURT: After I think.

MR. THOMAS: That -- oh, I'm sorry.

THE COURT: Please give my law clerk the pages of the transcript that cover this, and I'll review it and either rule or have a discussion with both of you at the same time -- not now.

MR. BERKE: Thank you, your Honor. I can say it on the record now that's helped a little bit. I have the pages.

THE COURT: You have it. Let me jot them down. Just a minute.

MR. BERKE: Thank you, Judge.

It is Pages 698 and 699 of Thursday's transcript.

THE COURT: Do you have a photocopy by any chance?

MS. ROTHMAN: Your Honor, I think it begins on cross when it was brought up by Ms. James, and that's on 696.

THE COURT: Starting with 696?

MS. ROTHMAN: Correct.

THE COURT: Through 699?

MS. ROTHMAN: That's correct, your Honor.

MR. BERKE: And, your Honor, if I can just add a few more facts.

THE COURT: You wouldn't happen to have photocopies of those pages.

MR. BERKE: Your Honor, we do --

MS. ROTHMAN: We can pass up our copy.

MR. BERKE: We do, your Honor, of the transcript and we're getting that right now.

And your Honor, what I can say on the deferred comp issue, there were lawyers involved --

THE COURT: I'm not going to rule now.

MR. BERKE: Okay. I'll just tell you there were lawyers involved, there was a settlement with regard to deferred comp involving the counterparty banks, as well as the individuals who received a percentage of the deferred comp as part of the settlement.

THE COURT: Put this into a motion. This is a motion to strike the testimony on Pages 696 to 699 of Thursday's transcript.

MR. BERKE: We will prepare a letter, your Honor, today and submit it. We appreciate that. Thank you.

THE COURT: All right.

MR. BERKE: And I also have a copy of the letter that was filed, if that's helpful. I know your Honor has one other issue to raise beforehand.

THE COURT: Hand it up, please.

MR. BERKE: Thank you, Judge.

THE COURT: Has the government seen it?

MR. BERKE: Yes.

THE COURT: The other question I had was having to do with the exhibits and the testimony on -- what is it? The cap table. I didn't understand it.

MR. THOMAS: Your Honor, as --

THE COURT: I'm looking, for example, at GX5037A.

MR. THOMAS: Your Honor, we put up 5037A on the screen there.

THE COURT: Yeah, I see.

MR. THOMAS: I'm happy to answer any question the Court has about this and related evidence.

THE COURT: What's the relevance of this document?

MR. THOMAS: Your Honor, a core question in the case is why Mr. Hwang bought the stocks when, in the manner, and at the prices that he did. The government's accusation is that he did it to manipulate, with the intent to manipulate, and the defense's answer is that he did it because he sincerely believed in the stocks. These records are the contemporaneous records throughout 2020 and into 2021 of what Mr. Hwang's own research team said these stocks were worth, and that were conveyed to him at least on a weekly basis, if not more, and the --

THE COURT: Tell me, for example, on this exhibit with Viacom?

MR. THOMAS: I think on this one it might be around Page 59. But we'll have to flip ahead and see. Give us one second, your Honor, to find it.

(Pause)

MR. THOMAS: All right. Your Honor, sorry about that delay. It's on the screen now.

So if the --

THE COURT: Can you zoom in more?

MR. THOMAS: Your Honor, we'll enlarge the target price portion, for example. And you'll see that before this scheme began, the research function of Archegos reported that optimistically the Viacom securities were worth 55 or $45 per share, depending on which analyst was reviewing it.

THE COURT: Where do I see that? Oh, I see the top --

MR. THOMAS: That's correct, your Honor. And at the end --

THE COURT: 55SC, what does that stand for?

MR. THOMAS: The top one is Brendan Sullivan, that's a research analyst we expect to call at trial. The second one relates to Steven Chen who I understand may be on the defense list as a witness.

THE COURT: So the price that is shown here is $34 plus, and the analysts think it is worth $10 or $20 a share

more?

MR. THOMAS: That's correct, your Honor.

THE COURT: What's the relevance?

MR. THOMAS: What we'll prove is that Mr. Hwang was buying these securities at 80 and $98 a share by the end of the scheme approximately, and he's vastly overpaying for them, well out of proportion to the underlying fundamental value that his own research team describes to him at the start of the year.

THE COURT: So when was he buying this?

MR. THOMAS: He buys it over the course of 2020, with most of the purchases at higher prices occurring in early 2021.

THE COURT: And he's buying above the market?

MR. THOMAS: What we intend to show through expert testimony and through the testimony of Mr. Tomita is that Mr. Hwang was internally buying, not just above his own research team's fair assessment, but above the then prevailing market prices. He's consistently overpaying for the stock in order to cause the prices to rise.

THE COURT: What is the date of this?

MR. THOMAS: This example is from before the scheme, January 30, 2020.

THE COURT: And the buying that took place that you believe was manipulative occurred when?

MR. THOMAS: It's concentrated in the fall of 2020 and continues until the scheme collapses on March 24, 2021.

THE COURT: So why would this document of January 2020 be relevant to the conditions of the market at the end of December -- end of 2020?

MR. THOMAS: Because this shows what Archegos valued the securities at before Mr. Hwang's motive to manipulate the securities arrest.

THE COURT: Well, there are major uncertainties that are discussed here, but we don't know if they came to fruition or not? Can you do various programs that Viacom was negotiating for? So I don't understand the relevance of a January 30, 2020, document to a manipulation that was alleged to occur towards the end of 2020.

MR. THOMAS: Your Honor, I certainly take the Court's questions, which I think really would go to the type of inferences and the weight of the inferences to be drawn from the evidence. But respectfully, from the government's perspective, it is centrally relevant that prior to the scheme, Mr. Hwang did not assign a particularly high value to the Viacom securities or any other securities in this portfolio, and only over time, once he needed to explain why he was buying at ever higher prices did he pressure his analysts to change their views and cover up what had happened.

THE COURT: I'm not prepared to strike this. I think, however, the government needs to focus on its case better, not to prolong the trial with useless documentation.

MR. THOMAS: We understand, your Honor. We'll --

THE COURT: No you don't understand, you're just saying.

MR. THOMAS: Yes, your Honor.

THE COURT: Take it to heart. You'll lose your case on excessive documentation.

Okay. Another matter at hand, what do you want me to rule on with Becker?

MS. ROTHMAN: Well, your Honor, it's the government's letter, so I can start.

Mr. Becker, as the Court knows, is a cooperating witness. He's a member of the conspiracy at Archegos.

THE COURT: Yeah, I know about that, but what do you want me to rule on?

MS. ROTHMAN: We intend to offer excerpts of his notebooks during the time, e-mails that he exchanged with the defendants and other co-conspirators --

THE COURT: On the ground that he's -- these are statements of a co-conspirator?

MS. ROTHMAN: They are co-conspirator statements. Some of them are statements of the defendants, which I don't expect there to be an objection to. There are statements --

THE COURT: How much of a foundation do you have to provide before these statements become admissible at the Court?

MS. ROTHMAN: Well, as to co-conspirator statements, I

expect within the first few minutes of Mr. Becker's testimony he will say that he agreed with the defendants to commit the crimes that he did, including lying to the banks to advance Mr. Hwang's trading.

THE COURT: Having heard this testimony, Mr. Berke, is there an objection to its admissibility?

MR. BERKE: Your Honor, as to certain documents, no. At as to certain documents, yes. And if I could, your Honor, just --

THE COURT: Why don't you raise the document, since the jury is here, in the usual way?

MS. ROTHMAN: That's fine with the government.

MR. BERKE: Your Honor, could I make one -- just raise one issue with regard to the broader conspiracy claim?

THE COURT: Sure.

MR. BERKE: As we submitted in our letter, which we apologize for the -- for when you received it.

THE COURT: How could you give it to me earlier, you got in this morning.

MR. BERKE: I know, I'm --

THE COURT: Don't apologize when you don't need to. There will be other reasons when you need to.

MR. BERKE: I hope not, but I'll be ready.

Mr. Becker told -- Mr. Becker has admitted, and this was in grand jury testimony by the agent, that he did not

recall a single interaction with Mr. Hwang about any false statement he made to the counterparties.

THE COURT: You'll bring -- you'll take this up at cross-examination.

MR. BERKE: We understand. We just don't think the government's going to be able to prove any false statement conspiracy involving this -- we don't believe the government will be able to prove even a foundational basis of a conspiracy to make false statements involving Mr. Hwang, and that may be behind certain objections we make to certain documents. But we want to alert that issue for your Honor's consideration.

And then just with regard to the agency arguments as well, while there is an agency argument that we recognize will allow for the admission of certain documents, if certain employees are just simply gossipping or making complaints about Mr. Hwang or Mr. Halligan, we don't think that falls under agency exception. But we agree, your Honor, it makes sense to take it up with the documents.

THE COURT: Let's bring in the jury.

MS. ROTHMAN: Your Honor, can I put one quick thing on the record. I think it's important. The conspiracy here is not just a conspiracy to make false statements, it's a racketeering conspiracy that Mr. Becker will testify he was a member of. I want that to be clear.

THE COURT: Thank you. I'm more than duly alerted,

I guess. Having been duly alerted once I can say I've been duly alerted again.

MS. ROTHMAN: Understood.

Okay.

(Pause)

(Jury present)

THE COURT: Good morning, members of the jury. Did you all have a pleasant weekend?

JUROR: Yes.

THE COURT: Enjoyed the weather?

JUROR: Yes.

THE COURT: Cried when the Knicks lost?

JUROR: Yes.

THE COURT: Be seated, please. We still have the Rangers. And the Yankees are winning.

All right. We have a new witness today.

MS. ROTHMAN: Yes, your Honor. The government calls Scott Becker.

THE COURT: Mr. Becker, wherever you are. Come up.

SCOTT BECKER,

called as a witness by the GOVERNMENT,

having been duly sworn, testified as follows:

THE COURT: Let's pay attention to the oath, folks.

DEPUTY CLERK: Please be seated.

Please state your full name and spell your last name slowly for the record.

THE COURT: Spell your full name.

THE WITNESS: Scott Vincent Becker. B-E-C-K-E-R.

THE COURT: You may question, Ms. Rothman.

MS. ROTHMAN: Thank you, your Honor.

DIRECT EXAMINATION
BY MS. ROTHMAN:
Q. Good morning, Mr. Becker.
A. Good morning.
Q. I want to direct your attention to 2020 and early 2021. Where were you working?
A. Archegos.
Q. What was Archegos?
A. Archegos was a family office, managing the capital of Bill Hwang.
Q. What was your job there?
A. I was the director of risk management.
Q. Did you commit crimes in connection with your work at Archegos?
A. Yes, I did.
Q. What crimes did you commit?
A. Racketeering conspiracy, securities fraud, and wire fraud.
Q. What did you do to commit these crimes?
A. I lied to banks to induce them to make loans to Archegos so it could pursue its trading.
Q. Mr. Becker, did you commit these crimes alone?
A. I did not.
Q. Do you see any of the individuals with whom you committed these crimes in the courtroom today?
A. Yes, I do.

Q. Who do you see?
A. I see Mr. Hwang and Mr. Halligan.
Q. Mr. Becker, can you please identify Mr. Hwang by where he is seated and an article of clothing that he is wearing?
A. He's seated here in the center.
THE COURT: Where is Mr. Hwang?
THE WITNESS: Right here in the center wearing a purple tie.
THE COURT: Where is Mr. Halligan?
THE WITNESS: He's behind him. He just stood up.
THE COURT: The record will reflect the notifications.
BY MS. ROTHMAN:
Q. Mr. Becker, why did you lie to the banks?
A. Because it was part of my job.
Q. From whom did you get that understanding that it was your job to lie to the banks?
A. From Mr. Hwang, Mr. Halligan, and Mr. Tomita.
Q. Who is Mr. Tomita?
A. He was a head trader at Archegos.
Q. What was Mr. Hwang's role at Archegos?
A. He was owner of the company.
Q. What was Mr. Halligan's role at Archegos?
A. He was the chief financial officer.
Q. With whom did you agree to lie to the banks?
A. With all three, so Mr. Hwang, Mr. Halligan and, Mr. Tomita.

Q. Who did you report to at Archegos?
A. To Mr. Halligan and Mr. Hwang.
Q. Who directed you to lie to the banks?
A. Mr. Halligan.
Q. Have you since pleaded guilty to your crimes?
A. Yes, I have.
Q. Are you testifying today under the terms of a cooperation agreement with the government?
A. Yes, I am.
Q. Now, Mr. Becker, you testified that you pled guilty to racketeering conspiracy, among other crimes. What did you do that makes you guilty of that crime?
A. I lied to banks as part of my job with others at Archegos.
Q. At a general level, what did you lie to the banks about?
A. I lied to them about general portfolio statistics.
Q. And specifically what about the portfolio did you lie about?
A. I understated the risk of the portfolio. So those statistics included concentration, the size of the largest positions in the portfolio, the exposure, or the leverage of the portfolio, I understated -- I overstated excess cash balances, and also lied about the liquidity or how quickly the positions in the portfolio could be sold.
Q. How many banks did you lie to?
A. 12, all of Archegos' counterparties.

Q. When you lied to the banks, what did Archegos get from the banks?
A. It received loans from those banks.
Q. What did Archegos use those loans for?
A. To purchase securities.
Q. Between 2020 and early 2021, approximately how much money did the banks lend to Archegos?
A. Tens of billions of dollars.
Q. When did you stop lying to the banks?
A. When Archegos collapsed in late March 2021.
Q. And Mr. Becker, when Archegos collapsed, what happened to those billions of dollars that the banks had lent to Archegos?
A. They could not be paid back. It was gone.
Q. We'll come back to the collapse. I want to start with some background.
How old are you?
A. I'm 40 years old.
Q. Where did you grow up?
A. I grew up in Port Jervis, New York.
Q. Did you go to college?
A. Yes, I did.
Q. Where did you go to college?
A. Manhattan College.
Q. What did you study there?
A. I was a double major in accounting and finance.

Q. What was your first full-time job after college?
A. I was an auditor at Ernst & Young.
Q. What did you do there?
A. I audited the financial statements of financial services companies.
Q. After Ernst & Young, where did you work?
A. Tiger Asia.
Q. When did you start at Tiger Asia?
A. In October 2007.
Q. What was Tiger Asia?
A. Tiger Asia was a hedge fund managed by Mr. Hwang.
Q. At Tiger Asia, who did you report to?
A. I reported to Mr. Halligan and Mr. Hwang.
Q. What was Mr. Halligan's role at Tiger Asia?
A. He was the chief financial officer.
Q. What relationship, if any, did Tiger Asia have to Archegos?
A. In 2013, Tiger Asia converted into a family office and changed its name to Archegos.
Q. Now, prior to joining Tiger Asia in 2007, had you met Mr. Hwang and Mr. Halligan?
A. Yes, I had.
Q. When had you met them?
A. During my college internship at Tiger Management.
Q. What is Tiger Management?
A. Tiger Management, in the late 90s, was one of the largest

hedge funds in the world. By the time I was there in the early two thousands, it had focused primarily on investing in a new generation of hedge funds. There's a term tiger cubs that would be used to describe them.
Q. Was Tiger Asia one of the tiger cubs that had been invested in by Tiger Management?
A. Yes, it was.
Q. Was Mr. Hwang a tiger cub?
A. Yes, he was.
Q. Did Mr. Hwang talk about being a tiger cub?
A. Yes, he did.
Q. Was Mr. Hwang comparing himself to other tiger cubs?
A. Yes, he did.
Q. Which ones?
A. Most frequently Chase Coleman, who managed global.
Q. When Mr. Hwang --
THE COURT: Let me interrupt. When you say Hwang invested in other hedge funds, is that what he did? Invest in other hedge funds?
THE WITNESS: No, Mr. -- Tiger Management --
THE COURT: Face the jury.
THE WITNESS: Tiger Management was an investor that invested in other hedge funds. Most of the early tiger cubs, that new generation of hedge funds, were former Tiger Management employees who had started their own business.

THE COURT: He did not invest, at that time, in securities of public companies. He invested -- gave money to private hedge funds.

THE WITNESS: The investor in those tiger cubs I'm describing is Tiger Management. Bill was one of the funds that Tiger Management invested capital into.

THE COURT: You mean that he invested money in his own company?

THE WITNESS: Mr. Hwang invested in securities, his company Tiger Asia, was one of the funds that Tiger Management invested into. Tiger Management and Tiger Asia were two separate entities.

THE COURT: Both owned by Hwang?

THE WITNESS: No, Mr. Hwang only owned Tiger Asia. Tiger Management was a separate entity owned by someone else.

THE COURT: Go ahead.

MS. ROTHMAN: Thank you, your Honor.

BY MS. ROTHMAN:

Q. Mr. Becker, would Mr. Hwang also compare himself to other investment managers?

A. Yes, he would from time to time.

Q. Which ones?

A. On occasion, to Tao Li, he was a former Tiger Asia employee who launched his own firm, Teng Yue Partners. Also, on occasion, he compared himself to Warren Buffet.

Q. I want to direct your attention to late 2019 or early 2020. Do you recall an occasion on which Mr. Hwang compared Archegos' performances to that of other investment funds?

THE WITNESS: Yes.

MR. BERKE: Objection, your Honor.

THE COURT: Sustained.

BY MS. ROTHMAN:

Q. Mr. Becker, you testified that Mr. Hwang would compare himself to other investment managers; is that right?

A. Yes, it is.

Q. Do you recall an occasion on which he did so in 2019 or 2020?

MR. BERKE: Objection, your Honor.

THE COURT: Overruled.

THE WITNESS: Yes, I do.

BY MS. ROTHMAN:

Q. Tell us about it.

A. As part of -- it was either a year end or beginning of the year, presentation given to the investment staff, some of the employees of Archegos, Bill had asked me to work on a presentation that compared Archegos' portfolio performance to that of several other funds including Tiger Global, Teng Yue Partners and Berkshire Hathaway.

Q. What did you do?

A. I -- as directed by Mr. Hwang, I created the report. He

had several edits over the course of about a half a day or so, in creating that report, and when he made the presentation to the analyst team, I was in the room projecting the presentation that I had created from my phone to the television in the conference room.

Q. What did you hear Mr. Hwang say?

A. He expressed disappointment in Archegos' returns. He had stated that perhaps he should close down Archegos and invest his capital in Tiger Global or Teng Yue Partners instead of running his own capital at Archegos because their performance was better. He also compared his performance to Berkshire Hathaway. That's the company led by Buffet. I believe Archegos' performance was slightly ahead of Warren Buffet, so he expressed disappointment that he just barely beat Warren in terms of performance.

Q. All right. Now, Mr. Becker, you said you started at Tiger Asia in 2007, correct?

A. Yes.

Q. What was your role then?

A. Operations.

Q. What were your responsibilities in operations?

A. Operations. We worked on anything accounting and tax-related for the fund.

Q. From the beginning, what did you learn about who made the decisions at Tiger Asia?

MS. MULLIGAN: Objection.
THE COURT: You can answer.
THE WITNESS: Mr. Hwang.
BY MS. ROTHMAN:
Q. As part of operations, would you prepare reports on Tiger Asia's portfolio holdings?
A. Yes, I would.
Q. Who were those reports for?
A. Mr. Hwang.
Q. At Tiger Asia, did everyone have access to portfolio information?
A. No, they did not.
Q. Who had access to that information?
A. The operations team including myself, the trading desk, Mr. Hwang, and Mr. Halligan.
Q. Who decided what information would be shared?
A. Mr. Hwang.
Q. I want to move ahead to 2013 when Tiger Asia becomes Archegos. Okay?
THE COURT: How did it become Archegos?
MR. BERKE: Your Honor, do you mean mechanically?
MS. ROTHMAN: I can --
THE COURT: Yes. I mean mechanically. If you know.
THE WITNESS: I do, I was involved in that process.
The entities, the Tiger Asia entities that had

existed, they were in the process of changing the names of those entities into Archegos. So the entities themselves were the same, it was just a name change.
BY MS. ROTHMAN:
Q. What else had to be done to convert Tiger Asia into Archegos?
A. Tiger Asia had outside investors. So those outside investors, their investment was returned to them as a redemption process, that's called. I was involved in the process of closing the books and records for those investors before their cash could be transferred out. So after their cash was returned when Archegos commenced, the only investor was Mr. Hwang.
Q. Who picked the name Archegos?
A. Mr. Hwang.
Q. Did he tell you what the name meant?
A. Yes, he did.
Q. What did he say?
A. It was Greek for leader or chief.
Q. I want to talk very briefly about the corporate structure of Archegos.
MS. ROTHMAN: Ms. Sonderby, can you please pull up for the witness what's been marked for identification as Government's 267?

BY MS. ROTHMAN:

Q. Mr. Becker, do you recognize this document?

A. Yes, I do.

Q. What is it?

A. This is an -- a map of the organizational structures -- entities of Archegos.

MS. ROTHMAN: Your Honor, the government offers into evidence 267.

MR. BERKE: No objection, your Honor.

MS. MULLIGAN: No objection.

MS. ROTHMAN: May we publish to the jury?

THE COURT: Did you prepare?

MS. ROTHMAN: Thank you.

THE COURT: Did you prepare this?

THE WITNESS: In my time, while working at Archegos, I may have prepared this schedule.

THE COURT: Have you used this document?

THE WITNESS: While working at Archegos, yes. Sometimes, this was provided to counterparties so they could understand Archegos' structure.

THE COURT: Received in evidence you may show it to the jury.

(Government's Exhibit 267 received in evidence)

MS. ROTHMAN: Thank you, your Honor.

BY MS. ROTHMAN:

Q. Now that everyone can see, Mr. Becker, what are we looking at?

A. This is an organizational chart of the various Archegos entities or companies.

Q. If we can highlight Archegos Fund LP, which is in the bottom left. What is that entity?

A. That is the main Archegos entity. That was the investment fund where the securities were held. That was the counterparty to the banks.

Q. So when Archegos would borrow money from the banks, it was Archegos Fund LP doing that borrowing; is that right?

A. Yes, that is correct.

MS. ROTHMAN: We can now highlight Archegos Capital Management LP, which is slightly above. Thank you.

BY MS. ROTHMAN:

Q. What's that entity?

A. That is the investment manager of Archegos Fund LP. So that is the entity all Archegos employees were employed by.

Q. Mr. Becker, if I could ask you to walk us through the remaining entities on Government Exhibit 267?

A. Sure. So on the lower left side, you see Archegos Fund LLC, that was a small entity. Essentially, it was a brokerage account at Morgan Stanley. It was wholly owned by the main fund, Archegos Fund, LP.

Going up the chain, as we mentioned Archegos Capital Management, that was the investment manager. All of the Archegos employees worked for that entity. On top of that, Archegos Capital LLC. That was the general partner of Archegos Capital Management. For -- for legal purposes, the LP or limited partnership needs to have a general partner, so that's why that entity exists.

Going over to the right side, Archegos Capital Partners LLC, that was the general partner of the fund. Again, same idea, for legal purposes, a limited partnership entity needs to have a general partner. And then at the bottom of the chart where you see Archegos Fund at the bottom, that was a separate investment fund that invested in other outside hedge funds.

Mr. Hwang Capital, he was the only investor in that fund. I think, in simple terms, the best way to view this is that all these entities rolled up to Bill, he was the only investor and owner of these entities.

Q. So from 2014 forward, whose money made up the capital of Archegos?

A. Mr. Hwang.

Q. Who made the trading decisions at Archegos?

A. Mr. Hwang.

Q. Was Mr. Hwang also involved in the day-to-day decision-making at the fund?

A. Yes, he was.
Q. What other types of decisions would Mr. Hwang make?
MS. ROTHMAN: We can take this down, Ms. Sonderby.
THE WITNESS: He would be involved in all decisions. Even small decisions such as office furniture, art that hung up in the office, if you had a meeting in a conference room, he had a certain way that he wanted people to sit at the conference table.
BY MS. ROTHMAN:
Q. Could information about the portfolio be shared without Mr. Hwang's approval?
A. No, it could not.
Q. All right. Mr. Becker, you said your title was the director of risk management when Archegos collapsed. When did you become the director of risk management?
A. In January of 2019.
Q. Who offered you that title?
A. Mr. Halligan.
Q. How did you feel when he offered you -- withdrawn.
Was that a promotion?
A. No, my responsibilities didn't change materially.
Q. How did you feel when he offered you the new title?
A. I was happy about it. I saw it as an opportunity to work on new things that I hadn't worked on historically.
Q. Did your feelings about the position change over time?

A. Yes, they did.
Q. How did they change?
A. After a few months of having the role, I came to an understanding that that title typically at other investment funds, that person's main responsibility would be to oversee portfolio risk of the fund, which I had no oversight over.
Q. And when you say "portfolio risk," what do you mean by that, Mr. Becker?
A. So anything that could make the investment portfolio risky, such as concentration, the size of positions, leverage, the amount of borrowing that exists in a portfolio, things like that.
Q. Who made those types of decisions at Archegos?
A. Bill did, Mr. Hwang.
Q. Now, fast forwarding for a moment, Mr. Becker, after the collapse, did you, Mr. Tomita, and Mr. Halligan speak about your title?
A. Yes, we did.
Q. What did you say?
A. This was a conversation the weekend after Archegos collapsed. The three of us on a phone call were stressed out given the collapse of Archegos. To introduce some levity into the conversation, I had stated that it could be worse, you could be the director of risk management of the fund that just collapsed and took out half of Wall Street.

Q. How did Mr. Tomita respond?
A. He responded that when the executive committee was discussing the title of director of risk management, he had expressed that perhaps that was not a good name for my title -- my prospective title because I would not oversee any of the portfolio risk.
Q. What else did Mr. Tomita say?
A. When he expressed that, Diana Pae, another member of the executive committee, told him he was not being a team player.
Q. What did you understand Ms. Pae's comment to mean?
MR. BERKE: Objection, your Honor.
THE COURT: Sustained.
BY MS. ROTHMAN:
Q. When Mr. Tomita told you that Ms. Pae had said he wasn't being a good team player by resisting your new title, what did you understand Mr. Tomita to be implying?
MR. BERKE: Objection, your Honor.
THE COURT: Sustained.
BY MS. ROTHMAN:
Q. At Archegos, could you question decisions made from the top?
MR. BERKE: Objection, your Honor.
THE COURT: Overruled.
THE WITNESS: No, you could not.

BY MS. ROTHMAN:

Q. Why not?

A. Because Mr. Hwang made all those decisions.

Q. Would that include titles of positions?

A. Yes. That -- I'm not aware of any decisions that Mr. Hwang didn't make at Archegos.

THE COURT: Did you think your title was meaningfully descriptive of what you did?

THE WITNESS: No, I did not.

THE COURT: What did you do? What was your job?

THE WITNESS: My job prior to receiving the title was operations so, again, anything accounting and tax-related for the fund, I still had --

THE COURT: Keeping track of what happened at the fund?

THE WITNESS: Day-to-day accounting responsibilities, booking trades, preparing periodic financial statements, preparing internal reports for Bill. The --

THE COURT: And when you were promoted to risk management, did your job change in any way?

THE WITNESS: Not materially. There were some additional responsibilities related to risk, a term I'll call enterprise risk, so these were risks such as cyber security risk, physical security risk, things like that.

THE COURT: Your new job -- new title gave you those

new duties?

THE WITNESS: Yes, some of those new duties, correct.

MS. ROTHMAN: Thank you, your Honor.

BY MS. ROTHMAN:

Q. But it didn't give you any oversight into the risk of Mr. Hwang's portfolio, correct?

A. No, it did not.

Q. Now, Mr. Becker, do you know if your title as director of risk management was provided to banks that Archegos wanted to do business with?

A. Yes, it was.

MS. ROTHMAN: Ms. Sonderby, please pull up for the witness what's been marked for identification as Government Exhibit 1002A.

BY MS. ROTHMAN:

Q. Do you recognize this document?

A. Yes, I do.

MS. ROTHMAN: Do you want to scroll through so Mr. Becker can see all of the pages? Thank you.

BY MS. ROTHMAN:

Q. What is this?

A. This is a compliance letter that was given to Archegos' counterparties to explain its compliance initiatives.

MS. ROTHMAN: Your Honor, the government offers 1002A into evidence.

MR. BERKE: May I ask to see the first page, please? And the last page.

Your Honor, we have no objection.

THE COURT: Received.

MS. MULLIGAN: Your Honor, no objection. Thank you.

THE COURT: Thank you.

(Government's Exhibit 1002A received in evidence)

MS. ROTHMAN: May we publish?

THE COURT: You may.

MS. ROTHMAN: Thank you.

BY MS. ROTHMAN:

Q. All right. Mr. Becker, what is this document?

A. This is a compliance letter that was provided to counterparties that overviewed Archegos' compliance initiatives at a high level.

Q. Were there different versions of this document?

A. Yes, there were.

Q. What's the date of this version?

A. I believe this was sometime in 2020.

Q. We can zoom in on the first paragraph and highlight the first sentence, which reads:

This letter is intended to summarize the major changes that have been instituted at Archegos Capital Management LP, formally Tiger Asia Management, since January 2010.

So let's look at some of those changes, Mr. Becker.

If we can go to Page 2, Paragraph 6? And zoom in on the paragraph that talks about you.

Now, Mr. Becker, this paragraph says that you work on areas of the firm, including risk. What portion of your time in 2020 and 2021 was spent on risk analysis?

A. Very little.

Q. What portion of your time was spent on portfolio risk?

A. None.

Q. We can zoom out and focus on some of the other people listed on the first and second page.

Let's go to Page 1, Paragraph 1. Zooming in on Andy Mills. What was Mr. Mill's role at Archegos?

A. He was the executive chairman and co-chief executive officer.

Q. When did he join Archegos?

A. I believe in 2014.

Q. Did he have a relationship with Mr. Hwang before joining?

A. Yes, he did.

Q. What was his relationship with Mr. Hwang?

A. It was through some of their shared charitable interests.

Q. We can zoom out and focus on Paragraph 2.

What was Mr. Jones' role at Archegos?

A. He was a co-president of the firm.

Q. When did he join?

A. I believe he joined in approximately 2017.

Q. Did he have a relationship with Mr. Hwang before joining Archegos?
A. Yes, he did.
Q. What was it?
A. He managed an investment fund that Mr. Hwang invested into.
Q. Okay. We can zoom out and go to the third paragraph, which is at the top of Page 2. Focusing on Diana Pae.
What was Ms. Pae's role at Archegos?
A. She was also the co-president.
Q. When did she join?
A. Around the same time that Andy Mills joined in 2014.
Q. Did she have a relationship with Mr. Hwang before joining Archegos?
A. Yes, she did.
Q. What was it?
A. I believe her children and Bill's children attended the same school.
Q. Was it common for Archegos employees to have pre-existing relationships with Mr. Hwang?
A. Yes, it was.
Q. Was there a term at Archegos used to describe these people?
A. Yes, there was.
Q. What was it?
A. The term was called in network.
MS. ROTHMAN: We can zoom out of that paragraph.

Thank you, Ms. Sonderby.

BY MS. ROTHMAN:

Q. Could you hire someone at Archegos if they were out of network?

A. You could, but it was difficult to do so.

Q. Were you in network?

A. I was because of my internship at Tiger Management.

Q. Was Mr. Halligan in network?

MS. MULLIGAN: Objection.

THE COURT: Overruled.

THE WITNESS: Yes, he was because of his employment at Tiger Management.

BY MS. ROTHMAN:

Q. By 2020, for how many years had Mr. Halligan worked for Mr. Hwang?

A. In aggregate for his time at Tiger Management and Tiger Asia and Archegos, 20 years, approximately.

Q. To your knowledge, had anyone had Archegos worked for Mr. Hwang for longer than Mr. Halligan?

A. No.

Q. How, if at all, did the fact that Hwang -- Mr. Hwang hired people whom he had pre-existing relationships affect the culture at Archegos?

MR. BERKE: Objection, your Honor.

THE COURT: Sustained.

BY MS. ROTHMAN:

Q. Mr. Becker, what was the culture like at Archegos?

MR. BERKE: Objection, your Honor, to that question.

THE COURT: Can you rephrase it?

BY MS. ROTHMAN:

Q. What were the values of Archegos?

MR. BERKE: Objection, your Honor.

THE COURT: Is it the case that the purpose of Archegos was to make investments according to the desires of Mr. Hwang?

THE WITNESS: I would characterize it slightly different.

THE COURT: Go ahead.

THE WITNESS: It was one where you -- it was a culture of service to Mr. Hwang.

BY MS. ROTHMAN:

Q. What do you mean by that?

A. You're -- the main role of employees at Archegos was to do what Bill told you to do.

THE COURT: Who is they?

THE WITNESS: Archegos employees.

THE COURT: Was to do what they told you to do. Who is they?

THE WITNESS: To do what Mr. Hwang told you to do.

BY MS. ROTHMAN:

Q. Was loyalty discussed at Archegos?

A. Yes, it was.

Q. How so?

A. In a way where you -- you could not express disagreement with Mr. Hwang. You were expected to be loyal to his views and his wishes.

Q. How --

MR. BERKE: I would object, your Honor, and I'd move to strike that answer, the nature of it.

THE COURT: Did anybody tell you that, or was this inferred by you?

THE WITNESS: No one told me explicitly, no.

THE COURT: Sustained. Eliminate that from your mind, members of the jury.

BY MS. ROTHMAN:

Q. Would Mr. Hwang tolerate differences of opinions at Archegos?

MR. BERKE: Objection, again, your Honor. No foundation, objectionable question.

THE COURT: Sustained.

BY MS. ROTHMAN:

Q. Mr. Becker, did you ever disagree with Mr. Hwang publicly?

A. No, I did not.

Q. Did you see other people disagree with Mr. Hwang publicly?

A. Very rarely.

Q. How would Mr. Hwang respond when people at Archegos disagreed with him?

MR. BERKE: Objection, your Honor.

THE COURT: You said there were very few instances where others in the company stated in the hearing of others an objection to what Mr. Hwang was doing?

THE WITNESS: Yes.

THE COURT: And when those -- in those instances, what was Mr. Hwang's reaction?

THE WITNESS: He rejected any concept of disagreement from those people, and put those disagreements down fairly harshly.

THE COURT: It's fair to say that he was the boss and you did what the boss wanted to do?

THE WITNESS: Yes, that's fair to say.

BY MS. ROTHMAN:

Q. Thinking about your 13 years at Archegos, on how many occasions do you recall an employee disagreeing with Mr. Hwang publicly?

MR. BERKE: I would object at this point, your Honor.

THE COURT: Sustained.

BY MS. ROTHMAN:

Q. Did you ever see Mr. Tomita disagree with Mr. Hwang?

MR. BERKE: Same objection, your Honor.

THE COURT: Overruled.

THE WITNESS: Yes, on one occasion, I recall Mr. Tomita disagreeing with Mr. Hwang.

BY MS. ROTHMAN:

Q. Tell us what happened.

THE COURT: When -- when did this happen?

THE WITNESS: In approximately 2015.

BY MS. ROTHMAN:

Q. What happened?

A. It was something trading related. The trading office where Mr. Tomita sat was a few feet away from my cubicle. There was a discussion about trading strategy. Will had expressed disagreement, and, Mr. Hwang's reaction was, perhaps you should go work somewhere else if you don't agree with me.

Q. After that, did you ever hear Mr. Tomita disagree with Mr. Hwang publicly again?

A. No, I did not.

Q. Mr. Becker, did you follow the directions you were given at Archegos?

A. Yes, I did.

Q. Could you advance at Archegos if you pushed back on what Mr. Hwang wanted?

MR. BERKE: Objection, your Honor.

THE COURT: I think you've covered it.

MS. ROTHMAN: I just have one more question on this

topic, your Honor.

THE COURT: Sustained.

BY MS. ROTHMAN:

Q. How, if at all, do you believe you personally were rewarded for following directions at Archegos?

MR. BERKE: Objection.

THE COURT: Sustained.

MS. ROTHMAN: Okay.

BY MS. ROTHMAN:

Q. Mr. Becker, did you receive a bonus in 2020?

A. Yes, I did.

Q. How did that size compare to other bonuses you had received?

MR. BERKE: Objection, your Honor.

MS. MULLIGAN: Objection.

THE COURT: Sustained.

BY MS. ROTHMAN:

Q. What was the size of your bonus in 2020, Mr. Becker?

A. My year end bonus was $660,000.

Q. How much was your annual salary?

A. $250,000.

Q. Now, Mr. Becker, before we move on, I want to talk about one more part of the compliance letter.

MS. ROTHMAN: If we can pull up 1002A, please. And let's turn to Page 3, Paragraph 4, zooming in on the top.

Thank you.

BY MS. ROTHMAN:

Q. This paragraph reads:

All trades are reviewed daily and compliance has primary responsibility for reviewing and approving all trades.

To your knowledge, were all of Mr. Hwang's trades reviewed daily by compliance?

MR. BERKE: Objection --

MS. MULLIGAN: Objection.

MR. BERKE: -- your Honor, for this witness.

THE COURT: Overruled.

THE WITNESS: No not to my knowledge.

BY MS. ROTHMAN:

Q. Did you participate in compliance --

THE COURT: Would you have knowledge of that area? Of a review trade by trade?

THE WITNESS: Not direct knowledge as to whether it was being done every day, all day.

THE COURT: Who at Archegos was invested with that responsibility, if any?

THE WITNESS: Can you repeat the question, your Honor?

THE COURT: Who at Archegos was invested with the responsibility of reviewing trades on a daily basis, if anybody?

THE WITNESS: No one at Archegos.

BY MS. ROTHMAN:
Q. Mr. Becker, did you participate in compliance meetings?
A. Yes, I did.
Q. How often were they held?
A. I was involved in quarterly compliance meetings.
Q. Was the riskiness of Mr. Hwang's portfolio discussed at those meetings?
A. No, it was not.
Q. Was the riskiness of Mr. Hwang's trading discussed at those meetings?
A. No, it was not.
Q. Mr. Becker, there's a reference in Paragraph 4 to the executive chairman and co-chief executive officer who is Mr. Mills. To your knowledge, did Mr. Mills review all of Mr. Hwang's trading?
A. No, not to my knowledge.
Q. Did compliance review any trading at Archegos?
A. They reviewed personal employee trading outside of the Archegos fund.
Q. And finally, Mr. Becker, focusing on 2020 and 2021, would it have been feasible for compliance to review all of Mr. Hwang's trades?
MR. BERKE: Objection, your Honor.
THE COURT: Sustained.

BY MS. ROTHMAN:

Q. Focusing on 2020 and 2021, Mr. Becker, what was the volume of Mr. Hwang's trading?

A. Nonstop. All day, every day.

MS. ROTHMAN: We can take down 1002A.

BY MS. ROTHMAN:

Q. I want to focus on 2020 and 2021. You testified that Mr. Hwang was trading nonstop, every day. What was your work like?

A. Very busy and hectic.

Q. What made your work so busy and hectic in 2020 and 2021?

A. Most of my job in that time frame was helping the trading desk decide which brokers to trade with. So Mr. Hwang would give the trading desk his orders, the traders via Bloomberg Chat would notify me what those orders were. I would refer to Excel-based models where I tracked margin and capacity with brokers, and gave the trading desk the instructions of who to trade with. That was for every trade order that Mr. Hwang had given the desk.

Q. We'll come back to that work. Were there other things that you spent your time doing each day?

A. Yes, in addition to that, I had my -- up to that point, normal trade -- normal job responsibilities surrounding operations, accounting and tax matters.

Q. What did that mean?

A. I helped the operations team prepare most of that -- most of that work during the day was preparing internal reports for Bill periodically, at the beginning of the day, throughout the day, and at the end of the day.

Q. When did things get busy at Archegos?

MR. BERKE: Objection, your Honor, to the form of that question.

THE COURT: It's too vague.

BY MS. ROTHMAN:

Q. When did Mr. Hwang's trading increase in frequency that it made your work busy?

MR. BERKE: Same objection, your Honor.

THE COURT: Let me put it this way: You kept abreast -- it was your job to keep abreast of Mr. Hwang's trading, correct?

THE WITNESS: As Mr. Hwang traded, the frequency of his trading increased the amount of work that I had to do.

THE COURT: So -- did your -- did your job entail keeping track of what trades Mr. Hwang transacted?

THE WITNESS: Yes, that was part of that, yes.

THE COURT: So you knew the daily volume of his trades?

THE WITNESS: Yes, I knew the daily volume of his trades even before they were actually executed in the market.

THE COURT: How did you know that?

THE WITNESS: Because as Bill gave the trading desk his trade instructions, the trading desk came to me first asking which broker to execute those trades with, and then the trading desk executed those trades in the market with those brokers.

THE COURT: And what were the considerations you used to decide which broker to do the trade with?

THE WITNESS: It was a complicated process that involved the broker with the best margin efficiency. So with the lowest margin rate. So the most leverage could be used for each trade. In addition to which broker actually had the capacity to trade. So which brokers had room in their portfolios that Archegos had with them to execute those trades with.

THE COURT: And you made those decisions?

THE WITNESS: In conjunction with the trading desk, yes. It was a lot of constant communication on those matters.

THE COURT: So could you compare the volume of transactions month-to-month in the last three months of 2020?

THE WITNESS: Yes, I could.

THE COURT: Please do so.

THE WITNESS: The frequency of trades increased at the end of 2020.

THE COURT: By what factor each month? Can you say?

THE WITNESS: It's difficult to quantify.

THE COURT: Was there a little increase each month, big increase?

THE WITNESS: Big increases in volume.

THE COURT: Can you quantify, say from October to November 2020?

THE WITNESS: I couldn't quantify using numbers, no, your Honor.

THE COURT: And November to December?

THE WITNESS: I couldn't quantify that either. But generally the trade volume increased in that time period.

THE COURT: Doubled?

THE WITNESS: I'm sorry, your Honor. I can't quantify --

MS. ROTHMAN: Thank you, your Honor.

BY MS. ROTHMAN:

Q. Let me help a little bit, Mr. Becker.

Thinking back to the years you worked at Tiger Asia and Archegos before 2020, had Mr. Hwang's trading volume ever been so great before?

A. Only during the very short periods of volatility in the markets. Such as the financial crisis. So those periods could last a couple of weeks. The longest I recall was during the financial crisis when perhaps six months of it, it was busy.

Q. And how did that compare to what Mr. Hwang was doing in 2020 and early 2021?

A. The -- in that period of 2020 to 2021, the trade frequency was higher than even those times during the financial crisis. And that period was essentially nonstop for over a year.
Q. Beginning in March 2020, from where were you working?
A. At my home in Goshen, New York.
Q. Is that in the Southern District of New York?
A. Yes, it is.
Q. Now, focusing on 2020 and 2021, aside from the frequency of Mr. Hwang's trading increasing, did the size of his trades also change?
A. Yes, it did. The sizes increased as well.
Q. How large would Mr. Hwang's trades get?
A. Can you reframe the question?
Q. Would it be uncommon for Mr. Hwang to place trades for hundreds of millions of dollars in a day?
A. No, it would not. That was common in that time period.
Q. Focusing on 2020 and 2021, how big did Archegos' capital grow?
A. At its peak just before its collapse, it was approximately $36 billion.
Q. And how large did Archegos' gross exposure grow?
THE COURT: What does gross exposure mean?
THE WITNESS: The gross exposure is the aggregate total market value of all the securities held in the portfolio.
THE COURT: You mean the lending part of it or the

whole amount?

THE WITNESS: The whole amount that -- that is after the banks lent cash to Archegos, and it used those loans to purchase securities. So that gross exposure was a combination of actual cash that Archegos paid, in addition to any borrowed funds.

MS. ROTHMAN: I --

THE COURT: So the total price paid for the gross assets? How did it differ from gross assets? You said there were gross assets of 36 billion, right?

THE WITNESS: The funds capital was 36 billion. Which I could define --

THE COURT: And what is capital?

THE WITNESS: Capital is -- I think the simplest way to look at it is what was left after the fund paid all of its loans back to banks.

THE COURT: Would it -- is it net equity, is that capital?

THE WITNESS: Yes, yes. Net equity. Another term that could be used for capital is net asset value.

MS. ROTHMAN: May I continue, your Honor?

THE COURT: Yes. But I want you to define these firms with the witness.

MS. ROTHMAN: Yes, your Honor.

THE COURT: When you say -- let's define "gross

exposure."

THE WITNESS: Gross exposure is the aggregate or total market value of all securities held by the fund. Because the fund borrowed to purchase securities, the gross exposure was higher than the capital of the fund.

THE COURT: So the net asset value as it -- was 36 billion, as of what date?

THE WITNESS: As of March 19, 2021.

THE COURT: And the gross exposure on that date?

THE WITNESS: Approximately $160 billion.

BY MS. ROTHMAN:

Q. Now, Mr. Becker, we talked about the frequency and size of Mr. Hwang's trading. Did the names that Mr. Hwang was purchasing also change in 2020 and 2021?

A. Yes, they did.

Q. How did they change?

A. Since the firm became Archegos in 2013, through early 2020, the largest names in the portfolio were large cap U.S. names, names such as Amazon and Netflix. As we got into the spring of 2020 and forward, those positions -- they were still in portfolio but they were much smaller. The largest names in the portfolio were less liquid, primarily Chinese ADR companies that are listed in the United States.

Q. What are some names that come to mind?

A. Viacom, BIDU, GSX, iQ, Vipshop, Discovery, Class A and C,

among others.
Q. Had certain of those names appeared in Mr. Hwang's portfolio before 2020?
A. They had been in the portfolio, yes.
Q. If so, how did the size of those positions compare to their size in 2020 and 2021?
A. They were much smaller prior to 2020.
Q. Before 2020, what was the largest position in Mr. Hwang's portfolio?
A. I believe it was Amazon.
Q. And in 2020 and 2021, what became the largest position?
A. Viacom.
THE COURT: And to obtain the funds to buy the Viacom, Chinese stocks, did Mr. Hwang sell his shares in Amazon and other large U.S. public companies?
THE WITNESS: Yes. In some cases, yes.
THE COURT: And in some cases, he just held his stocks and bought up other positions?
THE WITNESS: Yes, in some cases.
MS. ROTHMAN: Your Honor, I'm going to take a hint from you and start with the definition.
BY MS. ROTHMAN:
Q. What's a swap, Mr. Becker?
A. A swap is a contract that an investment fund could enter into with a broker whereby you gain economic exposure to an

underlying security. Equity swaps was the product that Archegos traded in. It was different than investing in what would be called cash or equity security. With a cash or equity security, you actually go out and purchase the actual shares. With a swap contract, the investment fund doesn't purchase the actual shares, the investment fund entered into a contract with the bank where the economic impact to the investment fund is the same as if it had invested in the actual equity shares.
Q. Do you have an understanding of why Archegos traded through swaps?
A. Yes, I do.
Q. Why is that?
MR. BERKE: Objection, your Honor.
THE COURT: Overruled.
THE WITNESS: Because when you invest in securities via swap, those are not part of the calculation for required filing requirements with the SEC.
BY MS. ROTHMAN:
Q. So what does that mean, Mr. Becker?
A. So if you -- there are various filings, but the general filing would be if you own more than 5 percent of a company's outstanding shares. So if you own 6 percent of a company's outstanding shares, via cash or equity where you actually own shares, you would trigger a public filing requirement. If you invest the same amount of money in the same security for the

same number of shares in a swap contract, you do not trigger a filing requirement.

Q. Did Mr. Hwang have to report his swap holdings?

A. No, he did not.

Q. As --

THE COURT: That's because in a swap, you don't own the stock, you have an interest in whether or not the stock appreciates.

THE WITNESS: Right. That's correct. Or depreciates.

THE COURT: Essentially, a bet whether a stock goes up or down without holding the stock.

THE WITNESS: Yes, that's accurate.

THE COURT: So if you don't hold the stock, it doesn't count in your 5 percent?

THE WITNESS: Correct.

BY MS. ROTHMAN:

Q. And we'll come back to this, Mr. Becker. But on internal reporting for portfolio size, did Archegos treat swaps and equity holdings the same?

A. Yes, it did.

Q. Now, as part of your job, Mr. Becker, did you monitor Archegos' holdings to make sure its equity position stayed below 5 percent?

A. Yes, I did.

Q. What did you do?

A. On a weekly basis, I prepared a report called the ownership test, that -- it was an accounting for Archegos' equity or cash positions, and the ownership percentage of each of those cash positions. The idea was to monitor it so that Archegos stayed below the filing threshold of 5 percent.
Q. Why did you do this?
A. I was told to.
Q. Who told you to do it?
A. Mr. Halligan.
MS. ROTHMAN: Ms. Sonderby, can you pull up what's in evidence as Government Exhibit 541, please?
BY MS. ROTHMAN:
Q. Mr. Becker, is this an e-mail from you on January 7, 2021?
A. Yes, it is.
Q. What's the subject?
A. Ownership test.
Q. Okay. And who are you e-mailing?
A. I'm e-mailing Mr. Mills, Mr. Halligan, Mr. Jones, the trading desk, the operations group, Mike Satine, the chief compliance officer, and Fernanda Piedra, the other compliance officer.
Q. Is this -- withdrawn.
MS. ROTHMAN: Let's scroll to the bottom of this page and the top of Page 2, focusing on the holdings in the United States. We can zoom in on -- that's perfect. All the

way to the bottom where it says "Rocket."
BY MS. ROTHMAN:
Q. So what information are you providing to Archegos here, Mr. Becker?
A. This is the percentage of each of these companies that the fund owned in cash or equity shares.
Q. Are any of them greater than 5 percent?
A. No, they are not.
Q. Why not?
A. Because that was the mandate, to keep that below 5 percent.
Q. Did you and Mr. Halligan ever discuss what might happen if Archegos owned more than 5 percent of a security through its equity holds?
A. We had jokes for a few years --
MR. BERKE: Objection, your Honor, to "jokes."
THE COURT: Sustained.
BY MS. ROTHMAN:
Q. What did Mr. Halligan say?
MS. MULLIGAN: Objection.
THE COURT: Overruled. What did Mr. Halligan say to you with regard to a 5 percent limitation on ownership, if anything?
THE WITNESS: That Archegos should not cross that 5 percent threshold and therefore trigger a public filing for that holding.

MS. ROTHMAN: Okay. We can take this down.

Actually, pull it back up for one second, I'm sorry, Ms. Sonderby.

BY MS. ROTHMAN:

Q. I want to ask you about one security, which is GSX, which is listed on this list. You'll see right at the top of Page 2. It's in bold. Thank you.

So Mr. Becker, here you write that GSX dropped to 4.66 percent due to getting the official update from the company on the increased shares outstanding.

What are shares outstanding?

A. Shares outstanding is the total number of shares that are traded in the market for a particular company.

Q. And how would an increase in shares outstanding affect Archegos' holdings in a security?

A. It would lower the holdings on a percentage basis in terms of ownership percentage.

Q. Meaning if the shares outstanding goes up, Archegos can buy more equity shares without crossing the 5 percent threshold?

A. Yes, that's correct.

Q. Okay. Was Mr. Hwang interested in learning the number of shares outstanding of GSX in late 2020?

A. Yes, he was.

Q. What did he do to find out the answer?

A. He had contacted the investor relations group of the

company GSX to find out their official outstanding number of shares.

MS. ROTHMAN: Ms. Sonderby, we can take this down, and pull up what's been marked for identification at Government Exhibit 237.

If you want to scroll through so Mr. Becker can see both pages.

BY MS. ROTHMAN:

Q. Do you recognize this document?

A. Yes, I do.

Q. What is it?

A. This is the e-mail that we had just mentioned where Bill contacted the investor relations group.

MS. ROTHMAN: Your Honor, the government offers Government Exhibit 237 into evidence.

MR. BERKE: No objection, your Honor.

THE COURT: Received. Ms. Mulligan?

(Government's Exhibit 237 received in evidence)

MS. ROTHMAN: May we publish?

THE COURT: Ms. Mulligan?

MS. MULLIGAN: No objection, your Honor.

THE COURT: Received. Yes, you may.

MS. ROTHMAN: Thank you.

BY MS. ROTHMAN:

Q. So let's start at the second page, scrolling all the way

down to Mr. Hwang's first e-mail. We can zoom in on December 28, 2020.

What is your understanding of who ir@genshuixue.com is?

A. That was the investor relations group of GSX, the company that I mentioned earlier.

Q. And what is Mr. Hwang asking investor relations at the company in this e-mail?

A. He's asking them for the current outstanding share count.

Q. Does GSX respond?

A. Yes, they do.

Q. And what does Mr. Hwang do once he gets the answer?

MS. ROTHMAN: We can scroll up?

BY MS. ROTHMAN:

Q. I can be more specific, does he forward it to you?

A. Yes, he does.

Q. What is your understanding of why Mr. Hwang forwarded you this e-mail?

A. Because this was official confirmation of the shares outstanding updated for the secondary offering.

Q. And how would that affect the amount of GSX that Archegos could purchase?

A. It would increase Archegos' capacity to buy more.

MS. ROTHMAN: We can take that down.

BY MS. ROTHMAN:
Q. Now, focusing on mid to late 2020, what happened to the trading capacity that Archegos had at its existing counterparties?
A. It went down.
Q. What do you mean by that?
A. So Archegos was using its existing capacity by purchasing shares of these companies. And it was buying so much that it was running out of capacity to continue to buy more.
Q. And this constraint in capacity, was it across all names or with certain names in particular?
A. Certain names in particular.
Q. Which names?
THE COURT: What do you mean by "capacity"?
THE WITNESS: Capacity, I mean buying power or the ability to purchase additional shares in those securities.
BY MS. ROTHMAN:
Q. Would the banks give Archegos a certain amount of capacity at each bank?
A. Yes, it would.
Q. Okay. And just to loop back, in mid to late 2020, what happened to that capacity?
A. It was being used so quickly that the capacity was running out.
Q. And I think I had asked you if those constrictions on

capacity where it was running out, was it across the board or certain names, and you said certain names. What were some of the names that you recall?
A. So those were generally the largest names in the portfolio. So that included Viacom, BIDU, GSX, iQ, Tencent Music, Discovery Class A, Class C, Vipshop, among others.
Q. As part of your role, would you monitor capacity levels?
A. Yes, I would.
Q. Why did you do that?
A. I was directed to do that.
Q. Who directed you to do it?
A. Mr. Halligan and Mr. Tomita.
Q. And when capacity got tight, what were you directed to do?
A. I was directed to lie to banks so that they would increase additional capacity for Archegos.
Q. How would Archegos get more capacity from its existing banks?
A. The typical process, Mr. Tomita would request additional capacity from a counterparty. And before that counterparty could give Archegos that capacity, their credit team would have to sign off. At that point, I would speak to the credit teams. In those conversations, I would lie. The credit teams would then sign off on those capacity increases, and Archegos would have that capacity that it requested.
Q. We're going to come back to those conversations with the

banks. Before we do, Mr. Becker, were there other things that you would help do to increase Archegos' capacity?
A. Yes, there were.
Q. What would you do?
A. So in addition to adding additional capacity at existing counterparties, Archegos also signed up for new broker relationships to get new capacity from those brokers as well. I was involved in the onboarding process to set up those brokers.
Q. Were there times that Archegos would move around its positions in swaps to increase capacity?
A. Yes, there was.
Q. What did you do there?
Let me ask a better question. How did Archegos do that?
A. Archegos did that -- there were two main ways that it did that, depending on the type of security. So if it was a cash security, you could transfer those securities from broker A to broker B. Sometimes, that would increase capacity at one of those brokers.
THE COURT: What is a cash security?
THE WITNESS: A cash or equity security where the fund owned the underlying shares.
BY MS. ROTHMAN:
Q. Mr. Becker, how would moving a position from one broker to

another increase capacity?
A. With some brokers they had a specific set of margin rules. By moving securities around, you would sometimes create additional capacity by moving securities out of a broker, for example, to create additional room for new investments.
Q. And let me ask you, what's "margin," Mr. Becker?
A. Margin is a term that's used to describe an investment fund purchasing securities, a term would be purchasing securities on margin. So a bank would lend cash to an investment fund in order to purchase those securities. Margin -- you'd also use the term margin rate. So, for example, if a margin rate was ten percent, you could purchase $100 worth of securities by putting down $10 cash and borrowing the remaining $90 from the bank. Those are the loans that I discussed earlier.
Q. Did part of your responsibilities include monitoring the margin rates that Archegos was paying for these securities?
A. Yes, it did.
Q. How did you do that?
A. I did that primarily through Excel-based margin models that I had built that duplicated the margin rules that each broker had.
Q. When did you first create these models?
A. I believe it was in 2018 or so.
Q. Back then, what was the purpose of those models?
A. So that Archegos could trade using the most efficient

margin. So the lowest margin rates.

Q. Why were you looking at that?

A. For practically the entire time I had worked for Tiger Asia and Archegos, that was something that was very important to Bill.

Q. To Mr. Hwang?

A. I'm sorry, to Mr. Hwang.

Q. What was important to Mr. Hwang?

A. Margin rates of securities.

Q. How did you know margin rates were important to Mr. Hwang?

A. That was something that he looked at very closely because he had the operations team that I was a part of. Starting around the time of the financial crisis in 2008, had created a weekly report, we deemed the margin reports, that took a snapshot of the current rates of all of the positions in the portfolio across all the banks and sent that to Mr. Hwang. He would have -- often have questions on those reports. He would often have ad hoc questions that may not directly relate to a report. He would sometimes ask for simulations of various scenarios related to margin, so you'd understand the impact that his prospective trading decisions would have on margin rates.

THE COURT: Is this a good time for our mid-morning recess, Ms. Rothman?

MS. ROTHMAN: Yes, your Honor.

THE COURT: Jury, are you ready for it? Okay. Close-up your books, leave them on your chair. And we'll take ten minutes.

(Jury not present)

MS. ROTHMAN: May the witness step down, your Honor?

THE COURT: Yes. Don't talk to anybody, but you can step down.

MR. BERKE: Your Honor, I had one issue to raise, but I can raise it after the break, before we resume.

THE COURT: Might as well raise it now. Everybody sit down.

You can leave, Mr. Becker.

Yes, Mr. Berke?

MR. BERKE: Thank you, your Honor. I just wanted to raise an issue and move to strike one aspect of the testimony. Your Honor may remember early in his testimony, Mr. Becker was asked a question about a conversation he had with Mr. Mr. Tomita and Mr. Halligan, both who are alleged to have been coconspirators after the collapse. And when Mr. Becker was asked what did Mr. Tomita say, he went onto describe something Mr. Tomita repeated that Ms. Diana Pae had said about his title, and then made a reference and a joke about the title.

THE COURT: You objected --

MR. BERKE: Well, I did not object at the time because the question that the witness was asked is, what did Mr. Tomita say, but the answer that Mr. Becker gave was what Diana Pae had told Mr. Tomita and Mr. Tomita told Mr. Becker. Now, Ms. Pae

is not alleged to be a co-conspirator. Again, these are --

THE COURT: Why don't you find it in the transcript, and I'll deal with it before the jury comes in.

MR. BERKE: Thank you, your Honor. I'll have it for you.

MS. MULLIGAN: Your Honor, I would request that that entire testimony be stricken because it's a conversation with Mr. Tomita and Mr. Halligan, it's not alleged that Mr. Halligan said anything, and now it would be left with an incomplete --

THE COURT: You'll show me the specific part in the transcript and I'll rule.

MS. MULLIGAN: Yes, your Honor. We'd ask for that all to be stricken. Thank you.

(Recess)

(Continued on next page)

THE COURT: Be seated.

MR. BERKE: Your Honor, with your permission, while I'm standing, may I hand up the transcript that we were talking about up to your Honor?

THE COURT: Yes.

MR. BERKE: Thank you so much.

THE COURT: Okay. I read it.

MR. BERKE: Thank you, your Honor. And I would just note that it's a rough transcript, so it's a little -- so the testimony --

THE COURT: I'm aware of that.

You're focusing on what? What would you like me to strike?

MR. BERKE: I would like you to strike, your Honor, when the question is: At 10:47, 37 seconds, how did Mr. Tomita respond?

He responded that when the executive committee was discussing the title of director of risk management, he had expressed perhaps that it was not a good name for my title, my prospective title, because I would not oversee any portfolio risk.

What else did Mr. Tomita say when he expressed that?

And this should be Ms. Pae — that's Diana Pae — said that a member of the executive committee told him he was not being a team player. Diana Pae is not alleged to be a

co-conspirator. That's plain hearsay. It's objectionable.

We then objected, and your Honor sustained a series of questions.

But the question that was asked was how did Mr. Tomita respond. The answer, your Honor, is clearly, we believe, inadmissible and should be stricken.

MS. ROTHMAN: If I may respond, your Honor.

I think a few points.

First, Mr. Tomita is a co-conspirator; there's no dispute about that. And so his statement is admissible as a co-conspirator statement, and that does most of the substance here.

Ms. Pae's comment, which Mr. Tomita relays, is admissibility on at least two grounds:

She is the president of the company; she is an agent of the defendant and, therefore, that statement is admissible as a statement of a party's agent. It's a statement in the course of her work as the president in figuring out titles that people will have.

Second, I'm not sure there's really a hearsay objection, but it's not being offered for the truth of the matter asserted, simply that it was said. So I don't see a basis to strike.

The questions I asked later, the Court sustained objections to, there's no understanding coming in. But the

fact that it was said is permissible and should be allowed to stay in the transcript.

THE COURT: Motion to strike is granted.

One might say that Mr. Berke or Ms. Halligan -- sorry, Ms. Mulligan should have been more aggressive in their objections. But they were blindsided because he said what somebody else said. And when the question followed was made, I sustained the objection.

So I sustain the objection.

I'll instruct the jury -- what do you want me to instruct the jury? This is coming in several times in different ways. It's so redundant at this point. All I'm doing is drawing attention to something that you might not want me to draw attention to. I'm asking Mr. Berke and Ms. Mulligan.

MR. BERKE: Your Honor, if I could have a moment with Ms. Mulligan.

THE COURT: Yeah.

MR. BERKE: Thank you, Judge.

(Counsel conferred)

MS. MULLIGAN: Your Honor, if I may, I think there's additional testimony above which Mr. Berke showed you.

Your Honor, I believe there's additional testimony above what Mr. Berke showed you that --

THE COURT: Use the microphone.

MS. MULLIGAN: I believe there's additional testimony, your Honor, that Mr. Tomita and Mr. Halligan were having a conversation. And the testimony, now stricken, would leave that.

THE COURT: What are you referring to?

MS. MULLIGAN: Your Honor, I'm sorry, I'm not able to get the --

THE COURT: When you find it, let me know.

The question I'm putting to you now is whether -- I've granted the motion to strike. Whether you want me to tell the jury anything or not, I suggest to you that since this is all redundant anyhow of what Mr. Becker went on to say, I probably just should grant the motion to strike.

MS. MULLIGAN: Your Honor, if I may, I would direct the Court to 10:47 at 01: And now fast-forwarding for a moment, Mr. Becker after the collapse, did you, Mr. Tomita, Mr. Halligan speak about your title?

And so that's leaving a false impression, your Honor, that conversation. So I would also ask for that to be stricken.

THE COURT: Denied. That motion is denied.

MR. BERKE: And your Honor, as to --

THE COURT: The question is do you want me to say anything to the jury?

MR. BERKE: We agree, your Honor suggested to not say

anything further to the jury.

THE COURT: Thank you.

Let's bring the jury in.

MS. ROTHMAN: May we get the witness, your Honor?

THE COURT: Yes, please.

(Jury present)

THE COURT: Be seated everyone.

Mr. Becker, you remain under oath.

Ms. Rothman, please continue your examination.

MS. ROTHMAN: Thank you, your Honor.

BY MS. ROTHMAN:

Q. Mr. Becker, before we took a short break, you were talking about margin rates. Do you remember that?

A. Yes, I do.

Q. And you had testified that Mr. Hwang used to be sensitive to margin rates. Do you remember that?

A. Yes, I do.

Q. Did that change with time?

A. Yes, it did.

Q. Focusing on 2020 and 2021, what happened to the margin rates that Mr. Hwang was willing to pay for his trades?

A. Those margin rates increased.

Q. So before 2020, what would an average margin rate be for a long security?

A. Approximately 15 percent margin.

Q. And just to define the term, when I say "a long security," what do you understand me to be referring to?
A. That would be purchasing a security outright. So you would -- as the price of the security appreciated or went up, you would profit.
Q. And did Archegos also purchase securities on the short side?
A. It would sell short securities, yes.
Q. And what did that mean?
A. That's the opposite. So you would profit if the stock price went down for a short security.
Q. So before 2020, what was an average margin rate for a long security?
A. Approximately 15 percent.
Q. And what about on the short side?
THE COURT: Is that interest or a portion of something else?
THE WITNESS: That's the margin rate. So one way to think of it is is the down payment for the security, so the cash that would be required to be --
THE COURT: The percentage of the value of a stock purchase had to be paid 15 percent in cash and the balance borrowed.
THE WITNESS: Yes, that's correct.
Q. And for securities that Mr. Hwang was selling short, what

would the margin rate be before 2020?
A. Generally, it would be a lower rate of approximately seven and a half percent.
THE COURT: These were not interest charges, these were the proportion of leverage that you could use.
THE WITNESS: Correct. These are -- these are the down payments or the cash percentage that would be required to post for investing in a security.
THE COURT: Is it accurate to consider that a cost or was there a limitation?
THE WITNESS: Generally, when you invest in a security, the cost would be the total cost of the security; so it would include the amount of cash that you posted for that security — in this example, 15 percent — in addition to the loan that you receive from the broker — in this case 85 percent. So your total cost of investing in the security would be the sum of the two.
BY MS. ROTHMAN:
Q. In 2020 and 2021, what did the margin rates increase to for certain securities?
A. In some cases, 100 percent.
Q. And with 100 percent margin rate, what does that mean for how much money Mr. Hwang is putting down?
A. 100 percent of the price of that security or investment.
Q. What are some names you recall where the margin rate went

up to 100 percent?

A. Viacom, BIDU, GSX, Discovery Class A and C, Tencent Music, IQ, among others.

Q. Now, Mr. Becker, you talked about those margin models you had prepared in 2018. Were you still using those in 2020 and 2021?

A. Yes, I was.

Q. What purpose were you using for -- what purpose were you using them for in 2020 and 2021?

A. Primarily to track capacity or buying power that was remaining at that broker in individual securities.

Q. What do you mean by that?

A. So those -- those Excel-based margin models, in addition to showing what the margin rates would be for purchasing securities and the impact on the portfolio as the market moved — because they were dynamic rates in most cases — those same schedules could also track capacity or your remaining purchasing power overall at a specific broker, as well as for an individual security that's held at that broker.

Q. Now, Mr. Becker, from your perspective, why was Mr. Hwang willing to pay more margin for his securities?

MR. BERKE: Objection, your Honor.

THE COURT: Sustained.

Q. From your perspective, were the banks willing to lend money to Archegos at lower margin rates?

A. No, not in the time period -- as it got into 2020, the margin rates that the banks were willing to lend Archegos to purchase -- to invest in securities were generally higher than previously.
Q. Mr. Becker, to get more capacity from the banks, did you lie to the banks?
A. Yes, I did.
Q. Why did you lie?
A. Because that was my job.
Q. Now, focusing on 2020 and 2021, did you maintain notebooks at Archegos?
A. Yes, I did.
Q. Why did you keep these notebooks?
A. To track what I was working on throughout the day.
Q. What would you write in the notebooks?
A. Those could be directives from managers, they could be to-do items that I needed to complete on a given day, and they could also be some notes in regards to the actual work that I was doing.
MS. ROTHMAN: Ms. Sonderby, can you please pull up for the witness what's been marked for identification as Government Exhibit 51A, focusing on pages 124 to 126. If we could just flip through to 125 and to 126.
Q. Mr. Becker, do you recognize those three pages from your notebook?

A. Yes, I do.
Q. What are they?
A. These are excerpts of the notes we just spoke about.
Q. Do they reflect work that you were working on during your time at Archegos?
A. Yes, they do.
MS. ROTHMAN: Your Honor, the government offers into evidence Government Exhibits 51A at pages 124 to 126.
MR. BERKE: Could we just please see the second page for a moment. Thank you.
THE DEPUTY CLERK: Can we have those pages again.
MS. ROTHMAN: 124 to 126.
THE COURT: I don't think this document is — because of its difficulty to read and interpret — useful at this point in time except as a draft for whatever testimony you wish to elicit from the witness. I'll examine the admissibility.
Elicit the recollection of the witness and the recollection can be refreshed by this document.
BY MS. ROTHMAN:
Q. Mr. Becker, would you maintain notes on capacity contraints in your notebook?
A. Yes, I would.
Q. Why would you do that?
A. Because that was a major part of my day-to-day job responsibilities, so I was tracking what I was working on.

Q. And looking at pages 124 to 126 of this notebook, does that reflect notes you made about capacity in certain securities that Archegos had?

THE COURT: I said it's not understandable the way it is; it can only be understandable through testimony. Elicit the testimony.

MS. ROTHMAN: Understood, your Honor.

Q. How would you track the capacity that Archegos had?

THE COURT: How did you track.

Q. How did you track the capacity Archegos had?

A. A combination of my Excel-based margin models, as well as handwritten notes.

Q. At times, would Mr. Hwang ask you to run exercises to evaluate margin rates?

A. Yes, he would.

Q. What would he ask you to do?

A. Sometimes he would propose various scenarios of prospective trading strategies that he may pursue; and he wanted to better understand the impact on margin rates and on cash as a result of those prospective trading strategies.

Q. And focusing on 2020 and 2021, was Mr. Hwang willing to pay more margin for the securities he wanted to purchase?

A. Yes, he was.

Q. Now, focusing on this year, Mr. Becker, did you start to prepare something called a capacity note?

A. In 2020?
Q. Yes.
A. Yes, I did.
Q. What is a capacity note email?
A. That was an email that I prepared daily that summarized the capacity or buying power that the fund had on an individual stock basis. And as the analysis became more complicated, sometimes it showed notes on a broker basis that are overall constraints of a portfolio at a specific broker that needed to be tracked as well.
Q. When did you start preparing these emails?
A. In the summer of 2020.
Q. Why did you start doing this?
A. Prior to this process of preparing the reports, I was being asked on a regular basis from the trading desk about questions related to capacity. So rather than do that throughout the day, as I was working on other items, I proactively prepared this report so that there was one comprehensive source for this data each day.
Q. Who would you send these emails to?
THE COURT: Who did you.
Q. Who did you send them to?
MS. ROTHMAN: Thank you, your Honor.
A. Originally, those emails were sent to the trading desk and the operations team.

Q. When during the day did you send them typically?
A. Typically, at the end of the day; it would be one of the last items that I would work on.
Q. Did Mr. Tomita receive these emails?
A. Yes, he did.
Q. Did you later speak with Mr. Tomita about what he did with your emails?
A. Yes, I did.
Q. What did he, Mr. Tomita, tell you?
A. He thanked me for the work that was going into these, and told me that he was taking these notes and summarizing them for Bill and presenting them to Bill on a nightly basis. So he was stressing the importance of that work.
Q. And by "Bill," you mean Mr. Hang?
A. Mr. Hwang. Apologies.
Q. Now, Mr. Becker, there's a flash drive at your front table that's been marked for identification as Government Exhibit 750. Do you see that?
A. Yes, I do.
Q. Have you reviewed that flash drive?
A. Yes, I have.
Q. What's contained on it?
A. The capacity notes that I prepared while working at Archegos.

MS. ROTHMAN: Ms. Sonderby, can you please pull up for

the witness what's been marked for identification as Government Exhibit 733.

Q. Do you recognize this document?

A. Yes, I do.

Q. What is it?

A. This is an index showing all of the capacity notes that I created and distributed.

MS. ROTHMAN: Your Honor, the government offers into evidence Government Exhibit 733, the index, as well as the capacity notes that are included on flash drive 750. For the record, they are Government Exhibits 600 through 732 and their subparts.

MR. BERKE: Your Honor, we object to the --

THE COURT: Sustained.

MS. ROTHMAN: Let's pull up for the witness what's been marked for identification --

THE COURT: Are you offering this one in particular right now?

MS. ROTHMAN: Your Honor, there are hundreds of capacity notes. I intend to talk about a few of them with Mr. Becker. But for efficiency, I was hoping to offer them all through him and not -- sort of to move the case along, your Honor.

THE COURT: What's the position of defendants with regard to 733 for identification?

MR. BERKE: Your Honor, as I understand, this is just an index that has been created by the prosecution. We agree that there are certain capacity notes that are relevant and admissible. We believe those should be admitted, but not every single capacity note under the sun during this time period.

THE COURT: This is a summary of all capacity notes.

MR. BERKE: Yes, created by the prosecution.

THE COURT: That doesn't make it wrong.

MR. BERKE: Of course.

THE COURT: Have you had a chance to check these for accuracy?

MR. BERKE: Your Honor, we do agree that the dates match up with the GXs that have been placed on those capacity notes. Yes, it is accurate.

THE COURT: This is admitted.

(Government's Exhibit 733 received in evidence)

MS. ROTHMAN: And your Honor, I'm happy to go through several of the capacity notes. I would like, for efficiency, to admit all of them. The witness has reviewed them.

THE COURT: I already made a ruling, did I not?

MS. ROTHMAN: You did, your Honor.

So let's start with Government Exhibit --

THE COURT: You're all worried about efficiency, but we can't sacrifice integrity.

MS. ROTHMAN: Understood, your Honor.

Let's start with Government Exhibit 600. Can you please pull that up just for the witness, Ms. Sonderby.

BY MS. ROTHMAN:

Q. Mr. Becker, do you recognize this document?

A. Yes, I do.

Q. What is it?

A. This is a capacity notes report that I prepared.

MS. ROTHMAN: Your Honor, the government offers Government Exhibit 600 into evidence.

MS. MULLIGAN: No objection, your Honor.

MR. BERKE: Your Honor, no objection.

THE COURT: Received.

(Government's Exhibit 600 received in evidence)

THE COURT: You may show it to the jury.

MS. ROTHMAN: So we can zoom in on the text beginning "Here are some notes on capacity." All the way down to the bottom. Thank you. All right.

Q. So, Mr. Becker, looking at this capacity note email — if we can highlight GXS, VIAC, BIDU, IQ, TME and VIPS — why are those the names of the securities you included in this capacity note email?

A. These were names that, prior to sending this email, the trading desk was asking about frequently.

Q. Were they names that Mr. Hwang was buying frequently?

A. Yes, they were.

Q. Let's just get our bearings.

Underneath the name of each security we have CS swap and then a number. What does the information to the left of the colon reflect, like CS swap and DB swap?

A. That reflects the capacity in each of those individual names. Sometimes in a -- it's expressed in number of shares. So you see for GSX, three and a half million shares. Other times, like the row below, it's expressed in terms of market value. So DB swap, $15 million in market value is the capacity.

Q. So what does "CS swap"?

A. Credit Suisse swap.

Q. What about "DB swap"?

A. Deutsche Bank SWAT.

Q. "MS swap"?

A. Morgan Stanley swap.

Q. "NOM swap"?

A. Nomura swap.

Q. And "UBS swap"?

A. UBS swap.

Q. Can you talk us through the capacity that Archegos had in GSX in August 2020, the date you sent this capacity note.

A. There were 3.5 million shares capacity at Credit Suisse swap.

THE COURT: What does that mean?

THE WITNESS: So the investment fund's capacity to purchase shares of GSX, that individual security, at Credit Suisse was limited to 3.5 million shares of GSX.

THE COURT: And what's the relationship of swap to that limitation?

THE WITNESS: These -- the actual capacity for Archegos to purchase shares of these securities was on swap because Archegos had previously purchased cash shares, those shares that would be reportable for ownership purposes. It was already at a preset threshold that Archegos had, which was below the five percent legal filing requirement.

BY MS. ROTHMAN:

Q. So when it says --

MS. ROTHMAN: I'm sorry, your Honor.

THE COURT: Go ahead.

Q. When it says "swap," that's because it relates to the amount of swaps that Archegos can purchase through that bank; is that right?

A. Yes, that's correct.

Q. So for DB swab, where it says "15 million being used today," what does that mean?

THE COURT: When you say $3.5 million shares, you're not actually buying those shares, are you?

THE WITNESS: The limit that, in this particular case, Credit Suisse had given Archegos was 3.5 million shares. They

were eventually purchased through swap by Archegos. But that was the limit on this day.

THE COURT: What do you mean "purchased through swap"?

THE WITNESS: So the two -- the two methods that Archegos would use to invest in securities would be through cash, so that's actually purchasing the shares, or via a swap contract with a broker.

THE COURT: But you're not buying shares when you do a swap, are you?

THE WITNESS: You're not buying the shares for regulatory purposes. I think a simple way to look at it is as you had expressed earlier, your Honor, where you're essentially making a bet with that broker through a contract.

THE COURT: So you can make a bet as to 3,500,000 shares?

THE WITNESS: Yes, you could. And economically, that would have the same impact as purchasing 3.5 million shares if you actually bought those shares.

THE COURT: When you make a bet, you're betting on the shares increasing in value.

THE WITNESS: If the shares increase in value, you're winning the bet; and if the opposite occurs where the shares decrease in value, you're losing the bet.

THE COURT: Is there a time value on this contract?

THE WITNESS: No, not on these contracts.

THE COURT: So when you buy a swap, you're there forever or --

THE WITNESS: It depended per broker. There is typically a maturity date; sometimes a year, sometimes multiple years.

THE COURT: Okay. Go ahead, Ms. Rothman.

MS. ROTHMAN: Thank you, your Honor.

BY MS. ROTHMAN:

Q. So focusing on the capacity for GSX, when it says "DB swap, 15 million being used today," what does that mean?

A. It meant that Deutsche Bank's capacity limit was $15 million worth of GSX on swap. And there were trades already inputted that were being executed by the trading desk with Deutsche Bank to purchase those $15 million worth of GSX.

Q. For MS swap, where you write "none, reached MS internal limit," what does that mean?

A. There is no more capacity to purchase GSX via swap with Morgan Stanley.

Q. For Nomura swap where you write "right at threshold for margin add-on," what does that mean?

A. Meaning that any additional GSX that was purchased via swap through Nomura would include margin add-on; so the cost up front, the cash cost to purchase that security would be higher. That margin we spoke about earlier would be up, so there would be margin add-ons.

Q. And finally, for UBS swap where you write "260 million before reaching concentration limit," what does that mean?
A. That the fund had capacity to buy $260 million worth of GSX before reaching a concentration or size limit in regards to Archegos's portfolio solely at UBS which they had visibility into. Once -- each broker was slightly different with their margin rules that we discussed earlier.
Q. So this is an example from August of 2020. Why don't we take this down and pull up another capacity note for just you, Mr. Becker.

MS. ROTHMAN: Let's pull up what's been marked for identification as Government Exhibit 623.

Q. Do you recognize this document?
A. Yes, I do.
Q. What is it?
A. This was a capacity notes report that I sent in October 2020.

MS. ROTHMAN: Your Honor, the government offers Government Exhibit 623 into evidence.

MR. BERKE: Can we please see the whole thing.

Thank you.

Your Honor, we have no objection.

MS. MULLIGAN: No objection, your Honor.

THE COURT: Received.

(Government's Exhibit 623 received in evidence)

THE COURT: And it may be shown to the jury.

MS. ROTHMAN: Thank you, your Honor.

Q. So now we're in October, Mr. Becker. I want to focus on GSX again.

MS. ROTHMAN: If we can zoom in on the GSX paragraph in the middle.

Q. So at the top in bold you write: "Avoid UBS/Nomura for now." Why did you write that?

A. Although Nomura and UBS still had capacity to purchase additional shares of GSX on swap, the counterparties had either expressed not using that capacity right away or the margin rate at those brokers was higher than the margin rate at other brokers. I don't recall exactly which, but one or the other.

Q. Now, below GSX you have "maxed out CS." What does that mean?

A. Meaning there is no more capacity at Credit Suisse.

MS. ROTHMAN: We can stay zoomed in.

Thank you, Ms. Sonderby.

Q. And for Morgan Stanley swap when you write "133 million at 15 percent," what does that mean?

A. Meaning that Archegos had capacity to buy $133 million worth of GSX on swap at a 15 percent margin rate.

Q. Now, there's a lot of words after "Nomura swap." Can you explain what's going on there, Mr. Becker?

A. Yes, I could. I'll break it into two pieces.

So the first part, where it says "maxed out at ten percent concentration, add other exposure to use this capacity," in Nomura's margin methodology that would govern Archegos's portfolio just at Nomura, there is a ten percent concentration limit, meaning this particular position GSX was limited to ten percent of the Nomura portfolio that Archegos had.

One way that you could decrease concentration or the position size of an individual security in relation to the portfolio overall is you add other exposure. So that's why it's saying add other exposure to use this capacity. So if Archegos wanted to use Nomura swap for additional shares of GSX, it would have to dilute its existing GSX position so that the concentration would be below ten percent.

THE COURT: How would it do that?

THE WITNESS: It would invest in other securities through Nomura. So that that portfolio solely at Nomura would be a larger portfolio; so the portion that's GSX would be lower.

Q. And looking at UBS swap, you write "reached add-on level 74 million at 23.4 percent." What does that mean?

A. That means that the existing GSX position at UBS had reached a level where any additional GSX exposure that was added would be subject to a margin add-on; so the margin rate for subsequent purchases of GSX would be higher. And then it

goes through what the impact of that would be. So if Archegos had added an additional $74 million worth of GSX, it would be at a 23.4 percent margin rate.
Q. And Mr. Becker, we're only in October of 2020, but was Mr. Hwang willing to keep paying higher margin rates for the securities he wanted?
A. Yes, he was.
Q. Okay.

MS. ROTHMAN: Let's go to the second page and talk about Viacom for one moment. If we can zoom in on the Viacom paragraph.
Q. So does Archegos have capacity in Viacom at Credit Suisse on this date in October 2020?
A. No, it did not.
Q. If Archegos wanted to purchase Viacom and Morgan Stanley, what rate would it have to pay?
A. 100 percent.
Q. Mr. Becker, looking at UBS, how much capacity did Archegos have in Viacom at UBS on this date in October of 2020?
A. $140 million worth of Viacom capacity.
Q. What would the margin rate be?
A. At 15 percent.
MS. ROTHMAN: Now, we can take this down.
Q. And let me ask you this, Mr. Becker: Did there come a time

when you began sending these notes to Mr. Halligan as well?
A. Yes, there did.
Q. Why did you start including Mr. Halligan on these emails?
A. He had asked me to start including him.
MS. ROTHMAN: Let's pull up for the witness what's been marked for identification as Government Exhibit 638. You can just flip through so Mr. Becker can review the whole document.
Q. Do you recognize this?
A. Yes, I do.
Q. What is it?
A. This is an email chain that begins with a capacity notes email that I sent.
MS. ROTHMAN: Your Honor, the government offers Government Exhibit 638 into evidence.
MS. MULLIGAN: No objection, your Honor.
MR. BERKE: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 638 received in evidence)
THE COURT: You may show it to the jury.
MS. ROTHMAN: Thank you.
Q. Once we publish, let's focus on the bottom of page 1, which is your capacity note. Thank you.
And so now we're in November of 2020, Mr. Becker, do you see that?

A. Yes, I do.
Q. And just for one example, can you tell us what the capacity at -- actually, withdrawn.
I want to focus on Mr. Tomita's response to your email.
MS. ROTHMAN: We can scroll up.
Q. All right. Now, Mr. Tomita writes to you: "I spoke to Bill, and he said on Monday to think about reshuffling to minimize cash."
What did you understand Mr. Tomita to be saying here?
THE COURT: What did you.
Q. What did you understand Mr. Tomita to be saying?
A. That -- well, that he had an error in his email, that was my understanding.
THE COURT: Let me put the question this way: Did Mr. Tomita explain what he wanted you to do?
THE WITNESS: Yes, he did.
THE COURT: This was an instruction to you, was it not?
THE WITNESS: Yes, it is.
THE COURT: And what was the instruction?
THE WITNESS: To think about how to move around existing positions between brokers to maximize Archegos's excess cash.
Q. There's a line that says: "Namely closing out IQ at Mizuho

and MUFG and opening Viacom there." What was that instruction from Mr. Tomita?
A. The capacity constraints at those two counterparties, Mizuho and MUFG, they had an overall constraint of the -- in terms of the aggregate positions that Archegos had with each of those brokers.
So one way that you could -- the only way that you could add more exposure there in other positions would be to close some existing positions with those two counterparties out and substitute other names to use that same capacity. So that's what he's talking about here; so closing out swaps in IQ, which is one of the securities that Archegos invested in, and opening up swaps for Viacom instead.
Q. Would that proposal allow Archegos to purchase more Viacom?
A. Yes, it would.
Q. Okay. So let's scroll up to your email to Mr. Halligan.
Let me ask you this: Why do you forward Mr. Tomita's email to Mr. Halligan?
A. Because he was my boss. I was keeping him in the loop.
Q. Okay. And when you write: "I doubt Mizuho/Macquarie will give enough capacity on VIAC to make a big difference," what did you mean by that?
A. Mizuho and Macquarie were smaller counterparties for Archegos. And with the amount of Viacom that was being purchased every day by Archegos, I didn't think that the

capacity that those two counterparties would be able to provide would be material.

Q. You say material --

A. It would be used quickly --

Q. Thank you.

A. -- by Archegos.

Q. Thank you.

And let's just scroll up to Mr. Halligan's email, focusing on the line where he says: "In the future, can I start to be included in these communications with the desk."

At this point thereafter, did you include Mr. Halligan on all of your capacity note emails to Mr. Tomita?

A. Yes, I did.

Q. Why?

A. Because here he asked me to and he's my boss.

MS. ROTHMAN: We can take that down.

Let's pull up what's been marked for identification as Government Exhibit 707 and 707A side-by-side.

Q. All right. Do you recognize these documents?

A. Yes, I do.

Q. What are they?

A. This was a capacity notes email that I had sent, and resulting email chain because of it.

Q. Is it from February of 2021?

A. Yes, it is.

MS. ROTHMAN: Your Honor, the government offers into evidence Government Exhibit 707 and 707A.

MS. MULLIGAN: No objection, your Honor.

MR. BERKE: No objection, your Honor.

THE COURT: Received.

(Government's Exhibits 707, 707A received in evidence)

THE COURT: You may show them to the jury.

MS. ROTHMAN: Thank you.

Q. Before we turn to the substance, let's zoom in on your email on the left side, 707. Thank you. All the way to the bottom.

Now, Mr. Becker, at this point you're no longer sending out the substance by email, but you're putting it in a share location. Do you see that?

A. Yes, I do.

Q. Why did you start doing that?

A. I was instructed to not attach portfolio data to emails when they're being sent; to send an email, as you see here, and save it to a shared network drive that Archegos employees had access to, so that the actual data was not being sent via email.

THE COURT: Who gave you that instruction?

THE WITNESS: Patrick Halligan and Mr. Mills.

Q. Did you have an understanding of where that direction was coming from?

MR. BERKE: Objection, your Honor.

THE COURT: Sustained.

MS. ROTHMAN: We can zoom out.

I want to focus on the capacity note first and then turn back to the cover email. If we can look at 707A, looking at page 2, zooming on GSX. Thank you. A little bit lower. Should be at the bottom half of the page.

Q. So, now, we're in February of 2021. Does Archegos have capacity in GSX at Jefferies?

A. No, it does not.

Q. What about Morgan Stanley?

A. No.

Q. What about Credit Suisse?

A. No.

Q. What about Nomura?

A. No.

Q. If Archegos wanted to buy more GSX, what would the margin rate be at UBS?

A. 70 percent.

Q. If Archegos wanted to buy more GSX at Goldman Sachs, what would the margin rate be?

A. 100 percent.

Q. What would the margin rate be at Deutsche Bank?

A. 70 percent.

Q. What would the margin rate be at Macquarie?

A. 100 percent.
Q. Let's look at IQ, which is the security right below GSX. Did Archegos have capacity in IQ in February at Credit Suisse?
A. No, it did not.
Q. What about at Nomura?
A. No, it did not.
Q. Now, there's a note below that says: "Cash, 76 million at 15 percent." And then in bold: "Per today's filing, December secondary was closed." What do you mean by that note?
A. The company had a secondary offering. So in a secondary offering, it's a way for a company to raise capital for investors. When they have a secondary offering such as IQ had here, it increases the number of shares outstanding in that company. By increasing the number of shares outstanding, it gave Archegos additional capacity to purchase shares of IQ outright, so cash shares, and still stay below the five percent filing requirement threshold.
MS. ROTHMAN: So let's turn back to the cover email focusing on Mr. Halligan's response and Mr. Tomita's response. Perfect.
Q. So after you email out these notes, Mr. Tomita writes: "Great. So we can use the capacity tomorrow, ha ha."
And how does Mr. Halligan respond?
A. He responds with: "Aaand it's gone."
Q. What did you understand Mr. Halligan to be commenting when

he wrote "Aaand it's gone"?
A. How quickly --
MS. MULLIGAN: Objection.
THE COURT: Overruled.
A. How quickly Archegos would use its IQ capacity.
MS. ROTHMAN: We can take that down.
Let's pull up Government Exhibit 718 and 718A side-by-side please. I think our monitor in the back -- oh, there we go.
Q. Do you recognize this document?
A. Yes, I do.
Q. What is it?
A. It is a capacity notes email that I sent in March 2021.
MS. ROTHMAN: Your Honor, the government offers into evidence 718 and 718A.
MR. BERKE: Your Honor, we have no objection to the bottom part of the email that has the instructions. We would object to the top two.
MS. MULLIGAN: Similar objection, your Honor.
THE COURT: What do you mean by "top two"?
MR. BERKE: Two emails on the top, your Honor.
MS. ROTHMAN: It's Mr. Halligan's emails, your Honor.
THE COURT: Objection sustained to 718.
Wait a minute. I'm not finished. I have to rule on 718A.

MR. BERKE: Your Honor, it only -- it is only on 718.

THE COURT: What?

MR. BERKE: It is only on 718.

THE COURT: Okay.

MR. BERKE: No objection to 718A.

THE COURT: Okay.

MS. MULLIGAN: Thank you, your Honor.

MS. ROTHMAN: Your Honor, may we have a sidebar on this?

THE COURT: No.

Q. Mr. Becker --

MS. ROTHMAN: So I think 718A is admitted into evidence?

THE COURT: Yes, it is.

(Government's Exhibit 718A received in evidence)

THE COURT: You may show it to the jury.

MS. ROTHMAN: Let's pull up 718A.

Q. Now, Mr. Becker, just one question on this note, if we can zoom in on UBS.

So in March 2021, you have a note that "UBS is reviewing additional capacity; should have an answer on Friday."

Do you see that?

A. Yes, I do.

Q. Did Archegos request additional capacity from UBS in March

2021?
A. Yes, it did.
Q. Did you lie to UBS to get more capacity?
A. Yes, I did.
Q. Why did you lie?
MR. BERKE: Objection, your Honor.
THE COURT: Sustained.
What did you say to lie? What was your lie?
THE WITNESS: I had several lies to UBS concerning portfolio statistics.
THE COURT: Go ahead. Elicit it.
What's the matter?
MS. ROTHMAN: Your Honor, we're going to get to the lies to UBS at a later part of Mr. Becker's testimony. With the Court's permission, I can address them then.
THE COURT: Okay.
BY MS. ROTHMAN:
Q. Let me ask you this, Mr. Becker: Would Archegos employees sometimes say the phrase "Happy Groundhog's Day"?
MR. BERKE: Objection, your Honor.
MS. MULLIGAN: Objection, your Honor.
THE COURT: Overruled.
A. Yes, they would.
Q. What did that -- who would say that?
THE COURT: Who did say that?

Q. Who did say that?

MS. ROTHMAN: Thank you, your Honor.

A. That was a phrase used on a regular basis by myself, Peter DeSanto, one of the traders, and Mr. Halligan.

THE COURT: When you said it, what did you -- what did it signify to you and to others?

THE WITNESS: It was a reference to the movie *Groundhog's Day*, where in the movie every day is the same, over and over.

Q. What did you mean by that?

A. Because my workday was essentially the same over and over every day. Archegos was purchasing securities nonstop from the time the market opened to the time it closed. And I was very busy with my daily responsibilities during that time.

MS. ROTHMAN: We can take -- if we can scroll to page 2 of 718A, which is the March 2021 capacity note.

Q. Focusing on Viacom at the bottom, in March 2021, on this date, did Archegos have any more capacity for Viacom at Nomura or Morgan Stanley?

A. No, it did not.

Q. If Archegos wanted to purchase more Viacom at Goldman Sachs or Credit Suisse, what would the margin rate be?

A. 50 percent.

MS. ROTHMAN: We can take that down and pull up Government Exhibit 720 and 720A side-by-side.

Q. Do you recognize these documents?
A. Yes, I do.
Q. What are they?
A. This is an email chain on a capacity notes email that I had sent in March 2021.
MS. ROTHMAN: Your Honor, the government offers Government Exhibit 720 and 720A into evidence.
MR. BERKE: No objection, your Honor.
MS. MULLIGAN: No objection, your Honor.
THE COURT: Received.
(Government's Exhibits 720, 720A received in evidence)
THE COURT: You may show it to the jury.
MS. ROTHMAN: Thank you, your Honor.
I want to focus on 720A once it's up. And let's turn to page 2. We can leave 720 up as well, but let's turn to page 2 of 720A, focusing on page 2 and zooming in on GSX, the bottom.
Q. Where you write: "UBS swap 15.1 million at 100 percent," what does that mean?
A. Archegos had a capacity at UBS, a swap, to purchase $15.1 million worth of GSX.
Q. What would the margin rate be?
A. 100 percent.
MS. ROTHMAN: We can take that down. We can take it down. Thank you, Ms. Sonderby.

Q. All right, Mr. Becker. I want to now focus on the lies that you told to the banks when you worked at Archegos.

You testified when you started that Mr. Halligan directed you to lie to these banks. Was 2020 the first time he had directed you to lie to the banks?

A. No, it is not.

Q. Let's go back to 2017. At that point what was your job?

A. My title was fund accounting manager within the operations group.

Q. Who did you report to?

A. Mr. Halligan.

Q. Around then, who handled primary communications with banks at Archegos?

A. Mr. Halligan.

Q. Would he speak with banks by phone?

A. Yes, he would.

Q. Did there come a time when you began to shadow Mr. Halligan on these phone calls with the banks?

A. Yes, there did.

Q. How did that happen?

A. Prior to me joining him for these calls, oftentimes I would -- I would arrange these calls in an administrative function. So if the counterparty reached out via email, sometimes he would forward the email to me and I would set up a date and time for him to have these calls with counterparties.

Q. When you joined for the calls, what did you notice about the information that Mr. Halligan was providing to the banks?

MS. MULLIGAN: Objection, your Honor.

THE COURT: Change the form.

MS. ROTHMAN: Okay.

Q. When you joined for these calls, did you witness Mr. Halligan lie to the banks?

MS. MULLIGAN: Objection, your Honor.

THE COURT: Sustained.

Elicit the conversation.

MS. ROTHMAN: Okay.

Q. When you joined for these calls, what types of questions would the banks ask Mr. Halligan?

THE COURT: When you joined these conversations, what was said by you and by others?

THE WITNESS: In these conversations, Mr. Halligan would give -- he would answer the brokers' questions around general portfolio statistics.

Q. Would he answer questions about the size of Archegos's largest position?

MS. MULLIGAN: Objection, your Honor.

THE COURT: Change it to "did he."

MS. ROTHMAN: Did he. I'm sorry, your Honor. I'll work on it.

Q. Did he answer questions about the size of Archegos's

largest position?

MS. MULLIGAN: Objection, your Honor.

THE COURT: Overruled.

A. Yes, he did.

Q. What did he say?

MS. MULLIGAN: Objection, your Honor.

THE COURT: Overruled.

A. He said that Archegos's largest position was 35 percent.

Q. Was that true?

A. It was not.

Q. How did you know that was false?

A. While I was shadowing him for these calls, he would be sitting at his desk, I'd be standing behind him. The call would be on speakerphone, and he would have his computer opened to a sheet called the combo sheet which showed the portfolio.

I could see as he read it the percentage -- the actual percentage on that combo sheet was higher than the percentage that he stated on the phone when brokers asked that question.

Q. Did you and Mr. Halligan discuss the reason he was providing false information to the banks?

MS. MULLIGAN: Objection, your Honor.

THE COURT: Overruled.

A. Yes, we did.

Q. What did he say?

A. He stated that when we have these calls, we shouldn't -- we

shouldn't tell -- we shouldn't say that the largest position was any larger than 35 percent, even if it was higher.
Q. Did he say why?
A. Yes. He said because that number is ambiguous and they don't know how to calculate it anyway.
Q. And Mr. Becker, we'll come back to this, but was the number for the largest position size ambiguous?
MS. MULLIGAN: Objection, your Honor.
THE COURT: Overruled.
A. No, it was not.
Q. Did Mr. Halligan make other statements to the banks about Archegos's portfolio, aside from the largest position size?
A. Yes, he did.
Q. Did he give information about the liquidity of the portfolio?
A. Yes, he did, when asked.
Q. What did Mr. Halligan say?
MS. MULLIGAN: Objection, your Honor.
THE COURT: Overruled.
A. He said that the majority of the portfolio could be liquidated in approximately two weeks.
Q. With time, Mr. Becker, did you start to take over these calls with the banks?
A. Yes, I began taking these calls by myself.
THE COURT: You establish the date that this call had

taken place.
Q. So, Mr. Becker, you just testified about calls that you shadowed Mr. Halligan on when he lied to the banks. Do you recall the specific dates of those calls?
A. No, I do not.
Q. Do you recall the specific banks to whom Mr. Halligan made these false -- this false information?
A. No, I do not.
Q. Approximately what year were the calls that you just testified about did they happen?
A. In approximately 2017.
Q. When did you start to take over these calls?
A. In approximately 2018.
Q. How did you start to take them over?
A. Mr. Halligan instructed me to start taking these calls on my own.
Q. Did you continue lying to the banks on those calls?
A. Yes, I did.
Q. Why?
MS. MULLIGAN: Objection, your Honor.
THE COURT: Change the form.
Were you instructed?
THE WITNESS: Yes, I was.
Q. Who instructed you --
MS. ROTHMAN: I'm sorry, your Honor?

THE COURT: By whom?

THE WITNESS: By Mr. Halligan.

THE COURT: You may proceed.

Q. Now, Mr. Becker --

THE COURT: I want to get a better date. This conversation we talked about before, you don't remember when it happened more than approximately 2017?

THE WITNESS: No. There were several conversations. I would say in the period I was shadowing him, perhaps five to ten conversations.

THE COURT: What was happening in the market at that time?

THE WITNESS: I don't recall if it was anything -- anything volatile. These -- these typically would be periodic annual due diligence calls that the brokers would hold from time to time.

MS. ROTHMAN: May I continue, your Honor?

THE COURT: You may.

MS. ROTHMAN: Thank you.

BY MS. ROTHMAN:

Q. Directing your attention to 2020 and 2021, Mr. Becker, did the frequency of your communications -- how did the frequency of your communications with the banks change?

A. They increased.

Q. Why is that?

A. They went from -- whereas prior to that they were typically periodic check-ins or annual check-ins that some brokers had. With the onset of the COVID-19 pandemic, the market volatility, in general, counterparties wanted to speak on a more regular basis during that time frame.

Q. Did you continue lying to the banks?

A. Yes, I did.

Q. Why did you continue lying to the banks?

MR. BERKE: Objection, your Honor.

MS. MULLIGAN: Objection, your Honor.

THE COURT: You said you were instructed to lie.

THE WITNESS: Yes, that's correct.

THE COURT: Were you given a purpose for the lie?

THE WITNESS: Yes, I was.

THE COURT: Who said what to you?

THE WITNESS: Mr. Halligan instructed me to tell the lies to understate the reality of Archegos's portfolio situation.

THE COURT: In what respect?

THE WITNESS: In respect to concentration of the largest position in the portfolio and in regards to the leverage or the total amount borrowed by Archegos.

THE COURT: And were these percentages as respects all of the transactions that Archegos had or only those with respect to a particular bank?

THE WITNESS: These were general portfolio statistics that would apply to Archegos's portfolio in aggregate; so, no, not a particular bank.

THE COURT: So particular banks would inquire and the answers you just talked about were given.

THE WITNESS: Correct.

BY MS. ROTHMAN:

Q. Now, Mr. Becker, before we talk about those lies in more detail, let me ask you this: Prior to 2017, when you began shadowing Mr. Halligan on these calls, had you ever misled banks before at Mr. Halligan's direction?

MS. MULLIGAN: Objection.

THE COURT: Overruled.

A. Yes, I had.

Q. When was this?

A. From approximately 2007 through 2013.

Q. What did Mr. Halligan direct you to do?

MS. MULLIGAN: Objection, your Honor.

I need to be heard, your Honor.

THE COURT: I think we're too far afield.

MS. ROTHMAN: This was the subject of a pretrial ruling, your Honor.

THE COURT: I know.

MS. ROTHMAN: I'll be very brief.

THE COURT: I think we're too far afield. We'll take

it up at the recess. For the moment, the objection is sustained.

MS. ROTHMAN: I can move on.

Q. Okay. So let's talk about the statements you made to banks in 2020 and 2021 that Archegos's largest position size was around 35 percent of capital, okay?

A. Okay.

Q. Was that a lie?

A. Yes, it was.

Q. Focusing on 2020 and 2021, how large had Archegos's positions grown?

THE COURT: Try to be more specific in your question.

MS. ROTHMAN: Sure, I can.

Q. Focusing on the largest position that Archegos had, did it exceed 35 percent?

THE COURT: And the time period.

Q. In 2020 and 2021.

THE COURT: No, be more specific now.

MS. ROTHMAN: Okay.

Q. Let's focus on --

MS. ROTHMAN: I can come back to it, your Honor.

Q. How many times did you lie to banks about the size of Archegos's largest position?

THE COURT: I think at this point I'm going to require you to be specific as to time and place.

MS. ROTHMAN: Understood, your Honor.
Q. When you told the banks that Archegos's largest position was 35 percent, where did you get that number from?
MS. MULLIGAN: Objection, your Honor.
THE COURT: I'd like to find out -- sustained.
Place a time.
MS. ROTHMAN: Okay.
Q. Did Archegos maintain internal reports that showed its actual largest position size?
A. Yes, it did.
Q. What was that sheet called?
A. It was called the combo sheet.
MS. ROTHMAN: Ms. Sonderby, can we please pull up what's in evidence as Government Exhibit 475, and turn to tab March 22nd. And it's going to be out of Trial Director.
THE COURT: Yes, that's how to do it.
MS. ROTHMAN: Thank you.
Q. All right. I want to get our bearings on this sheet from your perspective, Mr. Becker. So what is this sheet called?
A. This is called the combo sheet.
Q. Did it have any other names?
A. It was also referred to internally as Pat's combo sheet.
Q. Why was it called Pat's combo sheet?
A. This is a sheet --
MS. MULLIGAN: Objection, your Honor.

THE COURT: Overruled.

A. This was a sheet that Mr. Halligan had created and maintained.

Q. When you joined Tiger Asia in 2007, did the combo sheet already exist?

A. Yes, it did.

Q. Who had programmed the formulas for the combo sheet?

A. Mr. Halligan.

Q. As you understood it, how often -- withdrawn.

Would Mr. Halligan review the sheet during the day?

MS. MULLIGAN: Objection, your Honor.

THE COURT: Time period.

MS. ROTHMAN: Focusing on 2020 and 2021.

THE COURT: Sorry, that's too big a time period. Why don't you go into the specifics of what you want to do.

MS. ROTHMAN: Understood, your Honor.

I just have a few more questions on the sheet itself.

THE COURT: We've had enough generality. Go to the specific.

MS. ROTHMAN: Okay.

BY MS. ROTHMAN:

Q. Looking at row S, Mr. Becker --

MS. ROTHMAN: If we can scroll to the right. Scrolling down. Thank you, Ms. Sonderby. If we could unfreeze 13 again. I'm sorry, so we can see the caption heading.

Scroll down. Thank you. Oh, scroll up. Thank you. Little higher.

Q. So in cell S37, it says "holding weight over capital." What does that information represent?

A. That represents in percentage terms the size of each of those positions. So it would be the market value of that individual security divided by the fund's capital.

MS. ROTHMAN: And if we can click on the formula in cell S52 for Viacom. If we can zoom out so we can see the cells that get highlighted. Scroll a little bit to the left. There we go. Scroll a little bit to the left. Thank you. Scroll up.

Q. All right. What's the numerator or the top number for the holding weight over capital?

A. It's the market value of that individual position or row.

Q. And what's the denominator or the bottom number?

A. It's the fund's capital.

Q. Okay. Who programmed the formula for row S in this sheet?

A. Mr. Halligan.

THE COURT: What are we doing? We're taking a fraction numerator which is the holding the particular sum, the denominator of which is the total capital of Archegos.

THE WITNESS: Yes, that's correct.

THE COURT: You want to know what percentage of Archegos's total capital is devoted to a particular stock?

THE WITNESS: Yes.

THE COURT: That's what we're doing here.

THE WITNESS: Yes, that's correct.

THE COURT: That's a concentration of your portfolio.

THE WITNESS: Yes, that's correct.

BY MS. ROTHMAN:

Q. Mr. Becker, in all of your years at Archegos, have you ever seen a combo sheet that calculates position size by taking market value and putting it over gross exposure?

A. No, I have not.

Q. Have you ever seen an internal report at Archegos that calculates position size that way?

A. No, I have not.

Q. Would the combo sheet change from time to time?

A. Yes, it would.

Q. How would it change?

A. Over time, as Bill had additional data that he wanted to see on the report, he would make the request and that data would be shown on the reports going forward.

Q. Did Mr. Hwang ever ask to add a column to the combo sheet that calculated position size by taking market value and putting it over gross exposure?

A. No, not to my knowledge.

Q. When you would speak with banks, when they would ask for position size, what did you understand them to be asking for?

MS. MULLIGAN: Objection.

THE COURT: I'll allow it. You may answer.

When banks asked you for size of positions, how did you respond?

THE WITNESS: I lied to them but --

THE COURT: No, but what did you say to them? What were you comparing?

THE WITNESS: I was comparing the statistic that's shown here in the sheet. So it was the market value of that security over the fund's capital.

Q. When they asked for that --

THE COURT: And when you say you lied to them, what did you misstate?

THE WITNESS: I understated that statistic.

THE COURT: You understated what, the percentage?

THE WITNESS: Yes, I understated the percentage.

THE COURT: So if a percentage in actuality came out to be 20 percent, you could say 15 percent? 18 percent? Ten percent?

THE WITNESS: In theory, you are correct, your Honor. Perhaps I could suggest numbers that were actually said.

THE COURT: I'd like you to --

MS. ROTHMAN: I'm getting there, your Honor.

THE COURT: Go to it right now and we're going to break for lunch. Last question.

MS. ROTHMAN: Let's click to March 8th on this combo sheet.

THE COURT: Okay.

MS. ROTHMAN: And let's scroll down to see the position size that Archegos had on March 8th, 2021. Focusing on the Viacom position in particular. Right there.

Q. Looking at cell S52, what was the actual size of Archegos's position in Viacom on March 8th, 2021?

THE COURT: What column are you looking at now?

MS. ROTHMAN: S52, your Honor.

THE COURT: That's line 52.

MS. ROTHMAN: Yes.

THE COURT: So what column?

MS. ROTHMAN: S.

THE COURT: "F" as in Frank?

MS. ROTHMAN: "S" as in Sam.

THE COURT: "S" as in Sam. Okay.

Q. What was the actual Viacom position?

THE COURT: Why don't you highlight it, highlight the line.

MS. ROTHMAN: I'm not sure we can highlight in Excel, your Honor. But we could click on it, which Ms. Sonderby has. Thank you.

Q. What was the actual position?

A. 84.2 percent.

Q. Did you speak to UBS on March 8th, 2021?

A. Yes, I did.

Q. Did you lie about position size?

A. Yes, I did.

Q. Why did you lie to UBS --

THE COURT: What did you tell them?

THE WITNESS: When they asked for that statistic, I told them that it was 35 percent.

Q. Where did you get that number from?

A. From Mr. Halligan.

MS. ROTHMAN: Do you want to take a break now.

MS. MULLIGAN: Objection, your Honor. Moved to strike. There's no year given.

THE COURT: March 2021. Right?

MS. MULLIGAN: But the instruction from Mr. Halligan, your Honor --

THE COURT: Excuse me, just a minute. What date are we talking about, March --

THE WITNESS: March 8th of 2021.

THE COURT: And you say Mr. Halligan told you to say 35 percent, when it was actually close to 85 percent?

THE WITNESS: He had given me those instructions in approximately 2017 to do exactly what you're describing, yes.

MS. MULLIGAN: Exactly, your Honor.

THE COURT: Just a minute, Ms. Mulligan.

You're applying an instruction given to you in 2017 to something in March of 2021?

THE WITNESS: Yes, it was the same task.

THE COURT: And when you said 35 percent, was that your number or Mr. Halligan's number?

THE WITNESS: The 35 percent was the number that he instructed me to give.

THE COURT: When did he instruct you to give?

THE WITNESS: He made the instruction in approximately 2017.

THE COURT: And was that instruction to carry forward to all responses to inquiries that were above 35 percent?

THE WITNESS: Yes.

THE COURT: In other words, whenever the concentration in the portfolio exceeded 35 percent and the bank asked, was it your instruction to answer 35 percent?

THE WITNESS: Yes, it was.

THE COURT: In all instances?

THE WITNESS: Yes, your Honor.

THE COURT: Objection is overruled.

We'll break for lunch. Come back at 2:15, please.

Don't discuss the case. Keep an open mind. Close up your books and give them to Ms. Jones.

(Jury not present)

THE COURT: Please be seated.

Witness, you're excused. Thank you.

Don't talk to anybody about the case.

(Witness not present)

MS. ROTHMAN: Your Honor?

THE COURT: Yes, Ms. Rothman.

MS. ROTHMAN: I intend to elicit through Mr. Becker after lunch that part of his work in 2020 with specific dates included providing compliance information to prospective banks in response to banks' questions about Tiger Asia's past regulatory action. This witness was on phone calls when these matters were discussed. And what I expect to --

THE COURT: Ms. Rothman, did you see how I linked up the current date with 2017?

MS. ROTHMAN: I did, your Honor.

THE COURT: Okay. So that's the way you do it.

MS. ROTHMAN: I'm going to learn from the best.

THE COURT: Start with what's clearly relevant; and then if you want to show a pattern, you may. You want to backdate something, show its currency.

MS. ROTHMAN: I will do that.

As I think you can see, your Honor, that this witness lied throughout his time at Archegos.

THE COURT: Look, I'm not the jury. I don't care if he lied or didn't lie. My only concern is that the testimony be admissible and fair.

MS. ROTHMAN: I will link it up to specific dates and then backdate.

With respect to Tiger Asia, if I may, I intend to elicit through this witness that in response to questions from banks about Tiger Asia and its past regulatory issues, Archegos would provide, among other things, letters that talked about their improved compliance.

This witness is prepared to discuss, consistent with the Court's leave pretrial rulings, that in 2009, there was a regulatory investigation into Tiger Asia for, among other things, insider trading; that the defendant, Mr. Hwang, settled that matter, paid a large fine; and that banks would ask about what had changed at Archegos in light of those past issues.

I intend to offer testimony about that in the afternoon through Mr. Becker. And we think it's admissible for the reasons we briefed pretrial.

MR. BERKE: Your Honor, if I may.

Your Honor already ruled that those regulatory matters are not admissible.

THE COURT: I'd like to absorb information when I get it. Then I'll give you a chance.

MR. BERKE: Thank you, Judge.

MS. MULLIGAN: Your Honor, may I just be heard --

THE COURT: All right. Go ahead, tell me everything.

MS. MULLIGAN: Your Honor, you may recall that we had

extensive briefing. And the government indicated in its briefing clearly that Mr. Halligan was not charged or named in any of the Tiger Asia matters. And now there's a change of course, and I believe they are trying to get in the back door what they couldn't get in the front door.

MR. BERKE: Your Honor, and if I may, on your Honor's prior ruling as to Mr. Hwang, there is no reason to bring out what your Honor said should not come in, the regulatory history. The why the banks needed the compliance information is marginally relevant. It is sufficient if it comes out that the banks cared about the compliance information, they asked about it, it was provided. If the government has a theory that it was false, they can then claim if it's a lie, it's a lie. There's not a reason --

THE COURT: Do you mind if I have a conversation with Ms. Rothman?

MR. BERKE: Of course, your Honor. Thank you.

MS. ROTHMAN: Thank you, your Honor.

THE COURT: Why is there a need to fill the air with argumentation?

MS. ROTHMAN: I'm sorry, your Honor?

THE COURT: Why is there a need to fill the air with argumentation when the real need is to explore? I'd like to explore with you, Ms. Rothman, why is the incident with Tiger Management relevant, and which particular instance are we

talking about and how does it relate? Because it seems to me that the prejudicial effect of this testimony outweighs its relevance.

MS. ROTHMAN: Your Honor, let me answer those questions specifically.

In late 2020, Archegos is running out of capacity. That's what that witness said. The documents are consistent with that.

THE COURT: We see that clearly. Okay.

MS. ROTHMAN: In response, to get more capacity, they need to onboard new counterparties. They onboard BMO, Bank of Montreal; they onboard Goldman Sachs. They tried to onboard several others. This witness will talk about just how important it was to the defendant, Mr. Hwang, to onboard those banks.

THE COURT: In 2020?

MS. ROTHMAN: In 2020 and early 2021. There are emails that we will offer that show that.

THE COURT: I don't think that's objectionable.

MS. ROTHMAN: Thank you.

THE COURT: But we're talking about 2017.

MS. ROTHMAN: Well --

THE COURT: And earlier.

MS. ROTHMAN: Well, when I'm talking about the compliance issue, I think the issue here is the following: In

onboarding those banks, the banks asked questions about Tiger Asia's past regulatory issues from the defendant, Mr. Hwang.

In order to assure the banks that they were a good trading partner, Archegos did a few things: They prepared that letter that we showed, 1002A, that talked about all of the compliance procedures at the bank at Archegos, which this witness has said were false. It was so important to Archegos to get these new counterparties, because they were running out of capacity, that they made representations about how things had changed from the past. As I think the Court will see, very little had changed, compliance was a farce. Trades weren't reviewed. That the witness will talk about, other witnesses will as well.

In order to explain how it's important to the banks --

THE COURT: Show me the document you want to put into evidence.

MS. ROTHMAN: So 1002A is already in evidence, your Honor. This was a document that was provided to Bank of Montreal, one of the counterparties that the defendants onboarded when they were desperate for capacity, which is a critical aspect of the government's case here, your Honor.

Thank you, Ms. Sonderby.

THE COURT: What is in 1002A that defendants object to?

MR. BERKE: Your Honor, we don't object to this

document. The government alleges it's a lie. They can present that evidence. We object to using it as an excuse to go back to 2008 about Tiger Asia.

THE COURT: Just a minute.

In what respect are you going to say it's a lie?

MS. ROTHMAN: I think the witness has already testified, if you go to page 3, paragraph 4, where it says: All trades were reviewed daily, including by Mr. Mills --

THE COURT: You've already discussed that.

MS. ROTHMAN: He said that's not true.

THE COURT: You've already discussed that.

MS. ROTHMAN: Correct. But it's important for the jury to understand what was motivating these banks and asking questions about what was going on at Archegos. It's not just --

THE COURT: No, it's not. It's an ordinary plain-vanilla request of a bank. A bank wants to know about the compliance checks. Because in this business, as we have learned, nobody knows the full extent of a portfolio. So the least thing you want to know is that the system is working within a particular company.

MS. ROTHMAN: Except what this witness will say is that Archegos is rejected by Bank of Montreal initially because of, in part, the past regulatory actions. When that happens, rather than accepting the rejection, because they are so

desperate for capacity, they reach back out to BMO and assure them on a call, among other things, that things have changed and that Archegos can be trusted as a trading partner.

THE COURT: When did they say this?

MS. ROTHMAN: They said this in November and December of 2020.

THE COURT: So why isn't that relevant, folks?

MR. BERKE: Your Honor, the part that happened in 2019/2020, that they were rejected as a partner and then there were further statements that the government wants to allege they were false, they can. But what caused BMO to ask these questions is not relevant. Tiger Asia, they knew about it, that's not relevant.

What's relevant is they asked these questions -- first they rejected. That's fine, they can bring out they rejected. Why they rejected doesn't matter. Then they asked questions. And then if they want to allege that false statements were made to Bank of Montreal to try to persuade them to do it, they can allege it.

THE COURT: Here's my ruling. Here's my ruling:

Whatever statements were made to induce Bank of Montreal to become a counterparty are relevant. The history is not relevant. But if the history was expressed, it is relevant. Focus on what was said in the conversations in -- when, in November, December --

MS. ROTHMAN: November and December of 2020.

THE COURT: And not on the history that brought us to that point. We will not have any explanation.

MS. ROTHMAN: Understood, your Honor.

MR. BERKE: But, your Honor, just to make sure we're clear, because I think the prosecution is intending to say that to the extent Bank of Montreal asked any questions about a regulatory resolution, they want to use that to bring in the regulatory resolution.

The issue is, your Honor, I believe it accomplishes what your Honor wants. If the prosecution elicits that Bank of Montreal was not comfortable approving Archegos because of the -- whatever -- they were not comfortable approving them based on the information provided and they rejected them. Archegos then provided more information which the government is free to allege is false. Going back to 2008, 15 years earlier, to get into a regulatory issue is not relevant.

THE COURT: I'm making a distinction. The distinction is we are focusing on conversations that occurred. Including in those conversations is anything that Bank of Montreal brought up.

MS. ROTHMAN: Understood, your Honor.

THE COURT: If Bank of Montreal brought it up and something was said to Bank of Montreal to allay their concern, it's irrelevant.

Now, ask this question: Did Bank of Montreal become a counterparty?

MS. ROTHMAN: They did, your Honor.

THE COURT: Okay. So to induce them to become a counterparty in large capacity is relevant to the issues of this case.

MR. BERKE: So, your Honor, in light of your Honor's ruling, we would ask though that all that's elicited from this witness is that Bank of Montreal raised issues about regulatory concerns regarding --

THE COURT: Whatever they said is relevant.

MR. BERKE: Your Honor, if they reference an SEC order — I don't know if they did or they didn't — we would object because that obviously puts --

THE COURT: Anything they want to know and how they're answered is clearly relevant.

MR. BERKE: But, your Honor, can I draw distinction?

I don't believe the questions -- they didn't ask questions about the regulatory matters. They asked questions about today. So they didn't ask questions about the regulatory matter, if I'm correct, they talked about today. So the fact --

THE COURT: The conversation will be: What did you say? What did you say? We'll have it in conversation. And whatever is said, is said. I'm not going to prevent that.

MR. BERKE: But, your Honor, if they bring out, Oh, Bank of America said in light of the guilty plea and SEC regulation, Tiger Asia, we want you to provide more information, that would be terribly prejudicial. We wouldn't have a chance to address it; we wouldn't be able to show what it is; we wouldn't put the defense; it would prejudice the jury.

THE COURT: It's relevant because it's a concern of Bank of Montreal that was allayed. It's part of the government's effort to prove that there were misrepresentations and a false creation of capacity to allow ever more buying of particular stocks. It's all part of a pattern.

I'm allowing it.

MR. BERKE: Your Honor, can I ask one question?

Can we just put in a short letter. The only question we would ask is if your Honor --

THE COURT: You want to write, you go write. I read anything you write.

MR. BERKE: Okay. But what I'm going to ask you, Judge, just so you'll know, that if they are going to put in something about regulatory matters, it refers generally to regulatory matters as opposed to the details. Because that would be terribly unfair for just the bottom line, which is so prejudicial to come in without the circumstances that are actually much more helpful --

THE COURT: If they ask about the circumstances and they were answered, that's part of the --

MS. MULLIGAN: Your Honor, may I just be heard on one issue with respect to Bank of Montreal?

I think Mr. Becker was talking about credit calls that he had. And this is a compliance letter. And there's a call that Bank of Montreal, with the global head of America and the chief compliance officer at Archegos, Michael Satine, is on that call. And I think the prosecutor should lay an appropriate foundation.

There are multiple calls here, your Honor. There are multiple calls. There's credit calls, there's compliance calls. All these executives are talking back and forth.

THE COURT: Ms. Rothman, Ms. Mulligan has the floor. Sit down, please.

MS. MULLIGAN: Yes, your Honor.

So I think things are getting kind of smashed together; and I think it's all -- put some sunshine in there, as we say in federal court, and let's find out what happened.

THE COURT: Ms. Mulligan, I am not going to tell Ms. Rothman how to proceed with her case. She can focus on any particular conversation she wants. And on cross-examination you can bring out the relevance of anything else.

I think we've exhausted this subject.

So we'll now break for lunch.

MS. ROTHMAN: Thank you, your Honor.

MR. THOMAS: Your Honor, when would you like us back?

THE COURT: As soon as -- close to 2:15 as possible.

MR. THOMAS: We'll be here, Judge. Thank you.

THE COURT: Don't get indigestion.

(Luncheon recess)

(Continued on next page)

AFTERNOON SESSION

2:17 p.m.

THE COURT: Sit down, please.

Ms. Rothman, can you give me a picture of what's going to be elicited from the witness with regard to the matter we had discussed before lunch?

MS. ROTHMAN: Yes, your Honor. So I expect to elicit that in the fall of 2020, there was a push at Archegos to onboard new counterparties. One of those counterparties was Bank of Montreal. What I expect he will testify to is that he had an initial credit call with the credit officer at BMO, Joe Boccuzzi.

THE COURT: A call with whom?

MS. ROTHMAN: Joe Boccuzzi, who worked at BMO.

THE COURT: Where?

MS. ROTHMAN: Bank of Montreal.

THE COURT: Oh, who had the call?

MS. ROTHMAN: Mr. Becker. Mr. Becker is going to say that he lied to Mr. Boccuzzi.

THE COURT: What was said with regard to Tiger?

MS. ROTHMAN: Yes, sure. So after his credit call, Archegos learns that they've been rejected by BMO for two reasons. What I expect he will say is part of it related to the volatility of Archegos' portfolio, and the other part related to their past regulatory issues.

THE COURT: And then what happened next?

MS. ROTHMAN: So Archegos doesn't want to accept that rejection. They reach out to BMO to learn more and try to persuade them to do business with them.

THE COURT: And what's said?

MS. ROTHMAN: So there are two parts of this conversation. There's a pre-meeting that happens with Mr. Becker, Mr. Halligan, Mr. Mills, and Mr. Mr. Tomita, in which they talk about what they're going to say on the call with BMO. There are notes of that pre-meeting in Mr. Becker's notebook. I can pull them up for your Honor if you'd like.

THE COURT: Go ahead.

MS. ROTHMAN: Okay. In short, they talk about how they're going to assure them that the legal issues from the past have been resolved, and that there is now stronger compliance to prevent those issues from happening again. Mr. Mills is going to talk about that. Mr. Halligan is going to talk about operations; Mr. Tomita is going to talk about trading.

After that pre-meeting, they have a call with BMO, and on that call, as I understand it, what the witness will say, is BMO starts by explaining why they rejected Archegos relating to the past regulatory issues and also the volatility of the portfolio. In response, Mr. Mills makes statements to assure BMO that Mr. Hwang can be trusted, that there's oversight and

Mr. Becker will talk about what he remembers. Thereafter, BMO accepts Archegos, and they start trading through Archegos.

I'll note this, your Honor, there's another call that Archegos has with BMO before the rejection, which focuses on compliance. Mr. Becker is on that call, he doesn't do much of the speaking. The speaking is done by Mr. Satine and Ms. Piedra, but there's also that call where the focus is on compliance in light of the past regulatory issues. That's the BMO story. I just want to say one thing for context.

BMO is not the only bank where this issue comes up. I expect other bank witnesses will talk about having similar concerns with Archegos given the past regulatory issues, and the representations that Archegos made to them about the changes.

And --

THE COURT: In a pre-meeting, who is going to testify about the pre-meeting?

MS. ROTHMAN: Mr. Becker.

THE COURT: What is he going to say essentially?

MS. ROTHMAN: Well, I can't sort of speak to his exact words, we could ask him outside the presence of the jury. I think what he would say, I'm pulling up his notes of the pre-meeting so I don't misspeak, your Honor. He'll say in the pre-meeting, there was a plan to talk about, as I remember, how Archegos trades, the concentration of the portfolio.

THE COURT: Just focus on the --

MS. ROTHMAN: And the legal issues. And the note reads Andy to offer his explanation. He did his own due diligence. And he'll talk about what they planned to say. And there's notes from the call with BMO where there's a note that reads SEC settlement and volatility of portfolio. And those are the two reasons BMO gave for rejecting Archegos. At that point, Mr. Mills assures them that things have changed. And Mr. Tomita talks about their willingness to put on a small position to build a long-term relationship.

THE COURT: You contend that what they said about the SEC matter was a lie?

MS. ROTHMAN: Well, I don't think what they said about the SEC matter was a lie. I think representations of changes that had happened was a lie. And I think, I don't know what the witness will say. I'm not sure how specific he will be about representations in this phone call, but I do know that the materials BMO got were that letter we just looked at, the 1002A that talks about the compliance, and then also had a specific call with compliance folks, Mr. Satine and Ms. Piedra to talk about --

THE COURT: I think you should leave out the pre-meeting.

MS. ROTHMAN: Your Honor, if I may, I think it's --

THE COURT: You don't need it. You can argue whatever

you want to argue from the conversations with Bank of Montreal. And the ruminations among the alleged coconspirators, what to say about the SEC settlement is unnecessary and unduly prejudicial.

MS. ROTHMAN: Your Honor, I don't expect there to be a discussion about what to say about the settlement during the pre-meeting. The notes don't reflect that, and I don't think Mr. Becker is going to say that. What he's going to say is that the topic of the settlement came up in conversation with BMO. That's what his notes reflect.

THE COURT: Well, as I said before, you can elicit whatever BMO said.

MS. ROTHMAN: Right.

THE COURT: And then you can elicit whatever was said in response.

MS. ROTHMAN: Okay. And, your Honor --

THE COURT: And you can elicit that it was a product of a conversation among --

MS. ROTHMAN: Yes.

THE COURT: -- Halligan, and who else?

MS. ROTHMAN: Mr. Halligan is present. Mr. Mills is present. Mr. Tomita is present. And Mr. Becker is present.

THE COURT: Then you may do that.

MS. ROTHMAN: If I may, your Honor, I'm seeking to admit Mr. Becker's notes of this conversation. Mr. Becker's

credibility has been attacked from the moment this case started. And this corroboration is important, and we are entitled to do it under the rules of evidence.

THE COURT: Let me see the note.

MS. ROTHMAN: Ms. Sonderby, can you please pull up 51C at 26? Thank you.

THE COURT: What does it say about the SEC?

MS. ROTHMAN: So in the bottom half, if we can zoom in. Go higher up from where the dash is. Thank you. All the way down, perfect.

So what Mr. Becker will say is that line, the slash, signifies when a new thing happens. So everything below that slash is the substance of the call with BMO. They declined working with them for two reasons.

THE COURT: You're going to hold this back and if it's necessary and appropriate, you'll do it on rebuttal.

MS. ROTHMAN: Okay.

THE COURT: It would be more effective for you anyhow.

MS. ROTHMAN: Okay. I can ask the witness what he remembers being said. Do I have permission to use it to refresh his recollection if need be?

THE COURT: You can use it to refresh his recollection.

MS. ROTHMAN: Thank you, your Honor.

THE COURT: You don't have to admit it into evidence

at this point.

MR. BERKE: Your Honor, if I may. The government has now conceded, and they're not alleging anything about Tiger Asia was false. In addition, your Honor, if all they want to bring out -- they have already brought out the BMO, rejected it for the volatility. They would show why they put --

THE COURT: I'm not going to truncate conversation.

MR. BERKE: -- but if your Honor allows it, I would ask that it just refer to regulatory issues, because it's terribly unfair, the SEC --

THE COURT: What?

MR. BERKE: That they only refer to regulatory issues or legal issues, because it's terribly unfair to say an SEC settlement was neither admitted nor denied, there was no admission, no resolution. And, Judge, if I may, further proof the prosecution did not even prep their witness on it, which is why they don't know what he is going to say, because they knew your Honor would rule that it can't come in. The only thing --

THE COURT: I'm not allowing a conversation to come -- whatever -- whatever --

MR. BERKE: Could --

THE COURT: Stop interrupting.

MR. BERKE: I'm sorry, Judge.

THE COURT: I ruled about this earlier. The

conversations between Bank of Montreal and Archegos are relevant. And the way that Archegos tried to overcome the objections is relevance. And I'm going to allow it.

MR. BERKE: Judge, can I ask one thing? Because we don't know what this witness is going to say, and your Honor has already noted the prejudicial nature of these resolutions, could we at least have Ms. Rothman lead and refer to it as a regulatory issue? That serves the purposes of the law --

THE COURT: I'm not going to change the witness's testimony.

MR. BERKE: We don't know what it's going to be, though, Judge.

THE COURT: I know. You'll object.

MR. BERKE: Judge, could we at least have an initial voir dire to find out?

THE COURT: I'm not going to tell the witness how to testify.

MR. BERKE: Judge, I hear that. But, again, we had so much legal briefing on this, and I fear that we're getting the worst scenario, that there's going to be the impression by the jury that there was an SEC resolution. That is false. It was neither admit or deny. There were no findings that he admitted to. It doesn't relate to these issues. We believe there are no false statements about them. So in some respects, this is the most prejudicial it can possibly be for Mr. Hwang, with all

due respect to you, your Honor.

We don't have an opportunity to contextualize it. It comes in in the worst way. It's not necessary. It's not alleged to be false. They can make all the claims they want about the false statements. You don't need to know the why or the details of the why, Judge. It's prejudicial in the worst possible way.

If they bring out there was a regulatory issue, and they were concerned about that, that accomplishes what the prosecution wants. And to use this as a wedge, as an excuse to get in this horrible, inadmissible evidence, your Honor, I, again, with respect to your Honor, submit that there's no legal basis, it's not appropriate, and it would be so unfair for Mr. Hwang, and prejudicial value so unfairly outweighs any probative value.

So I'd ask your Honor at least to consider, if you're going to overrule our objection to allow it, to at least have them lead so it's regulatory issues and not getting into the details about what we don't even know what the witness will say.

THE COURT: I ruled before. As I said, I'm not going to tell the witness how to testify.

Let's bring in the jury. You'll object when it's appropriate.

(Jury present)

THE COURT: Be seated. Mr. Becker, you remain under oath.

Ms. Rothman, you can continue your examination.

We're going to about five minutes to 4:00 today. I think a member of the jury has a problem after that, so we will break then.

DEPUTY CLERK: Judge, we have a problem, the second row, the monitors are out.

JUROR: Three of them are out.

THE COURT: They're not working?

DEPUTY CLERK: No.

THE COURT: We'll try to fix it.

Please write to your congressmen, members of the jury, so we can get better appropriations, to get better equipment.

MS. ROTHMAN: May I inquire?

THE COURT: Yes, you may.

MS. ROTHMAN: Thank you, your Honor.

BY MS. ROTHMAN:

Q. Mr. Becker, before we broke for lunch, you were talking about a phone call you had with UBS in March of 2021. Do you remember that?

A. Yes, I do.

Q. Okay. I want to focus your attention on a phone call you had with UBS in October of 2020. Okay?

A. Okay.
Q. Did you have a phone call with UBS in October of 2020?
A. Yes, I did.
Q. Who at UBS did you speak with?
A. Brian Fairbanks.
Q. What was Mr. Fairbank's role at UBS?
A. He was one of the credit officers.
Q. Focusing on this phone call in October of 2020, what, if anything, did Mr. Fairbanks ask you about Archegos' position in GSX?
A. He had asked whether the GSX position at UBS was Archegos' largest exposure to GSX, so he was inquiring about Archegos' GSX position overall.
Q. What did you say in response?
A. I said that the GSX position at UBS was a large part of its overall exposure.
Q. Was that the truth?
A. It was not.
Q. Okay. Let's play a portion of the recording.

MS. ROTHMAN: Ms. Sonderby, can you please pull up what's in evidence as Government Exhibit 2533 and 2533-T. I'm only going to play a portion, let's start at six minutes and ten seconds. And if the jurors would like to pull up their transcript binders, they can turn to 2533, Page 8, Line 5.

(Audio played)

MS. ROTHMAN: You can stop there, Ms. Sonderby.

BY MS. ROTHMAN:

Q. Okay. So Mr. Becker, when you told Brian Fairbanks that a large portion of the GSX position was at UBS, that was a lie, right?

A. Correct. That was a lie.

MS. ROTHMAN: Let's look at the Archegos position in GSX at that time. Can we pull up what's in evidence as Government Exhibit 476, please? And when you get there, Ms. Sonderby, please turn to tab October 21, so 10/21.

BY MS. ROTHMAN:

Q. Mr. Becker, before Ms. Sonderby scrolls down, what are we looking at?

A. This is the combo sheet as -- for October 21, 2020.

Q. Is it the combo sheet or the LP sheet?

A. Oh, apologies, this is the LP sheet.

Q. What's the difference between the combo sheet and the LP sheet?

A. The LP sheet breaks out each individual provision of the portfolio according to where it's held.

MS. ROTHMAN: So let's scroll down to the GSX position, focusing on what was held on October 21, 2020.

BY MS. ROTHMAN:

Q. Mr. Becker, on this date, how many shares did Archegos have at UBS?

A. It had 7,890,177 shares.

MS. ROTHMAN: And if you want to put the cursor -- right there, thank you, on E210, thank you, Ms. Sonderby.

BY MS. ROTHMAN:

Q. Now, on this sheet you see rows for GSX MUFG, GSX CS, GSX MS, GSX Jeffries, GSX DB, GSX MAC, and GSX NOM.

What do those rows reflect?

A. Each of those rows reflect a different counterparty where Archegos had that position GSX on swap.

Q. What was the total position size that Archegos had in GSX in October of 2020?

A. 41,675,455 shares.

Q. What did you think would happen if you had told UBS that Archegos had 41 million shares of GSX?

MR. BERKE: Objection, your Honor.

MS. MULLIGAN: Objection, your Honor.

THE COURT: Sustained.

BY MS. ROTHMAN:

Q. Mr. Becker, why didn't you tell UBS the truth about the holding size of Archegos in GSX?

MR. BERKE: Objection, your Honor.

MS. MULLIGAN: Objection, your Honor.

THE COURT: Sustained. The largest position was not a position in UBS, right.

THE WITNESS: Yes, that's correct, your Honor.

THE COURT: It was a larger position, right?

THE WITNESS: I'm sorry, your Honor, can you --

THE COURT: It was a larger position with another counterparty, right, than the broker -- the bank?

THE WITNESS: Yes, the largest counterparty for this security GSX was a different counterparty, Credit Suisse.

THE COURT: Credit Suisse. And there was another position also that was almost as large as UBS. What was that?

THE WITNESS: Yes. That's correct. Morgan Stanley.

THE COURT: And so -- you can take it from here, Ms. Rothman.

MS. ROTHMAN: Thank you, your Honor.

BY MS. ROTHMAN:

Q. So I'll continue, Mr. Becker.

So what was the position size at Jeffries?

A. 69,891 shares.

Q. What was the position size at Morgan Stanley?

THE COURT: We can see it --

MS. ROTHMAN: Your Honor, may I ask --

THE COURT: Did you know at the time you told Mr. Fairbanks that a large portion of the --

Did you know at the time you told Fairbanks that a large portion of Archegos holding of GSX was with UBS that that was not a true statement?

THE WITNESS: Yes, I did.

THE COURT: You can go onto something else now.

MS. ROTHMAN: Thank you, your Honor. I would like to ask the witness what he thought would have happened if he told UBS the true size of the position. I think it's relevant to --

THE COURT: You'd be guessing, wouldn't you?

THE WITNESS: Yes, that would have been my belief.

THE COURT: Objection sustained.

BY MS. ROTHMAN:

Q. Now --

THE COURT: You can argue that to the jury, you don't need a witness.

MS. ROTHMAN: Thank you, your Honor.

BY MS. ROTHMAN:

Q. Now, Mr. Becker, in the lead-up to your October -- well, withdrawn.

Can we look at the holdings -- before we do this. What is the total value of Archegos' holdings in GSX on October 21, 2020? Looking at cell K214?

A. $2,968,000,000.

MS. ROTHMAN: Ms. Sonderby, can we turn to that prior day, so October 20, one day before, and scroll down and look at --

THE COURT: Can you leave that for a minute?

MS. ROTHMAN: Yes. May I proceed?

THE COURT: You may.

BY MS. ROTHMAN:

Q. If we can turn to October 20, 2020, and look at the GSX position size one day before your call with UBS.

MS. ROTHMAN: Just scroll down.

THE COURT: What is the date?

BY MS. ROTHMAN:

Q. October 20, 2020. So one day before Mr. Becker's phone call with Mr. Fairbanks.

THE COURT: So that would be October 19.

MS. ROTHMAN: October 20.

BY MS. ROTHMAN:

Q. So looking at cell K212, what is the value of the GSX position on October 20?

A. $3,998,000,000.

Q. How much did the position drop in one day?

A. Approximately 25 percent.

Q. About a billion dollars?

A. Yes, by a billion dollars.

Q. Thank you. Now, Mr. Becker, in the lead-up to your call with UBS in October, had Mr. Hwang been purchasing GSX?

A. Yes, he had.

Q. Did Mr. Hwang want to purchase more GSX?

A. Yes, he did.

MS. ROTHMAN: Can we please pull up for the witness what's been marked as Government Exhibit 123?

BY MS. ROTHMAN:
Q. Do you recognize this document?
A. Yes, I do.
Q. What is it?
A. This is an e-mail chain originally sent from Mr. Tomita about GSX capacity.
Q. Is Mr. Hwang on this e-mail?
A. Yes, he was.
Q. Is Mr. Halligan on this e-mail?
A. Yes, he was as well.
Q. Do each of them send messages in this e-mail?
A. Yes, they both do.

MS. ROTHMAN: Your Honor, the government offers 123 into evidence.

MR. BERKE: No objection, your Honor.

MS. MULLIGAN: No objection, your Honor.

THE COURT: Received and it may be shown to the jury.

(Government's Exhibit 123 received in evidence)

MS. ROTHMAN: Thank you. We can publish that and scroll down to Mr. Tomita's e-mail to Mr. Hwang in September of 2020. We can just zoom in on the text. Thank you.

And if you can highlight the sentence that begins "UBS has around 1.7 million shares," at the top, thank you. And then, We can piece together around 100 million more at Jeffries and DB, but we'll need to offset with similar sized SPY. The

problem with GSX is SC, Nomura, MS are all pushed against legal ownership rules.

And then in bold, There are somewhere in the realm of 240 to $290 million additional capacity at current prices.

BY MS. ROTHMAN:

Q. Now, before we go up to see the following chain, I want to focus on the second paragraph from Mr. Tomita, where he writes, iQ and VIAC are both starting to get tighter but not as bad as GSX, and there is still capacity as long as we have flexibility to keep shorting.

When Mr. Tomita wrote "iQ and VIAC are both starting to get tighter," what did you understand him to mean?

A. That the capacity to purchase additional shares of IQ and Viacom was getting tighter and more limited.

Q. And was the capacity for GSX tight around this time?

A. Yes, it was.

MS. ROTHMAN: Let's scroll up to see Mr. Hwang's e-mail in response.

BY MS. ROTHMAN:

Q. Focusing on Mr. Hwang's e-mail from September 8, 2020, what does Mr. Hwang say about GSX capacity?

A. He says, Try your best to get GSX capacity, please.

Q. Okay. And then one month later is when you speak with UBS; is that right?

A. Yes, that's correct.

MS. ROTHMAN: Can you scroll up to the top?
BY MS. ROTHMAN:
Q. Now, I want to focus on your e-mail to Mr. Halligan.
Why do you forward this e-mail to Mr. Halligan?
A. To keep him in the information loop on this topic.
Q. And focusing on your first paragraph when you write, Will is still looking for more GSX capacity, see details below. We still have some capacity left, 240 to 290 million, but Bill wants more.
What were you telling Mr. Halligan that Mr. Hwang wanted more of?
A. More GSX capacity.
Q. And then one final question on this e-mail. Looking at the final paragraph you send to Mr. Halligan, when you write, I mentioned BNP to Will and he circling back with WF on an ISDA tomorrow.
What was WF?
A. WF was Wells Fargo.
Q. And what was Archegos trying to do with Wells Fargo around this time?
A. To begin an ISDA relationship so we could start trading equity swaps with Wells Fargo.
Q. How would that relationship affect Archegos' capacity?
A. It would increase its capacity.
Q. Okay.

MS. ROTHMAN: Now, let's take this down, and pull up Government Exhibit 469. We can scroll to September 1, 2020, the bottom of the -- yep, thank you.

BY MS. ROTHMAN:

Q. Now, before we were looking at the LP sheet, what sheet is this, Mr. Becker?

A. This is the combo sheet.

Q. For which month?

A. For September 2020.

Q. If I wanted to see which days Mr. Hwang purchased GSX in September of 2020, how would I do that?

A. You would go through each tab of the schedule, each tab representing a day. You would find the GSX row in each tab, and on that row, there was a column that would show the amount traded on that particular day.

Q. Have you done that, Mr. Becker?

A. Yes, I have.

Q. Have you checked to see the number of days that Mr. Hwang purchased GSX in September 2020?

A. Yes, I have.

Q. What did you find?

A. He purchased GSX in all but four days of September 2020.

Q. Is that consistent with your recollection of how often Mr. Hwang was purchasing GSX in 2020?

A. Yes, it is.

Q. Okay. Now, I want to go back to 2533, which is the transcript of your call with Mr. Fairbanks.

We don't need to play it, but I want to ask you a few questions about statements you made on the call.

MS. ROTHMAN: If you could turn to Page 7, Ms. Sonderby. Thank you.

BY MS. ROTHMAN:

Q. And looking at this line where you tell Mr. Fairbanks that he's, Very, very price target driven. So you know, they kind of set a price target and kind of go from there.

Why did you say that to Mr. Fairbanks?

A. That was my general understanding.

Q. Had you heard Mr. Hwang say that before?

A. Yes, I have.

Q. What did you hear him say?

A. That his investment strategy was very price-target driven.

THE COURT: What does that mean?

THE WITNESS: So in analyzing a security, you could arrive at a price target, so what you believe a stock should be worth, and compare that to the actual market price that is trading in the market, and that can be an input into your trading strategy -- your decision to buy or sell short.

BY MS. ROTHMAN:

Q. We can take that down.

Now, let me ask you this, Mr. Becker, based upon --

withdrawn.

Was Archegos required to provide written performance information to counterparties like UBS on a monthly basis?

A. Yes, it was.

Q. What reports did Archegos provide these banks?

A. A -- an e-mail that included the funds capital, the funds month to date, and year to date performance in percentage terms.

Q. Did that e-mail include the size of Archegos' position in certain securities across Wall Street?

A. No, it did not.

MS. ROTHMAN: Let's pull up what's in evidence as Defense Exhibit 7948. If we can turn to Page 6, please?

THE COURT: Is this in evidence?

MS. ROTHMAN: It is, your Honor.

MR. BERKE: Your Honor, we can put it up, from the defense.

MS. ROTHMAN: Thank you.

Q. And --

THE COURT: Are all monitors working?

JUROR: No. These three aren't in the middle row?

THE COURT: But you're not following.

JUROR: We can look at it.

Q. Now there is a line on this that reads transparency report. What does that refer to?

A. That refers to the report I previously mentioned. I can read the description if you'd like.
Q. Sure.
A. Transparency report means a month-end written report containing a statement of Net Asset Value, a calculation of the percentage change in Party B's performance from that of the preceding month.
Q. By when was Archegos required to provide that to the banks?
A. Typically within 20 to 30 days. This example, it's 20 days.
Q. And did Archegos follow those deadlines?
A. Not always, no.
Q. Were their occasions when Archegos would send its monthly performance reports late?
A. Yes, there were.
Q. Who at Archegos sent out these reports?
A. Mr. Halligan.
Q. We can pull up -- withdrawn.
What were some occasions when Mr. Halligan would send the reports late?
A. If they were sent late, oftentimes it was after a month where the fund had significant negative performance.
Q. Did Mr. Halligan tell you why he was sending the reports out late?
A. Yes. He mentioned that fact.

Q. What did he say?
A. That he was holding off on sending those reports because of negative performance in that report.
Q. Let's pull up what's been marked for identification as Government Exhibit 2186F and 2186F1, side by side.
Do you recognize these documents?
A. Yes, I do.
Q. What are they?
A. This is an e-mail with that month-end report we had just spoken about related to February month-end, 2020.
MS. ROTHMAN: Your Honor, the Government offers into evidence 2186F and 2186F1.
MS. MULLIGAN: No objection, your Honor.
MR. BERKE: No objection.
THE COURT: Received.
(Government's Exhibits 2186F and 2186F1 received in evidence)
THE COURT: You may show it to the jury.
MS. ROTHMAN: Thank you.
BY MS. ROTHMAN:
Q. Who sent this e-mail?
A. Mr. Halligan.
Q. What month's performance numbers are included?
A. February of 2020.
Q. By when was Archegos required to send this to the

counterparties?

MS. MULLIGAN: Objection, your Honor.

THE COURT: Overruled.

A. Depending on the counterparty, it would be expected to be delivered by mid to late March of 2020.

Q. When did Mr. Halligan send this e-mail?

A. April 13, 2020.

Q. Let's look at the performance, focusing on February 2020 numbers. Was performance positive or negative?

A. It was negative.

Q. We can highlight the numbers in the gross column on 2186F1.

What was the gross performance month to date?

A. Negative 20.8 percent.

Q. What was the gross performance year to date?

A. Negative 21.7 percent.

Q. We can take that down. And let's look at one or two more examples.

Can you pull up Government Exhibit 2186G and 2186G1 side by side?

Do you recognize this documents?

A. Yes, I do.

Q. What are they?

A. They are month-end reports delivered to counterparties for March 2020.

MS. ROTHMAN: Your Honor, the Government offers into

evidence Government Exhibit 2186G and 2186G1.

MS. MULLIGAN: No objection.

MR. BERKE: No objection.

THE COURT: Received.

(Government's Exhibits 2186G and 2186G1 received in evidence)

THE COURT: You may show it to the jury.

BY MS. ROTHMAN:

Q. So, Mr. Becker, I'm going to ask you the same set of questions.

Who sent this e-mail?

A. Mr. Halligan.

Q. What month's performance data is included?

A. March 2020.

Q. By when was Archegos required to send this information?

A. By mid to late April 2020.

Q. When did Mr. Halligan send the e-mail?

A. May 4, 2020.

THE COURT: Does this make a difference?

MS. ROTHMAN: Pardon?

THE COURT: Does two weeks late make a difference in this case?

MS. ROTHMAN: I think the witness testified to things that Mr. Halligan told him about, why he was doing it.

THE COURT: I think you might discriminate between

that which is important and that which is not.

BY MS. ROTHMAN:

Q. How is performance in March 2020?

A. The fund was down 45.8 percent.

Q. Let me ask you one question about the cover e-mail.

THE COURT: What difference did it make if these reports were on time or two weeks late?

THE WITNESS: If the reports were late -- if -- and they passed the terms in each of the broker contracts, the broker would then have the right to terminates its agreement with Archegos and liquidate its portfolio.

THE COURT: Did they?

THE WITNESS: Not as a result of this happening, no.

THE COURT: Any other factor involved -- any significance, from being two weeks late?

THE WITNESS: In terms of the counterparties' rights under the contracts with Archegos, no, I don't believe so.

MS. ROTHMAN: If I --

THE COURT: Was there a lot of stuff going on in these months, a lot of transactions?

THE WITNESS: Yes.

THE COURT: Hard to keep up with them?

THE WITNESS: Yes. It was a very busy time.

THE COURT: It took more time?

THE WITNESS: I believe the operations group had

closed these months. So for accounting purposes, when you're done with your work for the month, it's closed within two weeks of the previous month-end.

THE COURT: So it takes about two weeks to finish up your accounting reports and then some more time to prepare reports on what you learned?

THE WITNESS: It -- yes. It takes about two weeks to close the books for the fund, and I believe a very short period of time to create this report based on the data of closing the books for month-end.

MS. ROTHMAN: Why --

THE COURT: I think you should stick to what's important, please. It's a long case. You have to distinguish what's important and what's not.

MS. ROTHMAN: Okay.

BY MS. ROTHMAN:

Q. Did Mr. Halligan tell you why he would delay sending these reports?

A. So the counterparties would leave us alone.

THE COURT: For two weeks.

MS. MULLIGAN: Your Honor, I'm going to move to strike that testimony. Objection, and move to strike.

THE COURT: Did he say that?

THE WITNESS: Yes, he did.

THE COURT: Overruled.

MS. ROTHMAN: Thank you.
BY MS. ROTHMAN:
Q. Now, while we're on the topic of reports that Archegos gave to the counterparties, was Archegos also required to provide audited financial statements?
A. Yes, it was.
MS. ROTHMAN: Can we please pull back up Defense Exhibit 7948 at Page 6? And if I could ask defense to -- thank you. Just zooming in on the bottom line where it reads Party B., moving all the way to the right.
Q. By when was Archegos required to provide this information to the banks?
A. Typically within 120 or 150 business days. This particular instance for UBS is -- was 120 days.
Q. Did Archegos follow those deadlines?
A. No, it did not.
Q. What, if anything, did Mr. Halligan say to you about the audited financial statements that Archegos was required to prepare?
A. That they were not a priority in terms of work flow.
Q. Would banks ask for them?
A. Yes, they would.
Q. Typically, how would they request these reports?
A. Typically via e-mail.
Q. Can we please pull up for the witness what has been marked

for identification as Government Exhibit 119?

Do you recognize this document?

A. Yes, I do.

Q. What is it?

A. This is an e-mail from one of the credit officers at Credit Suisse asking for the audited financial statements.

MS. ROTHMAN: Your Honor, the government offers into evidence Government Exhibit 119.

MS. MULLIGAN: No objection.

MR. BERKE: No objection, your Honor.

THE COURT: Received.

(Government's Exhibit 119 received in evidence)

THE COURT: You may show.

MS. ROTHMAN: Thank you.

If we can publish to the jury, just to zoom in on the bottom half first, which is Mr. Nicoll's e-mail to Mr. Halligan.

BY MS. ROTHMAN:

Q. What year's audited financial statement is Mr. Nicoll asking for?

A. 2019. That would be as of December 31st, 2019.

Q. What's the date of his e-mail?

A. August 31, 2020.

Q. On what date was Archegos required to provide this information?

A. By approximately May 30th, 2020.
Q. And did Archegos provide it?
A. No, it did not.
Q. We can scroll up and look at Mr. Halligan's response when Mr. Nicolls asks for the audited financial statements.
So Mr. Halligan writes, can I have them now? How about now? How about now?
What did you understand Mr. Halligan to be doing?
MS. MULLIGAN: Objection.
(Pause)
MS. ROTHMAN: Can the witness answer?
THE COURT: Yeah. I'm sorry. Was there --
MS. MULLIGAN: Your Honor, I objected.
THE COURT: I'm sorry. I didn't hear.
MS. MULLIGAN: I apologize.
THE COURT: It's a bad question. Fix it up.
MS. ROTHMAN: Okay.
BY MS. ROTHMAN:
Q. Did Archegos provide the audited financial statements to Credit Suisse in August 2020?
A. No, it did not.
Q. Why not?
A. They weren't done yet.
Q. Did Mr. Halligan say that he was working to provide them to Credit Suisse?

A. No, he did not.
Q. What did he say instead?
A. He said, but can I have them now? How about now? Now?
Q. Did you understand Mr. Halligan to be making fun of Credit Suisse through their request?
MS. MULLIGAN: Objection, your Honor.
THE COURT: Do you understand this to be -- what's the matter?
Did you understand that Halligan was asking you, can I have them now? Is that a question directed to you?
THE WITNESS: No, your Honor. I don't believe this was a literal question do me.
THE COURT: What was it?
THE WITNESS: I believe this was a mocking comment, mocking the credit officer at Credit Suisse asking for the financial examinations --
MS. MULLIGAN: Objection, your Honor.
MR. BERKE: Objection.
THE COURT: Overruled.
BY MS. ROTHMAN:
Q. One more point before I moved on, Mr. Becker.
Was that attitude towards banks consistent with how Mr. Halligan referred to other banks?
THE COURT: Now, Ms. Mulligan.
MS. MULLIGAN: Objection, your Honor.

THE COURT: Sustained.

Q. How did that compare to the way --

THE COURT: Sustained.

MS. ROTHMAN: I'll move on.

BY MS. ROTHMAN:

Q. Let me ask you this, Mr. Becker. When were the audited financial statements for 2019 ready?

A. In October 2020.

Q. At that point, did you propose sharing them with the banks?

A. Yes, I did.

Q. What did you propose and to whom?

A. I proposed to Mr. Halligan that he distribute the audited financial statements via e-mail to the same recipients that received his monthly performance report that we had just discussed earlier, which my understanding was inclusive of all of Archegos' counterparties.

Q. How did Mr. Halligan respond?

A. He said, no, he didn't want to do that. He instructed me to only send them to those who had -- who requested them from me specifically.

Q. Did you follow Mr. Halligan's directions?

A. Yes, I did.

MS. ROTHMAN: Okay. Let's take this down and pull up Government Exhibit 242 and 242A.

THE COURT: One minute.

MS. ROTHMAN: Yes.

(Pause)

THE COURT: Sorry. Go ahead.

BY MS. ROTHMAN:

Q. And do you recognize this document, Mr. Becker?

A. Yes, I do.

Q. What is it?

A. This is an e-mail from one of the credit officers at Nomura asking me for the financial statements in March 2021.

Q. For which year's financial statements?

A. She's asking for the 2019 financial statements.

MS. ROTHMAN: Your Honor, the government offers 242 and 242A into evidence.

MS. MULLIGAN: No objection.

THE COURT: Received.

(Government's Exhibits 242 and 242A received in evidence)

THE COURT: You may show.

BY MS. ROTHMAN:

Q. I have two questions for this e-mail, Mr. Becker, once it is on the screen.

When did Archegos provide the 2019 audited financial statements to Nomura?

A. This e-mail, when it was requested.

Q. And that's in March 2021?

A. Correct.
Q. And to your knowledge, did Archegos send any counterparties audited financial statements for 2020?
A. No. They were not completed.
Q. Do you know if they were prepared?
A. I believe the work had begun.
MS. ROTHMAN: We can take this down.
BY MS. ROTHMAN:
Q. I want to talk now about Goldman Sachs, and I want to focus you on a conversation about Goldman Sachs in December of 2020.
Just to set the stage, when 2020 started, was Goldman Sachs a counterparty?
A. No, it was not.
Q. When did Goldman Sachs become a counterparty for Archegos?
A. In November 2020.
Q. Did you speak -- withdrawn.
Were you involved in conversations onboarding Goldman Sachs as a counterparty?
A. Yes, I was.
Q. Okay. Do you recall what they asked you about Archegos?
A. During the process, they had a lot of questions, many of which surrounded Archegos' investment portfolio.
Q. Okay. Did you provide information about Archegos' portfolio?
A. Yes, I did.

Q. Were you honest?
A. Not for all of those statistics, no.
Q. What do you recall lying about to Goldman Sachs?
A. I understated the largest position in the portfolio, so they had asked what it was. I stated the largest position was 35 percent of capital, just as we had spoken about earlier today.
Q. Now, by December 2020, had Archegos started trading through Goldman Sachs?
A. Yes, it had.
Q. Do you recall participating in a conversation with Goldman Sachs in December 2020 with you and Mr. Tomita?
A. Yes, I do.
Q. Who joined from Goldman Sachs?
A. Nastassia Weber and Phil Han, and I believe there may have been some others, but I don't recall their names.
Q. What do you recall Goldman Sachs saying on the call about GSX?
A. They had mentioned that they were looking at GSX, and they noticed that through public filings, some of the largest holders of GSX were other banks.
Q. How, if at all, did Mr. Tomita respond?
A. His response was that we, meaning Archegos, had noticed the same thing, and that was one of the reasons that Archegos' capacity to get additional GSX was difficult, because the

banks, separate from Archegos, had already owned shares of GSX.

Q. What did you think when Mr. Tomita provided that response?

A. I thought that was a good lie to address a question like that from a counterparty.

Q. Why did you think that?

A. My understanding --

MR. BERKE: Objection, your Honor.

THE COURT: Sustained.

Q. What was it that you believed Mr. Tomita was lying about?

THE COURT: What was the question?

A. My understanding is, as Archegos entered into swap contracts with brokers, the broker on their side would purchase the underlying shares in the securities. So in this example, if Archegos had entered into a swap contract with GSX, the broker who that contract was with would separately purchase shares of GSX, hold them internally on their books as a hedge. So it would -- the swap contract would mirror the position that was held internally for GSX.

So my understanding, because of that mechanic, was the largest banks that Goldman Sachs had noticed were actual owners of GSX shares that were traded, was as a result of Archegos' swap counterparties, because Archegos had swap contracts with GSX in large sizes across all of its counterparties.

THE COURT: What was untrue about the statement?

THE WITNESS: He minimized the impacts of -- of the

reason that the banks had held GSX.

THE COURT: Did he -- what was his statement again?

THE WITNESS: His statement was, that's funny, we've noticed that too. That's the reason why our capacity in GSX is tight; therefore, we have to get additional capacity from Goldman Sachs.

THE COURT: When, in fact, those banks were counterparties for swap contracts with Archegos?

THE WITNESS: Right. That's correct. So the reasoning that -- my understanding of Will's reasoning was he was stating that the banks -- for reasons other than Archegos, had owned GSX shares, and had their own internal ownership outside anything related to Archegos.

THE COURT: Explain to the jury about this hedge. Why would a counterparty, XYZ Stock, want to buy XYZ Stock?

THE WITNESS: Why an investment fund --

THE COURT: How does it operate as a hedge? That's the question for you.

THE WITNESS: Okay. So the mechanics of a swap contract, if you take Scenario A, where an investment fund actually purchases equity shares of a security, so you're actually buying the shares and you own them outright; in Scenario B, you enter into a swap contract for the same amount of shares of the same security. To the investment fund, the economic impact of each scenario is the same. If the price

appreciates, you're getting the same profit. If it goes down, you're getting the same loss.

The broker who the investment fund holds the swap contract with, in order to hedge their exposure to that swap contract, so that they are -- they're not on the hook for the P&L of that underlying security, on their own books and records, they'll purchase the shares of that security, therefore -- and if the stock goes up, and the -- they have to pay Archegos as winning in the swap contract. In their own books and records, internally, they own the underlying shares, so the appreciation on the underlying shares is equal to the appreciation that they will eventually have to pay Archegos. That hedging process, from my understanding, was typical for brokers for a swap contract.

Q. So, Mr. Becker, going into this call with Goldman Sachs, did you know the reason why GSX was appearing in bank's reporting?

A. Yes, I did.

Q. What was the reason?

A. Because the banks, through their hedges, were holding large quantities of GSX.

Q. And did you or Mr. Tomita disclose that fact to Goldman Sachs?

A. No, we did not.

(Continued on next page)

BY MS. ROTHMAN:
Q. After the call, did you speak with Mr. Halligan?
A. Yes, I did.
Q. What did you tell him?
A. I noted Will's comment about GSX. Commented on how that I felt that that was a -- that was a good lie to cover a question like that. And he agreed and said that's why it's good I was on these conversations with Will, so that our stories could be consistent for counterparties going forward.
Q. I want to talk about onboarding of new counterparties that Archegos tried to do in 2020 and 2021, okay?
And you testified that Goldman Sachs was added as a counterparty in 2020. Were there other counterparties that were added around that time?
A. Yes, there were.
Q. Who do you recall being added?
A. BMO, Bank of Montreal, was added in that time period.
Q. And before we talk about them, were there other counterparties that Archegos tried to add?
A. Yes, there were. There were three counterparties: Citibank, JP Morgan, and Bank of America. But those were never completed.
Q. Did you have an understanding of who at Archegos wanted to add new counterparties?
A. Yes, I did.

Q. Who was that?
A. Mr. Hwang.
MS. ROTHMAN: Let's pull up what's been marked for identification as Government Exhibit 137.
Q. Do you recognize this document?
A. Yes.
MS. ROTHMAN: And you can scroll to the second page too so Mr. Becker can see it all.
A. Yes, I do recognize it.
Q. What is it?
A. This is an email from Mr. Tomita to Mr. Hwang mentioning Bank of Montreal has prospective a counterparty for Archegos.
MS. ROTHMAN: Your Honor, the government offers into evidence Government Exhibit 137.
MR. BERKE: No objection, your Honor.
MS. MULLIGAN: No objection, your Honor.
THE COURT: Received.
(Government's Exhibit 137 received in evidence)
THE COURT: You may show it to the jury.
MS. ROTHMAN: We can scroll up a little bit so Mr. Hwang's -- perfect. Thank you, Ms. Sonderby. And let's zoom in on Mr. Hwang's email on October 23rd, 2020.
Q. Mr. Hwang writes: "I would like to pursue this as soon as possible. Please thank Austin."
What did you understand Mr. Hwang was referring to?

A. He would like to pursue a relationship with Bank of Montreal as soon as possible.
Q. Who's Austin?
A. Austin is Austin Scholl. He was one of the traders at Archegos.
Q. What, if anything, do you know about Mr. Scholl's relationship with BMO?
A. He had friends who were senior people at BMO.
Q. All right. Let's zoom out. And I want to ask you a few questions about BMO.
Were you involved in the onboarding process for BMO?
A. Yes, I was.
Q. What did you do?
A. I spoke to their credit team on several occasions to get their credit approval to be a new client on those conversations. I lied to them to induce them to accept Archegos as a counterparty.
Q. What did you lie about?
THE COURT: Let's have the conversation elicited, please.
MS. ROTHMAN: I'm sorry?
THE COURT: Elicit the conversation.
MS. ROTHMAN: Sure.
Q. So who at BMO did you speak to?
A. I spoke to Joe Boccuzzi, one of their credit officers.

Q. And generally, what did he ask you about Archegos?

THE COURT: When?

THE WITNESS: This was in the fall of 2020.

Q. Generally, what did he ask you about Archegos?

A. About portfolio statistics of Archegos's investment portfolio.

Q. What did you tell him was the largest position size?

A. I told him that it was 35 percent of capital.

Q. At the time --

MS. ROTHMAN: And let's pull up the combo sheet from October of 2020, which should be 470 -- maybe 470, Ms. Sonderby. And why don't we just pick October 20th. And if you can scroll down to the largest position size. Thank you. You have to go over to column S. Thank you. All right. Right there. A little further, Ms. Sonderby, so we can see the name of the security, scrolling to the right.

Q. So in October, GSX is what percent?

A. It was 80.8 percent.

Q. What about IQ, down in S83?

A. It was 48.2 percent.

MS. ROTHMAN: And let's scroll up and look at Viacom. Right there.

Q. In S52, what was the position size?

A. It was 71.5 percent of capital.

Q. What about BIDU in S50?

A. That was 59.9 percent capital.

MS. ROTHMAN: And let's scroll up if there's anything else. I think that might be it. We can just scroll down and go to the bottom to make sure we caught them all.

Thank you, Ms. Sonderby. We can take that down.

Q. After you spoke to Mr. Boccuzzi, did you learn if BMO had accepted Archegos as a client?

A. I learned that they decided to not accept Archegos as a client.

Q. How were you informed of this? Who told you?

A. I believe I heard through Mr. Tomita on the trading desk.

Q. What did he tell you?

MR. BERKE: Objection, your Honor.

THE COURT: Sustained.

Q. Okay. After you learned that BMO had rejected Archegos, did Archegos -- what did Archegos do in response?

A. It asked BMO to reconsider its decision.

THE COURT: Who did? Who asked?

THE WITNESS: It was asked on a Zoom call that I was a participant in. Several members of Archegos, including Mr. Mills, Mr. Tomita, Mr. Halligan, and myself were on the Zoom.

Q. Prior to the Zoom, did you have a conversation with Mr. Mills, Mr. Tomita, and Mr. Halligan about BMO?

MR. BERKE: Objection, your Honor.

THE COURT: Sustained.

Q. I want to focus on the phone call you had with Mr. BMO where Mr. Mills, Mr. Halligan, and Mr. Tomita were present. What did BMO say on the call?

MR. BERKE: Objection, your Honor.

MS. MULLIGAN: Objection, your Honor.

THE COURT: Sustained.

MS. ROTHMAN: Your Honor --

THE COURT: Just a moment.

Where was this call?

THE WITNESS: It was done via Zoom.

THE COURT: When?

THE WITNESS: Late 2020.

THE COURT: December/November?

THE WITNESS: It may have been December 2020.

THE COURT: Who placed the call?

THE WITNESS: It was a Zoom call, so all participants joined at the same time.

THE COURT: Who was the sponsor of the call?

THE WITNESS: I'm not sure if it was Archegos or Bank of Montreal.

THE COURT: Did Archegos want to have that call?

THE WITNESS: Yes, Archegos did want to have that call.

THE COURT: Okay. And who was there from Bank of

Montreal?

THE WITNESS: There were several Bank of Montreal employees, including the individual I was familiar with, the credit officer, Joe Boccuzzi. But I believe there were also three or four other people from BMO on the call as well.

THE COURT: Who spoke on behalf of Archegos?

THE WITNESS: Mr. Mills and Mr. Tomita.

THE COURT: And who on behalf of Bank of Montreal, if you remember?

THE WITNESS: I don't recall their names.

THE COURT: Okay. What was said to whom?

That's how you do it.

MS. ROTHMAN: Thank you, your Honor.

THE WITNESS: At the beginning of the call, Bank of Montreal expressed their reasoning for why they decided not to move forward with the relationship. And then the duration of the call, Mr. Mills and Mr. Tomita had stated their case of why BMO should reconsider that decision.

THE COURT: What did they say?

THE WITNESS: What did BMO say or Archegos?

THE COURT: What did Archegos say?

MS. ROTHMAN: Your Honor -- I'm sorry.

THE COURT: Yes?

MS. ROTHMAN: Nothing. Go ahead, Mr. Becker. I'm sorry.

THE WITNESS: Mr. Mills had spoken about one item that BMO was concerned about was prior regulatory matters that Tiger Asia had.

THE COURT: What did Mr. Mills say?

THE WITNESS: He had stated his due diligence process that he went through on Mr. Hwang specifically when he joined the firm in 2014.

THE COURT: Go ahead, Ms. Rothman.

BY MS. ROTHMAN:

Q. What did BMO say -- withdrawn.

Did you take notes of this meeting?

A. Yes, I did.

Q. Would looking up those notes refresh your recollection of who was present from BMO?

MS. MULLIGAN: Objection.

MR. BERKE: Objection, your Honor.

THE COURT: Nothing wrong with that question.

MR. BERKE: Fair enough, your Honor.

THE COURT: Overruled.

MS. ROTHMAN: Ms. Sonderby, can you please show the witness what is marked as 51C at page 26.

THE COURT: This is for identification, right?

MS. ROTHMAN: Yes, your Honor. It's not in evidence.

THE COURT: And the jury is not seeing this.

MS. ROTHMAN: Looking at these notes, take a moment.

And once you've looked at them, let me know if it refreshes your recollection on who was present from BMO.

A. Yes, it does refresh my recollection.

THE COURT: Who was present?

THE WITNESS: There were --

THE COURT: Speak from your recollection now having been refreshed.

THE WITNESS: It was four individuals from BMO: Joe Boccuzzi, as mentioned earlier; and the other three, their first names were Sabeen, Jordan, and Amy.

Q. So I think you had said that BMO raised concerns about past regulatory issues for Tiger Asia?

MR. BERKE: Your Honor, I'd object.

THE COURT: Overruled.

MS. ROTHMAN: Your Honor, may I inquire as to --

THE COURT: Go ahead.

BY MS. ROTHMAN:

Q. What did BMO say?

THE COURT: You may answer.

A. BMO said that their credit department was concerned with Tiger Asia's past regulatory problems.

Q. Did they elaborate on what their concerns were?

THE COURT: I don't think we need that.

MS. ROTHMAN: I can move on.

THE COURT: What was the response and by whom?

THE WITNESS: The response to that was from Mr. Mills of Archegos.

THE COURT: And what did he say?

THE WITNESS: He went through his due diligence process that he said he went through on Mr. Hwang before Mr. Mills joined the firm in 2014.

THE COURT: And did that have to do with aspects of compliance?

THE WITNESS: It did not. I don't recall his statements being of much substance. He had already been an acquaintance of Mr. Hwang.

BY MS. ROTHMAN:

Q. Did BMO raise any other concerns about Archegos in explaining why they had initially rejected Archegos as a client?

A. Yes, they did. The second reason that they gave was they had reviewed Archegos's monthly fund performance. And the statement that they had was that Archegos's investment portfolio was too volatile and they had terminated relationships with existing clients that were less volatile than Archegos.

Q. What did Archegos say in response?

A. Mr. Tomita stated that Archegos was hoping for a long-term partnership with BMO, and perhaps an initial investment portfolio with BMO of approximately 100 million might be a good

first step.
Q. Do you recall Mr. Tomita saying anything about capacity constraints that Archegos was facing elsewhere?
A. No, I do not.
Q. After this meeting, did BMO accept Archegos as a client?
A. Yes, they did.
Q. And when did Archegos start trading through BMO?
A. I believe it was around February of 2021.
Q. Do you know what, if any, written materials Archegos would have provided BMO in advance of them accepting Archegos as a client?
A. As part of that process, Archegos would have sent the compliance letter that they had sent to other counterparties.

MS. ROTHMAN: Can we pull up what's in evidence as Government Exhibit 1002A. This is in evidence.

Q. Mr. Becker, is this the compliance letter you're referring to?
A. Yes, it is.

MS. ROTHMAN: Let's just flip through real quick.

You can take that down.

Q. Now, Mr. Becker, focusing on BMO for one more moment, do you recall speaking with BMO again in March 2021, shortly before Archegos's collapse?
A. Yes, I do.
Q. Who did you speak with?

A. I believe it was Joe Boccuzzi, the credit officer.
Q. Do you recall what prompted the conversation?
A. No, I don't.
Q. What, if anything, had you sent BMO shortly before you spoke?
A. The fund's monthly performance reports that they hadn't previously received.
Q. For which month?
A. For January 2021.
Q. What did the fund's monthly performance reports for January 2021 show about fund performance?
A. The fund that month returned more than 100 percent; so the capital of the fund in that month would have more than doubled.
Q. And after you sent that information to BMO, did you speak with BMO?
A. Yes, I did.
Q. Who did you speak with?
A. Joe Boccuzzi, I believe, credit officer.
Q. What, if anything, do you recall Mr. Boccuzzi asking you?
A. He had asked about the fund performance from the reports that I had just sent him.
Q. Did you tell Mr. Boccuzzi about the largest position size at Archegos?
A. Yes, I did. He also asked that question: What was the largest position in Archegos's portfolio. And I stated -- I

lied again and stated it was 35 percent of capital.

MS. ROTHMAN: And let's pull up the combo sheet from March 2021, which is Government Exhibit 475. And let's turn to March 10th. We can just scroll down and look at the size of Archegos's positions on March 10th of 2021, column S. Thank you. We can stop right there.

Q. What's the position size for BIDU?

A. BIDU is 47.8 percent.

Q. For Viacom?

A. 83.2 percent.

MS. ROTHMAN: Scroll down.

All right. We can take that down.

Q. I want to move to January of 2021, Mr. Becker.

You just testified that fund performance was large in January 2021. Did you speak with the representative from Credit Suisse around then?

A. Yes, I did.

Q. Who did you speak with?

A. Sean Nicoll, one of the credit officers.

Q. Before you spoke with Mr. Nicoll, did you reach out to Mr. Halligan?

A. Yes, I did.

Q. Why did you speak with Mr. Halligan first?

A. Archegos's position in Viacom, which was the largest position in Archegos's portfolio, was a very large position at

Credit Suisse. Each broker had full access to all of Archegos's positions at that specific broker.

So prior to the call, knowing that Credit Suisse saw the large size of the largest position that Archegos held, Viacom, and how big that was at Credit Suisse, I didn't think that they would feasibly believe me if I told them that the largest position was 35 percent of capital.

Q. So what did you say to Mr. Halligan?

A. I asked him if I should still be telling counterparties that Archegos's largest position was 35 percent.

Q. And how did he respond?

A. He responded yes, keep doing that. It's an ambiguous calculation; they don't know the difference anyway.

Q. And focusing on your call with Credit Suisse in January 2021, what number did you tell them?

A. I told them that the largest position was 35 percent of capital.

Q. Now, Mr. Becker, focusing in January 2021, did Archegos also restrict access to portfolio information?

A. Yes, it did, internally.

Q. What happened?

A. Prior to that, on a daily basis, the portfolio was emailed internally from the operations team, who updated the reports throughout the day to senior investment staff within Archegos. Those were sent in attachments to emails.

Q. Which employees lost access to portfolio information beginning in late January 2021?
A. Many employees, including senior investment staff.
Q. What information did they lose access to?
A. They lost access to the numbers in the portfolio. So they -- I think in simple terms to explain it, they had received names that were in the portfolio on a less frequent basis, but not the actual dollar amounts of positions in the portfolio.
Q. Could they see the size of Mr. Hwang's purchases?
A. No, they could not.
Q. Could they see the size of Mr. Hwang's holdings?
A. No, they could not.
Q. Who at Archegos made the decision to restrict access?
A. Mr. Hwang.
Q. Did you document this change in your notebook?
A. Yes, I did.
Q. Why did you do that?
A. That would be normal practice to me. That was a task I was working on.
Q. Now, around this time, did Ms. Pae address Archegos at a firm-wide meeting?
A. Yes, she did.
Q. What, if anything, did she say about fund performance?
A. She had instructed employees -- she reminded employees to

keep fund performance and all Archegos data private, but specifically mentioned that employees should not mention to their spouses what Archegos's performance was.

Q. I want to move now to a conversation you had with UBS in February of 2021. Did you speak with UBS in February 2021?

A. Yes, I did.

Q. Do you recall who you spoke with?

A. I believe this was two of the credit officers, Yifei Cheng and Chris Salcedo.

MS. ROTHMAN: Your Honor, we're about to turn to our next recording. I'm happy to begin and try to finish today or start tomorrow. You let me know what the Court would prefer.

THE COURT: No, keep going.

MS. ROTHMAN: Keep going? Okay.

THE COURT: Ten or 15 minutes.

MS. ROTHMAN: Okay. If we can pull up for the witness and, I think, for the parties 2535 and 2535-T.

And your Honor, at this time I would offer into evidence 2535 and 2535-T.

MS. MULLIGAN: No objection, your Honor.

MR. BERKE: No objection, your Honor.

THE COURT: Received.

(Government's Exhibits 2535, 2535-T received in evidence)

THE COURT: You may play.

MS. ROTHMAN: Thank you, your Honor.

BY MS. ROTHMAN:

Q. Mr. Becker, who is Yifei Cheng?

A. He's one of the credit officers at UBS.

Q. And who is Chris Salcedo?

A. He's also one of the credit officers at UBS.

MS. ROTHMAN: Okay. So I want to start this recording at time stamp 8:50 and page 6, line 16.

All right. And we can begin playing.

Thank you, Ms. Sonderby.

(Audio played)

MS. ROTHMAN: Pause it right there.

Thank you, Ms. Sonderby.

Q. So, Mr. Becker, you just told UBS that Bill has high conviction in the names, didn't anticipate the type of performance in a relatively short period of time, and he sees significant upside. Why did you say that?

A. Because I had heard Mr. Tomita make that statement in other conversations with brokers that I was involved in.

Q. Did you know one way or another if Mr. Hwang had high conviction in the names he was --

MR. BERKE: Objection, your Honor.

THE COURT: Overruled.

A. I don't know, no.

Q. Do you know if he still sees significant upside in the

names?

THE COURT: I think he just answered the question.

MS. ROTHMAN: Thank you.

We can keep playing.

THE COURT: What line are we up to?

MS. ROTHMAN: I think we're right around line 13.

(Audio played)

MS. ROTHMAN: We can pause right there.

Q. Mr. Becker, UBS didn't ask you for excess cash numbers. Why did you provide that information?

A. That was a very normal question for a counterparty to ask in these credit conversations.

Q. How are you feeling during this phone call?

A. Nervous.

Q. Why?

A. Because --

MS. MULLIGAN: Objection, your Honor.

THE COURT: Sustained.

MS. ROTHMAN: We can turn to time stamp -- it should be 19:52, and it should be page 14 of the transcript, line 3.

We can play.

(Audio played)

MS. ROTHMAN: We can play a little longer.

Oh, yes.

THE COURT: Stop here?

MS. ROTHMAN: Stop for today.

THE COURT: Yes. And pick up again tomorrow.

MS. ROTHMAN: I will. Thank you, your Honor.

We'll pick it up tomorrow.

THE COURT: See you 10 o'clock tomorrow morning, members of the jury. Keep an open mind. Close your books; give them to Ms. Jones. Don't discuss the case.

(Jury not present)

THE COURT: Anything for me?

MS. ROTHMAN: Not from the government.

MR. BERKE: Nor I, your Honor. Thank you.

THE COURT: See you all tomorrow.

(Adjourned to May 21, 2024, at 10 o'clock a.m.)

INDEX OF EXAMINATION


Examination of: Page

SCOTT BECKER

Direct By Ms. Rothman . . . . . . . . . . . . . 802

GOVERNMENT EXHIBITS

Exhibit No. Received

267 . . . . . . . . . . . . . . . . . . . . . 813

1002A . . . . . . . . . . . . . . . . . . . . 821

237 . . . . . . . . . . . . . . . . . . . . . 845

733 . . . . . . . . . . . . . . . . . . . . . 869

600 . . . . . . . . . . . . . . . . . . . . . 870

623 . . . . . . . . . . . . . . . . . . . . . 875

638 . . . . . . . . . . . . . . . . . . . . . 879

707, 707A . . . . . . . . . . . . . . . . . . 883

718A . . . . . . . . . . . . . . . . . . . . 887

720, 720A . . . . . . . . . . . . . . . . . . 890

123 . . . . . . . . . . . . . . . . . . . . . 936

2186F and 2186F1 . . . . . . . . . . . . . . 943

2186G and 2186G1 . . . . . . . . . . . . . . 945

119 . . . . . . . . . . . . . . . . . . . . . 949

242 and 242A . . . . . . . . . . . . . . . . 953

137 . . . . . . . . . . . . . . . . . . . . . 960

2535, 2535-T . . . . . . . . . . . . . . . . 974