UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

               v.                        22 CR 240(AKH)

SUNG KOOK HWANG and PATRICK
HALLIGAN,
               Defendants.
------------------------------x
                                     New York, N.Y.
                                     June 27, 2024
                                     9:30 a.m.

Before:

              HON. ALVIN K. HELLERSTEIN,

                                     District Judge
                                     -and a jury-

                        APPEARANCES

DAMIAN WILLIAMS,
      United States Attorney for the
      Southern District of New York
BY:  MATTHEW D. PODOLSKY
     ANDREW M. THOMAS
     ALEXANDRA ROTHMAN
     SAMUEL ROTHSCHILD
     Assistant United States Attorneys

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
      Attorneys for Defendant Halligan
BY:  MARY MULLIGAN
     TIMOTHY HAGGERTY
     BONNIE BAKER
     ANIL VASSANJI
     RUPITA CHAKRABORTY

KRAMER LEVIN NAFTALIS & FRANKEL LLP
      Attorneys for Defendant Hwang
BY:  BARRY H. BERKE
     DANI R. JAMES
     JORDAN L. ESTES
     MICHAEL MARTINEZ
     MICHELLE BEN-DAVID
     SHAKED SIVAN
     DAYNA CHIKAMOTO

APPEARANCES (Continued)


ALSO PRESENT:
Anna Gamboa, USAO Paralegal
Arjun Ahuja, USAO Paralegal
Madeline Sonderby, USAO Paralegal
Raymond McLeod, Defense Trial Consultant

(Trial resumed; Jury not present)

THE COURT:  The jury is ready.  Don't sit until the jury comes in.  We're ready to go.

MS. ESTES:  Your Honor, should we get the witness?

THE COURT:  Yes, please do.

MS. ESTES:  Thank you, your Honor.

THE COURT:  We're still on your cross, right?  We're starting your redirect?

MR. THOMAS:  Cross-examination, your Honor.

THE COURT:  Sorry.  Cross.  Got it.  Good morning, Dr. Wahal.

THE WITNESS:  Good morning.

(Jury present)

THE COURT:  Good morning, everyone.  Please be seated. Dr. Wahal, I remind you, you remain under oath, and Mr. Thomas will continue his cross-examination.

MR. THOMAS:  Thank you, your Honor.

SUNIL WAHAL, resumed.

CROSS-EXAMINATION

BY MR. THOMAS:

Q.  Good morning, Dr. Wahal.

A.  Good morning.

Q.  I wanted to pick back up our conversation about algorithms. And on direct, you referred to one algorithm in particular, VWAP.  Do you remember that?

A.   I did.  I do.

Q.   And VWAP is an algorithm, generally speaking, that is designed to give the trader the volume-weighted average price over the interval that the algorithm trades, right?

A.   That's correct.

Q.   Now, if you run it over the entire day, you get that day's average price or thereabouts, right?

A.   That's right.

Q.   And you mentioned that a parent limit can block an algorithm like that from filling.  You described it as a gate?

A.   Correct.

Q.   You said thou shalt not pass was the instruction.

A.   That's what a parent limit does, correct.

Q.   If a trader puts in a VWAP order and also applies a parent limit that blocks the trade, the trader no longer will get the average price, right?

A.   Over the course of the period that the algorithm is operating, it will, but not thereafter because it will block various intervals.

Q.   Right.  And at the end of the trading day then, the order actually, would not have returned what the algorithm would otherwise have done absent the block, right?

A.   It will deliver VWAP over the period of which it's operating, but there are periods at which it's not operating because of the gate, and then it won't.

Q. You also talked about TWAP. That's time-weighted average price, right?

A. Yes.

Q. And that parcels out the orders into buckets over even time intervals?

A. Correct.

Q. And similarly, if a parent limit blocks TWAP from filling, then those time intervals will no longer be evenly spaced, right?

A. It operates the same way as I described VWAP. When the parent limit kicks in, it will no longer deliver TWAP. When the parent limit does not kick in, it will deliver TWAP.

Q. So if a trader puts in an order at 10:00, say, you know, buy TWAP, the algorithm tries to buy ten shares, say, every five minutes throughout the course of the day to parcel out the shares. That's how it works in concept, right?

A. Correct. Unless that -- as you described, unless that parent limit kicks in, in which case it won't trade and won't deliver TWAP over that interval.

Q. So if the block kicks in, the investor doesn't actually get TWAP?

A. For that period, correct.

Q. Now, you said yesterday on direct, you were asked a question, who decides what the child order limit price was, and you answered that it's the algorithm that decides. I wanted to

pick up on that. You would agree, right, that it's the trader

who selects the algorithm in the first place, right?

A. It is the trader that selects the algorithm, yes.

Q. And it's the trader who selects the parent order limit, if

any, it will be applied, right?

A. That's correct.

Q. And many of the algorithms actually have various risk dials

that you can adjust as the trader, right?

A. They do.

Q. There are urgency settings, right?

A. There are.

Q. And the urgency setting means you can tell the algorithm

buy more quickly, right?

A. The urgency settings can tell the algorithm buy more

quickly, buy more, there are different types of urgency

settings.

Q. Right. You referenced buy more. One of the urgency

settings could make it buy in larger chunks or buy more quickly

over an interval, right?

A. It depends on what the urgency setting is and how it's

parameterized. Some of these say buy more quickly. Some of

these say cross the spread, in other words, be an active order.

Some of these can, say, affect how big the child order is. So

there are different settings that do different things.

Q. And those are all available to a trader if they wanted to

modify them, right?

A. The dials are available to traders, yes.

Q. Did you happen to look at Archegos' urgency setting selections in your analysis?

A. I looked at some of them.

Q. And did you see sometimes they cranked it all the way up to the top?

A. They sometimes cranked up urgency settings, yes.

Q. And that would have an effect on the way that the algorithm actually operates in the markets, right?

A. Yes, it -- as you described, if you raise the urgency setting it tries to either buy more or at different prices. It affects how the algorithm operates. It doesn't micromanage each child order.

Q. But there's a direct relationship between the trader's inputs on the algorithm settings and the child orders that end up in the market, right?

A. There is, yes.

Q. Okay. And you also mentioned that in some circumstances, it's up to the algorithm to decide which venue is used to execute the trade?

A. Yes.

Q. But that's also something that can be adjusted in a setting, right?

A. It may or may not. Some algorithms allow for those setting

adjustments.  Some do not.  It really depends.

Q.  But you're familiar with a top of order placement program called a smart order router, right?

A.  Yes.  I know what a smart order router is.

Q.  And a smart order router would enable a trader to pick a particular venue in order to try to access liquidity at a specific venue, right?

A.  Yes, it's essentially using a broker's pipe.  It's not -- I mean, you can call an algorithm.  Most people don't call it an algorithm, most people just call it a smart order router.

Q.  Or direct market access?

A.  Direct market access is different than a smart order router.  DMA is what the EMS uses to get to a smart order router.  They're a little different.

Q.  In either circumstance and whatever we call it, there are, from the brokers, tools available to an investor to select which venues to put their trades through if they wish to use?

A.  Not typically through standard algorithms but through a smart order router.  But most investors -- large investors don't exclusively use smart order routers because it's a very manual kind of process.

Q.  My question is just about what is available and was available to Archegos to select which venue to route an order to if they wished to use it, right?

A.  For a child order, they could use a smart order router.

For each child order.

Q.   I want to turn and talk about "I would," the trade instruction for a moment.  Could you remind your jury what your understanding of the phrase "I would" means?

A.   I would is often a parameter in an algorithm that says at this particular price, I'm willing to complete the rest of my order if it's possible.

Q.   That means that the investor is telling the computer it's willing to buy at that price or any better price up to the quantity limit, right?

A.   Up to the quantity subject to availability.

Q.   Availability in the marketplace?

A.   In the marketplace, correct.

Q.   So that's to say colloquially, I'll take everything you got up to this price that I specify here, right?

A.   Yes, that's correct.

Q.   Okay.  Now, yesterday you were asked about whether a trade order could establish a floor under a price.  Do you remember that?

A.   I do.

Q.   And what you said was it doesn't function as a floor in any way.

A.   Correct.

Q.   Is that what you believe?

A.   It is what I believe.

Q.   Okay.  Now, Dr. Wahal, assuming that a trader is willing to buy every share offered at or below a given price in the market, the market price will meet or exceed that price, right?

A.   Assuming that that trader has -- is willing to buy every single share, yes.  Every single share.

Q.   That's the minimum price that the market would show, right?

A.   That's correct.

Q.   That's the floor?

A.   The assumption is the trader is willing to buy every single share, yes, correct.

Q.   Won't go below what the trader says?

A.   If you are willing to buy every single thing that is available in the marketplace, everybody offers, you know, whatever they offer.  I'm willing to take it.  I will do that.

MR. THOMAS:  So let's put up for everyone what is in evidence as Government Exhibit 9005 at page 52.

Q.   You were shown this exhibit on direct.  Do you recall?

A.   I do.

Q.   And starting at maybe 11:30 p.m. or so, you see that Archegos begins to be active in the market?

A.   Yes.

Q.   And for most of the afternoon, it looks to be transacting at around 43.15, perhaps?

A.   I see it.

Q.   Okay.  Now, there's a little bit of an increase in the

limit at the end of the day. Do you see that, too?

A. I do. Way towards the right?

Q. Just there in the final minutes before the close.

A. Yes.

Q. Okay. And so Archegos is transacting above 43.2 at that time?

A. Yes, that's correct.

Q. Okay. Now, if you look all the way to the left and compare that to the limit prices on the right, you see that Archegos is transacting through most of this day in the afternoon at higher prices than were available in the morning, right?

A. Correct.

Q. Now, on direct examination, you said for a concentrated investor that has an investment thesis that says, I think this thing is undervalued, I really need to put my money where my mouth is. I need to buy it, and if I don't buy it there's a cost associated with that. Do you remember that?

A. I do.

Q. And just for some context, that phrase "money where your mouth is," is that your phrase?

A. If I said it, it's my phrase.

Q. Is that one you discussed with the defense before taking the stand?

A. No.

Q. Okay. Looking here at 9005, page 52. Do you see Archegos

putting its money into the market at 9:30 a.m.?

A.  I'm sorry.  9005-52.  Am I supposed to be looking at something else on the screen?

Q.  That's the exhibit number.

A.  Okay.

THE COURT:  He's just identifying the question.  Just answer the substance to the question.

THE WITNESS:  So the question is do I see --

BY MR. THOMAS:

Q.  Is Archegos putting its money into the market at 9:30?

A.  It's not putting its money into the market at 9:30.

Q.  Or at 10:00?

A.  Or at 10:00.

Q.  Or at 11:00?

A.  Or at 11:00.

Q.  And when it does put its money in the market, it does so at higher prices than were available earlier in the day, right?

A.  Or at lower prices.  I see trading at -- let's see, it looks like around 11:30, maybe.

THE COURT:  He's asking you after 12:00.  The question is after 12:00.

THE WITNESS:  After 12:00, no.

BY MR. THOMAS:

Q.  And Archegos' participation volume is highest at the end of the day, right?

A.   Yes, I see it.

Q.   When the prices are comparatively higher than they were earlier in the day, right?

A.   Prices are higher.

Q.   Okay.

          MR. THOMAS:  We can take that down.

Q.   In your analysis of Archegos' trade orders, did you count up how many days after that day Archegos submitted buy orders at higher prices than were available that morning?

A.   I did not.

Q.   And did you count up how many days Archegos did not trade in that stock on days that followed that day?

A.   I don't recall that number, no.

          MR. THOMAS:  Let's put up Government Exhibit 9005 at page 68.

Q.   Do you recognize this to be one of Dr. Taveras' charts, don't you?

A.   I do.

Q.   And again here, do you see that there's a period where Archegos' orders are not filling in the market?

A.   I do.

Q.   And that's -- this is an end-of-day chart, and the period here is from 3:40 to 4:00.  Do you see that?

A.   I do.

Q.   And it looks to be about from the start of this period at

3:40 to maybe 3:47, Archegos gets no fills on its orders?

A.   That's correct.

Q.   And then later in the day, it raises its limit and then it fills?

A.   That's correct.

Q.   And its participation volumes at the end of the day were upwards of 40, 50, and 60 percent of the market volume over those intervals, right?

A.   That's correct.

Q.   And if you look at the little box on the right, in the final five minutes, Archegos' transactions amounted for 53 percent of the volume in that interval?

A.   I see that.

Q.   Okay.  And Archegos ends up transacting much of that volume at prices higher than were available at 3:40, right?

A.   Those prices are higher than at 3:40, that is correct.

Q.   And Archegos didn't put its money into the market at 3:40 when the prices were at 240 44?

          MS. ESTES:  Objection.

          THE COURT:  Overruled.

          THE WITNESS:  That's correct.

BY MR. THOMAS:

Q.   Now, if one of your students had a thesis that the long-term upside for a stock like this one, iQ, was 100 percent, it would go up 100 percent from where it was

trading that day, would it make sense to advise your student to not participate at 3:40 at those lower prices?

A.   It can.

Q.   It can make sense to skip that?

A.   It depends on what they think the market is going to do.

Q.   If they have a long-term investment horizon that says the stock will return 100 percent, do you think it makes sense to skip at 3:40 and participate at 50 and 60 percent at the end of the day?

A.   They may think that trading later in the day is beneficial. They may have an expectation that market prices between 3:40 and 4:00 will actually drop, and when they don't, they're wrong, and therefore, they end up buying.  They can't know the future.

THE COURT:  If they had such an expectation, and it didn't prove out, wouldn't they wait the next day?

THE WITNESS:  That depends on the investment thesis, your Honor.  It depends on how much capital they want to deploy and whether they wanted to do it, how patient they are.

THE COURT:  Wouldn't it be the case that if you wanted to accumulate a long position because the stock is going to go much higher than it is now, you would get a lot of stock whenever it was offered for fear that later on other investors would catch your idea and bid it up even higher?  Wouldn't that be the case?

THE WITNESS: So you try to trade. It's hard to forecast short horizon prices, so you don't know where prices are going to go at the point you're trading. You have an expectation of where you think they should go in the future, and then you simply try to trade as much as you can when other people are trading and that's generally towards the end of the day.

THE COURT: So you wouldn't want to trade in the morning at lower prices than the afternoon?

THE WITNESS: You don't know if prices in the morning are going to be lower. They could be lower later in the day.

THE COURT: You wouldn't just not be worried about 50 cents and 75 cents. You just want to get the stock when you can get the stock before other people get wise to your superior thinking?

THE WITNESS: Traders have an expectation, your Honor, of where they think the liquidity will be in the market, at what time they think the liquidity will be in the market, and they know that, in general, that's towards the end of the day.

MR. THOMAS: Thank you, your Honor.

You can take that down.

Q. You talked a little bit about front-running, so I want to touch on that subject very briefly. And just to provide some context, imagine, just to try to illustrate what the front-running concern is that you have in mind, if an

investor's plan was to buy 50 million shares of IBM over the day, it wouldn't be wise to send an order for 50 million shares to your broker at 9:30, say, take this to the market because other sellers would very quickly enter the market and move up the price, right?

MS. ESTES:  Objection.

THE COURT:  Overruled.

THE WITNESS:  No, it would not be wise to tell the world what you're about to do.

BY MR. THOMAS:

Q.  Right.  Because then, as you said, people who knew that you were in the market for 50 million would buy a chunk and then try to sell it back to you at better prices for them, higher prices for you?

A.  Correct.  That's the definition of front running.

Q.  That's part of the reason you said the algorithms chop up these big orders into small pieces, right?

A.  That is part of the reason, yes.

Q.  So that the child orders resemble sort of nondescript, small units, small blocks of stock that are taken to the market, right?

A.  That's correct.

Q.  To take the 50-million-share example of IBM, that might get broken down into a bunch of 100-share lots, right?

A.  Correct.

Q. And then each of those lots gets brought to the market in those child orders that you described?

A. That's correct.

Q. And the principal idea in breaking that down, I think you said, was that it prevents others in the market from detecting that you really wanted 50 million from the beginning, right?

A. Yes.

Q. In that example. And yesterday, the judge asked you some questions about whether the market could sense or intuit demand. Do you remember that?

A. I do.

Q. And the judge was right, wasn't he?

A. If you could remind me precisely what the judge said, that would be helpful.

Q. Well, in particular --

THE COURT: I wish you would tell that to the court of appeals.

BY MR. THOMAS:

Q. If sellers perceive an increase in demand, all other things equal, prices will rise, right?

A. Yes.

Q. Okay.

A. A future increase in demand, just to clarify.

Q. I appreciate the clarification. Now, what you were talking about yesterday was just the participants in the market don't

have visibility into the parent order itself, right?

A. That's correct.

Q. But there are indications that there may be an increase in future demand that are observable to market participants from time to time, right?

A. Market participants see transaction prices at current volume. It's really hard to make judgments about future demand.

Q. But there's an entire style of investing called momentum investing that you're familiar with, right?

A. I am.

Q. And that's built on a number of data points that those momentum investors believe indicate when a stock is trending up or trending down, right?

A. There is a style. That's correct.

Q. And so, there are traders in the market who respond to technical indicators in making their own decisions about when to buy or sell and in what size?

A. There are.

Q. Okay. And also, I want to talk for a moment about index funds. Are you familiar with index funds?

A. I am.

Q. Those funds track at a cross section of a market or an industry, right?

A. They do.

Q.   And they're typically weighted, right?

A.   They are.

Q.   Can you explain what that means to the jury?

A.   So let's suppose an index fund holds the S&P 500.  The proportion in which it holds the S&P 500 is based on how big each firm is, each one of those 500 firms is.  So if a firm is really big, it holds more of it.  If a firm is proportionately smaller, it holds smaller portions.

Q.   Are those weightings important?

A.   They can be.

Q.   And why is that?

A.   Well, I'm not sure I -- I understand the question.  Why are the weightings important?  Because they represent the weighted average of that particular index.

Q.   So if an investor, for example, was trying to get exposure to the telecommunications sector, for example, and they wanted to take that exposure in the form of an index, they could do that, right?

A.   If a telecommunications index is available, they could do that, yes.

Q.   And that index would try to represent in proportion to the size of the companies in the index?

A.   If it's weighted that way, yes, correct.

Q.   Now, as companies that are in any given index increase and decrease in market value, that will affect the weightings,

right?

A.   Yes.   That is correct.

Q.   And funds that hold indexes or make index-based trades will have to rebalance, won't they?

A.   It depends on how the weighting is done.   If it's -- the weighting is based on market capitalization, and there are no inflows or outflows into the fund, then they don't have to do any trading because the index automatically adjusts.

Q.   And what are the inflows and outflows that you described?

A.   If you put money into the fund or take money out of the fund, then the fund has to trade.

Q.   And index funds do, from time to time, for that reason, have to rebalance, right?

A.   They are not rebalancing the proportion of what they're owning in each fund, they're just -- in each security.   They are putting money into the securities in the same proportion. It's not called a rebalance.

Q.   Dr. Wahal, I don't want to get tripped up by a miscommunication.   Index funds do, from time to time, rebalance, right?

A.   It depends on the index.   They rebalance sometimes quarterly or annually.

THE COURT:   Let's talk in general.   In general, don't index funds continually rebalance as their profits and losses of the particular securities making up that index?

THE WITNESS:  They do not, your Honor.

BY MR. THOMAS:

Q.  But they do rebalance in proportion, at least some of them, to the market capitalization weight that that company contributes to the broader market as a whole, right?

A.  They do not.  They rebalance when the index is reconstituted.

THE COURT:  We're circular.  When are they reconstituted?  Same time they rebalance.  They rebalance when they're reconstituted.  They're reconstituted when they rebalance.  Let's not be circular, please.  Answer the question.

THE WITNESS:  So a Russell 2000 index fund, for example, it's a small cap index fund.  Rebalance is quarterly, sometimes annually.  It depends on the fund.  So it would rebalance either once a quarter or once a year.

BY MR. THOMAS:

Q.  And during those rebalances, it will buy or sell to achieve the then current distribution of weights that it aims to achieve in that index.

A.  That's correct, during that rebalance.

Q.  All right.  Dr. Wahal, you're the director of the Center for Responsible Investing at ASU; is that right?

A.  I am.

Q.  You help undergraduates learn how to manage investment

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

portfolios?

A.   I do.

Q.   Is the goal there to teach them how to be responsible portfolio managers?

A.   No.  The Center for Responsible Investing is wholly separate from the teaching aspect that you're describing.  The Center for Responsible Investing has to do with a public/private partnership in investments in things like solar power, water desalination, et cetera.  The two are entirely separate.

Q.   So I'm going to focus on the teaching then, I guess.

A.   Okay.

Q.   And you do teach undergraduates and MBA students about portfolio management, right?

A.   I do.

Q.   And is your aim to teach them how to responsibly manage portfolios?

A.   I'm not sure what you -- if you mean responsibly as in the sector responsibly or in some other term.

Q.   Well, are you teaching them to be irresponsible portfolio managers?

            MS. ESTES:  Objection.

            THE COURT:  I think we need to define what we mean by "responsible."

            MR. THOMAS:  Sure.

BY MR. THOMAS:

Q. Do you teach them how to manage risk appropriately?

A. I teach them to think about risk and return.

Q. And to manage it -- and I don't mean this in a green energy kind of way but an investing kind of way, responsible, right?

A. If you mean by responsibility to understand the difference between -- the connection between risk and return, yes, I ask them to understand the connection between risk and return.

Q. And the portfolios that they manage, they do so under certain constraints that you provide, right?

A. Yes, that's correct.

Q. And one of those constraints is that no position can be larger than 10 percent of capital, right?

A. That's correct. That's not my constraint. That's a constraint that comes from the endowment.

Q. That no position can be larger than 10 percent?

A. That's correct.

Q. And would you agree with me that bigger positions in single stocks bring with it more risk, all other things equal?

A. They bring with it more risk and potentially more return.

Q. And you're familiar with something called idiosyncratic risk, right?

A. I am.

Q. And can you tell the jury what idiosyncratic risk is?

A. Idiosyncratic risk is -- so imagine a stock moves up and

down.  So think of it as just being volatile.  Some proportion of that volatility when it moves up and down is because the market is moving up and down.  And some proportion of it is specific to the fund.  So the idiosyncratic part is the portion that is specific to the fund.  Does that help?

Q.  So if there were a large investment in a single company, some of the risk would be market risk, right?

A.  Correct.

Q.  And that's risk shared by that company and all the other companies, in theory, just as companies in the market generally, right?

A.  Correct.

Q.  And some would be this more specific risk, the idiosyncratic risk that attaches to that one company, right?

A.  That's correct.

Q.  And you don't hedge out idiosyncratic risk by hedging market risk, right?

A.  That is correct.

Q.  Now as a single name gets larger, it exposes the fund to more losses, all other things equal, right?

A.  Losses or gains.

Q.  But losses being one of the possible outcomes, right?

A.  Correct.

Q.  And depending on the size of that position relative to the other positions in the market, right, in the fund, losses in

one position could undermine the gains in the entire portfolio, correct?

A. They could. They could also overwhelm it in the gain side as well.

Q. But the losses could take --

THE COURT: We're talking about risk is a potential for loss, right? You could make a lot more money, but you can lose a lot more money.

THE WITNESS: Correct.

THE COURT: And that's risk.

BY MR. THOMAS:

Q. Dr. Wahal, just to make sure I understood you before, you talked about strategies that traders take to hide their positions, you know, from the market to avoid front-running and other things?

A. Yes.

Q. And to be clear, you're not advocating or suggesting that traders can legitimately mislead their brokers as to their trading strategy, right?

MS. ESTES: Objection.

THE COURT: Overruled.

THE WITNESS: I'm not suggesting any of those things. I'm just saying that front-running is a legitimate concern that traders have.

BY MR. THOMAS:

Q.   But just to be clear, you're not saying that traders are entitled to mislead counterparties in order to prevent front-running, right?

MS. ESTES:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I'm not suggesting anything of the kind.

BY MR. THOMAS:

Q.   Now, you advise Avantis; is that right?

A.   I do.

Q.   And you're aware that Avantis advertises to its investors that it tries to keep its trading costs low, right?

A.   It does.

Q.   That's one of the ways that Avantis tries to make more money for its investors, right?

A.   It does.

Q.   And among other things, Avantis advertises and tells its investors that spreading trades throughout the year reduces market impact and reduces expected trading cost, right?

A.   It does.

Q.   That's something that you think is accurate, right?

A.   I do think it's accurate.

Q.   And you agree with that principle?

A.   It's specific to the strategies employed.

Q.   Do you agree with the principle or not?

A.   Spreading out trading over longer periods of time, all else equal -- again, all else equal, because of trade-offs that I talked about, will have lower trading costs.

Q.   Now, in advising Avantis, have you recommended to them that they avoid participating systemically in closing auctions?

A.   I have not.

Q.   And in advising Avantis, have you recommended that they avoid purchasing in dark pools?

A.   I have not.

Q.   And in advising Avantis, have you counseled them that they should trade in market volumes exceeding 30 or 40 or 50 percent?

A.   I have not.

Q.   And have you advised Avantis that they should place most of their orders in the final minutes of the trading day?

A.   I have not.  I don't advise on those sorts of capacities.

Q.   Is that advice that you would be inclined to give if asked?

A.   I wouldn't speculate on what I'd do or would not give, but I don't advise on those capacities.

            MR. THOMAS:  Nothing further, your Honor.

            THE COURT:  Thank you.  Redirect, Ms. Estes.

            MS. ESTES:  Thank you, your Honor.

REDIRECT EXAMINATION

BY MS. ESTES:

Q.   Good morning, Dr. Wahal.

A.   Good morning.

Q.   So I want to pick up on where Mr. Thomas just left off.  So Mr. Thomas asked you a little bit about the students, helping manage the endowment at Arizona State, right?

A.   Yes.

Q.   And there was a 10 percent of capital limit there, right?

A.   Yes.

THE COURT:  Wait a minute.

MS. MULLIGAN:  Your Honor, we have no questions.

THE COURT:  Thank you.

MS. MULLIGAN:  Thank you very much.  I didn't want to -- just proceed.  Thank you.  No questions.

MS. ESTES:  Sorry, your Honor, my apologies.

MS. MULLIGAN:  No questions.

BY MS. ESTES:

Q.   So Dr. Wahal, you were asked a little bit about the risk in having a concentrated portfolio, correct?

A.   That's correct.

Q.   There's also benefits to having concentrated portfolios?

A.   There are.

Q.   What are the benefits?

A.   Idiosyncratic risk that I was asked about.  I have work that shows that idiosyncratic risk can be associated with high returns.  If you take large positions in a firm, sometimes that risk is rewarded and you can earn very, very high returns.

1705

There's other research that shows that a small set of stocks -- this is very well-cited research -- a small set of stocks can generate a disproportionate high return in the stock market over long periods of time from 1926 onwards.

Q. How would you describe the concentration of Warren Buffett's portfolio?

MR. THOMAS: Objection, your Honor.

THE COURT: Sustained.

BY MS. ESTES:

Q. All right. Dr. Wahal, you were asked a little bit about Avantis and its strategy to spread out trades over time, right?

A. Correct.

Q. And that is a strategy specific to Avantis, right, that's their strategy?

A. It is quite specific to Avantis.

Q. Are there a variety of portfolio management strategies out there?

A. There are many, many portfolio strategies out there.

Q. And portfolio managers have different strategies because they have different trading objectives, right?

A. They have different investment theses, different trading objectives, different types of portfolios.

Q. And is there one single investment strategy that is the right one?

A. No, there's no one size fits all.

Q. You're just trying to make money, right?

A. That is what people try to do.

THE COURT: And avoid loss, right?

THE WITNESS: Correct, your Honor.

MS. ESTES: Fair enough, your Honor.

BY MS. ESTES:

Q. All right. So Dr. Wahal, yesterday the prosecution asked you about some Goldman Sachs surveillance reports, right?

A. They did.

Q. Okay. And I think they asked you about some of the reports that had investments on foreign exchanges and one in a SPAC; do you recall that?

A. I do.

MS. ESTES: I want to pull up for the witness what is marked as Defense Exhibit 2091.

BY MS. ESTES:

Q. Dr. Wahal, do you recognize this as one of the surveillance reports from Goldman Sachs?

A. I do.

MS. ESTES: Your Honor, we offer Defense Exhibit 2091.

MR. THOMAS: Objection, your Honor.

THE COURT: Is that something we discussed yesterday?

MS. ESTES: No, your Honor. They offered a couple of these. We wanted to offer one here. It's responsive to their --

MR. THOMAS:  703, your Honor.

THE COURT:  Sorry?

MR. THOMAS:  703, your Honor.

THE COURT:  I know what you're talking about.  Why wasn't it brought up yesterday?

MS. ESTES:  Sorry, your Honor?

THE COURT:  Why wasn't it brought up yesterday?

MS. ESTES:  Mr. Thomas introduced two of these on cross.

THE COURT:  Is there more to this?

MS. ESTES:  Yes, your Honor.

And on page 31, Mr. McLeod?

THE COURT:  What page are you going to offer?

MS. ESTES:  Your Honor, we would offer page 31.  I think we probably need to offer the first page because it has the date, too, so page 1 and page 31.

THE COURT:  And what does this counter?

MS. ESTES:  Your Honor, Mr. Thomas asked questions about various of the companies that were in the Goldman Sachs surveillance report that Dr. Wahal relied on.  And this is another one of these reports, and it has -- it responds to certain questions Mr. Thomas asked.  I don't know if your Honor wants many to say more, but in particular, it has one of the at-issue stocks on the report here.

THE COURT:  All right.  You've said enough.  Objection

overruled.

(Defense Exhibit 2091 received in evidence)

MS. ESTES:  Thank you, your Honor.

Mr. McLeod, can you please publish that and let's zoom into page 31.  Well, actually, let's zoom into the top, so the jury can see what this is.

BY MS. ESTES:

Q.  Dr. Wahal, what is the date listed on this report?

A.  Twenty-second of February 2021.

MS. ESTES:  Okay.  And Mr. McLeod, can you go to page 31 and zoom into that section there?

Q.  Dr. Wahal, I just want to first direct your attention to the line saying VIAC.  What stock is that a reference to?

A.  That's Viacom.

Q.  And can you tell if this is a buy or a sell here?

A.  I can.  It's a buy.

Q.  It's a buy.  And what is the percentage of ADV here?

A.  19 percent of ADV.

Q.  And here, going above that, I think Mr. Thomas asked you questions yesterday about trades that over 100 percent of ADV. Do you recall that?

A.  I do.

Q.  Do you see the trade above that that says 161 percent ADV?

A.  I do.

Q.  How does that work?  How can you get over 100 percent ADV?

A.   So this is the trade on a particular day relative to average daily volume over some past period, whatever that past period may be.  It's typically often, you know, 20 days.  And so, if over the past 20 days, the stock was trading, let's say, on average a million shares, and on a particular day -- with some higher and some lower but on average a million shares.  And on this particular day, you bought more than a million.  You bought 1.6 million, then it would show up as 160 percent.

Q.   And in the reports, your view during this time frame, did you see any Archegos purchases that were over 100 percent ADV for a day?

A.   I did not.

Q.   Okay.

     MS. ESTES:  We can take that down, Mr. McLeod.

Q.   So Mr. Thomas also asked you yesterday about an earlier draft of your chart on the surveillance reports, right?

A.   Yes.

Q.   And that one excluded trades that were over 100 percent ADV, correct?

A.   That is correct.

     MS. ESTES:  Let's pull up for the witness Defense Exhibit 9233.

Q.   Dr. Wahal, do you recognize this as the earlier draft excluding purchases that were over 100 percent ADV?

A.   I do.

MS. ESTES:  Your Honor, we'd offer Defense Exhibit 9233.

MR. THOMAS:  No objection.

THE COURT:  Received.

MS. ESTES:  Thank you, your Honor.

(Defense Exhibit 9233 received in evidence)

BY MS. ESTES:

Q.  So Dr. Wahal, now that the jury can see this, what do we see here?  Can you describe what the gray is and what the blue is?

A.  So the blue is the average percentage of ADV for Archegos' trades culled from this report, these Goldman Sachs supervisory reports.  The gray is the average percentage of ADV for all of the other clients flagged in the same reports after excluding any percentage of ADVs that are bigger than 100 percent.

Q.  And why did you want to also analyze this with this exclusion?

A.  I wanted a sense for how robust the conclusions that I was drawing from the data were, whether they were somehow suddenly changed by having some of these percentage of ADVs that were bigger than 100 or not.  So you -- as a rule, as a financial economist, we like to look at things different ways to make sure that our conclusions are robust.

Q.  And so, what, if any, conclusions do you draw from this chart?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A.   Well, the average percentage of ADV for the Archegos trades in these reports looks very, very similar to the non-Archegos clients identified in these reports.

THE COURT:  I think you said that you found no Archegos trades over 100 percent of ADV?

THE WITNESS:  That is correct, your Honor.

THE COURT:  And other companies -- withdrawn.  Never mind.  You go ahead.

MS. ESTES:  Thank you, your Honor.

BY MS. ESTES:

Q.   So on this chart then, you wouldn't be excluding Archegos trades because there's none over 100 percent?

A.   That is correct.

Q.   Okay.  But you are excluding trades from other clients?

A.   That is correct.  So the 161 that you showed earlier, that would not be in this comparison set.

Q.   All right.

MS. ESTES:  We can take that one down.

Q.   Dr. Wahal, you were asked yesterday by Mr. Thomas about trading in dark pools and why you might want not to do that. Do you recall that?

A.   I do.

Q.   And I think you mentioned on cross that there may be a concern about leakage of information.  Do you recall that?

A.   I do.

Q.   What did you mean by that?

A.   So a dark pool is one where certain participants are allowed to trade.  Not everyone is allowed to trade.  And over the past, I guess, 15 years, maybe two decades or so, there have been concerns that when you send an order to a dark pool, you know, other people try to find out because they're asking about future demand from you.  And so that's referred to as leakage of information.  So you worry about front-running.  And there have been investigations and studies that look at whether there can be leakage of information.  The evidence is kind of mixed.  It is a concern that traders worry about.

Q.   All right.  And I just want to make sure I understand.  So how is it that information could leak?  Can you explain that from the dark pool?

A.   So, for example, this is a bit technical.  But for example, let's suppose I send a thousand-share order to a dark pool.  Somebody can say, I'm going to send a one-share order and see if it gets executed, and then if it does, then I'm going to send other orders on other venues to do that.  That's one example.

Q.   Okay.

        THE COURT:  Where is the leakage in that?

        THE WITNESS:  The leakage is that that one-share order executes, and that may give you an indication that behind that thousand-share order there are others because you've traded

one, so you probably want to trade 999.  And you would do that later, and so, I would raise prices in other venues.

THE COURT:  Do you think that's a realistic hypothetical with a dark pool?

THE WITNESS:  I do, your Honor.  It's discussed in trading documents that I've seen, sort of, Wall Street trading documents.

THE COURT:  So you search the dark pool, if someone wants to sell a certain stock, and the interest is well, I'll just take a small piece of it, and you worry that that information will get out and cause you trouble filling the rest of the order?

THE WITNESS:  That's correct, your Honor.

THE COURT:  Is that what you mean by leakage?

THE WITNESS:  That's correct, your Honor.  On the street that's referred to as toxicity.  That's the word that they use, I'm not sure I like it, but that's what it's called.

THE COURT:  The dark pool wouldn't do much business after that, would it?

THE WITNESS:  And that has happened, your Honor.

BY MS. ESTES:

Q.  All right.  Switching gears a little bit, Dr. Wahal.  So you were asked a little bit about using VWAP and TWAP orders with limit prices, do you recall that?

THE COURT:  Well, it wouldn't be a feature of a

responsible company, would it?

THE WITNESS:  You mean a responsible dark pool?

THE COURT:  Well, the dark pools are nothing but transactions being conducted by counterparties and if it were a responsible counterparties, you wouldn't expect to have any leakage, would you?

THE WITNESS:  You would hope not.

THE COURT:  You would expect not, wouldn't you?

THE WITNESS:  There are dark pools in which traders worry about the toxicity of the dark pool, your Honor.

THE COURT:  That wasn't my question.  All right.  Go ahead, Ms. Estes.

BY MS. ESTES:

Q.  Dr. Wahal, some of the concerns with these dark pools involve major investment banks, correct, and their dark pools?

A.  It does.  They do.

Q.  And those are some of the same counterparties that are involved in this case, correct?

A.  I believe so.

Q.  So switching gears.  So you were asked a little bit about VWAP and TWAP orders with limit prices, correct?

A.  Yes.

Q.  Is it common to use limit prices in the markets?

A.  It is fairly common to use limit prices.

Q.  And why do traders use limit prices?

A.   Parent limit prices are used to control trading.  There are sometimes concerns that prices can very, very quickly shoot up, and they do.  We saw -- or fall very, very quickly.  We saw one actually a couple of weeks ago where Berkshire Hathaway's price suddenly, I believe, it was -- fell by huge amounts very, very quickly.  It's called a flash crash.  And so, parent limits control for that sort of, so that you don't trade when something crazy like that happens.

Q.   And how does that compare to using a market order?

A.   If you have a market order and a price suddenly fell or suddenly rose, you would trade at that price.

Q.   Now, Mr. Thomas asked you yesterday a little bit about Dr. Battalio's midpoint price analysis.  Do you recall that?

A.   I do.

Q.   And your analysis was designed to be responsive to his analysis, correct?

A.   That is correct.

Q.   And you relied on his data when you did your analysis, correct?

A.   That is correct.

Q.   And you relied on the date range he used when you did your analysis, correct?

A.   That is correct.

Q.   So Mr. Thomas, I think asked you yesterday about a 57 percent participation rate.  Do you recall that?

A.   I do.

Q.   And he was looking at a participation rate in about a four-minute interval; is that right?

A.   I believe so.

Q.   Okay.  Now, Dr. Wahal, I think he asked you a little about a paper you wrote where you looked at interval parent orders over certain intervals.  Do you recall that?

A.   I do.

Q.   Okay.  And in your work, have you seen intervals where parent orders have -- where there is a volume of over -- not over, but 100 percent?

A.   Interval volume of over 100 percent?

Q.   Of 100 percent.

A.   Yes, I have.

Q.   So how does that happen?

A.   It can -- it can happen the same way.  You can -- there are intervals over which, you know, your large fraction of trading volume.

Q.   And so is it dangerous to cherry pick small time intervals and just focus on the volume in that interval?

          MR. THOMAS:  Objection.

          THE COURT:  Overruled.

          THE WITNESS:  If I can illustrate by way of example.  If I can take one trade that takes place on one millisecond, and my trade is 100 shares, I'm 100 percent of volume.  If I do

that over two milliseconds and there are two trades for 100

shares and 100 shares, and one of those is may trade, I'm

50 percent of volume and so on and so forth.

Q.  So as you change the interval, the volume number is going

to change, right?

A.  That's correct.

Q.  And could you slice and dice this a number of different

ways throughout the course of a market day, right?

A.  That's correct.

         MS. ESTES:  Let's pull up Government Exhibit 9005 at

64.

Q.  Dr. Wahal, you recall this is one of the slides you were

asked about yesterday?

A.  I do.

Q.  And I think you were asked why -- why wouldn't the trader

have put in a higher order at 3:40 p.m.; is that right?

A.  That is correct.

Q.  At 3:40 p.m., does the trader know where the market is

going for the rest of the day?

A.  No.

Q.  Is there any crystal ball where you can see what prices are

going to do?

A.  No.

Q.  Dr. Wahal, is there any danger in looking at charts like

this and trying to evaluate what happened in hindsight?

MR. THOMAS: Objection.

THE COURT: Overruled.

THE WITNESS: There's tremendous danger in -- it's called hindsight bias -- in looking back and Monday morning quarterbacking. When you trade, you trade in real-time. You don't know what the future holds. So you can always look back and say, Oh, I should have done this or I should have done that. Maybe I should have bought Nvidia a year ago. I didn't. It's always a dangerous thing to do. We can only do what we do in the current.

BY MS. ESTES:

Q. And do traders ever lose money on trades?

A. They do.

Q. And is that because they don't know where the market is going to go next?

A. Well, as you so eloquently put it, there is no crystal ball.

MS. ESTES: Nothing further, your Honor.

THE COURT: Thank you. Thank you, Dr. Wahal.

THE WITNESS: Thank you, your Honor.

THE COURT: You don't have to stay here anymore.

MS. MULLIGAN: It's too hot in here.

THE COURT: Let's take a short break before the next witness.

(Jury not present)

THE COURT:  Prepare your next witness.

MS. ESTES:  Thank you, your Honor.

(Recess)

THE COURT:  You can sit, folks.  We're not ready.  The jury is coming.

(Jury present)

MS. ESTES:  Your Honor, would you like us to get the witness out now or wait?

THE COURT:  Yes.  I'd like the witness out now.  What is the witness' name?

MS. ESTES:  Michael Johannes.

THE COURT:  And he's the last witness?

MS. ESTES:  He is the last one, yes, your Honor.

MR. BERKE:  And your Honor, just so your Honor knows, after the witnesses, we are going to have just a few documents to introduce as well.

THE COURT:  Come up here, sir.

Be seated everyone.

MICHAEL JOHANNES,

    called as a witness by the Defendant,

    having been duly sworn, testified as follows:

THE COURT:  You may inquire.

MS. ESTES:  Thank you, your Honor.

DIRECT EXAMINATION

BY MS. ESTES:

Q.   Good morning, Dr. Johannes.

A.   Good morning, Ms. Estes.

Q.   What is your educational background?

A.   I have an undergraduate degree from Marquette University, and a masters and a PhD. from the Department of Economics at the University of Chicago.

Q.   Where do you currently work?

A.   I currently work at Columbia University.

Q.   What's your title there?

A.   I have two titles.  I am the Ann Kaplan Professor of Business, and I'm the chair of the finance division in the graduate school of business.

Q.   What kind of classes do you teach at Columbia?

A.   I teach a range of classes at the MBA/masters level and PhD level that cover topics like investments and especially derivatives and derivative markets.

Q.   And when you say "derivatives," does that include swaps?

A.   That does include swaps.

Q.   Have you taught at other universities?

A.   I have.

Q.   Where else have you taught?

A.   I've taught at Princeton University.  I've taught at the Kellogg School of Management at Northwestern, and I've also visited Stanford University.

Q. What is your primary area of research?

A. My main area of academic expertise is in derivatives and investments, primarily derivatives.

Q. And aside from your academic experience, do you have professional experience related to derivatives?

A. I do.

Q. What is that?

A. I've been fortunate to be involved in a number of consulting projects. So from 2003 to about 2012, I was a consultant to a relatively large hedge fund that specialized in trading bonds and over-the-counter derivatives.

Q. Do you have any portfolio management experience?

A. I do.

Q. Can you describe that?

A. From about 2012 to the COVID period or a little bit after, I was a consultant to an investment fund called Clark Capital Management, which was a quantitative fund. So I was the director of research for the fund, but I was also later the portfolio manager for the fund.

          MS. ESTES: Your Honor, we would move to qualify Dr. Johannes as an expert.

          MR. THOMAS: No objection.

          THE COURT: So qualified.

          MS. ESTES: Thank you, your Honor.

1722

BY MS. ESTES:

Q.   Dr. Johannes, have you analyzed data and other materials in connection with this case?

A.   I have.

Q.   And were you working with anybody in your analysis of the data?

A.   I was.  I worked with a firm called Lexicon.

Q.   Are you being compensated for your time in this case?

A.   I am.

Q.   What is your hourly rate?

A.   My current rate is $1,400 an hour.

Q.   And are you being compensated for any of the work that people at Lexicon have done on the case?

A.   I am.  For some of the research staff at Lexicon, I receive something called attribution, which is a fraction of the billings for some of the research staff.

Q.   And does the amount you are paid depend in any way on the outcome of the case?

A.   It does not.

Q.   Dr. Johannes, I want to talk about the state of the markets in 2020 and 2021.  Could you describe what the markets were like during this period?

A.   So from 2020 to 2021 was the main COVID period.  So it was a really unique period of time in the world, in the economy, in financial markets.  So, in particular, as COVID spread, you

know, the economy got locked down. Schools were closed. There was an enormous response by the government to try to stimulate the economy, and so COVID really created a number of unique circumstances that had a major impact on financial markets.

Q. And did COVID affect the returns of particular companies?

A. It did. COVID had a very large effect on most companies. In particular, it created lots of winners, and there were also lots of losers.

Q. Can you describe what you mean by that?

A. Sure. So when Coronavirus first was spreading, if you were a company that did something like cruise lines, you were very negatively impacted, because once you have lockdowns, there's no more cruises. Or if you had a company that had movie theaters, you can't go to a movie theater because the virus spreads. There were examples of those that were losers, but there were also lots of examples of companies that were big winners because they had products or services that were particularly well suited for this unique set of circumstances that arose during the COVID period.

Q. Dr. Johannes, are you familiar with the level of volatility in the markets during this period?

A. I am.

Q. And how would you describe the volatility of the markets during this period 2020 to 2021?

A. So volatility is a general term to describe how much asset

prices were moving, and the COVID period was a period of extraordinarily high volatility; meaning, markets were really moving a lot.

Q.   Did you look at any metrics to assess the volatility?

A.   I have.

Q.   What did you look at?

A.   I looked at something called the VIX, which is the volatility index, which is a broad index that measures market volatility.

Q.   And based on your review of the VIX, how did the VIX, during the period, compare to prior periods?

A.   Not surprisingly, the VIX was really elevated.  The market was much more volatile during the COVID period than it had been for many years before and also it has been subsequent.  And so, the market volatility were elevated; meaning, stocks were moving a lot more than they normally did.

Q.   What significance, if any, can market volatility have for an investor?

A.   So if you think market volatility describes sort of the range of potential outcomes you can get in markets.  So when volatility is very low, stocks aren't moving much.  And when volatility is high, all of a sudden, you can have stocks moving a lot.  It could be down.  It could be up.  So volatility is high, that means there's an opportunity to make outsized gains. You can also have outside losses -- outsized losses.  And so,

elevated volatility is generally a period of elevated, and in this case extraordinary opportunities because asset prices are moving so much.

Q.   Dr. Johannes, did you do any analysis to show how extraordinary the markets were during this period?

A.   I have.

Q.   What do you do?

A.   So I've looked at things like volatility indices.  I've also looked at the movements of individual stocks to see if the movements in individual stocks were outsized relative to prior periods or sequential periods.

Q.   What did you find in that analysis?

A.   Any way I sliced, and maybe not surprisingly, COVID was an extraordinary period of time.  So you had stocks going up by a factor of two, three, four, five; really outsized gains in response to the unique set of circumstances that we saw during that period of time.

So, for instance, you could have a stock like, say, Peloton, when you are locked down at home and you can't go to the gym, you buy a bike and you exercise at home.  Or it could be a stock like Zoom, which I don't think I had heard of pre-COVID, and when you are locked down and working from home, you go on Zoom to have meetings with colleagues or other people.  So the stocks of these companies responded with really outsized gains.

Q.    Were there any changes in market participants during this time after COVID?

A.    There were changes in the participants in the market.

Q.    Could you describe changes?

A.    Sure.  So one of the major changes was there was a big increase in retail trading activity.  So retail trading generally refers to non-professional traders.  And what we saw during COVID is that the number of retail traders went up, but also the activity of those retail traders went up.  So there were a lot of people opening trading accounts, and then there was an associated increase in trading activity from these retail accounts.

Q.    What contributed to the rise of retail trading?

A.    I think that there were a couple of factors; the main ones being the unique circumstances associated with COVID.  So you can't go to work, so it's easier to trade in your online account at home because you don't have your colleagues looking over your shoulder.  There was a large government stimulus, so there were checks sent to people.  Many people deposited those checks in their brokerage account and invested it.

        Also, as I mentioned earlier, these were extraordinary markets, so the opportunity to make really outsized gains during the COVID period was much higher than in prior years.  And so, I think a combination of all these factors led to an increase in retail participation in the markets.

Q.   And did that increase in retail participation contribute to market volatility?

A.   It did.

Q.   How so?

A.   So I think the best way to think about this is through a well-known example of some stocks in January 2021, like GameStop, that had truly extraordinary price increases.  We now know that there were a lot of retail traders.  But just more generally, when you have new participants coming into the market with money to invest, that can induce volatility into the markets.  And you combine that with the fact that you have this unique set of circumstances, and you have a lot of new participants in very volatile markets.

Q.   Dr. Johannes, are you familiar with the term "meme stock"?

A.   I am familiar with the term, yes.

Q.   What is a meme stock?

A.   I have to admit, I'm not sure I can really define one, but in general, I think it refers to a number of stocks which were widely discussed on social media platforms, which also had dramatic increases in trading volumes, dramatic increases in stock prices, just really, sort of remarkable increases in activity associated with those stocks with the -- I think the best example or the most widely known one is GameStop, but there's also other ones like Bed Bath & Beyond or Koss, the company that makes headphones.

Q.   Were any hedge funds affected by this meme stock?

A.   There were some.  You know, hedge funds tend to be typically kind of secretive, but there's at least some that we know were affected by this.

Q.   Are you familiar with Melvin Capital?

A.   I am.

Q.   Was that one of the hedge funds affected?

A.   That was.

Q.   And did you review Melvin Capital's SEC filings listing its positions?

A.   I did.

Q.   How was Melvin Capital affected by the meme stock movement?

        MR. THOMAS:  Objection, your Honor.

        THE COURT:  Sustained.

Q.   Dr. Johannes, you said you reviewed Melvin Capital's SEC filings of its positions.  Did Melvin Capital have short exposure to any of the securities at issue in this case?

A.   They did.

Q.   What securities?

A.   They had short exposure to Viacom and GSX.

Q.   And what kind of short exposure did Melvin Capital have?

A.   So there's different ways to get exposure.  You could buy or short sell the stock or you can buy or short swaps or you could enter into option contracts.  Melvin Capital had bought -- put option contracts on a number of stocks including

GSX and Viacom.  And so, through those option contracts, they obtained short exposure, which means that had those stocks fallen in price, the option contracts would have had large payoffs.

Q.   Dr. Johannes, can options trading affect trading in underlying stock?

A.   It can.

Q.   OK.  So first let me ask you:  What is an option?

A.   So an option is a type of derivative contract.  So if you think, there's underlying assets like stocks and bonds.  Then there's things like total return swaps.  Those are a derivative contract whose value is derived from the underlying assets, and then there's contracts called options, and options are different from things like swaps.

Options are contracts, which give you the right but not the obligation, to buy an underlying asset during a given period of time for a given price.  So I could buy what is called a call option, say, on Apple stock, and that would give me the right over a given period of time to buy Apple but at a fixed price.

The key for an option is it's a right; it's not an obligation, as the term option applies.  So you don't have to do anything, but if, for instance in the case of Apple, the stock price goes up, you could exercise your option, and then you could buy Apple at a price below the market.

Q.   Was there an increase in options trading in 2020 and 2021?

A.   There was an increase in options trading.  Like overall market trading volumes, options trading volumes surged during the COVID period.  So I think they were roughly double or maybe even more than they had been in prior years.  So there was a lot more options trading activity during this period of time.

Q.   And did you look at the options trading in GSX during this time period?

A.   I did.

Q.   What did you find?

A.   Relative to the pro-COVID period, GSX's options trading volumes were much higher.

Q.   And so, what, if any, significance do that have?

A.   This is another derivatives market where investors go to gain exposure, and there's a huge amount of activity or a large -- a large increase in the amount of activity in this derivatives market during this period of time during the COVID period.

          (Continued on next page)

Q. Can that affect the regular market with respect to GSX?

A. I'm sorry. Could you restate the question.

Q. Can increased activity in a derivatives market affect the underlying active in the stock market?

A. It can. So, if I'm an investor and I buy an option, there is someone on the other side who is selling me the option. And, for instance, if I buy an option on Apple, which pays off -- if Apple's stock price goes up, the person who sold that is going to have to pay me a lot of money if Apple's stock goes up. So the counterparty may choose, typically does choose to hedge their position. So if I buy an option on a stock, the counterparty may go and buy the underlying stock in order to hedge their exposure.

So the two markets are linked, and an increase in trading activity in the options market could result in an increase in trading in the underlying asset.

Q. Did you look at options trading in Viacom during this period?

A. I did.

Q. What did you find there?

A. The same pattern occurred, that trading in Viacom options was much higher during the COVID period than it was in prior years.

Q. In addition to the change in market participants during this period, were there any changes in the volume of trading

during certain times of the day during this period?

A.   There were.

Q.   Can you explain that?

A.   Yes.  As I mentioned earlier, overall trading volumes increased a lot, whether it was in underlying stocks or in derivative markets, like options markets, but also sort of the way or the time at which people were trading changed also.

So one of the big developments during this period was a dramatic increase in trading before the normal market trading hours.  So historically normal market hours are 9:30 to 4.  But increasingly financial markets are operating around the clock.  One of the things that we saw during the COVID period was a dramatic increase in trading before the normal market opened, before 9 or 9:30 a.m.

Q.   Dr. Johannes, I want to talk a little bit about the securities at issue in this case, starting with Viacom.

How did Viacom's stock do when COVID hit?

A.   When COVID first hit at the beginning of 2020, Viacom's stock crashed.

Q.   And did COVID create any market opportunities for Viacom?

A.   It did.  So the stock first dropped about 75 percent, reflecting, again, these unique circumstances and its impact on the company.  But Viacom at the same time was planning on rolling out a streaming service.  So ViacomCBS has this huge library of content, and they were planning on rolling out a

streaming service to sell that content directly to consumers. So instead of watching a show whenever it showed up on cable, you subscribed to Paramount Plus, and you can watch this show whenever you want.

Q.   Let's turn to GSX.  How did that stock do when COVID hit?

A.   So GSX is a Chinese company.  Its full name is GSX Techedu, and it is an online educational company.  So you subscribe to their platform and it has K through 12 educational materials.

And this is a stock which was particularly well-suited for coronavirus because when the economy is locked down and you can't go to school, your kids can log on, and they have a full educational platform for K through 12.  And in fact when coronavirus hit, it hit first in China, and GSX is largely a Chinese company.  Unlike Viacom, whose stock price crashed, GSX's stock price in early 2020 actually went up and that's just reflecting -- they had the product offerings that were particularly well-suited for this period of time with the circumstances that coronavirus brought us.

Q.   Dr. Johannes, did you look at GSX's stock price during periods in 2020 and 2021?

A.   I have.

MS. ESTES:  Mr. McLeod, can you pull up for the witness Defense Exhibit 9158, what's marked for identification.

Q.   Dr. Johannes, do you recognize this chart?

A.   I do.

Q.   And what does this chart show?

A.   So this chart shows GSX's stock price in August, late July, and August of 2020 and associated trading volumes.

          MS. ESTES:  Your Honor, we offer Defense Exhibit 9158.

          MR. THOMAS:  No objection.

          THE COURT:  Received.

          (Defendant's Exhibit 9158 received in evidence)

          MS. ESTES:  Thank you, your Honor.

          Mr. McLeod, can you please publish.

Q.   Dr. Johannes, now that the jury can see this chart, what time frame are we looking at here?

A.   This is from the last week in July to the middle of August.

Q.   And this is for GSX?

A.   Yes, GSX.

Q.   What does the black line there on the screen represent?

A.   The black line represents the closing price of GSX's stock price.

Q.   And what do the blue bars at the bottom represent?

A.   The blue bars represent overall market volume in the trading of GSX's stock.

Q.   And what do the green bars there represent?

A.   The green bars represent Archegos' increase in their net positions.  So a positive bar would indicate buying.

Q.   Dr. Johannes, why did you select this period to look at GSX's stock price and the associated volume?

A.   So, in general, I wanted to understand the patterns of stock price movements as they were associated to Archegos' trading and, in particular, when stock prices went up a lot, why did they go up and was it associated with Archegos' trading activities.

Q.   So let's look at the first date there, July 27, 2020.

What is the stock price on around that day?

A.   It looks like it's about $85 a share.

Q.   Was Archegos trading that day?

A.   They were not.

Q.   If you look across the chart through August 6, 2020, is Archegos trading on any of those days reflected in the chart?

A.   They are not trading on any of those days.

Q.   And so in that period, from July 27 through August 6, what is the increase in the stock price during that time?

A.   You can see the stock price increased from the low 80s all the way up to about $130 a share, so a 50 or 60 percent stock price increase.  These are just the closed prices, so the ranges of prices during the day are different.

Q.   Is that a significant increase?

A.   Yes.  This is a remarkable increase.  Stock price increasing 50 or 60 or 70 percent in weeks or months would be large.  This is an increase in a matter of days.

Q.   Those are days when Archegos is not trading?

A.   That's correct.

Q.   So August 7, I see there is some green at the bottom.  What does that represent?

A.   That's Archegos' net trading positions or the increase or decrease in their net trading position.

Q.   What happens to the stock price on that day?

A.   On the 7th, the stock price falls from say 130 to 105 or 110, so a dramatic stock price decrease.

Q.   So Archegos buys on the day this stock goes down?

A.   That is correct.  They bought on the day that the stock price fell.

Q.   And then let's just round this out.  What does the stock price look like on August 11, 2020?

A.   It's about $100 a share.

Q.   Dr. Johannes, what, if any, conclusions do you draw from this chart?

A.   So what I conclude from this is that GSX had a dramatic stock price increase, 60 or 70 percent, and that increase was unrelated to Archegos' trading because they didn't trade.  And so the increase could have been due to news about the company, it could have been due to other optimistic investors coming into the market to buy the stock.  It could have been --

MR. THOMAS:  Objection, your Honor.

THE COURT:  Overruled.

Q.   You can continue.

A.   So the price increase over this period could have been due

to other -- it was certainly due to non-Archegos related trading activity.  It could have been due to news.  It could have been due to other optimistic investors coming in the market and buying.  It could have been due to industry news.  Maybe there was a coronavirus outbreak in China and sort of bad news for coronavirus might have been good news for GSX stock.

But whatever caused the stock price to go up from 80 to 130 was unrelated to Archegos because they weren't trading on those days.

MS. ESTES:  Mr. McLeod, we can take that down.

Q.  Dr. Johannes, did you undertake a similar analysis for the company Farfetch?

A.  Yes.

Q.  What kind of company is Farfetch?

A.  Farfetch is an online retailer, so you can buy clothes or accessories online, which online retailers, I think there was a lot more attention to them during the COVID period because you couldn't go to the mall or shop in crowded stores.

MS. ESTES:  Mr. McLeod, can we pull up Defense Exhibit 9161 for the witness.

Q.  Dr. Johannes, do you recognize this?

A.  I do.

Q.  Is this your analysis related to Farfetch?

A.  Yes.

MS. ESTES:  Your Honor, we offer Defense Exhibit 9161.

MR. THOMAS:  No objection.

THE COURT:  I'm sorry?

MR. THOMAS:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 9161 received in evidence)

MS. ESTES:  Thank you, your Honor.

Mr. McLeod, can you please publish.

Q.   Dr. Johannes, what's the period that's covered in this chart for Farfetch?

A.   This is from late October through the middle of November in 2020.

Q.   And why did you select this period for Farfetch?

A.   Again, I was trying to understand how market movements were related to Archegos' trading activity, and this was a period when Farfetch had a dramatic increase in its stock price.

Q.   So starting at October 26, 2020, what was the stock price around that day?

A.   About $28 a share.

Q.   And then where does it end up around November 13, 2020?

A.   A little bit above $45 a day.

Q.   I want to ask you about some particular days on here.  On November 2, 2020, the blue line is very high.  What does that mean?

A.   So the blue line captures overall trading volume in the market.  So on that day it traded about 22 million shares of

stock.

Q.   Did Archegos trade on that day?

A.   Archegos did not trade on that day.

Q.   Was there any news on that day?

A.   There was.

Q.   What was the news on that day?

A.   So there was an announcement that Farfetch or there was a news story that Farfetch was going to enter into some agreement with Alibaba, this giant Chinese technology company.

Q.   Can you tell what the price increase is around that day with the news.

A.   The price increase is from about 28 to 33, so $5, which is maybe about 15 percent on that day.

Q.   Turning to November 6, 2020, do you see a price increase on that day?

A.   I do.

Q.   Was there any news on that day?

A.   Yes.  On November 6, there was an announcement from the company, if I recall, that they were doing a joint venture with Alibaba and a luxury-goods company called Richemont that Farfetch and the other two were going to enter into this new business.

Q.   Then looking at November 10, 2020, so there is a green bar there.  That means Archegos was trading that day?

A.   Yes, that's correct.

Q.   What happens to the stock on that day when Archegos is trading?

A.   On November 10, the stock price decreed from maybe 41 -- 44 to 41, so at a $3 decrease.  On that day Archegos increased their exposure to that stock.

Q.   Archegos is, again, buying when it goes down?

A.   Yes.  They are buying on the down day.

THE COURT:  Where is that on the chart?

MS. ESTES:  It's November 10, your Honor, is what we were looking at.

THE COURT:  It's a small down after a large increase followed by another increase, right?

THE WITNESS:  That's correct.  The stock went from 45 to 41, roughly, but on a $45 stock, that's an 8 or 9 percent decrease.  And then it did continue to go up afterwards, up to somewhere above 45.

Q.   Dr. Johannes, when it goes up afterwards on November 11, 12 and 13, is Archegos trading on any of those days?

A.   Sorry.  Could you repeat the dates.

Q.   On the last three days on the chart, November 11, 12, and 13, does Archegos trade on any of those days?

A.   They are not.

Q.   So what, if any, conclusions do you draw from this chart?

A.   The conclusions are similar to the previous one.  So over this period of time, Farfetch's stock increased from 28 to 45,

something like 60 or 70 percent, a really extraordinary increase in price, and the price increase was not due to Archegos' trading; rather, it was due to news or other -- certainly a couple of news events I discussed, as well as presumably other market activity, other buyers came into the market or there was other news going on at this time.

MS. ESTES:  Let's take this one down.

Q.   Did you undertake a similar analysis for Viacom?

A.   I have.

MS. ESTES:  Mr. McLeod, can you pull up Defense Exhibit 9163.

Q.   Dr. Johannes, you recognize this?

A.   I do.

Q.   Is this an analysis for Viacom?

A.   Yes.

MS. ESTES:  Your Honor, we offer Defense Exhibit 9163.

MR. THOMAS:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 9163 received in evidence)

MS. ESTES:  Thank you, your Honor.

Q.   Dr. Johannes, now that the jury can see this chart, what time period for Viacom does this cover?

A.   This is from late February through the mid of March in 2021.

Q.   Why did you select this period?

A.   This was another period where there were really large stock price increases, and I wanted to understand how those increases were related to Archegos' trading activity.

Q.   So I want to start with March 8, 2021.

Do you see an increase on that day?

A.   Yes.

Q.   And how big was the increase on that day?

A.   The stock price went up from about 75 to 85, so 10 to 15 percent price increase.

Q.   Is that significant?

A.   That's a large stock price increase.

Q.   What can you tell about Archegos' trading on that day?

A.   As you can see, on the 8th, there were maybe 21 million total shares traded on that day.

Is it OK if I mark on this graph?

THE COURT:   Yes, it is OK.

Q.   Yes.

A.   I will just mark a circle to make sure we see the right day.  That's March 8.  You can see, that was about 21 million shares.  You see a tiny sliver at the bottom, which was Archegos' activity.  So they bought, but a very, very small amount.

Q.   Was there any news on that day?

A.   There was.

Q.   What was the news on that day?

A.   March 8 was the Monday after the famous Oprah Winfrey/Meghan Markle interview that I think was shown on 60 Minutes, and this was an example of the types of things that you would get on Paramount Plus, which is the ViacomCBS streaming service.

Q.   What, if any, significance do you find in this increase on a day where Archegos' trading volume is very low?

A.   Similar to the other examples, so the stock price went up a lot on that day, about 15 percent, and it clearly wasn't Archegos' trading activity, and on this day there was significant news in the market with the Meghan Markle interview.

Q.   So what about March 12, 2021, do you see an increase on that day?

A.   I do.

Q.   Was there any news on that day?

A.   There was.

Q.   What was the news on that day?

A.   So on March 12, a Citibank equity analyst published a research report on Viacom stock.  And if I recall the title of the report was, it's dangerous to be barish, or it's dangerous to have a negative view on the stock.

Q.   What significance, if any, can a report like that have on a stock price?

A.   Market participants get information from many different

sources. One of those sources are analysts who study these stocks and study these industries. And so on this date you had a prominent equity analyst issuing this report, and you also had the stock price increase a lot.

Q. How did the stock price on that day, how did that compare to Viacom's historical highs?

A. That was the all-time high in Viacom's stock price, so on that day the stock closed at about -- I think it was about $95 a share, and that was the highest that Viacom stock had ever traded.

Q. Was Archegos trading on that day?

A. Archegos was trading, but they were a seller on that day. There was total trading volume of almost 40 million shares. I'll mark that right there. There is a huge amount of trading activity. You can see this is much higher than all of the other days. And then you can see at the bottom here that Archegos was in fact a net seller. They sold a couple of million shares or reduced their position by a couple of million shares in Viacom on that day.

Q. Dr. Johannes, is it common for investors to trade around a core position?

A. It is.

Q. Could you explain what that means.

A. Sure. So an investor thinks a stock price is going to go up over time, but of course it doesn't go up in a straight

line.  It goes up and it goes down.  So often it's common for investors, if there is a big increase, you sell a little.  And then if there is a decrease, you buy it back.  It's actually commonly called tactical trading.  So you have a core position.  And you sell a little bit when it goes up, you buy a little bit when it comes down.  It's a very common trading technique.  And the reason you do it is, if you're right about the stock, that it continues to go up over time, you're going to magnify your gains because you would have sold some on up days, and then you buy more on down days.

Q.  Dr. Johannes, what, if any, conclusions can you draw from this chart here?

A.  The conclusions would be that, in late February through mid March of 2021, Viacom's stock price had a really extraordinary increase.  Again, the scale of this is the stock had gone from about 65 to 95, and there was really large news announcements or news release to the market over this period of time.

        And the trading was largely unrelated to Archegos' trading activity.  In fact, on the day when the stock price attained its highest, highest level to date, Archegos was a net seller, which tells me there were a lot of other buyers in the market who were willing to pay $95 a share for the stock on that day.

        MS. ESTES:  Mr. McLeod, you can take that down.

Q.  Speaking of other buyers in the market, Dr. Johannes, did

you undertake an analysis of how the at-issue securities performed on days when Archegos wasn't buying?

A.  I have.

        MS. ESTES:  Let's pull up for the witness Defense Exhibit 9240.

Q.  Dr. Johannes, I think you may be able to clear the red circles on your screen.  I don't know if you could see that at the bottom.

A.  Sorry.

Q.  Great.

        Dr. Johannes, do you recognize this document?

A.  I do.

Q.  And is this the analysis that you just described?

A.  Yes.

        MS. ESTES:  Your Honor, we offer Defense Exhibit 9240.

        MR. THOMAS:  Based on yesterday's conversation, no objection, your Honor.

        THE COURT:  Received.  Show it.

        (Defendant's Exhibit 9240 received in evidence)

        MS. ESTES:  Thank you, your Honor.

Q.  Dr. Johannes, now that the jury can see this chart, first of all, what does this chart represent?

A.  So this chart shows the cumulative returns on the at-issue stocks, at-issue long stocks.  On days when Archegos was not trading or they weren't buying, they could have been selling on

net.

Q.   Why did you undertake an analysis of what the stock looked like on days where Archegos wasn't trading?

A.   So interested to understand the relationship between -- sort of a more general relationship, as opposed to the specific examples we went through earlier, of how Archegos' trading related to stock price movements, and, in particular, if the stock prices went up, was Archegos trading when the stock prices went up.

Q.   What time period does this cover?

A.   This is from October 1, 2020 through March 19, 2021.

Q.   Let's look at the blue bar on the left there.  What does that bar represent?

A.   That's BIDU stock, and on the Y axis you can see the cumulative return.  It's about 175 percent.  And that says that BIDU's stock went up by 175 percent on days that Archegos wasn't trading.

Q.   It underneath BIDU it says 45 days.  What is that a reference to?

A.   That would be the number of days that Archegos was not trading BIDU during this period of time.

Q.   So let's look at the next one, discovery class A.  What is the cumulative return on days where Archegos is not trading or not net buying?

A.   It's over 50 percent.

THE COURT:  Would you add up the notional profits of a company on days that Archegos did not trade?

THE WITNESS:  It's not the profits.  It's the changes in the stock price.  So it's the stock returns on those days.  So, for example, it could have gone up 5 percent on one day and 7 percent on another day, so I would accumulate those returns.

THE COURT:  And returns means increases of value?

THE WITNESS:  Percentage increases in value, correct.

THE COURT:  They are not returns because you are not realizing them.  They are notional.

THE WITNESS:  That is correct.

Q.  Dr. Johannes, for any of these stocks, was the number negative, was the cumulative return of the price negative on days Archegos didn't trade?

A.  No.  It was positive for all of these -- all of the at-issue stocks.

Q.  What was it for Farfetch?

A.  Farfetch, it was almost 250 percent.

Q.  Then what was it for Viacom?

A.  For Viacom it was a little bit more than 50 percent.

Q.  Dr. Johannes, what conclusions, if any, do you draw from this chart?

A.  I wanted to understand more generally whether Archegos' buying was associated with stock price increases.  And in order to understand the impact of Archegos, I wanted to look on days

they didn't trade.  Because if stock prices had been inflated due to Archegos' trading, you would expect that, on days they didn't trade, the stock prices would go back down if the increases had been because of their buying activity.  Not only did the stock prices not go down on the days they didn't trade, actually, the stock prices went up on the days they didn't trade.

So from that I would conclude that, like the other pictures, why did the stock prices go up.  It went up because of a combination of news for these companies, could have been other optimistic investors investing, could have been industry news.  But factors unrelated to Archegos' trading drove these large price increases on days they didn't trade.

Q.  Dr. Johannes, did you undertake a similar analysis for a longer time frame, from March 2020 to March 2021?

A.  I did.

Q.  And did you similarly see positive cumulative returns on days Archegos didn't trade?

A.  Yes.  The results were, I guess, qualitatively similar, although the numbers were different for the different time period.  But each of the stocks -- every one of the stocks had gains on days when Archegos was not trading in the market.

MS. ESTES:  We can take that down.

Q.  Dr. Johannes, I want to talk a little bit about the mechanics of swaps.  And is that something that you are

familiar with from your academic research?

A.   Yeah.  One of the main areas of my academic research is our derivatives markets and, in particular, over-the-counter derivatives markets, markets that are not on an exchange but where you would pick up the phone and call or otherwise call an investment bank and execute a trade.

Q.   So when an investor buys a total return swap, does it buy the underlying share of the security?

A.   No.

Q.   Who, if anyone, buys the underlying share?

A.   So when you execute a total return swap, the person sort of buying the total return swap just gains exposure to it.  The counterparty, in this case a dealer bank, would often or would typically even buy the underlying stock to hedge their exposure in the total return swap.

Q.   Does the person buying the swap control the hedges of that counterparty dealer?

A.   They don't.

Q.   Can you explain why not.

A.   After the derivative contract, a total return swap just means if the stock goes up, you have a million shares total return swap and the stock goes up $10, you make $10 million.  It's a derivative contract.  It's not the same as owning the underlying shares.  If the dealer chooses to hedge their position on the other side of a trade with Archegos, what the

dealer does in how they hedge, when they hedge or what they do with their hedges subsequently has nothing to do with Archegos per se.

Q. Do counterparties have incentives to offload their hedges?

A. They do.

Q. Can you explain those.

A. Sure. In the example earlier, Archegos buys a total return swap from, say, Morgan Stanley. Morgan Stanley may buy the underlying shares to hedge that. Morgan Stanley does that because they are making fees off the transaction, so Archegos is paying fees for this derivatives contract to Morgan Stanley.

Now, if Morgan Stanley could find another investor to takes the opposite position to Archegos, Morgan Stanley can get rid of the underlying shares, and in that situation they would be charging fees twice, but they don't have any underlying sort of capital invested in it because, say, a long total return swap for one hedge fund is offset or -- for Archegos is offset by a short total return swap from another hedge fund. So the bank doesn't have to hold any shares then, but they earn double the fees. So that's one example where a bank can -- where it is incentivized to find another counterparty to take the other side of the position.

THE COURT: Someone is holding the hedge shares.

THE WITNESS: That's correct. In that case they would be sold back to the market.

Q.   Dr. Johannes, you said that was one example.

THE COURT:  Go back to the market in what sense?

THE WITNESS:  The dealer, if they found an offsetting short total return swap, they would sell their -- if they had a hedge, they would sell the underlying hedge into the market, and there would be some other buyer who would buy those shares and possess them.

THE COURT:  The result of a swap would be that there would be somebody buying additional shares.

THE WITNESS:  When the swap is initiated, it's common or typical for the dealer to hedge it.  But what happens subsequently, for example, if the dealer found someone to take the opposite position, then the dealer would sell those underlying shares.

THE COURT:  Endlessly numbers of times perhaps.

THE WITNESS:  Endlessly.  They go back into the market, and then they just circulate in the market.

THE COURT:  But as a result of the swap, it's the same as buying the shares, only instead of you owning it, somebody else owns it.

THE WITNESS:  You have exposure to a bank.  What the bank subsequently does, you don't know.  So you don't really know if they hold the shares or if they found another person to offset them.

THE COURT:  Typically, though, somebody is going to be

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

holding those shares.

THE WITNESS:  I guess, always somebody is holding the shares.  You don't know if it is the dealer or if they have sold it off to someone else in the marketplace.

Q.  Dr. Johannes, you said an offsetting total return swap might be one example of how a counterparty can offload hedges. Were there any other examples?

A.  Yeah.  The other main example would be through the process of short selling.

Q.  How does that work?

A.  Short selling is the opposite of buying.  If you want to buy a stock, you give money and you acquire something you didn't have.  Short selling is a process where you can sell something that you don't already own.  If I were to short-sell a stock, I would find somebody who has the stock, I'd borrow it from them, and then I'd sell it into the market.  That's the process of short selling.  And I do that because I think the stock price is going to go down, and later I'll buy it back at a lower price.

So the key to short selling is, you have to find someone who already has the stock, and a common source to borrow shares to sell are the dealer banks themselves.  They have, for instance, hedges in a stock, and they are generally happy to lend those shares out to a short seller because the short seller pays fees to them to borrow the stock.  And so

that's another situation in which the bank has incentives, if they have a trade with Archegos, to find someone else to take the other side of it so they can earn fees on both legs.

Q.   Dr. Johannes, did you look at any data related to short interest in the at-issue long positions?

A.   I have.

Q.   At a high level, what did you see in that data?

A.   So short interest gives the sense of -- it's an estimate, because it's hard to know exactly, but an estimate of how many shares have been short sold.  And for all of the at-issue companies, they had shares that had been short sold, but that's not at all unusual.  Most companies have some shares that have been short sold, but there is a huge range.  Some have very few.  Some have more.  All of them did have shares that had been short sold.

Q.   So what, if anything, did you learn from the data?

A.   Short selling is a natural activity.  Just like if you think something's price is going to go up, you can buy it, if you think something's price is going to go down, you can short-sell it.

     The fact that they are short selling to me is just a sign of sort of -- it's a sign of, I guess, normal market activity.  But, in particular, that if you wanted to short-sell it, you have to find the shares.  And the fact that there was short selling out there tells you that short sellers were able

to find the shares in order to sell them into the marketplace.

Q.  Dr. Johannes, did Archegos control most or all of the available shares in the at-issue securities through their swap positions?

A.  They did not.

Q.  Can you explain why not.

A.  As I said before, after Archegos or any counterparty enters into a total return swap with a dealer bank, the earlier example of Morgan Stanley, whatever Morgan Stanley does with those shares later, the original counterparty there, Archegos, doesn't have any control, and they also don't know what they have done with those shares.

Q.  Dr. Johannes, I want to switch topics slightly.

Did you analyze the volume in the relevant securities from October 2020 through March 2021?

A.  I have.

MS. ESTES:  Can we pull up for the witness Defense Exhibit 9239.

Q.  Dr. Johannes, you recognize this as your analysis of volume?

A.  I do.

MS. ESTES:  Your Honor, we offer Defense Exhibit 9239.

MR. THOMAS:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 9239 received in evidence)

MS. ESTES:  Thank you, your Honor.

Mr. McLeod, can you publish.

Q.  Dr. Johannes, now that the jury can see this, can you explain what this chart shows?

A.  Sure.  For each of the at-issue stocks, I've calculated average daily trading volumes in terms of number of shares changing hands, and I have done it for two periods.  The first period is 2019, think of sort a normal market period of time, and then the second period is October 2020 to March 2021.  For this period I've calculated it excluding Archegos' related trading activities, which assumes that they entered into a total return swap, the counterparty fully hedged the position.

Q.  Why did you undertake the analysis?

A.  Similar to the other analysis, I wanted to understand what was going on in the market unrelated to Archegos' trading activity.  And so previously we looked at price and volume charts, and this is a more general analysis of overall trading volumes.

Q.  Let's look at one example there.  What did the market volume for Viacom look like in 2019?

A.  In 2019, Viacom traded about 4 million shares per day.

Q.  And then what about in this later period, October 2020 to March 19, what did the volume, excluding Archegos, look like during that time?

A.  If you take out the Archegos related trading, it was

trading about 13 million shares a day over this period of time.

Q.   What significance, if any, do you find here?

A.   The dramatic increase in trading volumes tell me that not only was there a lot of activity, but for every trade there is a buyer and a seller, so there were a lot of other buyers buying Viacom's stock over this period of time.  In fact, the case of Viacom is many times more than we saw in prior years.

Q.   Let's look at another example.  What do you see for BIDU there?

A.   For BIDU, in 2019, it was about three and a half million shares traded per day, and then in October through March, excluding Archegos, it was about seven, almost eight million shares per day.

Q.   How would you describe the pattern here for the other at-issue stocks?

A.   In general, the trading during the October to March period, taking out trading potentially related to Archegos, was generally higher, but, at a minimum, similar to what it was in 2019.  This is important because this takes out Archegos' related trading.  So the non-Archegos trading during October was similar to or more often higher than it was in earlier time periods.

Q.   Is there one where it's lower?

A.   Yes.  If you look at Texas Capital Bank Shares, the non-Archegos trading during this period was a little bit lower

than overall trading in 2019.

Q.   Looking at this chart holistically, what, if any, conclusions can you draw?

A.   Relative to prior periods, and if we take out Archegos-related trading, there was more trading activity. Again, every time there is a trade, there is a buyer.  During this period of time, there were more people buying the at-issue stocks on a typical day -- this is the average trading day -- over the October to March period than there were in, say, 2019.

          MS. ESTES:  Mr. McLeod, you can take that down.

Q.   Dr. Johannes, we talked about meme stocks a little bit earlier.  Did you analyze Archegos' trading in GSX during the meme stock period?

A.   I have.

          MS. ESTES:  Let's pull up Defense Exhibit 9148.

Q.   Dr. Johannes, you recognize this?

A.   I do.

Q.   Is this the analysis of GSX trading during the meme stock period?

A.   Yes.

          MS. ESTES:  Your Honor, we offer Defense Exhibit 9148.

          MR. THOMAS:  No objection.

          THE COURT:  Received.

          (Defendant's Exhibit 9148 received in evidence)

          MS. ESTES:  Thank you, your Honor.

Q.   Dr. Johannes, now that the jury can see this, what is the time frame we are looking at here?

A.   This is from mid January, January 13, through the end of January, January 29.

Q.   Is this during the height of the GameStop movement?

A.   Yes.  The main GameStop, the sort of most extraordinary day during that whole episode was January 27.

Q.   Let's look at the GSX price on January 13.  What does the price look like on that day?

A.   It's about $55 a share.

Q.   And then where does it go to on January 27?

A.   It goes -- it has increased to more than $140 a share.

Q.   How would you describe an increase like that?

A.   That is an extraordinary price increase, 55.  It's more than a hundred percent in a couple of weeks' time.

Q.   On the day of that increase, with the really high blue bar there, what does Archegos' trading look like?

A.   Archegos sold a couple of million shares or reduced their total return swaps position by a couple of million shares on that day.

Q.   So the day it's shooting up they are selling?

A.   That's correct.

Q.   Did they contribute to the price increase on that day?

A.   No.  Because they weren't buying.  They were selling on that day.

Q.  Dr. Johannes, are you familiar with the concept of cornering the market?

A.  I am.

Q.  What does that mean?

A.  A market corner or cornering refers -- it's typically used in the context of commodity markets, and it refers to a situation where a market participant acquires all of the underlying commodity that needs to be delivered for, say, a derivatives contract, like a futures or a swap.

So, for example, you could have a corn contract, and in a month someone needs to deliver physical corn.  And cornering refers to a situation where a market participant buys all or much of the actual corn that can be delivered because these contracts have specifications that you have to deliver a certain grade of corn on a certain day in a certain location. And cornering refers to a process whereby a participant buys a large fraction of that corn, say, and locks it away in a silo.

So then when other market participants, who are short the contract, they have to physically deliver the corn, but they can't find the corn because somebody else has bought it and kind of locked it away.  That is sort of the general -- at least, in finance when people refer to cornering of a market, that's sort of the general mechanism that occurs in a stock -- in a corner, which is typically in a commodity market.

Q.  Do you have an opinion on whether Archegos had cornered the

market in GSX?

A.   I do.

Q.   What's your opinion?

A.   GSX did not corner the market.  Sorry.  Archegos did not corner the market in GSX in January of 2021.

Q.   Can you explain.

A.   Sure.  So there is two related factors here.  The first is, as you can see, over this period of time, the stock price went up a lot, but it wasn't Archegos' trading driving it.  So they either traded very small amounts, didn't trade at all, or were actually selling into these price increases.  It certainly wasn't their active trading inflated or pushed up prices.

But, secondly, as I mentioned earlier, when you enter into a total return swap, you don't control what the counterparty does with any hedges that they have.  So even if say Morgan Stanley had bought some shares of GSX, Archegos doesn't control those at all.  Morgan Stanley can do with those as they see fit.

Because they weren't buying to push the price up over this period of time and because they didn't control the underlying stock, they didn't take the stock and lock it away somewhere, they did not corner the market in GSX.

Q.   Does the high volume of trading you see on certain days in this chart tell you anything about cornering the market?

A.   It says there was a lot of other trading activity.  Again,

for every trade, there is a buyer and seller, so somebody was able to buy the stock, somebody was able to sell the stock.

For instance, on January 27, this main meme stock day, when GameStop went up a lot, there were over 3 million shares of GSX that traded in the market, and Archegos was actually a seller on that day.

Q.  Dr. Johannes, I believe you mentioned Melvin Capital had short exposure to GSX, is that correct?

A.  Yes.

Q.  And that company was one of the targets of the meme stock movement, correct?

A.  That company meaning?

Q.  Melvin Capital.

A.  Correct.

MS. ESTES:  Now, let's take that down.

Q.  Dr. Johannes, did you also look at the price of Viacom during the meme stock period?

A.  I have.

MS. ESTES:  Let's pull up Defense Exhibit 9162.

Q.  Do you recognize this, Dr. Johannes?

A.  I do.

MS. ESTES:  Your Honor, we offer Defense Exhibit 9162.

MR. THOMAS:  No objection.

THE COURT:  Received.  Show it.

(Defendant's Exhibit 9162 received in evidence)

MS. ESTES:  Thank you, your Honor.

Q.  Dr. Johannes, now that the jury can see this, what stock does this look at?

A.  This looks at ViacomCBS.

Q.  What time period does this cover?

A.  This is the same time period during this meme stock period.

Q.  So let's look at the price of Viacom during this period. Where does it start on January 13?

A.  $43 a share.

Q.  And then where on January 27, where does it end that day?

A.  Maybe $46 a share.

Q.  What is the price increase you see there?

A.  About 10 percent.

Q.  What significance, if any, do you draw from this?

A.  So a couple of things.

One, the stock price increased a fair bit over this time.  While Archegos was buying, you can see on many days, relative to market volume these were not large transactions. And, in particular, on the 27th, there were 45 million shares of Viacom that were traded, and Archegos did buy on that day but a small amount.

And this is the exact same time period of this meme stock craze where we saw this same pattern in other stocks, where stock prices are going up, and you have dramatically higher trading volumes.  You can see, on the 27th, the trading

volume of 45 million is far more than any other day before this or subsequently during this time period.

Q.   Looking at January 28, the stock price goes down on that day, right?

A.   Yes.  It declines from 46 to about 40.

Q.   So what does Archegos' trading volume look like on that day?

A.   Archegos increased their trading and bought a significant number of shares on that day or increased their exposure significantly on that day.

Q.   Are you familiar with the term buying the dip?

A.   Yes.

Q.   What does that mean?

A.   Buying the dip is somewhat self-explanatory, but you have a stock price that goes down and you buy it when it goes down. You think if you're an investor who is optimistic who thinks the stock price is going to be higher, if the stock price goes down, you're getting it at discount.  It's kind of like, when you go to the store and something you want to buy is on sale, so you buy more of it because its price is cheaper.  That's this term of buying the dip.

        MS. ESTES:  Mr. McLeod, you can take that down.

        Mr. McLeod, can we pull up what's in evidence as Government Exhibit 9005, page 95.

Q.   Dr. Johannes, did you review this chart before your

testimony?

A. Yes.

Q. What stock does this cover?

A. This is for Vipshop, which is an online retailer, largely in China.

Q. Can you see the stock price for Vipshop during this period. How is it represented in the chart?

A. So the stock price is in black, so it goes up from 20 or 22 to $45.

Q. And then do you see the yellow and blue lines on this chart too?

A. I do.

Q. What do those represent?

A. The yellow line is an index called the XRT, and the blue line is an ETF, if I recall, that is associated with the index of Chinese companies.

Q. Can you draw any conclusions from the fact that a stock price outperformed an index?

A. In general, it's hard to draw any meaningful conclusions when just comparing an individual stock to an index.

Q. Why is that?

A. If you think of what an index consists of, say the S&P 500, there are 500 different companies in it, and over any given period of time, some of the stocks go up, some of the stocks go down, and some of them are unchanged.

At any point in time you can look and say, here is some stocks that outperform the index, and here are some stocks that went down more than the index did.  But it is hard to make any meaningful conclusions because that's just the nature of an index.  If you have a lot of different stocks, some of them could go up a lot, some of them could go down a lot.  And the fact that any given stock went up more or went down more than an index itself doesn't provide any meaningful information other than the fact that some stocks -- it's not uncommon for stocks to outperform the index and it's not uncommon for stocks to underperform an index also

Q.  Dr. Johannes, did you do any comparison between the Vipshop stock price and the individual companies within the indices?

A.  I have.

MS. ESTES:  Let's pull up Defense Exhibit 9243 for the witness.

Q.  Dr. Johannes, do you recognize this?

A.  I do.

Q.  What does this represent?

A.  So this is a stock price chart comparing the two at-issue online retailers, Vipshop and Farfetch, to our retail EFT, which I think Dr. Taveras used as a comparison.

Q.  Let me pause you right there, Dr. Johannes.

MS. ESTES:  Your Honor, I would offer Defense Exhibit 9243.

MR. THOMAS: Subject to yesterday's discussion, no objection.

THE COURT: Received.

(Defendant's Exhibit 9243 received in evidence)

THE COURT: The objection yesterday was overruled.

MS. ESTES: Thank you, your Honor.

Q. Dr. Johannes, now that the jury can see this, can you describe what this shows.

A. Yes. Sorry for jumping the gun there.

So I want to do compare the performance of the two online retailers, Vipshop and Farfetch, to the stocks in the index that Dr. Taveras made the comparison to. So this is the S&P retail EFT which tracks the S&P retail index.

There is a lot of stocks in this index. So in order to focus the analysis, I picked the stocks in that index that went up more than Vipshop -- sorry -- more than Farfetch.

Q. And did some also go lower than Vipshop and --

A. Yes. As I mentioned, when you have a broad index, some stocks go up, some stocks go down.

Q. The little blue line there that's at the top, what does that represent?

A. So that is the performance of Vipshop. And to do this, since there is so many different stocks, I had to normalize it, so I did the following experiment. Suppose you had hundred dollars and invested it in the stock, what would the value of

that have been over time.  So I did that for every stock in the index.

Q.  Dr. Johannes, just so we are all clear, can you circle on the screen where the stock price for Vipshop is.

A.  It's a little bit hard to see, but at the end it's there.

Q.  The slightly darker blue?

A.  Yeah.

Q.  What is the light blue one you see at the top, what is that company?

A.  I think it's Rubicon Project.

Q.  What about the orange one that you see, the second highest one, what do you see there, what company is that?

A.  I think that's Blink Charging.

Q.  Which line represents Farfetch?

A.  Farfetch is the green line.  So the box -- the color of the box matches the stock price.  So towards the bottom there, that sort of bright green line is Farfetch's stock price.

Q.  What conclusions, if any, can you draw from this?

A.  As I mentioned earlier, when you have a broad index, some stocks go up, some stocks go down, and you don't want to compare to the overall index because we know that there is a lot of variation underneath it.

So what I did was compared it to the underlying companies, and from this I conclude a couple of things.  There were many other companies over this period of time in

Dr. Taveras' index which went up by more than Vipshop or Farfetch, and you can see that many of these stocks did go up over this period of time, but the performance of Vipshop or Farfetch, relative to these stocks, wasn't, in particular, extraordinary.  There were other stocks, as you can see, that went up a lot more.  Some went up and some came down.  But the performance of these wasn't notable in particular.

Q.  Dr. Taveras also compared some of the stocks to the Golden Dragon Index.  Did you also look at the performance of companies within that index?

A.  I have.

MS. ESTES:  Let's take this down and pull up Defense Exhibit 9241 or 9235.

Q.  Do you recognize this, Dr. Johannes?

A.  I do.

Q.  Is this the comparison involving the Golden Dragon Index?

A.  Yes.

MS. ESTES:  Your Honor, we offer Defense Exhibit 9235.

THE COURT:  The objection was overruled yesterday. The document is received.

(Defendant's Exhibit 9235 received in evidence)

MS. ESTES:  Thank you, your Honor.

Mr. McLeod, can you please publish.

Q.  Dr. Johannes, now that the jury can see this chart, what does it represent?

A.   So this represents a comparison of the Chinese ADR at-issue stocks that Archegos held from October to March, comparing to now all the stocks in the NASDAQ Golden Dragon's index, this index of Chinese stocks that trade in the U.S.  You can see there is many lines here, and I tried to include now all of the stocks in the index and not just the ones that outperformed. It gets hard to see all of them, because there is so many stocks, but --

THE COURT:  You run out of colors.

MS. ESTES:  True, your Honor.

A.   You also have to squint to see the names at the bottom.

Q.   Fair enough, Dr. Johannes.

So the boxes on the right there, what companies are those?

A.   Those are the Archegos -- the at-issue long stocks that Archegos held, as well as FUTU, which was a large short position at Archegos.

Q.   What's a short position?

A.   A short position in this context is a stock that Archegos had short exposure to, meaning if the stock went down, they would have made money; and if the stock went up, they lose money.

Q.   Which of Archegos' stocks within this Golden Dragon Index performed the best?

A.   Actually, the highest performing stock in the index was the

stock that Archegos had a large short position in.

Q. FUTU?

A. Short exposure to, which was FUTU.

Q. What conclusions if any, do you draw from this chart?

A. As I said earlier, it's hard to compare an individual stock to a broad index, and it's better or to me it's more useful to look at the comparisons to the underlying stocks. However, when do you that, what you see is, stock prices are moving all over the place. So for these stocks, many stocks had really dramatic increases. Some of them went up, some of them came down. But the at-issue stocks, I wouldn't say, were remarkable at all, and in fact the stock that went up the most was the one that Archegos had been shorting or had short exposure to over this period of time.

MS. ESTES: We can take this down, Mr. McLeod.

Q. Dr. Johannes, did you also do an analysis of streaming companies and their performance during this period?

A. I did.

MS. ESTES: Let's pull up for the witness Defense Exhibit 9237.

Q. Dr. Johannes, do you recognize this?

A. I do.

Q. Is this your streaming analysis?

A. I do.

MS. ESTES: Your Honor, we offer Defense Exhibit 9237.

MR. THOMAS:  No objection, your Honor.

THE COURT:  Received.

(Defendant's Exhibit 9237 received in evidence)

MS. ESTES:  Thank you, your Honor.

Q.  Dr. Johannes, now that the jury can see this, what does this analysis show?

A.  So this analysis is a similar price chart, but it compares to -- compares Viacom and Discovery and IQ, which were the three companies, at-issue companies that were launching streaming services, to other companies that either had streaming services or were launching new streaming or streaming-related services.

Q.  Where is Viacom represented on the chart?

A.  Viacom is the dark blue -- the dark blue line.

Q.  Where is discovery on the chart?

A.  Discovery class A is the bright green line.

Q.  What is the dark purple line at the top of the chart?

A.  The dark purple line is Fubo TV, another company that had a TV steaming service that was launched.

Q.  What about the gray line right below the purple?

A.  The gray line is Bilibili, which is a Chinese streaming service.

Q.  Do you see some lines at the bottom that are relatively flat?

A.  I do.

Q.   What are those?

A.   The kind of neon green line is Netflix and the line at the bottom is IQ, one of the at-issue companies.

Q.   What conclusions, if any, do you draw from this chart?

A.   So there is a wide range of behavior among streaming companies, so you see some like IQ either didn't go up a lot or were roughly flat.  An incumbent firm, like Netflix, which a lot of people have already subscribed to, you can see that's the bright green light, it's sort of flat over this period of time.  And then the prices of these other companies which were introducing streaming or streaming-related services generally went up, but they were extremely volatile.  Some of them went up by a lot and then came down.  Other ones were sort of trending up over this period.

As I said earlier, it's hard for me to draw a lot of meaningful conclusions from these comparisons because when you look at a number of different companies, some of them go up, some of them go down.  In a given industry there could be winners, there could be losers.  And so if you narrow the window down to these streaming related companies, there were many stocks that had larger price increases at times and there were stocks that didn't go up at all.

MS. ESTES:  Mr. McLeod, you can take that down.

Switching gears a little bit, Dr. Johannes, let's pull up what's in evidence as Government Exhibit 9005, page 6.

Q.   Did you review this chart before your testimony?

A.   I have.

Q.   To be clear, is this your chart?

A.   No.

Q.   Does this chart show you anything about the total level of Archegos' portfolio in 2019?

A.   No, it does not.

Q.   Did you see an analysis of the concentration of Archegos' portfolio in 2019 and other years?

A.   I have.

MS. ESTES:  Let's take this down and pull up defendant Exhibit 9133.

Q.   Do you recognize this, Dr. Johannes?

A.   I do.

Q.   And is this your analysis of concentration in Archegos' portfolio over time?

A.   Yes.

MS. ESTES:  Your Honor, we offer Defense Exhibit 9133.

MR. THOMAS:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 9133 received in evidence)

MS. ESTES:  Thank you, your Honor.

Q.   Dr. Johannes, now that the jury can see this, what does this chart show?

A.   So this chart shows the concentration in Archegos'

portfolio as measured by the concentration, the position size of their 10 largest investments as a percentage of all their long investments. So if you own 50 stocks, this would be the fraction of your overall long portfolio invested in the top 10 stocks in your portfolio, the ones you hold largest positions in.

Q. Looking at June 2015, what does the bar there represent?

A. So the bar represents, if you look at these top 10 positions, what fraction of their total long book or long portfolio did those top 10 names represent. And a number of 90 percent says that the top 10 positions were 90 percent of their overall long stock exposure at that time.

Q. Would you describe that as a concentrated portfolio?

A. That's a very concentrated portfolio.

Q. What is the concentration level in December 2020?

A. In December 2020, it's also about 90 percent.

Q. So what, if anything, do you conclude from this?

A. This chart shows me that Archegos held a very concentrated portfolio. I would even refer to a number at 60 or 70 percent as a concentrated portfolio. So over the entire period of time there was a characteristic that they intended to hold a highly concentrated portfolio of long stocks.

Q. Dr. Johannes, did you look at the concentration of Archegos compared to other concentrated investors?

A. I have.

MS. ESTES:  Let's pull up Defense Exhibit 9134.

Q.   Dr. Johannes, do you recognize this?

A.   I do.

Q.   What does this show?

A.   This is a comparison of -- a list of other, in my view, well-known investors who hold concentrated portfolios, concentrated long portfolios of stocks.

MS. ESTES:  Your Honor, we offer Defense Exhibit 9134.

MR. THOMAS:  Subject to the Court's earlier ruling, no objection.

THE COURT:  Received.

(Defendant's Exhibit 9134 received in evidence)

MS. ESTES:  Thank you, your Honor.

Q.   Dr. Johannes, now that the jury can see this, what does this chart represent?

A.   This chart represents the long positions as a fraction -- sorry.  Let me back up.  It represents the concentration, the value of the top 10 positions as a fraction of the total long positions for a number of different investors who hold concentrated portfolios.

Q.   Let's look at the left side there, where it says Berkshire Hathaway at the bottom.  What is Berkshire Hathaway?

A.   Berkshire Hathaway is the holding company that Warren Buffet runs.

Q.   What is the first dark blue, the darkest blue bar

represent?

A.   That's the long concentration in December 2019.

Q.   Then what do the other three bars represent there?

A.   Concentration in December 2020, December '21, and December 2022.

Q.   What sort of concentration levels do you see there for Berkshire Hathaway?

A.   They run concentration in their long book of roughly 80 percent or higher.

Q.   Can you see on this chart how that compares to Archegos' concentration?

A.   Yes.   The red line was Archegos' concentration in March 2021 and, if you recall, that was roughly the highest it had been, about 90 percent.

Q.   Let's look at the third one there.   What's the third company you see?

A.   That is Pershing Square.

Q.   Whose company is that?

A.   It's a hedge fund or investor company run by Bill Ackman.

Q.   What's the concentration levels you see for Bill Ackman's funds?

A.   It's close to a hundred percent.

Q.   What, if any, conclusions do you draw from this?

A.   It's not uncommon for investors to hold concentrated positions.   These are very high levels of concentration, but

other investors hold concentrated portfolios or, in this case, concentrated portfolios of long stocks.

Q.   What's the purpose of having a concentrated portfolio?

A.   I think it's easy to understand if you back up and think of, what's the goal of holding, say, the overall market portfolio.  It's, you are going to get kind of the average return on a really broad list of stocks.

The goal of concentrated portfolio is to outperform the market.  And if you have a small number of companies or a number of companies that you have a high conviction in, if you hold a concentrated portfolio and if your investment thesis is right, you're going to have really high returns.  So the general goal of holding a concentrated portfolio is to outperform the market and, presumably, for hedge funds by a lot.

MS. ESTES:  We can take that down.

Q.   Dr. Johannes, did you do any analysis of Archegos' leverage over time?

A.   I have.

MS. ESTES:  Let's pull up Defense Exhibit 9137.

Q.   Dr. Johannes, do you recognize this as your analysis of leverage?

A.   I do.

MS. ESTES:  Your Honor, we offer Defense Exhibit 9137.

MR. THOMAS:  No objection.

THE COURT:  Received.

(Defendant's Exhibit 9137 received in evidence)

MS. ESTES:  Thank you, your Honor.

Q.  Dr. Johannes, now that the jury can see this, what does this chart show?

A.  So this chart shows Archegos' leverage, which is sort of their total exposure divided by their capital from 2018 to 2021.

Q.  What does the blue line show?

A.  The blue line gives their exposure.  So, for example, a number of 500 percent, you have $100 in capital and you have exposure to $500 in stock, so that would be how to interpret that number.

Q.  What does their leverage look like in September 2019?

A.  In September 2019, I am going to just mark it on here, it's about six times leverage.

Q.  What do you see their leverage at the beginning of March 2020?

A.  In the beginning of March 2020, it's a little bit higher. It's closer -- it's closer to about seven.

Q.  So then can you just walk through how you see their leverage evolving through 2021.

A.  Sure.

The COVID period is in blue, and you can see that their leverage declined from about seven to closer to four by

the summer of 2020, and then their leverage increased back up.
Again, to increase your leverage, either your capital falls or
your exposure increases, and in this case it was largely their
exposure increase.  They were adding to their positions.

So by September, October 2020, it was back to about
six, so a little bit below where it was before COVID broke out,
I will just mark that here, and similar to where it was in
2019.

Q.  I think there is a dip later on the screen.  Is that
happening in early 2021?

A.  Yes.

Q.  What can cause leverage to fall?

A.  Leverage can fall either because the numerator, your
exposure goes down, or because your capital goes up.  If you
have $500 in stocks and a hundred dollars in capital, if your
leverage goes up -- sorry -- if your capital increases, your
leverage goes down.  Alternatively, you could sell off stocks
and reduce your position for the same amount of capital and
that would cause your leverage to decrease.

Q.  How would you describe Archegos' leverage in 2021, compared
to at the end of the year in 2020?

A.  So their leverage decreased significantly in
January 2020 -- January 2021.

Q.  If leverage falls and you want to get back to a target
level of leverage, what do you have to do to get back to the

target?

A.   You would have to increase your exposure.

Q.   When you say increase your exposure, what do you mean?

A.   You can think of that as adding to your positions, so adding exposure to the long stocks.  You could think of that as buying the stocks, although they entered into total return swaps, for the most part.

          MS. ESTES:  Let's take that one down.

Q.   Dr. Johannes, can I request that you clear your screen again so the red circles go away.  Thank you.

          Dr. Johannes, have you analyzed trading volume in Viacom and BIDU on March 25 -- average daily trading volume on March 25, 2021 in dollar terms?

A.   I have.

          MS. ESTES:  Let's pull up Defense Exhibit 9160.

Q.   Do you recognize this, Dr. Johannes?

A.   I do.

Q.   Is this the analysis you just described?

A.   Yes.

          MS. ESTES:  Your Honor, we offer Defense Exhibit 9160.

          MR. THOMAS:  No objection.

          THE COURT:  Received.

          (Defendant's Exhibit 9160 received in evidence)

          MS. ESTES:  Thank you, your Honor.

          Mr. McLeod, can you please publish.

Q.   Dr. Johannes, now that the jury can see this, what does this chart show?

A.   This chart summarizes trading volumes in BIDU and Viacom for various look-back periods of five days, 10 days, and so on.

Q.   Is this relative to March 25, 2021?

A.   Yes.

Q.   So where it says five-day, what does that represent?

A.   What I do for this is, I look at every transaction during the day and the dollar amount.  So if you buy a hundred shares at $50 a share, that would be $5,000.  So for every transaction I add up the dollar-weighted trading volume, and then I average it, in the case of five days, for the previous five days in the market.

Q.   For this chart that would be the five days before March 25?

A.   Correct.

Q.   What was it if you're looking at the five-day average trading demonstrating for BIDU at that time?

A.   It was about $2.7 billion.

Q.   Then there are different intervals for 10, 20, 30 day.  Can you explain what those represent.

A.   Sure.

     Because trading volume on a day-to-day basis changes over time, it's common to look at different windows of time. So instead of looking at the average for the past five days, I looked at the average for the past 10, 20, and 30 days.

Q.  In the financial industry, do people look at different time periods to calculate average daily volume?

A.  Absolutely.

Q.  What are some common time periods people look at?

A.  I think different people look at different things, but it's certainly common to look at 5, 10, 20, 30, those sort of time intervals.

Q.  So these time intervals are representative of what's used in the industry?

A.  In my experience, yes.

Q.  Looking at the 30-day ADV for BIDU for March 25, what is it?

A.  $3.3 billion a day.

Q.  Let's just walk through the ADV you see for Viacom.  What is it for five days?

A.  It's $3.6 billion.

Q.  What is it for 10 days?

A.  About $3.2 billion.

Q.  What is it for 30 days?

A.  $1.8 billion.

        MS. ESTES:  We can take that down.

        Mr. McLeod, if we can pull up Defense Exhibit 9238.

Q.  Dr. Johannes, do you recognize this?

A.  Yes.

Q.  What does this chart show?

A.   This chart shows Archegos' net position increases for their long portfolio as a percentage of their capital.

          MS. ESTES:  Your Honor, we offer Defense Exhibit 9238.

          MR. THOMAS:  No objection.

          THE COURT:  Received.

          (Defendant's Exhibit 9238 received in evidence)

          MS. ESTES:  Thank you, your Honor.

          Mr. McLeod, can you publish.  Great.

Q.   Dr. Johannes, now that the jury can see this, what are you showing in this chart here?

A.   So this chart shows, for different stocks dates, trading -- dollar trading volumes, capital amounts, and then the size of the trade relative to the capital they had on the prior date.

Q.   Why did you look at the size of the trades relative to the capital amount?

A.   In my view, the dollar amount of the trade doesn't provide a meaningful comparison over time.

Q.   In your experience in portfolio management, do portfolio managers look at purchases as a percentage of capital?

A.   Yes.  It's common, I would say, both in my practical experience, but also in teaching classes.  When you look at portfolios, you typically think of it as a fraction of overall capital.  So, for example, suppose you have $100,000 in your retirement account and you buy $50,000 of the S&P 500, so that's a 50 percent trade or a 50 percent allocation.

However, if you had a million dollars in your account and you bought $50,000, that would only be a 5 percent trade. It would be a very small trade, even though the dollar amount is the same.

When the size of your account or the capital is changing over time, it's sort of an apples-to-oranges comparison if you're comparing dollars because if you have a small amount, a trade could look really big in terms of dollars. And if you have a big account, a small trade could be bigger than the trades were previously.

Because of that, it's common, when thinking through portfolios, to think, you do it in units of the account size.

Q. Looking here, how are these purchases ordered in the chart?

A. They are ordered from the trades that were the largest fraction of capital in the account to the lowest, but conditional on all of them being greater than 1 percent. So they were meaningful trades in the first place.

Q. Does this cover all of the trades that qualify here in Archegos' portfolio during this period?

A. No. It's just the ones that were greater than 1 percent. It also is just for the long stocks.

Q. But it's all trades greater than 1 percent in longs from January 2020 to March 2021?

A. That's correct.

Q. What is the largest purchase as a percent of capital?

A.   On April 20, 2020, in Alibaba, there was a trade of 13 percent of capital.

MS. ESTES:  Let's zoom out here.

Mr. McLeod, can you zoom into row 21 there.

Q.   What is this trade, Dr. Johannes?

A.   This is a long trade, a long purchase in Viacom in November 2020.

Q.   Is this the largest trade as a percentage of capital for Viacom during this period?

A.   Yes.

THE COURT:  I need a personal minute.  I'm sorry.

(Pause)

THE COURT:  Please continue, Ms. Estes.

MS. ESTES:  Thank you, your Honor.

BY MS. ESTES:

Q.   Dr. Johannes, just picking up here, I believe you testified, this is the largest Viacom trade during this time period, is that right?

A.   Yes.

Q.   When is the date of that?

A.   November 6, 2020.

Q.   Just for comparison, what is the trade you see above that at 20?

A.   Amazon.

MS. ESTES:  Let's zoom out.  Let's go to line 32.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

THE COURT:  Are these fill orders?

THE WITNESS:  These are actual trades.

THE COURT:  Single trades.

THE WITNESS:  Or at the end of the day, it's the amount traded on a given day.

THE COURT:  On that chart, the trades are the trades for a whole day or any particular trade?

THE WITNESS:  That's the accumulated trades on an entire day.

THE COURT:  Thank you.

MS. ESTES:  Thank you, your Honor.

Q.  For BIDU, Dr. Johannes, what does this line, line 32, show?

A.  So on April 8, they had a trade worth over 4 percent of capital in BIDU.

Q.  Was this the largest trade for BIDU as a percentage of capital during that period?

A.  Yes.  I think so.

MS. ESTES:  Let's zoom out.  Let's go to the second page, Mr. McLeod.

Q.  Dr. Johannes, is this second page just more trades that are over 1 percent of capital?

A.  That's correct.  In this the trade sizes were sorted by how large they were, so the largest ones are first.

MS. ESTES:  Let's look at row 78.

Q.  What's the date of that trade?

A.   March 23, 2021.

Q.   What is that trade as a percentage of capital?

A.   2.58 percent.

Q.   If it's the 78th row, what does that mean in terms of how it compares to other trades on this chart?

A.   There were at least 77 other trades in individual stocks or in total return swaps that were larger.

          MS. ESTES:  Let's zoom out and go to line 98.

Q.   What's the date of this trade for BIDU?

A.   March 23, 2021.

Q.   What is that trade as a percentage of capital there?

A.   About 2.2 percent.

Q.   So then how does this compare to other trades we see?

A.   As you can see by the row number, 98, that means there were 97 other trades in individual companies that were larger.

          MS. ESTES:  Let's zoom out here.

          Mr. McLeod, let's just go to the next page.  Let's go one more page, and one more page.  Let's go -- can we go to the last page, Mr. McLeod.

Q.   Dr. Johannes, looking at this chart, how many trades during this period were greater than or equal to 1 percent of net capital?

A.   337.

Q.   How would you describe trades of that size?

A.   I mean, they are all meaningful trades.  As I said, if you

have $100,000 in your account, buying a thousand dollars would be a 1 percent trade.  If you had $100,000, buying $5,000 would be a 5 percent trade.

Q.   Fair to say Archegos is a big buyer?

A.   They are a big buyer, but as measured as a fraction of capital, it's a couple of percent.

          MS. ESTES:  Let's take that down.

Q.   Dr. Johannes, turning to the week of March 22, 2021, did you analyze any news relevant to the companies in Archegos' portfolio that week?

A.   I did.

Q.   Was there any news related to Viacom that week?

A.   There was.

Q.   What was that news?

A.   During the week, Viacom announced a share sale.  They are going to sell additional shares of equity, as well as a convertible bond.

Q.   What happened to Viacom's stock in response to the news?

A.   So there is sort of two pieces of news.  The first is the announcement of the share sale and the second is the pricing of the share sale, at what price are the shares going to be sold.

          And, in response to that, Viacom's stock price crashed, so it fell by the most -- the two-day fall in Viacom's stock price was its largest fall in many years.  I looked back to 1990, and it was the largest two-day fall in Viacom's stock

history.

Q.   What significance, if any, does that have?

A.   It's not uncommon for stock prices to fall when companies announce share sales, and this was a very large -- the stock fell quite a bit when they announced the share sell.

Q.   Aside from that news related to Viacom, was there any news related to Chinese ADRs that week?

A.   There was.

Q.   What was that news?

A.   There were three different pieces of news that came out associated with the Chinese companies.

The first was a regulatory, news about the U.S., the SEC, the Securities and Exchange Commission, with sort of a regulatory clampdown on accounting of Chinese firms.  There were going to be new accounting restrictions or potentially new accounting restrictions on those firms.  And if the firms didn't comply with those accounting restrictions, they could be delisted from U.S. exchanges, meaning they couldn't be traded on the exchange.  They couldn't be traded on the New York Stock Exchange or the NASDAQ.  If you don't comply with accounting rules, you can't be traded on exchanges in the U.S.

The second bit of news was about a regulatory action in China where the government was going to set up a company to handle data associated with a number of technology companies. So I think if the technology companies had private data, that

there would be this government entity which would regulate or control the data.

The third piece of news was also out of China, which was that the regulatory authorities there were looking into Tencent, the big Chinese company, including its subsidiary, Tencent Music, which was one of the at-issue stocks.

Q.  How did the stock prices of Chinese ADRs react after this news?

A.  They generally fell, and they fell by a lot.

Q.  Does that include Archegos' Chinese ADRs?

A.  It does.

Q.  What about other Chinese ADRs that Archegos didn't own?

A.  As I said, most of the other Chinese ADRs, if you measure it by, say, the Golden Dragon's index, had significant drops also.

Q.  What about Archegos' short position, FUTU, did that stock price drop too?

A.  That also dropped.

Q.  Dr. Johannes, what significance, if any, did these two news events have in terms of Archegos' portfolio?

A.  Viacom's stock crashed.  Discovery is a closely related company issuing a streaming service.  That stock fell a lot. And this group of Chinese stocks also fell dramatically at the same time, during the same week.  And so you have large positions in concentrated portfolio that led to large losses.

Q.   Dr. Johannes, in your experience analyzing markets, was the occurrence of all these events around the same time unusual?

A.   It was.  If you think of a U.S. company like Viacom deciding to issue stock, that decision is independent of the SEC announcing accounting regulations for Chinese companies, which in turn is independent of Chinese regulatory authorities initiating a new data privacy program, which in turn is probably independent of an antitrust investigation of Tencent Music or Tencent's parent company.  So you have -- the news affecting Viacom and the news affecting the Chinese stocks are independent.  They are not related.  It's not as if one caused the other.

Q.   Dr. Johannes, what was the performance of the broader stock market during this period?

A.   So the overall market, if you looked at something like the S&P 500 or the NASDAQ index, was roughly unchanged.  I think maybe one was up a little and the other was down a little, but not meaningfully so.

Q.   What significance, if any, did that have in terms of Archegos' short portfolio?

A.   So Archegos had a number of hedge positions in place where they had short positions in broader stock market indices, things like the S&P 500 or the NASDAQ.

     Because the overall market didn't go down, those hedges didn't pay off that week.  It was the individual stocks

that went down, but not the overall market, due to, as I mentioned, the news in Viacom or the news coming out of China. So the hedges that they had placed on the overall market didn't pay off that week.

Q.  Dr. Johannes, what conclusions, if any, do you draw from this?

A.  The catastrophic losses the final week were triggered by news about Viacom, news about these Chinese companies, and those events were both really large and independent.  As I said, the drop in Viacom stock price was the largest two-day drop on record.  And then we saw a lot of these -- the Chinese ADRs all falling, not just the ones that Archegos owned sort of more broadly.

So you had these two independent events.  Certainly in the case of Viacom it was a very rare event.  It's sort of like earthquake hits and then a hurricane hits and they are not related to each other.  They just happen to occur at the same time.

MS. ESTES:  No further questions, your Honor.

THE COURT:  What do you want to do, Mr. Thomas?

MR. THOMAS:  I can start for 10 minutes, your Honor, and then we will pick it up tomorrow.

THE COURT:  Good.

CROSS-EXAMINATION

BY MR. THOMAS:

Q.   Good afternoon.

A.   Good afternoon.

Q.   I want to pick up where we left off.  But before I get to some of the particulars, I just want to make sure I understand your views on a few subjects more generally.

Are you a believer in the efficient markets hypothesis?

A.   It really sort of depends how you define that.

Q.   You talked a lot about news affecting stock prices.  Is it your view that news gets priced into the stock market?

A.   I mean it's my view that news affects stock prices, but my view of financial markets is that there is lots of different participants.  Different participants interpret things in different ways.  And because of that, when I see a piece of news and another person sees a piece of news, they may disagree about the news' importance.

So stock prices do react to news, but it's difficult in that it's not always clear what the effect of the news is.  People can disagree about that, and markets could take time to digest news.

Q.   So the stock price reactions that you described in response to news on direct, those were just your gut assessment of what occurred?

MS. ESTES:  Objection.

THE COURT:  Overruled.

A.  These were news events, and they occurred at the same time that stock prices moved, sort of in the same direction as the -- sort of as the implications of that news.

Q.  Let's turn to the final week since we left off there.  One piece of news that you focused on, which I think you described it or likened to an earthquake, was the regulatory development that the SEC announced?

A.  There were these three events that affected Chinese ADRs.  One was a regulatory event with respect to the SEC.

Q.  That's the one I want to pick up with.

When you likened that to an earthquake, was the idea to tell the jury it was unexpected?

A.  It wasn't that event.  It was the combination of those events that I likened to an earthquake.

Q.  The SEC regulatory event, should the jury understand you to be saying that it was a surprise?

A.  I mean, the news articles indicated that this was important news.  It's true that there had been rumors, I think, of SEC actions in the past, but the news articles that I read attributed -- it at least attributed part of the declines to this SEC regulatory action with regard to accounting of Chinese ADRs.

Q.  Dr. Johannes, my question is particular to surprise.  Should the jury take you to be saying that it was a surprise?

MS. ESTES:  Objection.

THE COURT:  Overruled.

A.  As I said, there is -- news can come in different forms. There can be rumors of something, and then there could be an article that says, this thing is going to happen.  If everybody already knew it was going to happen, it wouldn't be news. However, if there is new information in the news, that then becomes news.

Q.  Let's pick up on whether everybody knew it was already going to happen.

Are you aware, in late December of 2020, Congress passed a law called holding foreign companies accountable?

A.  I am aware of that.

Q.  Are you aware that that law mandated that within 90 days of its enactment that the SEC promulgate those very regulations?

MS. ESTES:  Objection.

THE COURT:  Overruled.

A.  I haven't read the details of the law.

Q.  You're not aware that it had a provision mandating that the SEC announce those regs in 90 days?

A.  I am aware that there is a law that had provisions, as you said.

Q.  In late December, that's 90 days before the week of March 22, right?

A.  Yes.

Q.  That was the SEC complying with the congressional mandate,

right?

A. The news --

MS. ESTES: Objection.

THE COURT: Overruled.

A. The news the week of -- that final week was that the SEC was indeed going to apply these new accounting rules.

Q. You described there had been rumors before. You would agree with me that an act of Congress is not a rumor so much as a law?

MS. ESTES: Objection.

THE COURT: Overruled.

A. Again, I am not an expert in law, but Congress can do things, and regulatory agencies, there can be some latitude of how or when they are going to do things. And so it's my opinion that the news that week on the SEC regulatory action was a bit of news that moved the market.

Q. Given that you weren't aware of the 90-day mandate, I take it that didn't factor into your assessment of the price impact of that news?

A. I didn't read the congressional law that was passed in December, no.

Q. Did the defense draw that to your attention?

MS. ESTES: Objection.

A. I'm sorry. I don't understand the question.

THE COURT: Sustained.

Q.  The other thing you said that was unprecedented was the Viacom issuance.  Did I hear that correctly?

A.  I didn't say that the Viacom issuance was unprecedented. Companies somewhat frequently issue -- it's not uncommon for companies to issue stock.

Q.  And that happens most commonly when the stocks run in price, right?

A.  It can happen in many periods of time.  In the financial crisis, banks in the U.S. issued stock when their stock prices were very low.  It can happen for various reasons and various times.

Q.  One of the times that it happens most commonly is when a stock runs up in price, right?

A.  I don't know about most commonly.  It can happen when stocks are low, when stocks are high.  It can happen at different periods of time.

Q.  Now, in your research related to this case, did you review analyst reports about Viacom?

A.  I have.

Q.  Did you review those reports to see if, in the lead-up to March, they were speculating about the possibility of an issuance?

A.  I have read many reports.  Sitting here right now, I can't recall offhand if there was a discussion in one or there were many reports on Viacom.  I can't recall offhand right now if

there were speculations or discussions of equity issuance per se.

MR. THOMAS:  Let's put up an example, which is in evidence, Government Exhibit 5503.

Q.  You recognize this to be an equity research report on Viacom from March of 2021?

A.  Yes.

Q.  And this one is published by Wells Fargo and one of the authors is Steven Cahall?

A.  That looks right.

MR. THOMAS:  Let's go ahead to page 9.

Ms. Sonderby, if we could enlarge for everyone the paragraph second from the bottom, a final consideration.

Q.  Do you see, sir, that it reads:  A final consideration for valuation is the prospect of a capital raise at these levels. Recall that AMC theaters issued equity after a big rally.  And while we're not experts on this company, it's undoubtedly stronger in the aftermath, so the rerating prophesy gets fulfilled.

Do you see that?

A.  I do.

Q.  And a capital raise, that's a reference to issuing more stock, correct?

A.  It could be.  They could sell bonds also, but it could be either.

MR. THOMAS:  Let's take that down.

Q.  Now, let's go back to this table that you presented.

MR. THOMAS:  Let's put up Defense Exhibit 9238.

Q.  Now, the purpose of this chart was to try to make Archegos' March 23 trade appear normal, right?

MS. ESTES:  Objection.

THE COURT:  Overruled.

A.  I was asked to look at their trades and the size of their trades.

Q.  Not the size of the trades in dollars, but the size of the trades as a percent of capital, right?

A.  I was asked to look at the size of their trades and, as I mentioned earlier, it's common, both in teaching and when managing a portfolio, to look at trades or positions as a fraction of the overall portfolio.  So, to me, this was the natural metric, and, to me, it's the metric that I both teach in classes and portfolio managers typically use.

THE COURT:  You looked at it for a certain reason. What was your reason in looking at it?

THE WITNESS:  I was asked by the attorneys to look at the sizes of their trades.

THE COURT:  And you drew some conclusion from it.

THE WITNESS:  Yes.

THE COURT:  Mr. Thomas is asking you about that.

THE WITNESS:  My conclusion was, measured as a

fraction of their capital, that they often made large trades, and also that, to me, it's an apples-to-oranges comparison to compare dollars when the amount of capital is changing over time.

As I mentioned, if you have a hundred thousand dollars and you buy $50,000 in stock, that's a 50 percent trade that looks really big. But if you have 10 million and you buy $50,000 in stock, that's a small trade. The units matter. And if I want to understand how large of a trade was, I want to know how large it was relative to the size of the account, the capital at hand.

Q. There are a couple of things to work through there.

First of all, this doesn't actually show trades, right, as you point out; it's just net trade volume on a specific day, right?

A. That's correct.

Q. So it could be multiple orders or a single order, this table doesn't tell you?

A. Sure. When I say trades, I should say the increase in their exposure over the course of a day, which could have been executed in different ways.

MR. THOMAS: Perfect place to stop, your Honor.

THE COURT: Thank you.

Thank you, members of the jury. We are recessing now, and we will resume tomorrow at 9:30. I have high expectations

that we will finish proofs tomorrow, and I'll tell you tomorrow what the next schedule will be.

(Jury not present)

THE COURT:  Is that a good assumption, Mr. Thomas, that we will finish tomorrow?

MR. THOMAS:  Yes, your Honor.  I estimate that I'll probably have about two and a half hours of cross, which I understand should leave enough time for redirect and the remaining exhibits the defendants wish to offer.

THE COURT:  We will devote Monday morning to motions and Monday afternoon to the charge conference.  We will be off Tuesday and Wednesday.  Come back Monday, July 8 for argument.

How long do you think -- who is going to do the argument?

MR. THOMAS:  I was going to handle the principal summation, and Mr. Podolsky was going to handle the rebuttal summation, your Honor.

THE COURT:  How long, in total, do you think you need?

MR. THOMAS:  Your Honor, we understand the Court's preference for efficiency.  Might we talk with defense counsel and see if we can come up with an agreeable global proposal?  We will obviously work with whatever time the Court gives us, but we want to make sure we have something that works for everyone.

THE COURT:  I'm asking you.  What do you think you

need?  They are not going to take longer than you.

MR. THOMAS:  They will if you let them, your Honor.

THE COURT:  You have the burden.

MR. THOMAS:  That's true.

I expect to take about two hours, and Mr. Podolsky will probably take half an hour.

THE COURT:  Two hours for Mr. Thomas, half hour for Mr. Podolsky.  We start at 9:30.  That means by noon or so you should finish.

MR. THOMAS:  Yes, your Honor.

THE COURT:  Mr. Berke.

MR. BERKE:  Your Honor, I can do our summation on behalf of Mr. Hwang in the same time as the prosecution, two and a half hours, if that would be acceptable to your Honor.

THE COURT:  I was thinking that both you and Ms. Mulligan would have the equivalent time.

MR. BERKE:  We might be able to work it out, your Honor.

Can I have a moment with Ms. Mulligan.  We have talked about it before.

THE COURT:  Yes.

MR. BERKE:  Thank you, Judge.

MS. MULLIGAN:  Your Honor, I think we will need between an hour and a half and two hours, and Mr. Haggerty will be delivering our summation, and obviously it's a collaborative

effort.  But Mr. Haggerty --

THE COURT:  I don't think you should take that long, Ms. Mulligan.

MS. MULLIGAN:  Your Honor, we have a lot to cover.  I think we have been highly efficient throughout this trial, both in our opening and our cross-examination of witnesses, and we now need to tell the jury and sum up with our defenses.

Your Honor, obviously, we have been working on this summation, and I think we will run at least an hour and a half, your Honor.

THE COURT:  I think that's unreasonably long.  You're on three counts and probably you are going to go after Mr. Berke.  I think you're unreasonably long.

How long do you think, Mr. Berke?

MS. MULLIGAN:  Your Honor --

THE COURT:  Just a minute, Ms. Mulligan.

MS. MULLIGAN:  I'm sorry.

THE COURT:  I'll get back to you.

MR. BERKE:  Your Honor, I would need, with respect, two to two and a half hours, given the number of stocks involved, given the very complicated trading manipulation issues that we have to address.  It will take some time.  But I will be able to do it in two hours, two and a half hours, with your Honor's permission.

THE COURT:  Let's say you have got two hours.

MS. MULLIGAN:  Your Honor, there were many counterparty witnesses that we have to address.  There were over 51 various alleged misrepresentations, at least identified by the government, so we have quite a lot of material to cover here, and I think an hour and a half would be sufficient.

We are quite happy to work late in the day, and hopefully we can have all summations in one day.  That's certainly our goal.  We do need time, your Honor.  I think it goes without saying --

THE COURT:  One minute.

Say again, Ms. Mulligan.

MS. MULLIGAN:  Your Honor, there are a number of counterparty witnesses that we need to address.

THE COURT:  What's your bottom line?

MS. MULLIGAN:  My bottom line, your Honor, is an hour and a half.  We will need every minute of that, your Honor.

THE COURT:  And you want two and a half or two, Mr. Berke?

MR. BERKE:  Your Honor, if it means getting everything in in one day, which we do think is preferable, we would get it done in two hours.

THE COURT:  We are not going to get it all in in one day.  It's not going to be possible.

MR. BERKE:  Your Honor, we would be open, if you were open to it and the jury were open to it, to starting earlier on

Monday and going a little bit later.  We do think there is value in having all the summations in one day and the charge the next, if your Honor agreed and thought it was possible.

THE COURT:  I can't start before 9:30.

MR. BERKE:  Your Honor, if you did think it was going to go over to two days, we would ask for two and a half hours. Thank you, Judge.

THE COURT:  If the government finishes by noon, and we start, with some slippage, let's say 1:30, we are 4:00 with Mr. Berke and, given some break time, 6:00 for Ms. Mulligan, giving Mr. Podolsky a half hour, he may want more, given the length of the defense.  He would finish Tuesday morning.

So I'm suggesting to the defendants that if you don't want the psychological advantage of a fresh day, you are going to have to shorten your time.

MR. BERKE:  Your Honor, can we discuss and report back tomorrow?  I would also ask.  I know this is --

THE COURT:  I need to talk to my law clerks also on this to see, because I'm just listening to you folks and thinking about how life as a juror might be to have a day full of words like this.

MR. BERKE:  I understand, Judge.

Your Honor, would it be possible, as I have seen -- I know your Honor is more experienced than anybody in these areas -- but would it be possible to arrange for a lunch for

the jury that day?

THE COURT:  There will be lunch for the jury.

MR. BERKE:  We took a short break.

THE COURT:  There will be lunch for the jurors.

MR. BERKE:  Good.  So a shorter lunch will be possible.

THE COURT:  You have to allow for some slippage here.

MR. BERKE:  For good reasons.  I understand.

MR. PODOLSKY:  Just to raise one scheduling thing for people to keep in mind, at least so far there is one juror who has to leave on Mondays at 4 p.m.

THE COURT:  That's another thing too.  We are going to lose some jurors.  I don't quite know how many, but it's going to be more than one.

MR. BERKE:  Your Honor, I know juror number 6 has been teaching a class.  Maybe we could inquire tomorrow whether on July 8 she would still have her class going on and whether that would be an issue or not, given the schedule.

THE COURT:  Give me a few minutes.

MS. MULLIGAN:  Your Honor, with permission of the Court, I am very sorry, but I need to leave to attend to a funeral, and Mr. Haggerty will take over, if that's OK.  I made arrangements.

THE COURT:  Sure.

Sorry about that, Ms. Mulligan.

THE COURT:  Be seated.  We have one more wrinkle.  I think one of the jurors has to leave at 4:00 on Monday.  I think it's No. 6, and we think one juror will want to be excused tomorrow.  Question:  Should we excuse Ms. Phinn, No. 6, if she has to leave at 4:00 on July 8?

MR. PODOLSKY:  I think our view is we should not for two reasons.  One, I think there's a risk that we'll end up having to go into the second day anyway, and certainly there won't be enough time for instructions.

THE COURT:  Let's go by the other way then.  Here is my thought, strong thought.  Mr. Thomas goes between 9:30 and 11:30.  I will amount to something, but of course, it won't start promptly at 9:30 and there will be a break or something.  It will be noon.  Lunch will be served.  At 2:00, Mr. Berke goes for an hour and a half, and then Mr. Haggerty goes for an hour.  So it's like 1:00 to 2:30; there will probably be slippage, 3:00 to 4:00, some slippage.  Mr. Podolsky goes for a half hour, which means we're finished around 5:00, between 5:00 and 5:30.  That way things work out and all summations in one day.

What do you say, folks?  Maybe Ms. Phinn will stay, but if she can't stay for a day, my proposal is that we excuse her.

MR. BERKE:  Your Honor, maybe the juror, if she knows a week -- maybe not a week -- yeah, a week in advance, she may

make arrangements.

THE COURT:  She may adjust.  I'll tell the jury what the schedule is.

MR. BERKE:  Your Honor, can I ask that for the lunch, instead of taking an hour and a half, two hours --

THE COURT:  No, it's one hour.

MR. BERKE:  One hour.

THE COURT:  It's basically 12:00 to 1:00, but nothing ever works like a railroad schedule.

MR. BERKE:  No, no, no.  Understood.  Please, that is true on its face, and we know that.  I want to make sure I heard, your Honor.  How long will I have for my summation?

THE COURT:  An hour and a half.

MR. BERKE:  Your Honor, I believe two is bare, bare minimum, and I believe --

THE COURT:  It's been a long trial, and I just don't feel like I want to crack a whip too hard.  But if you take longer, inevitably -- and this is Mr. Haggerty, too -- we're going to have Mr. Podolsky speaking Tuesday morning.

MR. BERKE:  Could I at minimum, your Honor, have an extra 15 minutes?  Again, just because there's 11 stocks. There's a lot of companies here.

THE COURT:  I don't want to go past 5:30.

MR. BERKE:  OK.

THE COURT:  And I'm willing to accommodate whatever

flexibility you want provided that:

        (a) It's realistic;

        (b) There's an hour for lunch; and

        (c) We finish at 5:00 or 5:30, not later, because the jury can't take it.

        MR. BERKE:  Understood, Judge.

        THE COURT:  I'm advised that Ms. Phinn has to teach a class, and that it's very improbable that she will be able to adjust her schedule.  But we'll give her the opportunity, and if she can't do it, I think we need to excuse her.

        MR. HAGGERTY:  Your Honor, for our part, if I may, with great respect for the Court, in recognition of the challenges that the scheduling presents, for the reasons Ms. Mulligan explained, we don't feel that an hour is sufficient to address the variety of issues, important issues, that have been raised by the prosecution as against Mr. Halligan specifically.  So at a minimum, while we do think that an hour and a half really is our bottom line, we would respectfully ask for, at a minimum, an additional 15 minutes.

        THE COURT:  An hour and a quarter.  And Mr. Berke, what do you want?

        MR. BERKE:  Your Honor, if it's the difference of getting it in a day, I would do it in an hour and 45.

        THE COURT:  One and three-quarters.

        MR. BERKE:  Thank you, Judge.

THE COURT:  All right.  So we've got Thomas for two hours taking us to noon.  Berke for an hour and three-quarters taking us, with a break, to 3:30, and Haggerty taking us to 4:45.  Podolsky taking us from 5:00 to 5:30.  That's workable, I think.

MR. PODOLSKY:  It's certainly workable, your Honor.  I would feel bad for Juror 6 for having sat through the whole thing if she can't attend, but it's certainly workable from our perspective.

MR. BERKE:  We will make it work, your Honor, yes.

THE COURT:  Mr. Haggerty?

MR. HAGGERTY:  As will we, your Honor.  Thank you.

THE COURT:  So the Government has two hours for its main presentation.  Berke has an hour and three-quarters.  Haggerty has an hour and 15 minutes.  Thomas has a half hour.  Agreed, everybody?

MR. PODOLSKY:  Yes, your Honor.

MR. BERKE:  Yes, your Honor.  Thank you.

MR. HAGGERTY:  Yes, your Honor.  Thank you.

THE COURT:  OK.  See you tomorrow at 9:30.  That would mean I am taking the instructions Tuesday morning, and the jury can deliberate.  I will tell the jury tomorrow morning what our proposed schedule will be and see if it gives rise to any problems, and then we'll deal with it.  OK.  Good night.

(Adjourned to June 28, 2024, at 9:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                      Page

SUNIL WAHAL

Cross By Mr. Thomas  . . . . . . . . . . . . . .4678
Redirect By Ms. Estes  . . . . . . . . . . . .4703
MICHAEL JOHANNES

Direct By Ms. Estes  . . . . . . . . . . . . .4719
Cross By Mr. Thomas  . . . . . . . . . . . . .4793

DEFENDANT EXHIBITS

Exhibit No.                                      Received

 2091   . . . . . . . . . . . . . . . . . . . .4708

 9233   . . . . . . . . . . . . . . . . . . . .4710

 9158   . . . . . . . . . . . . . . . . . . . .4734

 9161   . . . . . . . . . . . . . . . . . . . .4738

 9163   . . . . . . . . . . . . . . . . . . . .4741

 9240   . . . . . . . . . . . . . . . . . . . .4746

 9239   . . . . . . . . . . . . . . . . . . . .4755

 9148   . . . . . . . . . . . . . . . . . . . .4758

 9162   . . . . . . . . . . . . . . . . . . . .4762

 9243   . . . . . . . . . . . . . . . . . . . .4767

 9235   . . . . . . . . . . . . . . . . . . . .4769

 9237   . . . . . . . . . . . . . . . . . . . .4772

 9133   . . . . . . . . . . . . . . . . . . . .4774

 9134   . . . . . . . . . . . . . . . . . . . .4776

 9137   . . . . . . . . . . . . . . . . . . . .4779

 9160   . . . . . . . . . . . . . . . . . . . .4781

 9238   . . . . . . . . . . . . . . . . . . . .4784