**CLIFFORD CHANCE US LLP**

TWO MANHATTAN WEST
375 9TH AVENUE
NEW YORK, NY 10001

TEL +1 212 878 8000
FAX +1 212 878 8375

www.cliffordchance.com

**By Email**
**Confidential Treatment Requested**

Direct Dial: +1 (212) 878-3386
E-mail: john.friel@cliffordchance.com

November 18, 2024

Alexandra Rothman
Assistant United States Attorney
United States Attorney's Office
Southern District of New York
The Jacob K. Javits Building
26 Federal Plaza, 37th Floor
New York, New York 10278

Re:   *United States v. Hwang and Halligan*, 22 Cr. 240 (AKH)

Dear Ms. Rothman:

On behalf of our client, the Bank of Montreal ("BMO" or "the Firm"), we write to provide the following Victim Impact Statement in connection with the upcoming sentencings of defendants Sung Kook ("Bill") Hwang and Patrick Halligan (together, "Defendants").

As a victim of Defendants' crimes, BMO respectfully asks that the Government seek an order compelling Defendants to make restitution in BMO's favor, pursuant to the Mandatory Victims Restitution Act ("MVRA"). The trial evidence establishes that BMO, a counterparty to Archegos Capital Management ("Archegos" or "the Fund"), suffered loss resulting from the deceptive scheme underlying at least two offenses for which Defendants were convicted. As set forth below, BMO believes it is entitled to restitution in the amount of $6,112,426.43, comprised of its lost principal and prejudgment interest.

### I.   **Applicable Law**

The MVRA mandates that sentencing courts "shall order" defendants to make restitution for all "offense[s] against property" under Title 18 of the United States Code, "committed by fraud or deceit," in which "an identifiable victim" has suffered "pecuniary loss." 18 U.S.C. §§ 3663A (a)(1), (c)(1).

A "victim" is entitled to restitution anytime they are "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). Eligible losses arise from any act by the defendant "that is the basis of the offense of conviction." *United States v. Vilar*, 729 F.3d 62, 97 (2d Cir. 2013) (citations omitted). Where

the offense of conviction "involves as an element a scheme, conspiracy, or pattern of criminal activity," the MVRA is explicit that "all actions undertaken by the defendant pursuant to the scheme are part of the 'offense of conviction' for the purposes of restitution." *United States v. Kinney*, 610 Fed. App'x 49, 52 (2d Cir. 2015) (citing 18 U.S.C. § 3663A(a)(2)). The offending acts fulfill the statute's requirements of direct and proximate causation when they are a "necessary factor" in bringing about a "foreseeable" injury. *United States v. Goodrich*, 12 F.4th 219, 229 (2d Cir. 2021) (citations omitted).

As to calculating the restitution award, victims are entitled to receive "the full amount of [their] losses," 18 U.S.C. § 3664(f)(1)(A), including the increased "value" of their property between the dates of loss and sentencing, 18 U.S.C. § 3663A(b)(1)(B). The Second Circuit has affirmed that the foregoing provisions of the MVRA authorize the sentencing court to award prejudgment interest on victims' losses. *See United States v. Qurashi*, 634 F.3d 699, 705 (2d Cir. 2011) (upholding award of prejudgment interest on insurance payments obtained by fraud). In *Qurashi*, the Circuit explained that prejudgment interest approximates the "time-value" of loss resulting from "the deprivation of the victim's ability to put its money to productive use," thereby remaining faithful to the MVRA's "primary and overarching goal" of restoring victims "to their original state of well-being." *Id.* at 703-04 (citations omitted).

Where, as here, more than one defendant has contributed to a victim's loss, "the court may make each defendant liable for payment of the full amount of restitution." 18 U.S.C. § 3664(h). Finally, the "economic circumstances of the defendant" are not an appropriate consideration in assessing the amount of restitution. 18 U.S.C. § 3664(f)(1)(A).

## II. BMO Has Been Victimized by Defendants' Crimes

### A. Defendants' Crimes Obligate Them to Make Restitution to Victims

Defendants were convicted of offenses for which the MVRA makes restitution compulsory. To fuel the market manipulation scheme underlying separate counts of conviction, Defendants schemed to deceive Archegos' counterparties about Archegos' financial performance, to induce them to finance Archegos' trading activity. For their roles in this misrepresentation scheme, Defendants were convicted of counts that included racketeering conspiracy and wire

fraud.[1] Because both crimes are quintessential Title 18 offenses "committed by fraud or deceit," the MVRA obligates Defendants to make restitution to the counterparties who they victimized. *See, e.g.*, *United States v. Catoggio*, 326 F.3d 323 (2d Cir. 2003) (affirming that RICO violations under subsection (c) are subject to mandatory restitution under MVRA); *United States v. Avenatti*, 81 F.4th 171, 175 (2d Cir. 2023) (same, for wire fraud).

B.      Trial Evidence Establishes that BMO is Entitled to Restitution

BMO is a victim of Defendants' misrepresentation scheme. Testimony elicited at trial showed that for years, Defendants directed their subordinates to deceive counterparties about Archegos performance as a matter of course, to obtain or increase financing opportunities for Defendant Hwang's capital. In the final months before Archegos collapsed, as the Fund exhausted its trading capacity with its existing lenders, Defendants ordered their subordinates to seek out new counterparties to new sources of capital to maintain Defendants' manipulative trading strategy. BMO was one such new counterparty. Using the same deceptive tactics they had long deployed on others, Defendants' Archegos subordinates misled BMO into onboarding the Fund, only to default on their obligations to BMO weeks later. Because the record cements the requisite link between Defendants' offending conduct and BMO's resulting injury, BMO is entitled to restitution under the MVRA.

The record identifies numerous offending acts by Defendants, undertaken to further scheme to mislead BMO and other counterparties. Senior Archegos employees Scott Becker and William Tomita—cooperating witnesses whom the Indictment labels Defendants "Archegos Conspirators," ECF No. 1 ¶12—testified that they lied to BMO at the direction of both Defendants. They recounted how Archegos employees labored in an autocratic "culture of service" to Defendant Hwang, who—as the sole investor in Archegos—made "all decisions" about the size and concentration of the Fund's positions, the amount of leverage on which to rely, and the information about the portfolio that employees could share with investors. Trial Tr. 815:19-817:14; 825:14-19.

Mr. Becker testified that, as "part of [his] job" at Archegos, he was "directed" by Defendant Halligan "to lie to" Archegos' bank counterparties, BMO among them, "to induce them to make

---

[1] *See* ECF No. 1 (Indictment) ¶¶ 68-72 (Count One, charging racketeering conspiracy in violation of 18 U.S.C. § 1962(c)) & ¶¶ 81-82 (Count Eleven, charging wire fraud in 18 U.S.C. § 1343); *see also* ECF No. 249 (Verdict Form).

loans to Archegos so [the Fund] could pursue its trading." Trial Tr. 802:19-20; 804:3-25. Defendant Halligan, who was responsible for communicating with Archegos' counterparties before passing that role to Mr. Becker, had lied to those counterparties about Archegos' portfolio, and directed Mr. Becker to continue doing the same, including by instructing that Mr. Becker should not "ever" tell bank lenders when Archegos' most concentrated positions exceeded 35% of Fund asset value. Trial Tr. 891:1-898:6. Likewise, Mr. Tomita testified that Defendant Hwang "taught" and "instructed" him to "tell[] lies," to "give misleading pictures about the fund and its positions," and to furnish "materially misleading information to banks in exchange for them to finance [Archegos'] trades and lend us money." Trial Tr. 3039:3-12; 3410:17-19.

Both men gave substantial, unrebutted testimony singling out BMO as a target of this scheme. In late 2020, Archegos was "running out" of capacity to trade in certain securities at the heart of Defendants' manipulation scheme. Trial Tr. 847:2-848:24. It was during this period of stress that Defendant Hwang "command[ed]" Archegos employees to pursue new banking relationships as additional sources of trading capacity. Trial Tr. 1053:9-25; 1521:6-14. Defendant Becker testified that he was "directed to lie to banks so that they would increase additional capacity for Archegos" or, in the case of new counterparties, provide "new capacity." Trial Tr. 848:14-849:9; 863:5-9. In October 2020, Defendant Hwang instructed Mr. Tomita to "pursue a relationship with Bank of Montreal *as soon as possible*," and to "thank" the Archegos employee who had presented that opportunity. Trial Tr. 960:3-961:8 (emphasis added).

Mr. Becker testified that he lied to BMO's "credit team" on "several occasions," to "induce them to accept Archegos as a counterparty." Trial Tr. 961:9-17. He told these lies directly to Mr. Joseph Boccuzzi, the BMO credit officer responsible for evaluating Archegos' risks as a potential counterparty. Trial Tr. 1811:17-1812:20. As Defendants had taught him to do, Mr. Becker misled Mr. Boccuzzi about the size of Archegos' most concentrated swaps positions. Trial Tr. 961:24-963:1; 969:21-971:9.

For his part, Mr. Boccuzzi testified that the Defendants' scheme harmed the Firm. Mr. Boccuzzi explained how each misrepresented portfolio detail contributed materially to BMO's evaluation of Archegos' ability to meet margin calls to the Bank. In addition to lies about the degree of concentration of Archegos' portfolio, these misrepresentations included: the specific stocks in Archegos' portfolio; the amount of Archegos' available cash reserves; the length of time required to liquidate Archegos' positions; Archegos' available trading capacity with other banks; and the strength of Archegos' compliance control environment. (Trial Tr. 1815:5-1836:18).

Mr. Boccuzzi testified that in line with his usual practice, he inserted these lies, *verbatim*, into a memo that he prepared and distributed to decision makers within BMO, providing his "credit analysis and recommendation" for whether, and in what capacity, to onboard Archegos as a client. Trial Tr. 1833:4-1839:5. Those decision-makers used that report to evaluate, and ultimately approve, Archegos as a swaps counterparty. Trial Tr. 1838:8-1839:5. Mr. Boccuzzi's testimony recounted how, even after BMO had initially concluded that Archegos was too risky to onboard, Archegos sought a follow-on meeting during which Defendant Halligan and Messrs. Becker and Tomita misrepresented key details about Archegos' business to BMO employees, resulting in BMO approving Archegos as a counterparty. Trial Tr. 1830:7-1839:5. And Messrs. Boccuzzi and Becker both testified that just weeks before Archegos' collapse, Mr. Becker falsely reassured Mr. Boccuzzi about Archegos' performance, preventing BMO from discovering the truth about Archegos' precarious financial position in time to exit its positions before the Fund's collapse. Trial Tr. 1841:6-1842:12, 1843:24-1848:14 (Mr. Boccuzzi); Trial Tr. 969:21-971:10 (Mr. Becker).

Defendants' scheme to conceal Archegos' financial condition from its counterparties was a "direct" cause of BMO's injury, because it was a "necessary factor" in bringing about that loss. *Goodrich*, 12 F.4th at 229. Mr. Boccuzzi testified that BMO's recommendation to onboard Archegos was based on the lies told during the due diligence exercise with Archegos. Mr. Tomita testified that Archegos was the sole source of the portfolio information that counterparties need to evaluate the Fund's risk of default. Trial Tr. 3439:23-25. Mr. Tomita testified that counterparties would have "fired [Archegos] as a client immediately and liquidated the portfolio," had they understood "the full picture of the level of risk and the size of [Archegos'] positions." Trial Tr. 3039:6-8; 3052:10-15.

Equally, BMO's losses were a "foreseeable" consequence of Defendants' scheme. *Goodrich*, 12 F.4th at 229. That scheme misled BMO about details critical to evaluating the risk that Archegos' financial condition would leave it unable to "make good on [its] obligations to the bank," most prominently, its obligation "to meet daily margin calls." Trial Tr. 1816:21-25; 1817:5-1820:12. To be sure, BMO was injured when that very risk materialized: Archegos' extreme, concentrated positions left it dangerously exposed to market fluctuations, causing it to default on its obligations to BMO by failing to meet margin calls under the parties' financing arrangement. Trial Tr. 1849:17-21; 1850:11-13. Defendants could not have failed to foresee that BMO's unwitting exposure to the Fund's precarious financial condition left BMO exposed to that risk. *See, e.g., United States v. Paul*, 634 F.3d 668, 678 (2d Cir. 2011) (bank lenders entitled to restitution of loan amounts obtained by fraud, in furtherance of defendant's stock manipulation scheme).

### III. BMO Has Calculated the Losses for Which it Requests Restitution

BMO is entitled to an order of restitution in its favor in the amount of $6,112,426.43, broken out as set forth below.

**$5,212,059.67** is comprised of losses resulting from Defendants' above-described scheme to fraudulently induce BMO to provide swaps financing to Archegos. That amount is to compensate BMO for the amount of Archegos' default on its payment obligation to BMO after Defendants' scheme unraveled. *See* Declaration of John D. Friel ("Friel Decl."), ¶¶ 2-3 & Ex. A (appending testimony of Mr. Boccuzzi testifying to amount of Archegos' default on its payment obligations to BMO, Trial Tr. 1850:13). Excluded from this request are $434,938.88 in losses that Archegos has since repaid to BMO. *See* Friel Decl. ¶4; *see also* 18 U.S.C. § 3663A(b)(1)(B) (property returned to the victim is ineligible for restitution).

**$900,366.76** is comprised of prejudgment interest on the above-identified losses, to more fully compensate BMO for the "time-value" of having been deprived of the "productive use" of those funds for more than three years. *See Qurashi*, 634 F.3d at 705.

The appropriate rate of interest to assess is within the Court's discretion. BMO respectfully urges the Court to adopt the weekly average of the one-year constant maturity Treasury yield published by the Board of Governors of the Federal Reserve System (the "Weekly Treasury Rate"). That is the rate of post-judgment interest that federal law applies to restitution awards (*see* 18 U.S.C. § 3612(f)(2)(B)), and to civil judgments (*see* 28 U.S.C. § 1961(a)-(b)). Because both forms of interest serve a common goal—compensating parties for the time-value of money they are owed—sentencing courts in this District have borrowed from those statutes in adopting the Treasury Rate for awards of prejudgment interest under the MVRA. *See United States v. Glencore Int'l A.G.*, No. 22 CR 297 (LGS), 2023 WL 2242469, at *9 (S.D.N.Y. Feb. 27, 2023) (awarding prejudgment interest of 5.0425% to victims of bribery); *United States v. Smerling*, No. 21 CR 317 (DLC), 2022 WL 1806300, at *2 (S.D.N.Y. June 1, 2022) (awarding prejudgment interest of 2.036% to victims of bank fraud).

As of November 14, the most recently-published Weekly Treasury Rate was 4.29%.[2] BMO's prejudgment interest calculations apply that rate to the principal amount between March 31, 2021 and November 20, 2024. These are the dates on which the Firm notified Archegos of its

---

[2] *Available at* https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15.

CLIFFORD CHANCE US LLP

- 7 -

default, and of Defendant Hwang's planned sentencing, respectively. Finally, to simulate an annual investment in Treasuries since the time of its loss, BMO requests that its prejudgment interest be compounded annually, as federal law requires for interest on civil judgments. *See* 28 U.S.C. § 1961(b); Friel Decl. ¶5 (describing calculation of requested prejudgment interest)

\*   \*   \*

In light of the foregoing, BMO respectfully asks that the Government seek an order awarding restitution to BMO in the amount of $6,112,426.43. I am available to discuss the foregoing at your convenience.

Sincerely,

John D. Friel

Encl.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>SUNG KOOK HWANG and PATRICK HALLIGAN,<br>              Defendants. | No. 22 CR 240 (AKH) |

**DECLARATION OF JOHN D. FRIEL**

John D. Friel declares and states as follows:

1. I am a partner with the law firm Clifford Chance US LLP ("Clifford Chance"), counsel to non-party Bank of Montreal ("BMO") in connection with its request for restitution in the above-captioned matter. I make this declaration based on my personal knowledge, information, and belief, and my review of relevant documents.

2. Attached hereto as Exhibit A is a true and correct copy of an excerpt from the trial transcript in the above-captioned matter, containing sworn testimony of witness Joseph James Boccuzzi on May 29, 2024.

3. By letter dated March 31, 2021, BMO notified Archegos Fund, LP ("Archegos") that Archegos remained liable to BMO in the amount of $5,647,545.87 (including interest of $547.32) resulting from Archegos' default on its payment obligations to BMO pursuant to the IDSA Master Agreement executed between the parties as of March 2, 2021, and transaction #59143 thereunder.

4. Of the defaulted amount described in paragraph 3 above, BMO has recovered the following amounts from Archegos: $187,637.55 on December 22, 2022; $227,588.69 on March 10, 2023; $10,012.36 on April 18, 2023; and $9,700.28 on January 18, 2024.

5.  At my direction, an in-house accountant at Clifford Chance calculated BMO's requested award of prejudgment interest. This calculation applied an annual compound interest rate of 4.29%, the weekly average of the one-year constant maturity Treasury yield published by the Board of Governors of the Federal Reserve System under the title "Market yield on U.S. Treasury securities at 1-year constant maturity, quoted on investment basis" for the calendar week ending November 8, 2024. The calculation applied that rate to a principal of $5,646,998.55, comprised of Archegos' defaulted amount identified in paragraph 3 above ($5,647,545,87) reduced by $547.32 in interest on that amount. The period of the calculation is March 31, 2021 (the date identified in paragraph 3 above) to November 20, 2024. The calculation reduced the principal balance by the amounts and on the dates identified in paragraph 4 above. These steps result in prejudgment interest of $900,366.76.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: November 18, 2024
      New York, New York

_____
John D. Friel

# EXHIBIT A

```
O5TRHWA1
```

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
UNITED STATES OF AMERICA,

            v.                          22 CR 240(AKH)

SUNG KOOK HWANG and PATRICK
HALLIGAN,
            Defendants.
------------------------------x
                                        New York, N.Y.
                                        May 29, 2024
                                        10:00 a.m.
Before:

              HON. ALVIN K. HELLERSTEIN,

                                        District Judge
                                        -and a jury-
                      APPEARANCES

DAMIAN WILLIAMS,
     United States Attorney for the
     Southern District of New York
BY:  MATTHEW D. PODOLSKY
     ANDREW M. THOMAS
     ALEXANDRA ROTHMAN
     SAMUEL ROTHSCHILD
     Assistant United States Attorneys

FRIEDMAN KAPLAN SEILER ADELMAN & ROBBINS LLP
     Attorneys for Defendant Halligan
BY:  MARY MULLIGAN
     TIMOTHY HAGGERTY
     BONNIE BAKER
     ANIL VASSANJI
     RUPITA CHAKRABORTY

KRAMER LEVIN NAFTALIS & FRANKEL LLP
     Attorneys for Defendant Hwang
BY:  BARRY H. BERKE
     DANI R. JAMES
     JORDAN L. ESTES
     MICHAEL MARTINEZ
     MICHELLE BEN-DAVID
     SHAKED SIVAN
     DAYNA CHIKAMOTO
```

O5T6HWA2                    Boccuzzi- Direct

1              (In open court)
2              THE COURT:  You may swear the witness in.
3    JOSEPH BOCCUZZI,
4         called as a witness by the GOVERNMENT,
5         having been duly sworn, testified as follows: Joseph James
6    BOCCUZZI.
7              MS. ROTHMAN:  May I proceed, your Honor?
8              THE COURT:  You may.
9    DIRECT EXAMINATION
10   BY MS. ROTHMAN:
11   Q.   Good afternoon, Mr. Boccuzzi.
12   A.   Good afternoon.
13   Q.   Where do you work?
14   A.   Bank of Montreal.
15   Q.   How long have you worked there?
16   A.   A little over five years.
17   Q.   What is your position at BMO?
18   A.   I work in global markets corporate banking as a director in
19   the hedge fund team.
20   Q.   What is your responsibility?
21   A.   My primary responsibility is conducting the credit analysis
22   and recommendation for our hedge fund clients, performing
23   credit due diligence, recommending how much credit risk we're
24   comfortable in taking to our clients.
25   Q.   And focusing on the fall of 2020 and early 2021, was that

O5TRHWA3

1 think there's that material a difference.
2     THE COURT: Is it an issue of credibility?
3     THE WITNESS: In my view, no. It might have just been
4 the best estimate at the time.
5 BY MS. ROTHMAN:
6 Q. Would it have been different if the number were actually
7 70 percent of capital?
8     MR. HAGGERTY: Objection.
9     THE COURT: Sustained.
10 BY MS. ROTHMAN:
11 Q. If the number were actually 70 percent --
12     MR. HAGGERTY: Objection.
13 BY MS. ROTHMAN:
14 Q. Would you have wanted to know that?
15     THE COURT: Sustained.
16     MS. ROTHMAN: Understood.
17 Q. Now, Mr. Boccuzzi, how did BMO's relationship with Archegos
18 end?
19 A. It ended with the client defaulting.
20 Q. When did that happen?
21 A. Later in March 2021.
22     MS. ROTHMAN: We can show -- withdrawn.
23 Q. Did you reach out to Archegos in advance of the default?
24 A. On the day it was all happening, I did email Scott Becker
25 to try and check in with him.

1    THE COURT:  Do you remember the day of the week?
2    THE WITNESS:  It was that Friday.
3    BY MS. ROTHMAN:
4    Q.  Was that March 26, 2021?
5    A.  Yeah.
6    Q.  Did you hear back from Mr. Becker?
7    A.  I did not.
8    Q.  And did BMO eventually serve Archegos with a notice of
9    default?
10   A.  Yes, we did.
11   Q.  And how much money did BMO lose through its relationship
12   with Archegos?
13   A.  About five and a half million dollars.
14            MS. ROTHMAN:  Your Honor, may I have a moment?
15            THE COURT:  You may.
16            MS. ROTHMAN:  No further questions.
17            THE COURT:  Cross?  Ms. James?
18            MS. JAMES:  Thank you, your Honor.
19   CROSS-EXAMINATION
20   BY MS. JAMES:
21   Q.  Now, I just want to pick up where Ms. Rothman left off
22   there.  You had indicated that you had some questions about how
23   they may have derisked the portfolio and explained that in your
24   view return comes with risk.  But it's fair to say in taking on
25   Archegos, you knew and, in fact, documented in your credit memo