UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                                               :

UNITED STATES OF AMERICA                    :

                                           :

         - v. -                              No. 22 Cr. 240 (AKH)

                                           :

SUNG KOOK (BILL) HWANG,               :

                 Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

<br>

# SUPPLEMENTAL SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

<br>

DAMIAN WILLIAMS
United States Attorney
Southern District of New York
The Jacob K. Javits Federal Building
26 Federal Plaza, 37th Floor
New York, New York 10278

Matthew Podolsky
Alexandra Rothman
Samuel P. Rothschild
Andrew Thomas
Assistant United States Attorneys
- Of Counsel -

# TABLE OF CONTENTS

Page

I.  PRELIMINARY STATEMENT ........................................................................................ 1

II. THE PROPOSED DEFENSE SENTENCE .................................................................... 2

  A. The Sentence Sought By the Defense is Not Authorized by Law ..................................... 2

  B. The Court Should Not Reconsider its Sentence of 18 Years' Imprisonment .................... 4

III. RESTITUTION.............................................................................................................. 10

  A. Factual Background ..................................................................................................... 10

    1. The Counterparty Victims Extended Hwang Credit to Facilitate His Trades and Incur Risk.......................................................................................................................... 10

    2. Hwang and the Archegos Conspirators Intentionally Disrupted the Banks' Risk Management to Carry Out the Scheme ...................................................................... 13

      a.  Economic exposure............................................................................................... 13

      b.  Equity trades ......................................................................................................... 14

      c.  Margin .................................................................................................................. 16

    3. Archegos's Counterparties Incurred Substantial Losses From Archegos's Trades .. 17

    4. Archegos Employees Were Required, and Routinely Pressured, to Contribute to the Deferred Compensation Plans .................................................................................. 18

  B. Applicable Law............................................................................................................ 20

  C. Discussion ................................................................................................................... 22

    1. Counterparty Victims ............................................................................................... 22

      a.  Cause in Fact......................................................................................................... 23

      b.  Proximate Cause – Foreseeability......................................................................... 26

      c.  The Defendant's Restitution Proposal Would Lead to Inequitable and Unfair Results................................................................................................................... 31

      d.  Restitution is Not Too Complex to Compute ................................................. 33

    2. Innocent Archegos Employees................................................................................. 35

    3. Restitution Order Enforcement and Mechanics ........................................................ 37

      a.  General Effect of a Restitution Order ............................................................. 38

      b.  Joint Bank Accounts ............................................................................................. 39

      c.  Priority of Distributions ........................................................................................ 40

      d.  The Restitution Order is Immediately Enforceable Absent a Stay ................ 40

IV. FORFEITURE ............................................................................................................... 41

  A. Factual Background ..................................................................................................... 42

B. Applicable Law ................................................................................................ 44

C. Discussion ...................................................................................................... 46

V. CONCLUSION ...................................................................................................... 50

## I.    PRELIMINARY STATEMENT

The Government respectfully submits this supplemental memorandum to respond to the questions the Court raised at the initial sentencing hearings on November 20 and 21, 2024, for defendant Sung Kook (Bill) Hwang, and in advance of the final hearing scheduled for December 19, 2024.

First, the 18-year prison sentence articulated by the Court is both lawful and appropriate; by contrast, the defendant's proposed alternative sentence is not. Statutory law does not permit the Court to impose consecutive supervised release periods with home confinement conditions, as Hwang suggests, and the Court should not impose such a sentence even if it could. A sentence of 11.5 years' imprisonment would not be just punishment, but instead would create disparities in the sentencing of similarly situated defendants and, in fact, would result in lesser offenders this Court has sentenced serving lengthier sentences. Hwang's preference to serve all of his sentence at a minimal security institution does not supersede the requirements of Section 3553(a).

Second, Hwang may not avoid responsibility for compensating his victims for the losses he caused. The MVRA requires Hwang to return his victims to the position they were in before his fraud. For the counterparties, this means Hwang must pay for the margin loan amounts he took and lost; the variation margin he withdrew and lost; and the trading losses he imposed on the counterparties that facilitated his swaps. For the individual employees, this means that Hwang must restore to them the deferred compensation he lost through his trading conduct. Each of those categories of loss resulted from his offense and each of those categories of loss was foreseeable to him at the time he pursued his schemes. As directed by the Court, after meeting and conferring with defense counsel regarding the latest victim submissions, the Government will propose a restitution order for each of those categories of loss.

Third, the Court should order Hwang to forfeit his interest in the Archegos Enterprise and the proceeds of his criminal offenses. Hwang extracted billions from his counterparties and purposefully redeployed those proceeds in furtherance of the fraud. That Hwang later lost those funds when his scheme collapsed is no defense to a forfeiture order, nor is his choice to use those funds to pay for additional trading rather than additional luxuries. The Government's proposed forfeiture order is supported by the factual record and authorized by statute.

## II.    THE PROPOSED DEFENSE SENTENCE

### A.    The Sentence Sought By the Defense is Not Authorized by Law

At the November 21, 2024 sentencing hearing, defense counsel proposed to the Court that, in lieu of the 18-year prison sentence that the Court had stated it intended to impose, the Court should sentence Hwang to 11.5 years' imprisonment to be followed by 6.5 years' home confinement. (Nov. 21, 2024 Hr'g Tr. 114).  Defense counsel argued that the Court could do so by imposing multiple terms of supervised release consecutively. (*Id.*). This proposed sentence is not authorized by law.

First, the law does not permit multiple terms of supervised release to be imposed consecutively. The maximum term of supervised release for each of Hwang's ten counts of conviction is three years, and the law requires that multiple terms of supervised release run concurrently, not consecutively. *See, e.g.*, 18 U.S.C. § 3624(e) ("The term of supervised release commences on the day the person is released from imprisonment and runs concurrently with any Federal, State, or local term of probation or supervised release or parole for another offense to which the person is subject or becomes subject during the term of supervised release."); U.S.S.G. § 5G1.2 n.2(C) ("In the case of a consecutive term of imprisonment . . . , any term of supervised release imposed is to run concurrently with any other term of supervised release imposed."); *United States v. Fudge*, 592 F. App'x 86, 92 (3d Cir. 2014) ("18 U.S.C. § 3624(e) mandates that

multiple terms of supervise[d] release run concurrently." (internal quotation marks omitted));

*United States v. Refert*, 519 F.3d 752, 759 (8th Cir. 2008) ("18 U.S.C. § 3624(e) unambiguously

states that terms of supervised release on multiple convictions are to run concurrently." (internal

quotation marks omitted)). In short, the law does not permit the sentence urged by the defendant.

Second, there is no lawful mechanism for imposing a term of incarceration to be followed

by a term of home confinement. As the Second Circuit has observed, "*home detention* can never

be a proper sentence in its own right," and could only be imposed here as a condition of probation

or of supervised release. *United States v. Thomas*, 135 F.3d 873, 875 (2d Cir. 1998) (citations

omitted, emphasis in original). Indeed, any sentence of imprisonment must be served at a place

chosen by the BOP. Title 18, United States Code, Section 3621(a), provides that "[a] person who

has been sentenced to a term of imprisonment . . . shall be committed to the custody of the Bureau

of Prisons until the expiration of the term imposed, or until earlier released for satisfactory

behavior . . . .," and Section 3621(b) provides that "[t]he Bureau of Prisons shall designate the

place of the prisoner's imprisonment . . . ." Moreover, the Sentencing Reform Act abolished so-

called "split sentences"—that is, sentences split between imprisonment and probation, and

therefore, consistent with 18 U.S.C § 3561(a)(3), a defendant may not be sentenced to term of

probation (even with a condition of home confinement) at the same time as a term of imprisonment

for the same offense. *See, e.g.*, U.S.S.G. § 5B1.1 cmt. background; *Gov't of the V.I. v. Martinez*,

239 F.3d 293, 297 n.1 (3d Cir. 2001). In other words, the sentencing statutes do not permit the

imposition of a sentence of imprisonment followed by a sentence of home confinement, other than

as a condition of supervised release, which, here, would have a maximum term of three years.

None of this is to say that the defendant will necessarily serve his entire term of

incarceration in a BOP facility. As discussed further below, the defendant is almost certain to

receive substantial credits that will have the effect of significantly reducing his term of imprisonment. Congress also has mandated that the BOP, under certain circumstances, transfer prisoners to non-prison facilities, and granted the BOP, under certain circumstances, the authority to transfer prisoners to home confinement for a portion of their term of imprisonment. *See, e.g.*, 18 U.S.C. § 3624(c). But Congress has determined not to permit what the defendant now seeks— a sentence comprised of an 11.5-year term of incarceration with an additional 6.5 years of home confinement. Moreover, such a sentence would not be sufficient to satisfy the purposes of sentencing.

### B.     The Court Should Not Reconsider its Sentence of 18 Years' Imprisonment

The defendant argues that the Court should impose a sentence of no more than 11.5 years in prison solely on the basis that this defendant should not have to be housed in anything but a minimum-security facility. (Nov. 21, 2024 Hr'g Tr. 113). To that end, defense counsel has proffered to the Court that if the defendant is sentenced to more than 11.5 years' imprisonment, he will be precluded from serving his sentence in a camp and thus face, according to defense counsel, unduly harsh conditions of confinement. (*Id.*). First, the picture that the defense has painted for the Court is incomplete; as explained below, the defendant would almost certainly serve the substantial majority of an 18-year sentence at a minimum-security facility. Second, particularly because, as explained above, the Court could not grant the defendant's request without imposing an 11.5-year, rather than 18-year, sentence, the sentence requested by the defendant would not be sufficient to satisfy the purposes of sentencing, as set forth by the Court on November 20, 2024.

As an initial matter, any effort to impose a sentence to achieve a particular BOP outcome will be uncertain. The BOP has exclusive authority to "designate the place of the prisoner's imprisonment." 18 U.S.C. § 3621(b). The BOP will try to accommodate judicial requests regarding

incarceration "[w]hen consistent with policies or when such actions are consistent with sound correctional management." BOP Policy 5100.08, Inmate Security Designation and Custody Classification, ch. 5, p. 3.[1] Thus, no matter what sentence the Court imposes, the BOP will determine where Hwang serves that sentence.

There are four security classifications for BOP institutions: minimum, low, medium, and high:[2]

- Minimum security institutions, also known as "camps," have dormitory housing, a relatively low staff-to-inmate ratio, and limited or no perimeter fencing. Those institutions are work- and program-oriented.

- Low security institutions have double-fenced perimeters, mostly dormitory or cubicle housing, and strong work and program components. The staff-to-inmate ratio in low security institutions is higher than in minimum security facilities.

- Medium security institutions have strengthened perimeters (often double fences with electronic detection systems), mostly cell-type housing, a wide variety of work and treatment programs, an even higher staff-to-inmate ratio than low security institutions, and even greater internal controls.

- High security institutions have highly secured perimeters (featuring walls or reinforced fences), multiple- and single-occupant cell housing, the highest staff-to-inmate ratio, and close control of inmate movement.

In determining whether a prisoner should be housed in a minimum, low, medium, or high security institution, the BOP considers several factors, including the length of time that the prisoner has left on his sentence. *See, e.g.*, BOP Policy 5100.08, ch. 4, p. 6. In that regard, generally speaking, "[a] male inmate with more than ten years remaining to serve will be housed in at least a Low security level institution." *Id.* at ch. 5, p. 9.[3] According to the BOP,[4] the BOP typically

---

[1] Available at https://www.bop.gov/policy/progstat/5100_008cn.pdf.

[2] *See* https://www.bop.gov/about/facilities/federal_prisons.jsp.

[3] The defense has likely used the 11.5-year figure to account for the credit afforded for so-called "Good Conduct Time." This submission addresses such credit in more detail below.

[4] In preparing this submission, the Government has consulted with BOP counsel.

designates inmates like Hwang to low security institutions until they have less than ten years left on their sentence, at which point the BOP typically designates them to a minimum-security institution.

The defense is wrong to suggest that, by sentencing Hwang to more than 11.5 years' imprisonment, the Court will be consigning Hwang to serve his sentence in an unfairly punitive facility. For one thing, the defense has offered no support for its bald assertions that a low security institution, as compared to a minimum security institution, would subject Hwang to "a very high risk of violence," would "make[] it very hard for his family to visit," or would pose "restrictions . . . that are much harder for a 60 year-old person." (Nov. 20, 2024 Hr'g Tr. 113). Low-security facilities routinely permit family visits, furnish medical care, and aim to provide a safe living environment. For another thing, Hwang presents no compelling reason that his personal preference for the manner of his incarceration should outweigh the Section 3553(a) factors that support a substantial term of imprisonment in the first place. The Court was correct during the proceeding on November 20, 2024 to draw comparisons between the offenses of Hwang and those of Bernie Madoff and Sam Bankman-Fried (Nov. 20, 2024 Hr'g Tr. 44), both of whom received sentences well over 11.5 years' imprisonment. No doubt Messrs. Madoff, Bankman-Fried, and many like them—including David Hu, whom this Court sentenced to 12 years' imprisonment for defrauding investors in an over $120 million Ponzi-like scheme, *United States v. Hu*, 20 Cr. 360 (AKH)— would have preferred to spend the entireties of their custodial terms at camps, but, in all three cases, numerous of the Section 3553(a) factors dictated lengthy terms of imprisonment and the corresponding BOP security designation. Indeed, it would send precisely the wrong message if wealthy, Wall-Street stock manipulators like Hwang were permitted a lower sentence in order to avoid the BOP classification system that is applied equally to all inmates.

In any event, the length of Hwang's sentence does not determine *whether* he may his serve his sentence in camp, but rather *when* he may first begin to do so. As a general matter, the BOP moves to camps those nonviolent inmates projected to be released within ten years. Accordingly, if the Court were to impose the 18-year sentence that the Court announced on November 20, 2024, Hwang would likely be eligible to *move* to a minimum-security institution within roughly 52 months of commencing his sentence, as further explained below. Thus, the suggestion by defense that sentencing Hwang to "over 11.5 years means that he can no longer be in a minimal security prison" (Nov. 20, 2024 Hr'g Tr. 113) at the very least omits the fact that the circumstances of Hwang being designated to a low-security facility are only temporary.

Moreover, the actual time that Hwang will spend in custody will primarily be a function of "Good Conduct Time" reductions and "Earned Time Credit" under the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194 (2018). With respect to Good Conduct Time, a well-behaved prisoner can earn "up to 54 days for each year of the prisoner's sentence imposed by the court, subject to determination by the [BOP] that, during that year, the prisoner has displayed exemplary compliance with institutional disciplinary regulations." 18 U.S.C. § 3624(b). The BOP calculates Good Conduct Time based on a prisoner's whole sentence, not just the time a prisoner actually serves. As such, prisoners who exhibit "exemplary compliance with institutional disciplinary regulations" may earn "54 days for each year of the prisoner's sentence imposed by the court," including credit for time they never actually serve. *Id.* § 3624(b)(1).

With respect to Earned Time Credit, the First Step Act established a system under which a prisoner can earn additional credit by participating in programs aimed at reducing recidivism. These rewards include the accrual of up to 15 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities. *See id.*

§ 3632(d)(4)(A)(i)-(ii). An inmate is eligible to earn Earned Time Credits if: (a) he was convicted of a United States federal code offense; (b) he was not convicted of a disqualifying offense;[5] and (c) he is at an institution, but not in disciplinary segregation. Moreover, eligible prisoners are automatically enrolled in the program. Temporary operational or programmatic interruptions authorized by the BOP will not ordinarily affect an eligible inmate's "successful participation." 28 C.F.R. § 523.41(c)(3). For example, to the extent a prisoner is unable to participate in evidence-based recidivism reducing programs or activities as a result of the lack of availability of such programs or activities at a particular BOP facility, the prisoner will still earn the time credit.

Twelve months of Earned Time Credits may be used to reduce a prisoner's sentence. *See* 18 U.S.C. § 3624(g)(3). In mathematical terms generally, provided that the prisoner has no breaks in earning credits (*e.g.*, no disciplinary placement in SHU), a prisoner must serve 27 months to accumulate 12 months in Earned Time Credit; thus, a prisoner must serve a net of 39 months in custody (27 months + 12 months = 39 months) to get a year off his sentence. For any time served after 39 months, a prisoner can earn one-third of that time in Earned Time Credits. The remaining Earned Time Credits "shall be applied toward time in prerelease custody," such as a residential reentry center ("RRC") (also referred to as a "halfway house") or home confinement. 18 U.S.C. § 3632(d)(4)(C). Prerelease custody involves placement in an RRC, home confinement, or a combination thereof. While restrictions vary, depending on the individual defendant, individuals in prerelease custody can do such things as work, go to medical appointments, and go out to dinner. Individuals in home confinement have even fewer restrictions than those placed in a halfway house and are at liberty to be out and about in the community.

---

[5] Hwang was not convicted of a disqualifying offense, which include terrorism offenses, certain sex offenses, certain drug offenses, immigration offenses, and some serious violent felonies. *See* 18 U.S.C. § 3632(d)(4)(D)-(E).

The following table outlines the likely potential credits and effective sentences for Hwang if he were sentenced to 18 years' imprisonment, as the Court announced on November 20, 2024, and if he were sentenced to 11.5 years' imprisonment, as the defense urges.[6]

| Sentence | Good Conduct Time Reduction to Term of Imprisonment | Earned Time Credit Reduction to Term of Imprisonment | Time Spent in BOP Institution Before Likely Eligible for Camp | Earned Time Credit Toward Prerelease Custody | Total Time Spent in BOP Institution |
|---|---|---|---|---|---|
| 216 months (18 years) | ~32 months (972 days) | 12 months | ~52 months | ~48 months[7] | ~124 months (~10 years) |
| 138 months (11.5 years) | ~21 months (621 days) | 12 months | 0 months | 26 months[8] | ~79 months (~7 years) |

As reflected above, an 18-year sentence would see Hwang likely eligible for a transfer to a minimum-security institution (*i.e.*, a camp) after roughly 4 years and would see him likely eligible for release to prelease custody (*i.e.*, a halfway house or home confinement) after roughly

---

[6] The calculations set forth herein, including but not limited to this table, are not binding on the BOP. Those calculations are reasonable, educated estimates, based on information currently available and providing the best-case scenario (*e.g.*, Hwang does not incur any disciplinary infractions while in custody). Successful completion of the Residential Drug Abuse Program ("RDAP") could provide Hwang with an additional year reduction in his sentence, 18 U.S.C. § 3621(e)(2)(B), although Hwang does not appear to have a substance abuse problem.  (*See* PSR ¶¶ 155, 156).

[7] Calculated as follows: 184 months (time remaining after subtracting Good Conduct Time) - 39 months (the net time a prisoner must serve to get a year off of sentence) = 145 months (remaining time on the sentence). Then, 145 months ÷ 3 (because a prisoner can earn one-third of that time in Earned Time Credits) = ~48 months (Earned Time Credit toward RRC or home confinement).

[8] Calculated as follows: 117 months (time remaining after subtracting Good Conduct Time) - 39 months (the net time a prisoner must serve to get a year off of sentence) = 78 months (remaining time on the sentence). Then, 78 months ÷ 3 (because a prisoner can earn one-third of that time in Earned Time Credits) = 26 months (Earned Time Credit toward RRC or home confinement).

10 years. The Court's careful balancing of the Section 3553(a) factors amply justifies such a sentence, and the defense has offered no compelling reason for the Court to reconsider it.

## III.    RESTITUTION

The Mandatory Victims Restitution Act ("MVRA") requires Hwang to pay his victims in full for the losses resulting from his criminal offenses.

### A.    Factual Background

#### 1.  The Counterparty Victims Extended Hwang Credit to Facilitate His Trades and Incur Risk.

BMO, Credit Suisse, Jefferies, Macquarie, Morgan Stanley, MUFG, Nomura, and UBS, each acted as an Archegos trading counterparty during Hwang's schemes.[9] That is, each of the counterparties had a business relationship with Archegos in which the counterparty agreed to facilitate swap trades with Archegos pursuant to various contracts, such as ISDA master agreements. (*See, e.g.*, GX 319 (MUFG – Archegos ISDA)). "An ISDA is just a credit agreement used to trade derivatives." (Trial Tr. 1890 (Salcedo)). Through an ISDA, a counterparty bank and its client establish "a bilateral relationship" for trading derivatives. (Trial Tr. 2627 (Locasto)). Multiple counterparty banks also acted as prime brokers to Archegos and in that capacity facilitated equities trades, short selling, position settlement, and cash transfers. (*E.g.*, Trial Tr. 584 (Jones); Trial Tr. 1708 (Khambampati); Trial Tr. 1555 (Lukeman); Trial Tr. 2627 (Locasto)).

The counterparty victims each agreed to provide Archegos with the ability to trade financial instruments known as total return swaps. By their terms, a total return swap exposes both parties to the economic benefits and risks of holding an equity security without formal ownership. (Trial

---

[9] As proven at trial, Archegos had other counterparties and prime brokers, too, including Deutsche Bank, Goldman Sachs, and Wells Fargo, that do not seek restitution. The facts here relate to those financial institutions that suffered losses because of Hwang's misconduct and for which Hwang must be ordered to pay restitution.

Tr. 610 (Jones); Tr, 1559-60 (Lukeman)). They also exposed each party to the risk that the other party would not pay due amounts at the end of the contract. Hwang used these swap contracts to place large, concentrated, and highly-leveraged trades in a handful of securities. (GX 475). Hwang's trades necessarily exposed the banks to the same economic risks (in the opposite direction) that he took. So, for example, as the value of Hwang's swap positions tended to increase, the banks' swap positions tended to decrease, and the magnitude of each party's risks grew as stock prices moved further from the price that prevailed at the time the swap began. Moreover, the possibility that Hwang's positions would decline carried with it the chance that he and his fund would be unable to cover the losses at the end of the contract.

Because of the risks posed by a trading relationship, the counterparty banks engaged in diligence to decide whether to begin, continue, and expand business relationships with a hedge fund client, such as Archegos. Brian Fairbanks, who worked at UBS during the relevant period, explained that UBS performed a risk evaluation on clients "[b]efore they come in the door" to size up the risks of accepting a new client. (Trial Tr. 119 (Fairbanks)). Such diligence was "part of the underwriting process," (Trial Tr. 1674 (Kambhampati)), because, regardless of the specific trades that a client might make, the counterparty-client relationship fundamentally involved the bank extending credit (either in the form of loans or in the form of market exposure or both) to the client to facilitate the client's trading. A BMO employee framed the stakes simply: "We're the lender, so if they run out the money they're potentially going to lose our money. So I want to make sure they are taking prudent steps to protect the money they have because if they lose more than they have, they are essentially losing our money as the lender." (Trial Tr. 1816 (Boccuzzi)). Among other things, information about the client's portfolio, liquidity, available cash, and regulatory history figured into the banks assessment about whether and how to do business with a client like

Archegos. (*E.g.*, Trial Tr. 116, 119 (Fairbanks); Trial Tr. 707 (Miranda); Trial Tr. 1815 (Boccuzzi)).

Further, unlike Hwang and Archegos, Archegos's counterparties did not speculate on future market movements in particular stocks; rather, the counterparties provided the swaps to Hwang in order to profit from service and financing charges. (Trial Tr. 1558 (Lukeman)). Accordingly, Archegos's counterparties attempted to mitigate the economic risks they faced by facilitating Hwang's trades. To this end, most counterparties employed risk or capacity limits that cabined the total market exposure the bank had to Archegos's positions. Counterparty victims also traded with their clients "on a collateralized basis, meaning [clients] provide [the bank] with margin, they provide us money to secure their borrowing." (Trial Tr. 1882 (Salcedo)). And at the time Hwang traded—that is, struck a new swap—the counterparty mirrored that transaction by trading in equities. (Trial Tr. 1557-58 (Lukeman)). Indeed, the banks were "not in the business of blindly taking on balance sheet risk or single stock risk without [an equity hedge] without it being on a one-for-one basis facing the client." (Trial Tr. 1558 (Lukeman)). Moreover, these equity trades were a functional precondition to the formation of the swap and provided the reference price against which the swap's later performance would be measured: "[O]nce that hedge was complete, then, and only then, would the swap be written on that exposure." (Trial Tr. 1556 (Lukeman)). These equity purchases enabled the counterparty to guarantee that it would be able to sell the stock at the end of the swap period and perfectly offset any appreciation (or depreciation) in the value of a specific stock that would be owed to Archegos. (Trial Tr. 1557-58 (Lukeman)).

The equity purchases did not, however, guarantee that Archegos would pay the bank what it owed or that the bank would break even on the swap. If a swap moved against Archegos, then the equity purchases were necessarily worth less than the bank had originally paid to obtain them.

The banks therefore faced no upside benefit—that was promised to Archegos—and depended on Archegos to pay what it owed on the swap to offset any downside risk. To moderate the possibility of losses, counterparties required margin collateral, the size of which fluctuated with market performance. (Trial Tr. 1882 (Salcedo)). The various ISDA and trading contracts anticipated that if Archegos did not post margin as required it would default on its trading arrangement. (Trial Tr. 3507 (Tomita)). As a former UBS employee explained, a default would trigger the end of swaps:

> If the client defaults and runs out of money, we are left having to unwind, what we call unwind a swap, which is terminating the swap, but then we have the hedge, the physical shares we actually have to go and sell into the market. And that's where the loss comes into play. So we're unwinding that hedge, we're selling the stock to get out of the swap, the contract we wrote.

(Trial Tr. 117 (Fairbanks)).

### 2. Hwang and the Archegos Conspirators Intentionally Disrupted the Banks' Risk Management to Carry Out the Scheme

Hwang knew and expected that the counterparties would mitigate their risk by, among other things, capping economic exposure, requiring margin, and trading in the equity referenced by each swap. Hwang's schemes, however, required Archegos personnel to conceal the risks posed by doing business with Archegos and by permitting Archegos to trade.

#### a. Economic exposure

The conspirators knew that Archegos's counterparties limited the amount of economic risk they would take to facilitate Hwang's trading. Hwang, Tomita, and Becker became preoccupied with obtaining and enlarging this "buying power or the ability to purchases additional shares in those securities," which they referred to as "capacity." (Trial Tr. 847 (Becker)). Tomita recalled that during the scheme he and Hwang discussed capacity on "a daily basis, ongoingly throughout the day." (Trial Tr. 3172). Working from information conveyed by Becker, Tomita and the trades

also sent Hwang a daily "capacity update" email that included "a recap of all the capacity that we had at the different counterparties split up by stock." (Trial Tr. 3164-65 (Tomita); GX 2917). And Becker developed computer models to try to predict how additional trades would affect existing capacity.

As Hwang's efforts to inflate stock prices consumed more and more capacity at Archegos's various counterparties, the conspirators labored to persuade existing counterparties to increase their risk limits. Becker summarized how it worked:

> The typical process, Mr. Tomita would request additional capacity from a counterparty. And before that counterparty could give Archegos that capacity, their credit team would have to sign off. At that point, I would speak to the credit teams. In those conversations, I would lie. The credit teams would then sign off on those capacity increases, and Archegos would have that capacity that it requested.

(Trial Tr. 848 (Becker)). And the conspirators "were actively speaking to multiple potential new counterparties," to access additional buying power through them. (Trial Tr. 346, 3354-4 (Tomita)).

Hwang's team repeatedly induced the counterparties to extend or increase additional trading capacity—that is, take on more risk to facilitate further trading—by systematically misleading them. Among other things, Becker "understated the risk of the portfolio" by misrepresenting "concentration, the size of the largest positions in the portfolio, the exposure, or the leverage of the portfolio" and he also "lied about liquidity or how quickly the positions in the portfolio" could be sold." (Trial Tr. 804 (Becker)). These deceptions touched each and every counterparty victim. When asked, "How many banks did you lie to?," Becker responded, "12, all of Archegos's counterparties." (Trial Tr. 804 (Becker)).

### b. Equity trades

Hwang's swaps trades intentionally and predictably caused transactions in the equities markets. After receiving Hwang's directions, Archegos traders would enter those trades into "a

software system called EMSX." (Trial Tr. 3046 (Tomita)). Through EMSX, Archegos provided trading instructions to its counterparties, "making a direction to one of our counterparties to purchase a stock." (Trial Tr. 3046 (Tomita)). Specifically, the Archegos traders would create a "parent order" in EMSX that included the various criteria Hwang had decided for the trade, such as the ticker symbol, whether it was a swap or equity, the quantity of the order, applicable limits, and any algorithmic execution requests, and would assign either all or part of that "parent order" to a particular counterparty for execution. (Trial Tr. 1641-42 (Arnone); Trial Tr. 1869-70 (Masood); Tr. 3048-49, 3181 (Tomita); Tr. 1730-1731 (Tropper)). Once the order was placed, the counterparty would "go into the market and trade based off those instructions." (Trial Tr. 1642 (Arnone); Tr. 1586 (Lukeman)).  The counterparties transacted in equity in equal proportion to the swap orders for "100 percent of these names" so that "all of these [swap] names were hedged" by market transactions. (Trial Tr. 1560 (Lukeman)). As a result, Archegos traders received "real time feedback, every time, once the order was routed to the bank," meaning "every share purchased instantaneously [they] would see that updated real time[.]" (Trial Tr. 3071 (Tomita); Tr. 1871 (Masood)).

Although these equity transactions constituted hedges to the eventual swaps, Archegos fully controlled their purchase and sale. Archegos traders "would buy the stocks directly through [the] electronic trading platform where they would control that order[.]" (Trial Tr. 1555 (Lukeman); Tr. 1734 (Tropper)). The difference between an Archegos trader sending an order in swap form versus equity form was a largely a matter of "[c]hecking the box or doing a drop down," a choice that simply determined whether the counterparty purchased shares in the bank's name (and agreed to pass the benefits of ownership to Archegos) or in Archegos's name (and placed the stock in Archegos's brokerage account). (Trial Tr. 3048-49 (Tomita)). Whether Archegos

instructed the bank to trade on swap or equity, the counterparty transacted in the equities market on behalf of Archegos in the stock Archegos identified pursuant to the trading instructions Archegos supplied. (Trial Tr. 1559-60 (Lukeman); Trial Tr. 3047-48 (Tomita)). "Once the hedge was complete, then, and only then, would a swap be written on that exposure. So first comes the hedge, then comes the swap." (Trial Tr. 1556 (Lukeman); Tr. 1733-34 (Tropper)).

### c. Margin

The conspiracy also took advantage of the counterparties' margin frameworks to sustain and advance the trading scheme. Variation margin tracked fluctuations in the stock price so "if the investment of the stock increases or decreases in value, the variation margin is whatever the change is." (Trial Tr. 3059 (Tomita); Trial Tr. 2647 (Locasto)). "Variation margin can go both ways[:] against or for the client." (Trial Tr. 2660-61 (Locasto)). So if Archegos's position "would close down, in effect we would be losing money and that would result in us having to pay cash over to the counterparties." (Trial Tr. 3041 (Tomita)). Conversely, though "each counterparty had its own setup," as a general matter "if the positions at the counterparty made money, you usually had the ability to claw that money back." (Trial Tr. 3059 (Tomita)).

Hwang, in turn, used those funds to pay for additional trades which were structured in a way to maximize market impact. As Tomita explained at length, Hwang directed trades with "the intent of moving the price . . . for the aim of maximizing the amount of money [Archegos] could borrow from the banks against the stocks." (Trial Tr. 3040 (Tomita)). Becker, for his part, facilitated this by advising the trading team where each trade would go farthest: "So Mr. Hwang would give the trading desk his orders, the traders via Bloomberg Chat would notify me what the orders were. I would refer to Excel-Based models where I tracked margin and capacity with

brokers, and gave the trading desk the instructions of who to trade with. That was for every trade order that Mr. Hwang had given the desk." (Trial Tr. 832 (Becker)).

### 3.  Archegos's Counterparties Incurred Substantial Losses From Archegos's Trades

Multiple stocks in Archegos's portfolio declined in value the week of March 23, 2021. Though Hwang tried to manipulate his way back to profitability, he ultimately failed. (*See* GX 3056N). Hwang's efforts expended all of Archegos's available cash and left the firm by midweek without margin to post to the banks to sustain its swaps. (GX 3745R). As Tomita recognized, the failure to meet a margin call meant its positions would be unwound and the effort to manipulate the stocks would be lost: "[w]hen a default like that happens, that gets the counterparties the right to then go and take control of your portfolio and just sell everything and liquidate it." (Trial Tr. 3508 (Tomita)). Indeed, the various ISDA contracts expressly advised Hwang that collateral "in the form of securities may decline speedily in value" and that upon default the counterparties had a right to liquidate collateral without any prior notice. (*See, e.g.*, GX 315 at 52 (Jefferies - Archegos ISDA)).

Eventually the banks declared Archegos in default of its contractual obligations. (*E.g.*, Trial Tr. 738-39 (Miranda); Tr. 1177-78 (Becker); Tr. 1694 (Kambhampati); Tr. 1744 1850 (Boccuzzi)). Those defaults triggered Archegos's responsibility to pay what it owed under the swaps and to pay back all outstanding loans. As anticipated by the contracts, and as expected by Archegos, the counterparties then seized Archegos's posted collateral and closed out the hedges that had been purchased to create the swaps in the first place. (Trial Tr. 556 (Jones) ("[B]y receiving this, we knew that at least Credit Suisse in this case was positioning themselves to . . . force the sale of some of the securities that were in the Archegos fund."); Trial Tr. 1744-45 (Tropper); Trial Tr. 3508 (Tomita)).

For most of the counterparties, unwinding Archegos's positions crystalized substantial losses: the sale of those hedges did not offset the cost incurred to obtain them in the first place, nor did the sale of collateral make up the difference, nor did the capture of posted margin. Indeed, the counterparties discovered in trying to unwind the positions that each of Archegos's counterparties held many of the same large and concentrated positions, contrary to what Archegos had previously led the counterparties to believe, impairing their ability to unwind those positions without depressing prices further. As a result, even after crediting Archegos for the value of its posted margin, the value of its collateral, and for sums raised through the sale of hedges, the counterparties incurred far more in costs initiate Hwang's swap trades than they received by closing them. Becker summarized the result bluntly: When asked, "what happened to those billions of dollars that the banks had lent to Archegos?" Becker responded, "They could not be paid back. It was gone." (Trial Tr. 805 (Becker)).

### 4. Archegos Employees Were Required, and Routinely Pressured, to Contribute to the Deferred Compensation Plans

During the course of his criminal schemes, Hwang also employed dozens of innocent Archegos employees. These employees were paid an annual salary as well as a discretionary bonus. Hwang required all Archegos employees to defer 25% of their annual bonus and contribute those funds to the Archegos Capital Management Deferred Compensation Program (the "Primary Plan"). (Trial Tr. 459 (Martz)). Jesse Martz, a member of the Operations team, testified at trial that his contribution to the Primary Plan was a "requirement" and that the money he contributed "got taken out of [his] bonus automatically." (Trial Tr. 459 (Martz)). As to these contributions, employees were assured that their contributions would be safe, and that they would receive their original contributions, plus any gains resulting from the financial performance of the Archegos fund, after a period of five year. (Trial Tr. 460 (Jones); Huang Decl. ¶ 8).

In addition, senior employees at Archegos were given the option to defer an additional portion of their annual bonus and contribute those funds to the Archegos Capital Management LP Elective Deferred Bonus Plan for Knowledgeable Employees (the "Elective Plan"). (Trial Tr. 560 (Jones)). In 2018, senior employees could defer up to an additional 25% of their bonus. (Huang Decl. ¶ 11). By 2019, senior employees could defer up to an additional 35% of their bonus. (Huang Decl. ¶ 12). The Elective Plan was not truly elective. (Huang Decl. ¶ 13). Rather, Archegos employees were pressured by senior leadership at Archegos to contribute the maximum allowable amount to the Elective Plan. (Huang Decl. ¶ 14 ("I felt pressure from senior management to contribute the maximum amount to the 'Elective' Plan or risk being viewed by the Defendant and other senior managers as disloyal.");  Burn Ltr. 2 ("Mr. Burn also faced intense pressure to defer an additional 35% of the annual bonus due to him."); Sullivan Ltr. 1 ("At Archegos, maxing out our deferred compensation [] was made mandatory.")). Notably, employees were required to make their deferred contribution elections in November of each year, before they were told the amount of their annual bonus. (Huang Decl. ¶ 16). Employees like Cindy Huang and Brendan Sullivan understood they would be penalized by receiving a smaller bonus if they elected to contribute anything less than the full amount. (Huang Decl. ¶ 17 ("I felt pressure to elect the maximum percentage for fear that I would be penalized by receiving a smaller bonus."); Sullivan Ltr. 1 ("I, like all employees, knew that electing less than the maximum [] would result in being paid a lower bonus as retaliation for disloyalty.")). Employees were also induced to contribute the maximum amount based on assurances that their contributions would be protected and guaranteed against losses by Archegos. (Huang Decl. ¶ 8 ("The Primary Plan was presented as having no downside risks because employees' contributions were purportedly guaranteed against loss by Archegos."); Kealy Ltr. 4 ("Mr. Kealy was induced to make these additional, 'voluntary' contributions through

several material misrepresentations," including that the "Deferred Compensation Plan []
guaranteed the employees' payout amount at the end . . . would never fall below the original grant
amount.")). Those assurances proved hollow when Archegos collapsed in March 2021.

As Hwang's criminal schemes advanced in 2020 and early 2021, the balances of the
Primary and Elective Plans grew exponentially, from $71 million in February 2020 to $764 million
in March 2021. (GX 6618A). When Archegos collapsed, these amounts were reduced to zero. As
Jones testified at trial, in the wake of Archegos's collapse, Archegos employees were told that
their "deferred compensation . . . was going to be not worth anything." (Trial Tr. 560 (Jones)).
Martz recalled a similar message, recounting at trial how Andy Mills, the Co-CEO of Archegos,
told employees during a final Zoom call on March 29, 2021 that "deferred compensation . . . is no
longer going to be there for the employees." (Trial Tr. 458 (Martz)).

### B.    Applicable Law

The MVRA provides for mandatory restitution by a defendant convicted of a property
offense under Title 18, "including any offense committed by fraud or deceit," where "an
identifiable victim" has suffered a "pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii),
(c)(1)(B). Under the MVRA, anyone "directly and proximately harmed as a result of the
commission of an offense" or "directly harmed by the defendant's criminal conduct in the course
of [a] scheme, conspiracy, or pattern" of criminal activity is a "victim" entitled to restitution. 18
U.S.C. § 3663A(a)(2). "In each order of restitution, the court shall order restitution to each victim
in the full amount of each victim's losses as determined by the court and without consideration of
the economic circumstances of the defendant." 18 U.S.C. § 3664(f)(1)(A); *see United States v.
Qurashi*, 634 F.3d 699, 704 (2d Cir. 2011). "The primary and overarching goal of the MVRA is
to make victims of crime whole, to fully compensate these victims for their losses and to restore

these victims to their original state of well-being." *Qurashi*, 634 F.3d at 703; *see United States v. Coriaty*, 300 F.3d 244, 253 (2d Cir. 2002) ("statutory focus" of MVRA is "making victims whole").

"[T]he MVRA caps the restitution award at the actual amount of the victim's loss," *United States v. Thompson*, 792 F.3d 273, 277 (2d Cir. 2015), but "the calculation of these losses need not be mathematically precise," *United States v. Rivernider*, 828 F.3d 91, 115 (2d Cir. 2016). A district court must make only "a reasonable estimate" of a victim's loss "based on the evidence before it." *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007); *see also United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013) ("[A] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable."). A district court has discretion in the procedures used to determine an award "so long as the defendant is given an adequate opportunity to present his position as to matters in dispute." *United States v. Maurer*, 226 F.3d 150, 152 (2d Cir. 2000).

Courts interpret the MVRA to require restitution where a defendant's offense was a cause in fact and a proximate cause of a victim's loss. *See United States v. Goodrich*, 12 F.4th 219, 229 (2d Cir. 2021). The cause in-fact requirement is satisfied if the defendant's conduct was a but-for cause of the injury or loss, meaning the conduct was "a necessary factor in bringing about the victim's harm." *Id.* (citing *United States v. Marino*, 654 F.3d 310, 323 (2d Cir. 2011)). Proximate causation "is a flexible concept that generally refers to the basic requirement that there must be some direct relation between the injury asserted and the injurious conduct alleged." *Paroline v. United States*, 572 U.S. 434, 444 (2014). The key inquiry "'is whether the harm alleged has a sufficiently close connection to the conduct,' which [the Second Circuit] evaluate[s] based on whether that harm was 'foreseeable' to a defendant." *Goodrich*, 12 F.4th at 229 (quoting *Robers*

21

*v. United States*, 572 U.S. 639, 645 (2014)); *see also Marino*, 654 F.3d at 323-24. "[A] given proximate cause need not be, and frequently is not, the exclusive proximate cause of harm." *Sosa*, 542 U.S. at 704; *see also Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) ("[I]t is common for injuries to have multiple proximate causes.").

Restitution determinations may be made based on a preponderance of the evidence. *See United States v. Oladimeji*, 463 F.3d 152, 157 (2d Cir. 2006); 18 U.S.C. § 3664(e). In reaching its determination, the district court has broad discretion in the sources of information it may consider and is not bound by the trial record. *See United States v. Denault-Reynolds*, 810 F. App'x 38, 40-41 (2d Cir. 2020) (describing district court's broad discretion at sentencing and affirming use of hearsay evidence during sentence where hearsay bore indicia of reliability).

### C.    Discussion

The Court should order restitution to Hwang's counterparty victims and innocent employees. The order should be immediately enforceable, except as against Hwang's family residence, and the Court may structure the order to disburse recoveries first to the individual employees and second to the counterparty banks.

### 1.  Counterparty Victims

Hwang's conduct resulted in losses to the counterparties in three categories: (a) margin loans extended to Archegos that Archegos did not pay back; (b) variation margin paid to Archegos that Archegos did not return; and (c) losses incurred by facilitating Archegos swap trades. In order

to restore the counterparties into the position they were in before the misconduct, the Court should order Hwang to compensate the counterparties for each of these categories of loss.[10]

### a.  Cause in Fact

But for the misrepresentations and deceptions of Hwang's conspirators—which form the basis for Count Ten (securities fraud) and Count Eleven (wire fraud), and predicate conduct for Count One (racketeering conspiracy)—the counterparties would not have not have lost money on margin loans because no such loans would have been extended, they would have lost money by incurring stock exposure to facilitate swaps because no such swaps would have been written, and they would not have lost variation margin because they would not have sent any to Archegos. Accordingly, Hwang's offense is a cause-in-fact of the counterparties' losses. *See, e.g.*, *Marino*, 654 F.3d at 322 (finding "but for" causation to satisfy "cause in fact" requirement).

Hwang's schemes caused the banks to begin, continue, or grow their business with Archegos based on the false representations of the conspirators. Multiple bank employees testified generally about client due diligence and risk assessments and why information about liquidity and concentration played an essential role in business assessments for swap counterparties and prime brokers. (*E.g.*, Trial Tr. 116, 119 (Fairbanks); Trial Tr. 707 (Miranda); Trial Tr. 1815 (Boccuzzi)). Multiple witnesses described how, if presented with accurate information about Archegos's portfolio, they would have terminated their business with Archegos. (*E.g.*, Trial Tr. 184

---

[10] By law, the counterparties are also entitled to restitution for the expenses incurred as part of the criminal investigation of the offense, *United States v. Afriyie*, 27 F.4th 161, 169-70 (2d Cir. 2022), and for lost interest, *Qurashi*, 634 F.3d at 704-05. In light of the Court's remarks during the November 20, 2024 proceeding (Nov. 20, 2024 Hr'g Tr. 81), the Government does not revisit the issue as to the counterparties. The Government, however, renews its request that innocent Archegos employees be entitled to lost interest, as discussed below. The Court previously indicated its intent to award expenses, including attorneys' fees, to Archegos employees if they prove to be victims, (Nov. 20, 2024 Hr'g Tr. 88), and the Government asks the Court to follow that prior ruling.

(Fairbanks); Trial Tr. 3052 (Tomita)). Archegos personnel, however, repeatedly, purposefully, and systematically misled the counterparties on the subject of their inquiries. But for those lies, the banks would not have done business with Archegos—let alone extended billions in loans and credit to facilitate Hwang's trading. One witness even described how BMO had initially refused to onboard Archegos, only to reverse after received false assurances about its business practices. (Trial Tr. 1830-37 (Boccuzzi)).

More specifically, Hwang's schemes caused the banks to assume market risk to facilitate Hwang's trades. The counterparties provided swaps trading to Archegos as a service for fee. (Trial Tr. 1588 (Lukeman)). As part of that service, the counterparties transacted in equity stock, usually by permitting Archegos traders to electronically place orders in the name of the bank. (Trial Tr. 1654-55 (Arnone)). Although these equity transactions acquired stock on the bank's balance sheet, Archegos, not the counterparties, stood to benefit from changes in the stock's performance:

> THE COURT: If Archegos bought the stock, would the stock belong to Archegos?
>
> THE WITNESS: In this case, because they're long the swap, the answer is that the stock belongs to Credit Suisse and the swap belongs to Archegos, the economic equivalent of the contract between the two parties where Credit Suisse agrees to provide Archegos with a one-for-one performance of the underlying stock.
>
> THE COURT: So Archegos is buying stock for and in the name of the bank, and the bank is selling a swap, a contract to Archegos to give it the benefit of any interest in the stock?
>
> THE WITNESS: Yes, your Honor.
>
> THE COURT: And also of any decrease in the stock?
>
> THE WITNESS: Yes, your Honor.
>
> THE COURT: So the whole risk of the deal is by Archegos or the investor?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: And the bank operates so that it is without risk?
>
> THE WITNESS: In this instance, yes, sir.

> THE COURT: Without market risk?
>
> THE WITNESS: Without market risk, yes, sir.
>
> THE COURT: On the books of the company, the ownership is shown as the bank's ownership, not Archegos' ownership?
>
> THE WITNESS: Yes, your Honor.

(Trial Tr. 1559-60 (Lukeman)). Once that execution was complete, the counterparties carried the stock positions on their balance sheet. (Trial Tr. 1557 (Lukeman); Tr. 1662 (Arnone)). The counterparties thereafter took steps to mitigate the balance sheet impact of the economic exposure, but the original market exposure—the risk incurred to facilitate the swap—remained with the counterparty for the duration of the swap. (Trial Tr. 1737-38 (Tropper)).

Hwang's trading was the cause-in-fact for these transactions. The counterparties would not have written the swaps if they did not have equity trades to hedge the swaps. As Lukeman put it, "So first comes the hedge, then comes the swap." (Trial Tr. 1556 (Lukeman); Tr. 1733-34 (Tropper)). Relatedly, none of the counterparties would have traded in the equities underlying Archegos's swaps if Archegos had not executed swaps referencing those securities. After all, the banks were "not in the business of blindly taking on balance sheet risk or single stock risk without [an equity hedge] without it being on a one-for-one basis facing the client." (Trial Tr. 1558 (Lukeman)). As the Court heard during trial, these transactions all occurred through so-called Delta-1 desks that made money for the counterparties through financing charges, not through risk-taking equity trades. (*E.g.*, Trial Tr. 1558 (Lukeman)). Archegos's counterparties traded in equities solely because Archegos sought to engage in swaps trades, not because they had some investment view on the merits of Archegos's stock picks.

Finally, in the course of the swaps, multiple banks sent to Archegos "variation margin" and "excess cash" as Archegos's positions increased in value and thus as the amount the counterparties would pay on the swaps at the end of the agreements also rose. Hwang's conduct is a cause-in-fact

of these payments, too. The variation margin transmitted by the banks to Archegos theoretically collateralized Archegos's risk that the banks would not pay as agreed. What happened, of course, was the opposite. "[E]xcess cash was generated as a result of [Archegos's] trading activity," with Hwang "directing to buy the stock in a way that move[d] the stock prices," thereby "generating the excess cash." (Trial Tr. 3451 (Tomita)). Throughout the scheme, Archegos personnel withdrew excess cash used it to fund additional trading. When Archegos's positions turned sharply negative in March 2021, not only did Archegos fail to return the banks' posted collateral, it failed to post its own. Having taken the counterparties' collateral based on systematic misstatements, and having spent that collateral on manipulative trades, Hwang is responsible for the lost variation margin.

### b. Proximate Cause – Foreseeability

Hwang's offenses served as the proximate cause for the counterparties' margin loan, variation margin, and swaps trading losses. The key inquiry is "whether that harm was 'foreseeable' to a defendant." *Goodrich*, 12 F.4th at 229 (quoting *Robers v. United States*, 572 U.S. at 645). Here, the trial record demonstrates that Hwang well understood that his conduct would risk imposing the very lending and trading losses that materialized.

Hwang and his team purposefully deceived the counterparties about the risk of trading with Hwang—such as by concealing how large, concentrated, and illiquid his positions were—making losses that materialized from a collapse in large, concentrated, and illiquid positions and from lending to a fund with concealed risks entirely predictable. Hwang mostly evades this commonsense point by arguing that he personally did not personally lie to the counterparties in connection with any particular counterparty's onboarding or capacity increase decision, so he could not be responsible for losses that flow from that counterparty's decision. But this argument ignores the outcome of the trial. As the jury found, Hwang himself participated in the schemes to

defraud the banks even though others had the primary responsibility for conveying the misrepresentations. Moreover, as a legal matter, it is irrelevant that Hwang's conspirators (and not he) typically uttered the false statements to the banks. He bears responsibility to pay for harm caused by offense not merely his personal actions. *Marino*, 654 F.3d at 323-24.

Further, the fact that the scheme's misrepresentations could lead to margin loan, variation margin, and trading losses was obvious. For one thing, documentary and witness testimony showed that Hwang's conspirators systematically lied to Archegos's counterparties precisely to obtain the trading relationships and capacity precisely they expected the truth would have denied them. (*E.g.*, Trial Tr. 804 (Becker admitting that he lied to "all of Archegos's counterparties); Trial Tr. 897 (Becker explaining that Halligan instructed him to lie about concentration and the portfolio); Trial Tr. 3052 (Tomita acknowledging banks would not have done business with Archegos if they knew the truth); Trial Tr. 3429 (Tomita describing how the lies concealed Archegos's portfolio risk from counterparties)). That is, the counterparties inquired about Archegos's portfolio and trading strategy because those details affected the banks' estimates of the potential losses to doing business with Archegos.

For another, Hwang and conspirators directly controlled the counterparties' initial hedging transactions, exposing them to market risk. As Tomita explained, Archegos electronically traded the equity hedge for the counterparties in most circumstances, selecting the stocks, quantities, and manner of trading through a system called EMSX. (Trial Tr. 3066 (Tomita)). Moreover, Hwang personally knew and intended that the counterparties would trade in equity each and every time Hwang placed an order for a swap. The relationship between Hwang's swap order and an equity market hedge was the essential mechanism by which Hwang moved securities prices in his favor and the evidence shows that he and his conspirators acted accordingly: His head trader

acknowledged that he and the trading team knew they were causing equity transactions; Hwang gave trade orders in terms of limit prices and quantities at which to buy or sell; and the trading records showed that, in fact, the counterparties purchased and sold equities at the direction of Hwang and his traders. Thus, Hwang's claim that "the decision about what to do [with] the hedges . . . was a discretionary one" is simply false. (Nov. 20, 2024 Hr'g Tr. 83-84)

Hwang's argument fares no better when he posits that the counterparty's losses on the swap hedges in particular were not foreseeable to him. As Hwang now tells it, the decline in the prices of the equities underlying his portfolio may have been caused by other events and without definitive study to apportion responsibility, he cannot be asked to compensate banks for losses linked to market movements. (Hwang Restitution Mem. 9). In support, Hwang invokes *Ebbers*, where the Second Circuit affirmed the district court's loss estimate but observed that the decline in WorldCom's share price between the time of false financial reports and the disclosure of the defendant's fraud likely reflected multiple causes in addition to the criminal conduct, including announced lay-offs and reductions in capital expenditures. *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006).

This argument rests on sleight of hand. While it may be that some portion of market movements in Hwang's manipulated stocks resulted from other variables, the counterparties incurred economic exposure to Hwang's manipulated stocks only because they facilitated Hwang's trades in the first place. Unlike the victims in *Ebbers* or in *Rutkoske*, which Hwang also cites, the counterparty victims here are not market purchasers of stock who later discovered that they transacted at prices inflated by false statements. *Cf. United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007). Rather, they are lenders and credit providers who transacted in stock at the defendant's direction as part of a derivative trading service.

In circumstances, like this one, where the defendant's fraud induced a counterparty bank to extend credit in the first place, the Second Circuit has rejected the blame-it-on-the-markets excuse Hwang resorts to here. In *United States v. Paul*, the Second Circuit considered a defense argument that bank losses on margin loans were not caused by his fraud but rather by the subsequent decline in the value of collateral he supplied. Rejecting that argument, however, the Second Circuit observed that the victims' losses were "not caused by the decline in the value of [the collateral] stock, but, rather, by the making of the loans in the first instance." 634 F.3d 668, 677 (2d Cir. 2011). As the Second Circuit pointed out, "the stock was merely securing the fraudulently-obtained loans" thus "[t]he fact that independent market forces may have contributed to the decline in [the collateral] stock . . . is irrelevant to the restitution calculation[.]" Similarly, in *United States v. Turk*, the Second Circuit affirmed a loss calculation in a fraudulent inducement case over the defendant's objection that the lost truly resulted from a decline in the value of the collateral could not be attributed to her in light of *Rutkoske* and *Ebbers*. 626 F.3d 743, 751 (2d Cir. 2010). In concluding that the victims' "loss is the principal value of the loans they made to [the defendant] which were never repaid and which the buildings were supposed to have collateralized but never did," the *Turk* Court distinguished a stock investment purchase, which carried "the assumption of upside benefit and downside risk," from collateral on a loan, which is "merely the exchange of money for a promise to repay, with no assumption of upside benefit" on the collateral. *Id.* As the trial record conclusively established here, the counterparty victims here incurred equity risk at Archegos's direction and did so to give Archegos the benefit of any interest in holding the stock; for the counterparties, the stock ownership offset market risk from facilitating the stock transaction and provided no economic upside. (Trial Tr. 1558-60 (Lukeman)).

Nothing about how the counterparties managed their swaps over time changes this analysis. Hwang asserts that the banks contributed to their own losses because they "had complete discretion over when to close out those positions" and made "internal decisions" about hedging. (Hwang Restitution Mem. 18 (discussing Credit Suisse)). But Hwang fails to engage with—or even cite— *Turk* and *Paul*, which squarely place restitution responsibility with a defendant when the victim's collateral fails to offset the defendant's losses. Indeed, Hwang's repeated arguments that the counterparties should have done a different and better job at unwinding his positions continues to deny his own essential role in the counterparties' harms, including by forcing the counterparties to confront extraordinarily concentrated market risk they did not seek out on their own. None of the counterparties would have had to unwind tremendous amounts of Viacom, Discovery, TME, Vipshop, and the like but for Hwang's willful scheme to induce the banks to make those transactions in the first place. The hollowness of his position is further underscored by the fact that ISDA agreements themselves contemplate calculating losses by reference to "loss or cost incurred in connection with its terminating, liquidating, or re-establishing any hedge[.]" (GX 325 (UBS – Archegos ISDA)). Accordingly, Hwang knew before he began the scheme that the banks would sell their hedges if he defaulted and cannot express dismay now that they did so.

Hwang's related effort to dismiss the counterparties' trading losses as the product of a "discretionary" decision to sell at an inopportune time is without any factual support. (Nov. 20, 2024 Hr'g Tr. 84). Hwang speculates that the counterparties might have been able to recover more while closing his trades had they sold them later and in a different manner than they did. But his claim is pure conjecture and would imply that his victims were obligated to continue to carry billions of dollars of market risk long after they discovered they had been defrauded, notwithstanding their express contractual right to do so. Hwang cites no authority that conditions

restitution on such an approach. To the contrary, the Second Circuit has held that arms-length, market transactions can establish the appropriate loss or credit for restitution. *United States v. Boccagna*, 450 F.3d 107, 115-16 (2d Cir. 2006). So the amount recovered by the victims' sale of the positions in arms-length transactions is an appropriate measure of loss. Finally, as the Supreme Court has observed, "[a] requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between the conduct and the result is so attenuated that the consequence is more aptly described as mere fortuity." *Paroline v. United States*, 572 U.S. 434, 445 (2014) (discussing restitution under 18 U.S.C. § 2259). Nothing about the counterparties economic losses from the Archegos relationship can be described as fortuitous: they were induced to provide swap and margin lending service based on false information, induced to extend and expand market risk to facilitate swaps trades, and forced to unwind at a loss positions Hwang had selected as part of his scheme to manipulate the stock market. Hwang caused the resulting losses in every meaningful sense.

### c.    The Defendant's Restitution Proposal Would Lead to Inequitable and Unfair Results

While Hwang primarily argues that the Court should order no restitution at all, he alternatively argues that the Court should withhold restitution for what he calls "losses on hedges." (Nov. 20, 2024 Hr'g Tr. 83). The Government acknowledges that the Court may be inclined to accept this argument, as discussed during the November 20, 2024 conference. (Nov. 20, 2024 Hr'g Tr. 84-85). But the Court should reject it. Indeed, accepting the defense's proposal would be contrary to the factual record, as described above, and contrary to the purposes of restitution.

First, what Hwang dismisses as hedging losses are really swaps trading losses. When Archegos's positions collapsed in value, Hwang failed to pay margin as required under the swap agreements and, once the banks terminated those agreements, Hwang failed to pay the final

amounts owed under the swap contracts and failed to return margin he held on behalf of the banks. As discussed above, however, the counterparties had purchased stock as part of executing the swaps with Archegos—indeed, Archegos had directed those purchases electronically—and sold that stock (or closed equivalent derivative positions) when they closed-out the Archegos swaps. Because the Archegos swaps and the counterparty's market risk are coextensive, the "hedging losses" are nothing more or less than the out-of-pocket costs associated with Archegos's swaps. The counterparties' loss calculations credit Hwang with the proceeds recovered by the sale of the equity hedges but rightly seek compensation for the funds they expended to facilitate the swap but have yet to receive.

Second, Hwang's proposal would have the effect of eviscerating the counterparties' restitution award. As the Court has already recognized, the record firmly establishes that Hwang's trading imposed billions in losses on the counterparties. As set forth in the various victim submissions, most of the monetary losses suffered by most of the counterparties arise from the market trading undertaken to facilitate Hwang's swaps. To excuse Hwang from reimbursing the banks for their trading losses would be to fail the MVRA's command that the victims be restored to the position they occupied before sustaining injury. *Qurashi*, 634 F.3d at 703. The counterparties have billions in proven losses attributable to Hwang's trading that can only be remedied by a restitution order that reimburses them for trading losses. The Court would abuse its discretion in accepting the defense's proposal to ignore those losses and should reject it.

Third, the defendant's proposal to exclude swap trading losses would produce unfair and inequitable recoveries. Though each of the counterparties attempted to manage the risks of trading with Archegos, they each did so in slightly different ways. By virtue of the varying approaches, some counterparties faced greater or lesser losses in the form of margin loans, greater or lesser

losses in form of variation margin, and greater or lesser losses in the form of swaps trading. At the Government's request, the counterparties' submissions break down losses in each category. The Court can therefore observe that swaps trading losses are the only meaningful category of loss for certain victims. Denying those victims the ability to recover in restitution for those losses, but awarding restitution for victims whose losses arose from a different aspect of the risk management structure, would be to make restitution turn on the technicalities a bank's risk management approach. Given that each of the counterparties was, in fact, purposefully defrauded by Hwang and the trading of each was, in fact, used to advance Hwang's manipulative objectives, it would be inequitable to fashion a restitution order that treated Hwang's victims differently based on how they accounted for losses they each incurred from the same scheme.

### d.    Restitution is Not Too Complex to Compute

In addition to challenging causation, Hwang also invites the Court to spare him responsibility for restitution on the grounds that it would be complicated to calculate. (Hwang Restitution Mem. 2, 8-11). The Court should decline the invitation. The counterparty victims and the Government have supplied abundant factual support for a reasonable methodology of restitution. Hwang's arguments about the various potential intricacies of proof are both self-serving and unpersuasive. Unlike market participant victims—for which the Government has not sought restitution—the counterparties' losses are amenable to calculation and identity of the various counterparty victims is undisputed.

Urging otherwise, Hwang cites a handful of inapposite cases. First, Hwang cites *Hsu v. United States*, where the district court denied a Section 2255 motion based, in part, on the district court's failure to impose restitution in a circumstance where the government did not seek a restitution order. 954 F. Supp. 2d 215, 217, 221-22 (S.D.N.Y. 2013). *Hsu* does not discuss, let

alone guide, the computation of derivates losses or offer any meaningful analysis of the issues present here. Second, Hwang points to *United States v. Ferguson*, 584 F. Supp. 2d 447, 457-58 (D. Conn. 2008), where the district court's restitution decision turned on the fact that the victims had not been identified and could not reasonably be expected to be ascertained. *Id.* Contrary to *Ferguson*, the counterparty victims here have been identified. Third, Hwang invokes *United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006), where the Second Circuit vacated a restitution order that included an award to persons who were not victims of the defendant's offense. *Id.* at 123-127. Though *Reifler* discusses the district court's authority to decline to order restitution in particularly difficult factual scenarios, it did not hold that restitution would be too difficult to compute in every context that involved securities trades. In any event, the counterparty banks have tabulated their losses using trade data and bank records, making the Court's remaining task straightforward.

Hwang's further argument that this Court would have "to distinguish among categories of loss that are attributable to Mr. Hwang, others at Archegos like Mr. Becker, and the victims' own independent conduct and decisions" is simply wrong. (Hwang Restitution Mem. 9). Hwang must pay restitution for losses resulting from his schemes and conspiracies, not merely his direct personal conduct. "[C]ourts have uniformly read [the relevant statutes] to provide for restitution payable by all convicted co-conspirators in respect of damage suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions[.]" *United States v. Boyd*, 222 F.3d 47, 50 (2d Cir. 2000). The Court's essential responsibility in discerning what losses are the "result" of his offenses is to ask whether the banks would have lost what they did "but for" the defendant's offenses and whether the nature of the resulting losses was foreseeable to the defendant. As discussed above, where Hwang and his conspirators induced counterparties to facilitate swaps through systematic false statements, and where Hwang used

those swaps to pursue brazen acts of market manipulation, he is responsible for reimbursing his victims for the resulting losses without any assessment of his individual role or comparative responsibility.

Hwang's arguments are most strained when he implies that he should not have to pay restitution because "no realistic payment schedule exists that would permit Mr. Hwang to pay in full the purported losses claimed by the victims." (Hwang Restitution Mem. 9-10). The MVRA expressly forbids such a consideration in determining the value of the order: "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."). 18 U.S.C. § 3664(f)(1)(A). Hwang's related argument that the Court may diminish the recovery of victims by requiring him to litigate restitution (and therefore pay his lawyers to resist an order) strikes an even more astonishing level of absurdity because Hwang's desired outcome is that the Court order no restitution at all. (Hwang Restitution Mem. 10).

Hwang's conduct led to quantifiable losses for a discrete and identified set of counterparty victims. While a district court may decline to impose a restitution award where "the number of identifiable victims is so large as to make restitution impracticable" or where "determining complex issues of fact related to the cause or amount" of the losses would so complicate the proceedings that "the need to provide restitution to any victim is outweighed by the burden on the sentencing process," 18 U.S.C. 3663A(c)(3), neither circumstance would justify a failure to award restitution to the counterparty victims.

## 2. Innocent Archegos Employees

The innocent Archegos employees who lost millions of dollars in deferred compensation are victims of Hwang's crimes, and are entitled to restitution under the MVRA. This includes

restitution for the amounts contributed to the deferred compensation plans, as well as expenses incurred as part of this criminal investigation and prejudgment interest. As explained above, Hwang required his employees to defer 25% of their bonuses each year. (Trial Tr. 459 (Martz)). Moreover, senior employees were pressured and induced to defer an additional 35% of their bonuses. (*See, e.g.*, Huang Decl. ¶¶ 16-17). Hwang bet these contributed funds when he engaged in his market manipulation scheme. And when his scheme collapsed in March 2021, it was his employees' contributions that were reduced to zero. These financial losses were the direct result of Hwang's criminal schemes. Put differently, had Hwang not caused Archegos's collapse in March 2021, the employees would still have their original contributions in the deferred contribution plan. Thus, Hwang's criminal schemes are the but for cause of his employees' losses. *See, e.g.*, *Marino*, 654 F.3d at 322 (finding "but for" causation to satisfy "cause in fact" requirement).

It was also foreseeable that these innocent Archegos employees would lose their financial contributions as a result of Hwang's criminal schemes. As the evidence showed at trial, Hwang inflated the value of the Archegos portfolio to more than $35 billion dollars through his lies and manipulative trading. A portion of this portfolio was made up of employees' contributions. Hwang knew that he was putting these employee contributions at risk when he continued to artificially inflate stock prices and take on highly concentrated and multi-billion dollar positions in certain securities. That it all came crashing down—even if failure was not Hwang's original intention— is far from surprising, and thus proves that the Archegos employee losses were the foreseeable result of Hwang's crimes.

ERISA, a civil statute that affords certain protections to employees under employee welfare benefit plans, does not apply in the context of restitution. For this reason, the Court need not find

that Hwang was, or was not, a fiduciary of his employees' deferred compensation contributions to award restitution. Rather, the exclusive statutory mechanism for criminal restitution is set forth in the MVRA. Under the MVRA, the Court need only find that the employees were "directly and proximately harmed as a result of the commission of an offense" or "directly harmed by the defendant's criminal conduct in the course of [a] scheme, conspiracy, or pattern" of criminal activity is a "victim" entitled to restitution. 18 U.S.C. § 3663A(a)(2). Here, all of the evidence presented at trial, and as supplemented by the victim submissions provided in connection with sentencing, prove that the innocent Archegos employees were harmed as a result of Hwang's commission of the criminal offenses, and should be entitled to restitution.

Finally, assuming the Court agrees that the innocent Archegos employees are victims of Hwang's crimes, the Court should award restitution for their expenses incurred as part of this criminal investigation as well as prejudgment interest. By law, victims are entitled to restitution for the expenses incurred as part of the criminal investigation of the offense, *Afriyie*, 27 F.4th at 169-70, and for lost interest, *Qurashi*, 634 F.3d at 704-05. Employees Brendan Sullivan and Ryan Kealy have both asked the Court to reconsider its prior ruling and grant them prejudgment interest based on the financial hardships they have experienced over the past several years. (Kealy Ltr. 12; Sullivan Ltr. 4). The Government joins in their requests and asks the Court to reconsider its prior ruling and order prejudgment interest consistent with its prior decision in *United States v. Jaffe*, 314 F. Supp. 2d 216, 224 (S.D.N.Y. 2004).

### 3. Restitution Order Enforcement and Mechanics

In response to the Court's questions regarding the enforceability of an order during an appeal, the treatment of Hwang's family residence, and the significance of jointly held property to the collection of restitution, the Government addresses each subject below.

### a. General Effect of a Restitution Order

Pursuant to the MVRA, the full amount of restitution owed to the victims shall be ordered by the Court regardless of the defendant's economic circumstances or the availability of any assets. 18 U.S.C. §§ 3663A and 3664(f)(1)(A). Because any supportable restitution order here will exceed the defendant's net worth, the order will operate as an automatic lien on all of the defendant's property and rights to property—including property described mentioned in the PSR—that the United States may then enforce. *See* 18 U.S.C. §§ 3613(a) and 3613(c) (a restitution order is an automatic lien that can be enforced against all property of the defendant). With respect to the timing of restitution payment, the default rule is immediate payment by the defendant in full of the amount owed, unless the interests of justice warrant payment in installments. *See* 18 U.S.C. § 3572(d)(2).

For purposes of enforcing a restitution award and satisfying the lien, the United States obtains rights in the defendant's property equal to the defendant's rights. Accordingly, if Hwang has a unilateral right to obtain funds from a particular account, so will the United States have that right. *See* 18 U.S.C. § 3613(c) (restitution lien same as federal tax lien); *Aquilino v. United States*, 363 U.S. 509, 512-14 (1960) (federal law determines priority rights and debt collection procedures while state law only determines extent of debtor's interest in property to which lien attaches). Once it has been determined that state law creates sufficient interests in property for the lien to attach, state law is inoperative, and federal law controls. *United States v. Bess*, 357 U.S. 51, 56-57 (1958); *United States v. Nat'l Bank of Commerce*, 472 U.S. 713, 727 (1985); *Drye v. United States*, 528 U.S. 49, 58 (1999). The Supreme Court has held that the unrestricted right to withdraw funds from an account constitutes "property" or "rights to property" subject to provisional levy, regardless of the fact that other claims to the funds may exist and that the question of ultimate ownership may be unresolved at the time. *Nat'l Bank of Commerce*, 472 U.S. at 724-25.

As a general matter, there is no exemption for real or personal property of the type listed in the PSR, such as a homestead, life insurance or retirement funds from the enforcement of federal criminal debts. With respect to the defendant's home, the Government (through the Civil Division of the U.S. Attorney's Office) can enforce that lien in one or both of two ways: First, in the event the defendant or his spouse were to attempt to refinance or sell his real property, the title company would be required to contact the Government to arrange payment of net equity from any such transaction in order to obtain a partial release of the lien as to that real property. Second, the Government may affirmatively enforce the lien and seek a writ of execution to force a sale of real property. With respect to other personal property and funds, the Government can obtain a writ of execution, garnishment, or a restraining order to obtain funds held by the defendant or third parties following the entry of a restitution order.

### b.  Joint Bank Accounts

The extent of the Government's right to collect against jointly-owned property is limited by the defendant's interest in the property. In New Jersey, where Hwang and his spouse reside, state statutory law defines Hwang's ownership interest in jointly held accounts. Pursuant to Title 17, N.J. Stat., Section 16l-4:

> Unless a contrary intent is manifested by the terms of the contract, or the deposit agreement, or there is other clear and convincing evidence of a different intent at the time the account is created:
>
> a. A joint account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit. In the absence of proof of net contributions, the account belongs in equal shares to all parties having present right of withdrawal.
>
> [….]

For restitution, therefore, the Government could either collect from the joint accounts based on the presumption that Hwang and his wife each have a one-half interest in the accounts or establish

factually that Hwang's contributions to the account are higher. Before disposing of the defendant's interest, the United States would give notice to potentially interested third party claimants so that any objections or competing claims may be adjudicated.

### c.  Priority of Distributions

Pursuant to Title 18, United States Code, Section 3664(i), "[i]f the court finds that more than 1 victim has sustained a loss requiring restitution by a defendant, the court may provide for a different payment schedule for each victim based on the type and amount of each victim's loss and accounting for the economic circumstances of each victim." Here, as more than one victim has sustained a loss, the Court has authority to order a payment schedule that disburses recoveries to victims in a particular sequence or to do so *pro rata*.

The individual employee victims have sought priority disbursements in light of their personal circumstances and in light of the fact that *pro rata* distributions with the counterparties would result in minimal recoveries for them given the size of the counterparties' claims. Based on the individual employees' requests, the absence of any objection from the counterparty victims, and the interests of fairness, the United States supports a distribution schedule that prioritizes disbursements to the individual victims and will provide a proposed order to that effect.

### d.  The Restitution Order is Immediately Enforceable Absent a Stay

The Court's restitution order will be valid and enforceable once entered unless this Court (or the Second Circuit) stays the order. *See* 18 U.S.C. § 3664(o)(1)(B). In the Second Circuit, the decision to stay a restitution or forfeiture order turns on four factors: (i) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (ii) whether the applicant will be irreparably injured absent a stay; (iii) whether the issuance of the stay will substantially injure

the other parties interest in the proceeding; and (iv) where the public interest lies. *See United States v. Tagliaferro*, No. 19 Cr. 472 (PAC), 2021 WL 5983126, at *4 (S.D.N.Y. Dec. 17, 2021).

Here, Hwang has not made the required showing that the various factors weigh in favor of a stay. The Court's restitution award will be properly premised on Hwang's convictions for racketeering conspiracy, securities fraud, and wire fraud, and there is no realistic possibility that Hwang will succeed in his appeal of each of those counts of conviction. Moreover, the victims here—including the individual employee victims—have been substantially injured by his conduct and that harm will grow as Hwang litigates his appeal.

That said, to avoid the irreversible consequence of the sale of his family residence before the appeal is decided, the Government would agree to withhold execution of the restitution award as against Hwang's family residence until the appeal had been decided. Accordingly, the Government will propose a restitution order that will forestall the execution of the order in a manner that requires Hwang to sell his personal residence to contribute to his restitution award unless and until his appeals have been denied.

The Court should otherwise order restitution to be paid immediately. There is no good cause for further delay and identifying assets of Hwang's to liquidate will undoubtedly take time, making it all the more important to begin the process now.

## IV.    FORFEITURE

Finally, the Court should enter an order requiring Hwang to forfeit—in addition to his interest in the Archegos Enterprise, as the Court ordered at the first sentencing hearing—a sum of

money equal to the proceeds that Hwang obtained (and used) from his racketeering conspiracy and securities and wire fraud.[11]

### A.    Factual Background

As the evidence at trial established, Hwang conducted his market manipulation and fraud schemes to prevent the decline in value of his positions and to generate daily returns for Hwang and Archegos. (PSR ¶¶ 37-38, 64). As Tomita explained, the specific goal of inducing counterparties to engage in the trades directed by Archegos, and of manipulating the prices of the securities in Archegos's portfolio, was to prevent the value of his positions from falling, which would have resulted in Archegos having to make margin calls to its counterparties, and instead to generate profits on those positions at the end of each trading day. (Trial Tr. 3040-41, 3111-12 (Tomita)). Those daily profits were considered by Hwang and his employees at Archegos as free cash for Hwang to use, and could be withdrawn at Hwang's direction—in the form of excess collateral or margin—and used in whatever form Hwang saw fit. (PSR ¶ 37; Trial Tr. 3059, 3118-19 (Tomita)). As Hwang explained to Tomita, Hwang's goal was to generate $10 billion in excess cash—that is, money under his use and control—through his manipulative trading. (Trial Tr. 3448-49 (Tomita)). Indeed, as the trial testimony demonstrated, Hwang had total control over the use of that money, and was free to put in his personal bank account, or, as it happened, direct his co-conspirators to use it to further the criminal schemes. (Trial Tr. 3449 (Tomita); *see also* Trial Tr. 703-704, 779-80 (Miranda); Trial Tr. 364 (Martz); Trial Tr. 215 (Fairbanks); Trial Tr. 1742 (Tropper); Trial Tr. 3063-65, 3075-76 (Tomita)).

---

[11] A proposed preliminary order of forfeiture was attached as an Exhibit to the Government's initial sentencing submission.

Although all excess cash generated through these schemes was under Hwang's control, the Government made the follow conservative calculation of those amounts by taking only the cash in fact withdrawn from Archegos's accounts at various counterparties:

| Counterparty | Amount | Selected Record Evidence[12] |
|---|---|---|
| Credit Suisse (For the period Jan. 4 to March 26, 2021) | $4,191,035,165 | K. Fletcher Decl. at Exhibit 4, page 97, Column B. |
| Deutsche Bank (For the period Oct. 1, 2020 to March 26, 2021) | $6,086,381,811.83 | Exhibit A to Thomas Decl., collecting Deutsche Bank records. |
| Goldman Sachs (For the period Oct. 1, 2020 to March 26, 2021) | $560,000,000 | Exhibit B to Thomas Decl., collecting Goldman Sachs wire transfer records. |
| UBS (For the period Oct. 1, 2020 to March 26, 2021) | $831,893,978.72 | Exhibit E to Thomas Decl. |
| MUFG (For the period Oct. 1, 2020 to March 26, 2021) | $280,000,000 | Exhibit C to Thomas Decl., Column O. |
| Mizuho (For the period Oct. 1, 2020 to March 26, 2021) | $155,538,119.61 | Exhibit D to Thomas Decl. "Amount" column. |
| Jefferies (For March 2021) | $248,000,000 | October 4, 2024 Decl., of J. Miranda at 3-4. |
| **TOTAL:** | **$12,352,849,075.16** | |

---

[12] Citations refer to exhibits attached to the Government's initial sentencing submission.

### B.    Applicable Law

Forfeiture of the proceeds of both a racketeering conspiracy and of mail and securities fraud is mandatory. *See, e.g.*, *United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied."); *United States v. Torres*, 703 F.3d 194, 204 (2d Cir. 2012) (forfeiture and restitution both are mandatory). Specifically, with respect to racketeering conspiracy and as relevant here, Section 1963 directs that a district court, in imposing sentence, "shall order" a defendant to forfeit . . . any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity." 18 U.S.C. § 1963(a). Similarly, Section 981(a)(1)(C) subjects to civil forfeiture: "Any property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specific unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense." 18 U.S.C. § 981(a)(1)(C). Both wire fraud and fraud in the sale of securities are specified unlawful activities within the meaning of Section 981(a)(1)(C). *See* 18 U.S.C. §§ 1956(c)(7)(A), 1961(1).

In *Honeycutt v. United States*, the Supreme Court explained that an individual defendant may only be required to forfeit criminal proceeds that he personally acquired or controlled. 581 U.S. 443, 445-54 (2017); *see also United States v. Bergstein*, 788 F. App'x 742, 748 (2d Cir. 2019). As courts, including the Second Circuit, have made clear both before and after *Honeycutt*, however, proceeds of a crime "need not be personally or directly in the possession of the defendant . . . in order to be subject to forfeiture," but "must have, at some point, been under the defendant's control . . . in order to be considered acquired by him." *United States v. Contorinis*, 692 F.3d 136, 147 (2d Cir. 2012) (emphasis added) (citation and internal quotation marks omitted); *United States v. Tanner*, 942 F.3d 60, 68 (2d Cir. 2019). Moreover, temporary control is sufficient, and the defendant need not retain the proceeds. *See Tanner*, 942 F.3d at 68; *Rajaratnam v. United States*,

44

736 F. App'x 279, 284 (2d Cir. 2018) (although proceeds of insider trading were subsequently distributed to investors, with the defendant personally retaining only a percentage as management fees, defendant acquired those proceeds for forfeiture purposes where he "had authority over disbursements, and, thus, exercised 'control' over the proceeds 'at some point'" (quoting *Contorinis*, 692 F.3d at 147)); *United States v. Ohle*, 441 F. App'x 798, 803 (2d Cir. 2011) (rejecting challenge to forfeiture order that "appears to rest on the mistaken premise that [defendant] can only be required to forfeit fraud proceeds that he personally kept"); *United States v. Uddin*, 551 F.3d 176, 181 (2d Cir. 2009) (affirming forfeiture order based on entire amount of proceeds initially received by defendant, "[w]hether or not Uddin shared the cash he received"); *see also* 21 U.S.C. § 853(p)(1)(B) (permitting forfeiture of substitute assets from defendant where he has caused forfeitable property to be "transferred or sold to, or deposited with, a third party"). Finally, an individual defendant must forfeit proceeds received by a corporate entity where the "money paid to the corporation was effectively under the control of the individual." *United States v. Peters*, 732 F.3d 93, 104 (2d Cir. 2013).

Forfeiture is mandatory even where the defendant is required to pay restitution as well. *See, e.g.*, *United States v. Torres*, 703 F.3d 194, 196, 204 (2d Cir. 2012) (affirming propriety of imposing both forfeiture and restitution and noting that "[e]ight other Circuits to have considered orders of forfeiture and restitution in the face of 'double recovery,' due process-type challenges have affirmed their concurrent imposition" (collecting cases)); *see also United States v. Kasali*, 111 F.4th 637, 649 (5th Cir. 2024) (forfeiture and restitution are mandatory and serve two different purposes). Indeed, forfeiture and restitution obligations are separate and serve distinct purposes. "Restitution is remedial in nature; its goal is to make the victim whole. Forfeiture is punitive; it seeks to disgorge any profits or property an offender obtains from illicit activity." *Kasali*, 111

45

F.4th at 649 (internal quotation marks and citation omitted); *see also Torres*, 703 F.3d at 203

("forfeiture and restitution statutes serve different purposes"); *United States v. Kalish*, 626 F.3d

165 (2d Cir. 2010) (forfeiture "rids a defendant of his ill-gotten gains," while restitution

"compensates victims for their losses").

Of course, in practice, forfeited funds are often put toward making victims whole. In fact,

once assets have been forfeited, the authority to distribute them to victims rests exclusively with

the Attorney General, who has delegated this authority to the Chief of Money Laundering and

Asset Recovery Section ("MLARS") of the Department of Justice in Washington, D.C. *See* 21

U.S.C. § 853(i)(1); 28 C.F.R. § 9.1(b)(2). There are two administrative procedures through which

forfeited funds may be applied to restitution: remission or restoration. Remission involves a

petition by a victim (who may or may not have a restitution order in a criminal case) directly to

the Attorney General (through MLARS) seeking that forfeited funds be used to compensate the

victim for losses directly caused either by the crime of conviction, or by a closely related crime.

*See* 28 C.F.R. § 9.8. Restoration is a streamlined form of remission that is available only where

there is a criminal restitution order in place, which permits a United States Attorney's Office to

request that the Attorney General (through MLARS) transfer forfeited funds to a court for

satisfaction of a criminal restitution order if certain circumstances are met. *See* Department of

Justice, Asset Forfeiture Policy Manual, Chapter 14: Forfeiture and Compensation for Victims of

Crime, at https://cats.doj.gov/sites/afmlo/policies/Policies/ AFPM_Chapter14.pdf.

### C.    Discussion

Both as racketeering proceeds, under Section 1963(a), and fraud proceeds, under Section

981(a)(1)(C), Hwang must forfeit the value of the proceeds he extracted, which, as set forth above,

have been conservatively calculated to be $12,352,849,075.16. The various objections raised by

the defendant in his prior submission and during the initial sentencing proceeding are foreclosed by law.

*First*, Hwang need not have segregated the proceeds—here, the money extracted from the counterparties during the course of the conspiracy and wire and securities fraud schemes—and placed them into personal accounts for the proceeds to be subject to forfeiture. Instead, the proceeds need only have been under the defendant's control for some period of time. *See Bergstein*, 788 F. App'x at 748; *Tanner*, 942 F.3d at 68; *Contorinis*, 692 F.3d at 147. Here, as set forth above, it is beyond dispute that Hwang maintained control over all of Archegos's funds, including the "excess cash," which were proceeds that were paid by the counterparties in the form of variation margin. (*See, e.g.*, Trial Tr. 3059, 3118-19 (Tomita)). And in fact, again as described above, the funds to be forfeited consist of an amount of money that Hwang did have his employees extract from the counterparties.

*Second*, it is no bar to mandatory forfeiture that Hwang also be subject to restitution. *See, e.g.*, *Torres*, 703 F.3d at 196, 204. Inasmuch as both forfeiture and restitution are mandated by Congress and serve distinct purposes, both must be imposed. Even if forfeiture and restitution were not both mandatory consequences of the criminal convictions here, imposition of each would serve a practical purpose as well. For example, the applicable statutes differ regarding whether property may be recovered to satisfy the relevant obligation, and under what circumstances and limitations. *Compare* 18 U.S.C. § 3613(a) (property exemptions for restitution) and (b) (term of liability for restitution expires 20 years from defendant's release from prison) *with* 21 U.S.C. § 853(p) (no expiration date or exemptions for forfeiture of substitute assets); *see also United States v. Fischer*, 394 F. App'x 322-23 (7th Cir. 2009) (fines and restitution orders are subject to exemptions and time limitations that do not apply to forfeiture orders).

Additionally, the Department of Justice's Asset Forfeiture Fund, established by 28 U.S.C. § 524(c)(1), is a specially allocated fund statutorily created for the exclusive and limited purpose of and use in forfeiture matters. Congress has expressly authorized the Attorney General to pay, at his discretion, any expenses necessary to seize, detain, inventory, safeguard, maintain, advertise, sell, or dispose of property under seizure, detention, or forfeited pursuant to any law enforced or administered by the Department of Justice, or any other necessary expense incident to the seizure, detention, forfeiture or disposal of such property. 28 U.S.C. § 524(c)(l)(A). Indeed, the United States Marshal's Service has contracts in place with numerous vendors to take custody of and maintain property pending final orders of forfeiture for the disposition of forfeited property. In contrast, neither the Federal Debt Collection Procedure Act (FDCPA), 28 U.S.C. §§ 3202-05 and 3304-07, nor the MVRA, 18 U.S.C. 18 U.S.C. §§ 3612-15 and 3664(m)(1)(A), contain any provision of funding for the Government to pay the expenses and fees involved in seizing, storing, and selling property. The Government is only authorized to spend money from funds appropriated by Congress. *See United States v. Chem. Found.*, 272 U.S. 1, 20 (1926) (costs or expenses); *Automatic Sprinkler Corp. v. Darla Envtl. Specialists*, 53 F.3d 181, 182 (7th Cir. 1995) (noting that "anyone who seeks money from the Treasury needs a statute authorizing that relief." (citing numerous cases)). In short, a forfeiture order may provide the Government with additional options for enforcing the defendant's obligations, which can ultimately inure to the benefit of the victims, who can seek access to funds recovered through forfeiture by means of the restoration process.

*Third*, the necessity of forfeiture is not undermined by the fact that Hwang may have spent or lost the funds that he obtained from the counterparties. The law is well established that district courts may impose a money judgment in the amount of the criminal proceeds "'on a defendant who possesses no assets at the time of sentencing.'" *United States v. Green*, 777 F. App'x 23, 25

(2d Cir. 2019) (quoting *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010)); *see also Kalish*, 626 F.3d at 168-69 (affirming money judgment for proceeds of wire and mail fraud). The reason for this rule is clear: imposing forfeiture only where the defendant has retained the proceeds "could have the undesirable effect of creating an incentive for an individual involved in a criminal enterprise to rid himself of his ill-gotten gains to avoid the forfeiture sanction." *Awad*, 598 F.3d at 78-79 (affirming money judgment for proceeds of drug sales where defendant did not retain that money) (internal quotation marks, brackets, and citation omitted); *see also United States v. Robilotto*, 828 F.2d 940, 949 (2d Cir. 1987) (court may enter forfeiture money judgment for the amount of the illegal proceeds of a racketeering activities regardless of whether defendant retained the proceeds). Thus, so long as Hwang had control over the proceeds at some point in time, *Rajaratnam*, 736 F. App'x at 284, they are forfeitable by money judgment, even if Hwang managed to lose them all, *Awad*, 598 F.3d at 78-79. Because the trial evidence establishes these facts, the Court should impose the forfeiture order sought by the Government.

## V.    CONCLUSION

As the Court observed, Hwang committed "a dreadful crime" inflicting "billions of dollars" in losses on his business counterparties and leaving in the wake of his scheme "the wreckage of individual lives who trusted" him. (Nov. 20, 2024 Hr'g Tr. 57-58). In light of those circumstances, and in recognition of the statutory goals of sentencing, the Government respectfully submits that the Court should sentence Hwang to 18 years' imprisonment and impose restitution and forfeiture orders on Hwang in a manner that is commensurate with the gravity of Hwang's crimes and the financial harm he caused others.

Dated:  New York, New York
        December 10, 2024                          Respectfully submitted,

                                                   DAMIAN WILLIAMS
                                                   United States Attorney

                                          By: _____
                                                   Matthew Podolsky
                                                   Alexandra N. Rothman
                                                   Samuel P. Rothschild
                                                   Andrew Thomas
                                                   Assistant United States Attorneys