UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                    :

UNITED STATES OF AMERICA,         :
                                      :

                   Plaintiff,     :
                                      :     No. 22-cr-240 (AKH)

         - against -           :

PATRICK HALLIGAN,           :

                   Defendant.   :

-------------------------------------------------------------------x

# PATRICK HALLIGAN'S
# SENTENCING MEMORANDUM

FRIEDMAN KAPLAN SEILER
ADELMAN & ROBBINS LLP

7 Times Square
New York, NY  10036-6516
(212) 833-1100

January 17, 2025           *Attorneys for Patrick Halligan*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ..........................................................................1

I.   PATRICK'S PERSONAL BACKGROUND ..............................................2

    A.   Patrick's Childhood, His Loving Parents, and His Caring Sisters.........................2

    B.   Patrick's Life of Faith .................................................................5

    C.   Patrick's Civic Service ................................................................6

    D.   Patrick's Ambition to Service Leads Him to West Point,
        But Injuries During Boot Camp Change His Trajectory .........................7

    E.   Patrick Meets His Wife and Joins Her Loving Family ...........................8

    F.   Patrick and Honey Build Their Loving Family Together ......................11

    G.   Patrick's Conviction Upends His Family .......................................14

II.  OFFENSE CONDUCT ........................................................................16

III. PROCEDURAL HISTORY...................................................................16

IV.  THE ADVISORY GUIDELINES CALCULATION ...............................17

    A.   The Advisory Guidelines As Applied to White Collar
        Financial Crimes Are Draconian, Unduly Harsh, and
        Capable of Producing Unjust Sentences .........................................17

    B.   Probation's Advisory Guidelines Calculation Is Erroneous,
        But Even if it is Correct, It is Only a "Starting Point" for the
        Determination of a Fair and Just Sentence ......................................19

V.   BALANCING THE FACTORS UNDER SECTION 3553(A) DEMONSTRATES
    THAT THE PARTIES' JOINT SENTENCING PROPOSAL IS SUFFICIENT,
    BUT NOT GREATER THAN NECESSARY, TO ACHIEVE THE GOALS OF
    SENTENCING ................................................................................20

    A.   Patrick's Life of Kindness, Generosity, and Humanity, Together with His
        Family Circumstances, Warrant the Proposed Sentence ......................21

        1.   Patrick's Character ...................................................... 21

2.      Any Period of Incarceration Greater than the Proposed Term Would Impose Undue and Substantial Burdens on Patrick's Innocent Family.... 24

B.      The Nature and Circumstances of the Offense Support the Proposed Sentence..................................................................................25

C.      The Proposed Sentence Justly Reflects the Seriousness of the Offense [18 U.S.C. § 3553(a)(2)(A)] ................................................................................27

D.      The Proposed Sentence Is Sufficient to Achieve Specific and General Deterrence [18 U.S.C. § 3553(a)(2)(B)] ..................................................30

E.      There Is No Need to Protect the Public from Patrick, and He Does Not Require Training or Treatment [18 U.S.C. § 3553(a)(2)(C) and (D)] ...................32

F.      The Proposed Sentence is Appropriate and Just To Avoid Unwarranted Sentencing Disparities [18 U.S.C. § 3553(a)(6)] ......................................32

VI.    THE RESTITUTION AND FORFEITURE OBLIGATIONS PROPOSED BY THE PARTIES ARE SUFFICIENT TO ACHIEVE THE GOALS OF SENTENCING AND COMPLY WITH THE RESTITUTION AND FORFEITURE STATUTES  [18 U.S.C. §§ 3553(A)(7), 3664, AND 1963]...................34

VII.   PATRICK SHOULD BE GRANTED BAIL PENDING APPEAL ...............................35

CONCLUSION.................................................................................................................36

APPENDIX A ..................................................................................................................37

4926-5272-2960.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
552 U.S. 38 (2007)...........................................................................................17

*Kimbrough v. United States*,
552 U.S. 85 (2007)...........................................................................................18

*United States v. Adelson*,
441 F. Supp. 2d 506 (S.D.N.Y. 2006)..................................................18, 21, 32

*United States v. Anderson*,
267 F. App'x 847 (11th Cir. 2008) ...................................................................29

*United States v. Bills*,
401 Fed. Appx 622 (2d Cir. 2010) ...................................................................24

*United States v. Blaszczak*,
No. 17-cr-357 (S.D.N.Y. Sept. 13, 2018), Sentencing Tr., ECF No. 412. ............24

*United States v. Booker*,
543 U.S. 220 (2005).........................................................................................17

*United States v. Canova*,
412 F.3d 331 (2d Cir. 2005).............................................................................21

*United States v. Corsey*,
723 F.3d 366 (2d Cir. 2013).............................................................................18

*United States v. Crosby*,
397 F.3d 103 (2d Cir. 2005).............................................................................20

*United States v. DiMattina*,
885 F. Supp. 2d 572 (E.D.N.Y. 2012) ..............................................................21

*United States v. Dominguez*,
296 F.3d 192 (3d Cir. 2002).............................................................................30

*United States v. Ebbers*,
458 F.3d 110 (2d Cir. 2006).............................................................................19

*United States v. Emmenegger*,
329 F. Supp. 2d 416 (S.D.N.Y. 2004)...............................................................25

iii

**Page(s)**

*United States v. Greenwood,*
  Case No. 17 Cr. 630 (ER) (S.D.N.Y. Sept. 12, 2023), ECF No. 581 .....................................26

*United States v. Gupta,*
  904 F. Supp. 2d 349 (S.D.N.Y. 2012).........................................................................18, 19, 30

*United States v. Holmes,*
  Case No. 18-CR-00258 (EJD) (N.D. Cal. Nov. 18, 2022), ECF No. 1660 ...........................26

*United States v. Hussain,*
  Case No. 16-cr-00462-CRB (N.D. Cal. Jul. 30, 2018), ECF Nos. 419, 535,
  562..................................................................................................................................................33

*United States v. Isola,*
  548 Fed. Appx 723 (2d Cir. 2013)...........................................................................................24

*United States v. Jasen,*
   15-CR-00214 (M.D. Fla. Jan. 28, 2016), Sentencing Tr., ECF No. 86 .................................30

*United States v. Malik,*
  424 F. App'x 122 (3d Cir. 2011) ..............................................................................................28

*United States v. Olis,*
  Cr. No. H- 03-217-01, 2006 WL 2716048 (S.D. Tex. Sept. 22, 2006) ..................................29

*United States v. Parris,*
  573 F. Supp. 2d 744 (E.D.N.Y. 2008) .....................................................................................19

*United States v. Rioux,*
  97 F.3d 648 (2d Cir. 1996).......................................................................................................21

*United States v. Samaras,*
  390 F. Supp. 2d 805 (E.D. Wis. 2005).....................................................................................29

*United States v. Schulman,*
  No. 2:16-cr-00442 (E.D.N.Y. Oct. 6, 2017), Sentencing Tr., ECF No. 155 ..........................25

*United States v. Stewart,*
  590 F.3d 93 (2d Cir. 2009)........................................................................................................30

*United States v. Thompson,*
   19 Cr. 698 (ER) (S.D.N.Y. Feb. 4, 2021), Sentencing Tr., ECF No. 49 ................................25

*United States v. Vigil,*
  476 F. Supp. 2d 1231 (D.N.M. 2007) ................................................................................28, 29

4926-5272-2960.1

**Page(s)**

## Statutes

18 U.S.C. § 1963 ...........................................................................................................34

18 U.S.C. § 3143 ...........................................................................................................35

18 U.S.C. § 3553 .................................................................................................. *passim*

18 U.S.C. § 3664 ...........................................................................................................34

U.S.S.G. § 2A1.5 ...........................................................................................................18

U.S.S.G. § 2A3.1 ...........................................................................................................18

U.S.S.G. § 2B1.1 .......................................................................................................17, 26

U.S.S.G. § 2B1.1 Application Note 21(C) .................................................................25

U.S.S.G. § 2C1.1 ...........................................................................................................18

## Other Authorities

Erik Schatzker, Sridhar Natarajan, and Katherine Burton, "Bill Hwang Had $20
    Billion, Then Lost It All in Two Days," BLOOMBERG (April 8, 2021),
    *available at* https://www.bloomberg.com/news/features/2021-04-08/how-bill-
    hwang-of-archegos-capital-lost-20-billion-in-two-days ..........................................31

Lydia Moynihan, Archegos Founder Bill Hwang Charged with Fraud that Rocked
    Wall Street," NEW YORK POST (April 27, 2022), *available at*
    https://nypost.com/2022/04/27/archegos-founder-bill-hwang-arrested-
    charged-with-fraud/..................................................................................................31

Matthew Goldstein, "Multibillion-Dollar Fraud Trial Against Archegos Founder
    Nears Its End," THE NEW YORK TIMES (July 8, 2024), *available at*
    https://www.nytimes.com/2024/07/08/business/archegos-closing-arguments-
    bill-hwang.html ........................................................................................................28

U.S. Department of Justice, "Prison Reform: Reducing Recidivism by
    Strengthening the Federal Bureau of Prisons (updated Nov. 29, 2023),
    *available at* https://www.justice.gov/archives/prison-reform..................................31

Patrick Halligan respectfully submits this memorandum in advance of his sentencing, which is scheduled for January 27, 2025.

## PRELIMINARY STATEMENT

Patrick will be sentenced for serious crimes, but should not be defined by them. He is a man of character – his sister-in-law describes him as "the most loyal, selfless, generous, and faithful man I have ever met."[1] He is a man of faith – his childhood friend, now a Catholic priest, describes Patrick as "a man of service."[2] And he is above all a family man – what his oldest son calls "my role model" and "the foundation that my family relies upon."[3]

Patrick respectfully submits this memorandum, together with the many letters of support from some of the friends and family who know him best – so that Court may more fully understand Patrick's character, personal history, and characteristics when imposing a sentence that is sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.[4] Nothing in this memorandum seeks to call into question the jury's verdict, to minimize the seriousness of the crimes, or to shift blame to others.

Patrick respects the jury's verdict and recognizes that he must bear the consequences of his conviction. It has indeed upended his life. However, the conviction has also had a devastating impact on his cherished family, which is innocent. His middle son describes how the conviction has "turned our family life upside down," and explains that ███████████ ████████████████████████████████████████████████████[5]

---

[1] Ltr. from Golda Seguerra (Ex. N).

[2] Ltr. from Rev. Msgr. Luke M. Sweeney (Ex. W).

[3] Ltr. from Cameron Halligan (Ex. B).

[4] *See* 18 U.S.C. § 3553(a).

[5] Ltr. from Gavin Halligan (Ex. C).

Defense counsel and the government have agreed on proposed sentencing terms for the Court's consideration:

- Eight years' imprisonment (96 months);

- An order of restitution in an amount equal to the total compensation that Patrick received from Archegos during 2020 and 2021, which is $2,085,000. This restitution obligation would be subject to the payment schedule proposed by Probation in the PSR and further terms and conditions as to be provided to the Court in the form of a proposed order that the parties intend to submit to the Court;

- An order of forfeiture also in the amount of $2,085,000. This forfeiture obligation would be subject to further terms and conditions as to be provided to the Court in the form of a proposed order to be submitted, but which the parties have agreed will require a $500,000 payment within fourteen days of the entry of the forfeiture order and another $500,000 payment within one year of the entry of the forfeiture order; and

- Patrick is granted bail pending appeal.

For the reasons discussed below, we respectfully request that the Court impose a sentence that is consistent with the parties' joint proposal.

# I.
# PATRICK'S PERSONAL BACKGROUND

Patrick's character is best described by the people whose lives he has touched, as evidenced by the dozens of letters of support submitted by his family, friends, and former colleagues. These letters offer examples of Patrick's selfless acts of kindness, generosity, and love – acts that he performed not on a grand scale, but on a human scale, and not for any recognition or reward, but out of pure and genuine compassion.

## A.    Patrick's Childhood, His Loving Parents, and His Caring Sisters

Patrick Halligan was born on ███████████ in Yonkers, New York to his parents, Thomas and Ann Marie Halligan.[6] Patrick is the oldest of four children, the older

---

[6] Presentence Investigation Report ("PSR"), at ¶ 148.

brother to three sisters. His parents write that Patrick "has always been a helpful, concerned, and protective son and brother,"[7] and that he "set the tone for the younger [siblings]" as a "loving and caring big brother" and a "good example to his sisters and a valuable mentor."[8]

Both of Patrick's parents worked outside the home, his mother as an elementary school teacher in the Yonkers Public Schools for her whole career[9] and his father as a professional in the commercial real estate industry.[10] From a young age, Patrick stepped up to help around the home. His mother writes that "Patrick was five when he became a brother. He immediately embraced the arrival of each sister and through the years he would help the girls with school projects, coach them with sports and was always available for problem solving. He helped his Dad with home maintenance, car repairs and errands and was genuinely happy to help us all."[11]

Patrick's sisters describe the sort of genuine, lifelong bonds that can be forged only through shared love, mentorship, and selflessness. His youngest sister, Clare, writes about some of her memories of their childhood – watching the town fireworks from atop a fire truck (a prized perch that Patrick was able to secure as a volunteer for the Irvington Village Fire Department); running the annual Turkey Trot race together in memorable fashion (Patrick "was famous for winning the race," but after he finished, "[h]e would run back until he found me, and

---

[7]  Ltr. from Ann Marie Halligan (Ex. G).

[8]  Ltr. from Thomas Halligan (Ex. H).

[9]  Ltr. from Ann Marie Halligan (Ex. G).

[10]  Ltr. from Thomas Halligan (Ex. H).

[11]  Ltr. from Ann Marie Halligan (Ex. G).

4926-5272-2960.1

run with me to the finish line (again) encouraging me to finish strong"); Patrick buying Clare her first pet (a tortoise named Melanie).[12]

His sister Colleen describes the "afternoon adventures" that Patrick led "every day," with his younger sisters riding bikes alongside him as he jogged through "trails, the waterfront park, and of course a few good hills," while Patrick "never seemed to mind" when his sisters "fell off our bikes . . . got a flat tire or two, and struggled cycling up those hills" and stopped to "help us back up, make a light joke, and encourage us to keep going."[13]

Both Colleen and Clare grew up to be public schoolteachers,[14] and they both recall as children when Patrick overheard them making up a fake language, he offered to teach them a real language, Latin, and from that point forward he led Saturday morning Latin classes at the family kitchen table. Colleen writes that after Patrick's lessons on "declensions, Latin root word meanings, and the overall structure of the language . . . [w]hen Latin was offered at my high school, it was a breeze in comparison to Patrick's Saturday morning lessons."[15] Clare reflects that "[p]erhaps it's [Patrick's] love to learn that led me to the profession I have – a high school science teacher in Pearl River, NY."[16]

Patrick's sister Kelly writes that "Patrick helped me study for big tests, complete science projects, and learn how to drive; all of which must have taken much patience," how he always included his "little sister" in his activities: "fire department dinner dances, Corporate

---

[12] Ltr. from Clare Magnani (nee Halligan) (Ex. I).

[13] Ltr. from Colleen Moore (nee Halligan) (Ex. J).

[14] PSR ¶ 149.

[15] Ltr. from Colleen Moore (nee Halligan) (Ex. J); Ltr. from Clare Magnani (nee Halligan) (Ex. I).

[16] Ltr. from Clare Magnani (nee Halligan) (Ex. I).

4926-5272-2960.1

Challenge races, and lunches with friends."[17] And when Kelly graduated from high school, Patrick gave her the gift of a trip to England, which he planned, booked, paid for, and led himself, and which Kelly still describes decades later as "one of [her] most memorable trips."[18]

The genuine affection and mutual respect between Patrick and his sisters was so profound that when Clare was asked to describe her "hero" in her college admissions essay, she wrote about Patrick.[19] And now, almost two decades later, Clare writes that Patrick has become a "role model" to her three children – Patrick's niece and nephews – as he "continues to exemplify love and respect, leadership, the love of learning, and service."[20]

### B.    Patrick's Life of Faith

Patrick's parents and sisters also describe the important role that his Catholic faith has played in the family's life, and how Patrick has contributed to the faith community from a young age. His mother writes that Patrick and his friends "would leave early on snowy days to clear the driveway at the convent so the nuns could get to Mass before school started."[21] He served his church community as an alter server, and later as a lector and a Eucharistic minister. In high school, his community service project was bringing Veteran's Hospital patients to religious services.[22] In his adulthood, Patrick has volunteered to teach religious education classes

---

[17]  Ltr. from Kelly Governara (nee Halligan) (Ex. K).

[18]  *Id.*

[19]  Ltr. from Clare Magnani (nee Halligan) (Ex. I).

[20]  *Id.*

[21]  Ltr. from Ann Marie Halligan (Ex. G).

[22]  *Id.*

4926-5272-2960.1

on weekends and weeknights.[23] In 2019, Patrick traveled as a volunteer on a Christian mission to the Philippines.[24]

Patrick's sincere commitment to serving his faith is a through-line of his life, as evidenced by the letter of support that Patrick received from Rev. Msgr. Luke M. Sweeney. Patrick and Rev. Msgr. Sweeney (then known just as Luke Sweeney, and now the Pastor of Immaculate Heart of Mary Parish in Scarsdale, N.Y.) served as altar boys together at Immaculate Conception Church in their childhoods, and Rev. Msgr. Sweeney describes Patrick as "a good friend and person" who "worked hard and was a man of service."[25]

## C.    Patrick's Civic Service

Patrick's commitment to service is not limited to matters of faith. For years, he served as an active volunteer firefighter and volunteer EMT for the Irvington Fire Department and Irvington Volunteer Ambulance Corp., and his father still remembers Patrick often leaving the house on middle-of-the-night emergency calls.[26]

For over 15 years, from 2007 through 2023, Patrick was a volunteer with the Civil Air Patrol for the U.S. Air Force Auxiliary, where he assisted with inland search and rescue operations, held the rank of Captain, and also served as the unit's professional development officer.[27]

---

[23]  Ltr. from Bethany DeVito (Ex. L).

[24]  PSR ¶ 171.

[25]  Ltr. from Rev. Msgr. Luke M. Sweeney (Ex. W).

[26]  Ltr. from Thomas Halligan (Ex. H).

[27]  PSR ¶ 173.

4926-5272-2960.1

**D.    Patrick's Ambition to Service Leads Him to West Point,**
      **But Injuries During Boot Camp Change His Trajectory**

Patrick's father explains that Patrick has always been a hard and industrious worker. As a teenager, he filled weekend and summer hours with various jobs, including maintenance for a neighborhood school and work for his hometown's Public Works Department – essentially manual labor.[28]

Patrick's work ethic propelled his academic success as well. His parents explain that he always "applied himself in elementary, high school, and college."[29] He graduated 6th in his class from Iona Preparatory High School (New Rochelle, N.Y.) in 1994.[30]

After high school, Patrick received the high honor of admission to the United States Military Academy at West Point.[31] Rev. Msgr. Sweeney recalls that he was "so happy for [Patrick] and inspired" by Patrick's acceptance into West Point.[32] Patrick attended West Point beginning in Summer 1994, but unfortunately suffered a series of medical issues during boot camp – including an emergency appendectomy, ankle issues, a concussion, and a blood infection – that ultimately precipitated his honorable discharge and a change in his plans for the future.[33]

Despite these setbacks and serious health issues, Patrick enrolled at Manhattan College and pursued studies in business administration. He was able through rehabilitation to

---

[28]  Ltr. from Thomas Halligan (Ex. H).

[29]  *Id.*

[30]  PSR ¶ 166.

[31]  PSR ¶ 165.

[32]  Ltr. from Rev. Msgr. Luke Sweeney (Ex. W).

[33]  PSR ¶¶ 157, 165.

4926-5272-2960.1

participate on the school's track and field team, and he graduated in May 1998 – exactly when he would have graduated if he had been able to continue his studies at West Point.[34]

Building on his accounting and finance studies at Manhattan College, Patrick went to work in the finance industry after graduation, first at PricewaterhouseCoopers and then at Arthur Anderson.[35] In 2000, Patrick earned his licensure as a certified public accountant,[36] and he remained in the finance industry through the duration of his work in the back office operations groups at Tiger Asia Management and later Archegos.

**E.    Patrick Meets His Wife and Joins Her Loving Family**

Within about a year of after graduating from college, Patrick had met Honey Seguerra. They were both working as junior accountants for PricewaterhouseCoopers in Manhattan.[37] Honey describes "a kindness in [Patrick's] eyes that caught [her] attention – before his courtship caught [her] heart."[38]

That courtship lasted several years, and Patrick and Honey were married in June 2002.[39] Honey explains that "[f]amily is overwhelmingly important to [her] large, extended Filipino immigrant family," and that her family quickly "came to love [Patrick]" as a "wonderful, caring, patient, selfless" man – just as Honey loved him.[40]

Honey's family has confirmed how quickly – and how deeply – Patrick became part of their family. Honey's sister Golda Seguerra writes that "[f]or as long as Patrick has been

---

[34]  PSR ¶ 164.

[35]  PSR ¶¶ 185-190.

[36]  PSR ¶ 169.

[37]  Ltr. from Honey Seguerra-Halligan (Ex. A); PSR ¶ 151.

[38]  Ltr. from Honey Seguerra-Halligan (Ex. A).

[39]  PSR ¶ 151.

[40]  Ltr. from Honey Seguerra-Halligan (Ex. A).

my brother-in-law, our family has had Sunday dinners with my 3 sisters, spouses, and children."[41] She describes Patrick as "the most loyal, selfless, generous, and faithful man I have ever met. His love for his wife, my sister, is inspirational. All his free time is spent helping our mom, our kids, anyone who needs a hand."[42] Golda writes about the time that she and her family moved into a new home and didn't have money for renovations, Patrick helped "pull[] up carpet, painted, drywall[ed], and made if fun for all of us."[43] Honey's sister Dr. Bethany DeVito (nee Seguerra) provides some more examples of the sort of help that Patrick makes time to provide, such as helping her and her husband "fix electrical issues at home, [fix] broken car doors, digging holes to plant trees, [and] putting together a swing set/play area for [Bethany's] children."[44] She describes Patrick as "a profoundly dedicated family man" who "always puts family first," serving as a "loyal friend" to Bethany and her husband and a "mentor to [her] children."[45] And Honey's sister Marissa Seguerra writes that "[i]t would be the biggest understatement to say that Patrick Halligan is an extremely generous man, a humble man. He is always looking out for us, his extended family[,] if help is ever needed. He has the biggest heart."[46]

Honey's brother Eliezer M. Seguerra, Jr, M.D., similarly writes that "[s]ince the day my sister first introduced Patrick to our family, I have always regarded him as a righteous

---

[41]  Ltr. from Golda Seguerra (Ex. N).

[42]  *Id.*

[43]  *Id.*

[44]  Ltr. from Bethany DeVito (Ex. L)

[45]  *Id.*

[46]  Ltr. from Marissa Seguerra (Ex. Q).

and kindhearted individual. Not only as a loving husband and father to three children, but also as a caring uncle to my children and his many nieces and nephews."[47]

Indeed, four of Patrick's nieces have submitted letters describing Patrick's friendship, generosity, and "unconditional love." Julia Lin describes Patrick as like a "second father who has shown me nothing but unwavering support and unconditional love," and a "rock that holds the family together," and still remembers the hug that she and Patrick shared when she asked him to be her sponsor in the sacrament of Confirmation.[48] His niece Sarah DeVito writes that "I attribute a lot of the person that I have become, both personally and professionally, to the lessons that Patrick has taught me," and that Patrick has been "a constant source of support and safety," with support in big ways and small, including "cheering for me during my high school basketball games, teaching me how to drive a car, coaching me through running my first mile at our local high school track, or talking me through my first big heartbreak."[49]

Patrick's family describes how he has stepped up for the family in times of crisis, stress, and exceptional need. When his father was diagnosed ████████, Patrick "came immediately to help [] care for him and do whatever [was] needed during that difficult time."[50] His sister Clare writes how she "will always remember seeing my brother [Patrick] at the airport to unexpectedly pick me and my sister up" when they came home after receiving their father's ████ diagnosis.[51] His sister Kelly describes how Patrick "frequently visited" to provide support to her ██████████████████████████ and that Patrick "knew exactly how to cheer

---

[47]  Ltr. from Eliezer M. Seguerra, Jr, M.D. (Ex. M-1).

[48]  Ltr. from Julia Lin (Ex. R).

[49]  Ltr. from Sarah DeVito (Ex. U).

[50]  Ltr. from Ann Marie Halligan (Ex. G).

[51]  Ltr. from Clare Magnani (nee Halligan) (Ex. I).

4926-5272-2960.1

me up and when to sit quietly with me and just be a shoulder to lean on."[52] When two family members went through a difficult divorce, Patrick supported both of them – and the whole family – through the challenging period, as evidenced by the fact that both of the ex-spouses have submitted letters describing Patrick's steadfast support and unconditional love.[53] When Honey's aunt died and her immediate family did not have the financial resources to support the funeral expenses, "Patrick did not hesitate" to pay for the expenses and "grant her the dignity of a proper farewell."[54]

Patrick's niece Marissa C. Seguerra describes how "Uncle Patrick" "has always been a father figure," "never afraid to jump to the defense of anyone who needed it," and "always taught me to stay positive, even through the hardest times."[55] His niece Samantha Seguerra describes how "Uncle Pat was the one person who would stand up to ███████████ ███████, even at the expense of his own comfort."[56]

## F.    **Patrick and Honey Build Their Loving Family Together**

In 2003, Honey and Patrick had their first child, a son they named Cameron. Several years later, they had a second son, Gavin. Then in 2008 they had a daughter they named V██. Honey, Cameron, Gavin, and V██ have each described a family defined by the fullness of love, faith, and unconditional support.

---

[52]  Ltr. from Kelly Governara (nee Halligan) (Ex. K).

[53]  Ltr from Golda Seguerra (Ex. N); Ltr. from Jeffrey Lin (Ex. O).

[54]  Ltr. from Honey Seguerra-Halligan (Ex. A).

[55]  Ltr. from Marissa C. Seguerra (Ex. S).

[56]  Ltr. from Samantha Seguerra (Ex. T).

4926-5272-2960.1

Honey writes that Patrick's "'hobby' was and is to spend as much time as he could with his family."[57] She explains that no matter what else Patrick had going on, he always made time to attend the children's sporting events, school concerts, dance recital, "endless homework sessions," and "countless bike rides."[58] At the same time, he made a priority of teaching the children "right from wrong," and instilling character and compassion through his example.[59]

Cameron, Gavin, and V█████ describe some of the lessons they have learned from their father. Cameron, ███████████████████████████████████████████ █████████████████ describes how Patrick "played a vital role" in helping Cameron complete ██████████████████████████. Every day, Patrick wrote and mailed a handwritten letter of support and encouragement to Cameron during his ████████████████, and Cameron explains that his father's "unwavering support" and the "values my father has instilled in me" "have been integral to my progress ████████████████." Cameron is now ███████ ████████████████████████████████, and has completed ██████████████████████ ██████████████████████████████████████████.[60] Cameron describes his father Patrick as "the foundation that [the] family relies on."[61]

Patrick and Honey's son Gavin also describes his father's unconditional support: "Every morning I wake up knowing that I have someone to turn to for guidance and support – no matter what the circumstances may be. My father has been there for me my entire life – not just

---

[57] Ltr. from Honey Seguerra-Halligan (Ex. A).

[58] *Id.*

[59] *Id.*; *see also* Ltr. from Cameron Halligan (Ex. B); Ltr. from Gavin Halligan (Ex. C); Ltr. from V█████ Halligan (Ex. F).

[60] ██████████████████████████████████████████████████████

[61] Ltr. from Cameron Halligan (Ex. B)

4926-5272-2960.1

when he's got time or when he's not working. ***Always. He's put nothing above the lives of my mom and my brother and my sister***."[62] Gavin describes ██████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████, attended every "single track meet," and spent "many thankless seasons attending every little league game."[63] Gavin is now in his ██████████████████ ████████████.[64]

Patrick and Honey's youngest child, V████, describes her special bond with her father: "I consider myself to be the luckiest girl in the world to have such a supportive dad whether it be at the kitchen counter solving math homework, or the day that my life was forever altered ████████████████████████████. ***He has always been there***."[65]

████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████
████████████████████████████████ █ ██████████████
████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████

---

[62]  Ltr. from Gavin Halligan (Ex. C) (emphasis added).

[63]  *Id.*

[64]  PSR ¶ 151.

[65]  Ltr. from V████ Halligan (Ex. F) (emphasis added).

[66]  PSR ¶ 152; Ltr. from Honey Seguerra-Halligan (Ex. A).

13

4926-5272-2960.1



## G.  Patrick's Conviction Upends His Family

      The consequences of Patrick's conviction have torn through his family.

---

<div class="footnotes">

67  Ltr. from Honey Seguerra-Halligan (Ex. A); *see also* PSR ¶ 152.

68  PSR ¶ 152.

69  Ltr. from V████ Halligan (Ex. F); Ltr. from Honey Seguerra-Halligan (Ex. A); PSR ¶ 152.

70  Ltr. from ████████████████ (Ex. V).

71  Ltr. from V████ Halligan (Ex. F).

72  Ltr. from Honey Seguerra-Halligan (Ex. A).

73  PSR ¶ 152.

</div>



Promptly following Patrick's conviction, Honey began looking for work outside

the home. Since Cameron's birth in 2003, Honey had supported the family through her work

inside the home and as a dedicated leader and participant in the children's many activities.[78]

Facing the loss of income from Patrick's employment at The Grace and Mercy Foundation (he

resigned on October 15, 2024),[79] and the potential loss of the vital health insurance coverage

needed ██████████████████████████████████████████, Honey was able to

obtain employment as an entry-level accountant "so that [the children] at least do not have to

---

[74] *Id.*; ████████████████████████████████████████████
██████████████████████

[75] Ltr. from ████████████████ (Ex. D).

[76] Ltr. from ██████████████████ (Ex. E).

[77] Ltr. from ████████████████ (Ex. D).

[78] PSR ¶ 153; Ltr. from Honey Seguerra-Halligan (Ex. A).

[79] PSR ¶ 153.

4926-5272-2960.1

worry about how we will pay for groceries ██████████████████████████████ ██████████████, and to reassure them that we will continue to have a roof over our heads."[80]

Patrick's family members have expressed the pain that his absence will cause. Honey explains the family's shared grief in the possibility that Patrick will "miss all the young life 'milestones' [such as high school or college graduations] that most people take for granted,"[81] and Gavin pleads that the Court "you please consider returning [his father] to us as . . . possible? So that he can once again be our guide as we begin our adult lives?"[82]

## II.
## OFFENSE CONDUCT

Following a nine-week trial, Patrick was convicted of one count of racketeering conspiracy, one count of securities fraud, and one count of wire fraud (Counts 1, 10, and 11 of the Superseding Indictment, respectively). Given the Court's familiarity with the record from having presided over the trial, we do not repeat all of the facts here, but instead highlight in our discussion below (*see* Pt. V.B) just several facts that we believe are undisputed. Again, we do not offer these facts in an effort to dispute the jury's verdict, to minimize the seriousness of the offense conduct, or to argue that Patrick should not bear responsibility for his own crimes.

## III.
## PROCEDURAL HISTORY

Patrick was arrested on April 27, 2022. When agents arrived at Patrick's family home on Long Island to execute the arrest warrant, Patrick had already left for work. He was on the Long Island Railroad when he learned what was happening at his family home, and

---

[80]  Ltr. from Honey Seguerra-Halligan (Ex. A)

[81]  *Id.*

[82]  Ltr. from Gavin Halligan (Ex. C).

immediately got off the train and returned home to face his arrest head-on.[83] As Honey explained to Probation, she, Gavin, and V█████ were present when the agents arrived at their home, and this ████████████████████████████████████.[84]

Following his arrest, Patrick was granted bail subject to a $1 million personal recognizance bond, and subject to pretrial supervision.[85] He has complied with all conditions of his pretrial supervision.[86]

Trial was conducted over nine weeks from May through July 2024. The jury returned its verdict of guilt as to Patrick on Count 1 (racketeering conspiracy), Count 10 (securities fraud), and Count 11 (wire fraud).

## IV.
## THE ADVISORY GUIDELINES CALCULATION

### A.    The Advisory Guidelines As Applied to White Collar Financial Crimes Are Draconian, Unduly Harsh, and Capable of Producing Unjust Sentences

The Guidelines are not mandatory, nor are they entitled to any presumption of reasonableness.[87] A deviation from the advisory Guidelines range does not require "extraordinary" circumstances, nor may the reasonableness of a departure be judged by any "rigid mathematical formula."[88] Rather, the imposition of a fair sentence in each case, as to each individual defendant, requires "an individualized assessment" and "consider[ation] of all of the 18 U.S.C. § 3553(a) factors."[89]

---

[83] *See* PSR ¶ 154.

[84] *Id.*

[85] *See* ECF No. 9.

[86] PSR ¶ 17.

[87] *United States v. Booker*, 543 U.S. 220, 222 (2005); *Gall v. United States*, 552 U.S. 38, 50 (2007).

[88] *Gall*, 442 U.S. at 46.

[89] *Id.* at 50.

This case demonstrates why these precepts are just. The Probation Department's advisory Guidelines calculation of 43 is driven almost entirely by a 30-level enhancement that Probation applied based on the § 2B1.1(b)(1) loss table, assuming a total loss for Guidelines purposes of greater than $10 billion. After applying this 30-level enhancement to the base offense level of seven, the offense level of 37 for these non-violent and purely economic crimes is the same as, for example,

- a defendant convicted of conspiracy or solicitation to commit murder, with a 4-level enhancement for offering or receiving something of pecuniary value for undertaking the murder (§ 2A1.5);

- a defendant convicted of criminal sexual abuse, with enhancements for a victim under 12 years of age and serious injury (§ 2A3.1); and

- more than *double* the offense level for an elected official in a high-level decision-making position convicted of extortion under color of official right or offering or soliciting a bribe (§ 2C1.1).

Courts routinely remark upon the potential for gross unfairness in the steep enhancements that follow from high-dollar losses, and then deviate from the sentences that those enhancements would produce. Doing so is entirely proper: "courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines."[90] For example, Judge Underhill, concurring in *United States v. Corsey*, explained that "***the loss guideline is fundamentally flawed***" and "sentences in high-loss cases will remain wildly divergent as some district judges apply the loss guideline unquestioningly while others essentially ignore it."[91] Judge Rakoff in *United States v. Adelson* remarked that "the calculations

---

[90] *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (citation omitted).

[91] *United States v. Corsey*, 723 F.3d 366, 377–78 (2d Cir. 2013) (Underhill, J., concurring) (emphasis added).

under the guidelines have so run amok that they are patently absurd on their face,"[92] and in *United States v. Gupta* went on to state that "[t]he Guidelines' calculations for this offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data."[93] While imposing a sentence that departed substantially from the Guidelines range in a securities fraud prosecution, Senior District Judge Block in the Eastern District of New York called the Guidelines as applied to white collar crimes "a black stain on common sense."[94]

So too here, as applied to Patrick, for the reasons that follow. In fact, Probation concludes that *multiple* factors "may warrant a variance from [Patrick's] applicable sentencing guideline range."[95]

**B.    Probation's Advisory Guidelines Calculation Is Erroneous, But Even if it is Correct, It is Only a "Starting Point" for the Determination of a Fair and Just Sentence**

Patrick has lodged extensive objections to Probation's Guidelines calculation, including objections to the loss amount and enhancements that Probation has applied to reach its total offense level.[96] Those objections are incorporated here and are not waived, except that we hereby withdraw the objections listed in Appendix A.[97]

---

[92]    *United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 Fed. Appx. 93 (2d Cir. 2008).

[93]    *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111.

[94]    *United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008); *see also United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("Under the Guidelines, it may well be that all but the most trivial frauds in publicly traded companies may trigger sentences amounting to life imprisonment").

[95]    PSR ¶ 223.

[96]    *See* PSR pages 55-69.

[97]    We will advise Probation that these objections are withdrawn.

Counsel for Patrick and the government have reached agreement regarding an appropriate sentencing proposal for the Court's consideration. That proposed sentence, as described above, is premised on agreement that an individualized application of the 3553(a) factors supports the imposition of the proposed sentence below the Guidelines calculation. In other words, whatever Guidelines calculation the Court were to use as the "starting point" for sentencing, counsel for both parties agree that the correct outcome of an individualized analysis as to Patrick is the joint sentence proposal.

Accordingly, we respectfully submit that this agreement renders this the somewhat unusual situation where "precise calculation of the applicable Guidelines range may not be necessary," because regardless of what Guidelines range is applicable as a starting point, the Court may, "having complied with section 3553(a), make[] a decision to impose a non-Guidelines sentence, ***regardless of which . . . range[] applies.*** This leeway should be useful to sentencing judges in some cases to avoid the need to resolve all of the factual issues necessary to make precise determinations of some complicated matters."[98]

## V.
### BALANCING THE FACTORS UNDER SECTION 3553(A) DEMONSTRATES THAT THE PARTIES' JOINT SENTENCING PROPOSAL IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO ACHIEVE THE GOALS OF SENTENCING

Section 3553(a) directs that a sentencing court must "impose a sentence sufficient, but not greater than necessary" to achieve the goals of sentencing, while taking into account the "nature and circumstances of the offense and the history and characteristics of the defendant." A just sentence must "(1) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (2) "afford adequate deterrence to criminal conduct,"

---

[98] *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005) (emphasis added) (abrogated on other grounds in *United States v. Fagans*, 406 F.3d 138, 141 (2d Cir. 2005)).

(3) "protect the public from further crimes of the defendant," and (4) "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."[99]

An individualized assessment of Patrick's particular facts and circumstances, guided by the Section 3553(a) factors, demonstrates that the parties' jointly proposed sentence is fair, just, and sufficient but not greater than necessary to achieve the goals of sentencing.

## A. Patrick's Life of Kindness, Generosity, and Humanity, Together with His Family Circumstances, Warrant the Proposed Sentence

### 1. Patrick's Character

Patrick's family and friends have illustrated through their vivid examples and their emotional pleas for mercy that Patrick is a good man who shows kindness, generosity, and humanity when no one is looking and asks for nothing in return. *See* above Pt. I. These submissions call to mind Judge Rakoff's discussion in *Adelson*:

> [Defendant's] good deeds were not performed to gain status or enhance his image. Most of them were unknown to all but a few people until the time of his sentencing. ***But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.*** This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'[100]

---

[99] 18 U.S.C. § 3553(a)(2)(A)–(D).

[100] *Adelson*, 441 F. Supp. 2d at 513–14 (emphasis added); *see also United States v. DiMattina*, 885 F. Supp. 2d 572, 582 (E.D.N.Y. 2012) (support letters attesting to defendant's "good character and many acts of charity" justified reduction); *see also United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming downward departure based on extraordinary public service and good works); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (affirming district court's consideration of charitable works as appropriate basis for Guidelines departure).

Letter after letter describes indelible memories of Patrick's selflessness. His sister Kelly
remembers Patrick's emergency dispatch radio going off "many times . . . in the middle of the
night, and Patrick rushing out to respond to the emergency call" as a volunteer firefighter and a
volunteer EMT in Irvington.[101] His nieces Marissa Claire, Julia, and Samantha all independently
witnessed Patrick going out of his way – "even at the expense of his own comfort" – to welcome
the unwelcomed, comfort those in pain, and support those in need.[102] He paid for funeral
expenses of his wife's aunt when more immediate family could not.[103] He has helped friends and
family members with electrical repairs, car repairs, boat repairs, and disaster storm recovery.[104]
He has built backyard swing sets, dug holes for trees,[105] and painted rooms.[106] He has served his
faith in multiple capacities, from an altar boy to a lector to a Eucharistic Minister to a catechism
teacher to an ambassador on an overseas mission.[107]

       Patrick hoped to pursue a career of military service and started that process at
West Point, though the series of health calamities that he experienced during Boot Camp – what
his friend Will Faherty recalls as "a frightening time" – derailed that trajectory.[108] Remarkably,
Patrick not only "remained upbeat," but remained committed to civic service, not only through
his volunteer service as an EMT and firefighter, but also through his volunteer service as a

---

[101]  Ltr. from Kelly Governara (nee Halligan) (Ex. K).

[102]  Ltrs. from Marissa C. Seguerra (Ex. S), Samantha Seguerra (Ex. T), and Julia Lin (Ex. R).

[103]  Ltr. from Honey Seguerra-Halligan (Ex. A).

[104]  Ltr. from Bethany DeVito (Ex. L); Ltr. from Will Faherty (Ex. Y) ("Pat was always on hand to crawl
into cramped spaces [and] pull 120 lb. batteries from the engine room").

[105]  Ltr. from Bethany DeVito (Ex. L).

[106]  Ltr. from Jeffrey Lin (Ex. O).

[107]  Ltr. from Rev. Msgr. Luke M. Sweeney (Ex. W); Ltr. from Bethany DeVito (Ex. L); PSR ¶ 171.

[108]  Ltr. from Will Faherty (Ex. Y). Will Faherty describes Patrick experiencing amnesia, the result of
which was that he "couldn't even remember his parents, never mind friends."

captain in the Civil Air Patrol for the U.S. Air Force Auxiliary, where he served for over 15 years assisting with inland search and rescue operations.[109]

Patrick has always been present for others. From "endless homework sessions" to "countless bike rides"[110] ███████████████████████████████[111] to track meets with Gavin[112] to his nieces' dance recitals,[113] Patrick has made it his business to lift up the people around him. In their own words, Patrick is

- his family's "unshakeable foundation" (Cameron Halligan) (Ex. B)

- The family's "rock" (Julia Lin) (Ex. R)

- "a man of service" (Rev. Msgr. Luke M. Sweeney) (Ex. W)

- "the most loyal, selfless, generous, and faithful man I have ever met" (Golda Seguerra) (Ex. N)

- "inherently a good person" (Marissa Seguerra) (Ex. Q)

- "a good, selfless man" (Samantha Seguerra) (Ex. T)

- "in the truest sense, a genuine and good person" (Sarah DeVito) (Ex. U)

- a man who "has led a life larger than himself" (Will Faherty) (Ex. Y)

- "a profoundly dedicated family man" and a "constant source of emotional support" (Bethany DeVito) (Ex. L)

- "a family man, a kind hearted person who truly cares about people" (Jeffrey Lin) (Ex. O)

- a man who "exemplif[ies] love and respect, leadership, the love of learning, and service" (Clare Magnani (nee Halligan) (Ex. I))

---

[109]  PSR ¶ 173; Ltr. from Sarah DeVito (U).

[110]  Ltr. from Honey Seguerra-Halligan (Ex. A).

[111]  Ltr. from Cameron Halligan (Ex. B).

[112]  Ltr. from Gavin Halligan (Ex. C).

[113]  Ltr. from Julia Lin (Ex. R).

- a "righteous and kindhearted individual" (Eliezer M. Seguerra, Jr, M.D. (Ex. M-1)

2.    **Any Period of Incarceration Greater than the Proposed Term Would Impose Undue and Substantial Burdens on Patrick's Innocent Family**

One collateral consequence of the deep connections that Patrick and his loved ones have forged is that his conviction and the prospect of his incarceration have caused intense pain. As described above, ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

█████████ [114] Gavin ████████████████████████████ asks that the Court "please consider returning him to us as soon after these years as possible . . . . [s]o that he can once again be our guide as we begin our adult lives."[115]

This Second Circuit has repeatedly affirmed that a sentencing court may consider the effects that a defendant's sentence will impose on innocent family members when fashioning a just sentence. For example, in *United States v. Isola*, the Second Circuit explained that the defendant's "family circumstances and the effects of his incarceration on his daughter" was a mitigating factor under Section 3553(a),[116] and in *United States v. Bills*, the Second Circuit held similarly.[117]

---

[114] Ltr. from Honey Seguerra-Halligan (Ex. A).

[115] Ltr. from Gavin Halligan (Ex. C).

[116] *United States v. Isola*, 548 Fed. Appx 723, 725 (2d Cir. 2013).

[117] *United States v. Bills*, 401 Fed. Appx 622, 624 (2d Cir. 2010) ("the likely effects of [defendant's] incarceration on her daughter" was a mitigating factor under Section 3553(a)); *see also United States v. Blaszczak*, No. 17-cr-357 (S.D.N.Y. Sept. 13, 2018), Sentencing Tr., ECF No. 412, at 70:19-22 ("[t]he wreckage that a long period of incarceration would wreak on [defendant's wife] and on your son is horrifying to me. And the sentence I am going to impose on you is going to reflect that.") (Kaplan, J.).

24

In considering Patrick's history and characteristics to fashion a just sentence, we respectfully request that the Court consider Patrick's generous character and acts of genuine kindness; his meaningful commitment to his family and friends; and the impact that a sentence of incarceration will have on Patrick's innocent family, and in light of these considerations and the other Section 3553(a) factors impose the proposed sentence. Based on the life that Patrick has led and the impact he has made on those around him, there is every reason to hope and believe that he will find ways to use his experiences while incarcerated to help those around him learn and grow. These considerations weigh in favor of the Court's approval of the sentence proposed by the parties.[118]

**B.    The Nature and Circumstances of the Offense Support the Proposed Sentence**

Patrick was convicted of, and will be sentenced for, serious crimes. But several considerations counsel in favor of a sentence that deviates downward substantially from Probation's advisory Guidelines range.

*First*, as discussed above, the Guidelines' loss tables lead to a draconian sentencing calculation that, in this case, grossly exceeds any just sentence. Indeed, the Guidelines themselves allow that "There may be cases in which the offense level determined under this guideline substantially overstates the seriousness of the offense. In such cases, a downward departure may be warranted."[119] This is such a case.[120]

---

[118]  *Cf. United States v. Schulman*, No. 2:16-cr-00442 (E.D.N.Y. Oct. 6, 2017), Sentencing Tr., ECF No. 155, at 37:13- 38:14 (imposing below-Guidelines sentence where letters "paint a picture of a man who cares deeply about his family, his friends, his community, and his ideals" and "a man willing to go out of his way to help friends, acquaintances, colleagues, and members of his community").

[119]  Application Note 21(C) to § 2B1.1.

[120]  *Cf. United States v. Thompson*, 19 Cr. 698 (ER) (S.D.N.Y. Feb. 4, 2021), Sentencing Tr., ECF No. 49, at 28:25-29:7 (Ramos, J; "perhaps the fraud guidelines put entirely too much emphasis on the amount of the fraud, the money that's involved in the fraud. . . . I take the point that the amount of money does not necessarily get at the crux of the conduct that we are trying to prevent."); *United States v. Emmenegger*,

25

*Second*, in sharp distinction from other high-dollar fraud cases where substantial terms of imprisonment are imposed, the conduct that led to Patrick's conviction did not involve preying on vulnerable individual victims such as Holocaust survivors – like Bernie Madoff, or fleecing them of their life savings.[121] Nor did it involve any threat to any victim's health or safety.[122] Rather, Archegos traded with Wall Street's largest and most sophisticated banks, at least one of whom concluded in hindsight that its losses were "the result of a fundamental failure of management and controls in [the bank's own] Investment Bank."[123] We point this out not to litigate whether the victims are to blame here, but to illustrate that cases sentenced under § 2B1.1 come in many flavors, which is why any one-size-fits-all application of the Guidelines would result in an unjust sentence.

*Third*, with full respect to the jury's verdict, the Court may consider that Patrick was not the most culpable participant in the offense conduct. The government charged the defendants, and the jury convicted them, in a case that centered on trading activity that the jury ultimately found to be manipulative. Patrick was not a trader; he did not make a single

---

329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) ("The guidelines place undue weight on the amount of loss involved in the fraud.").

[121]  *E.g., United States v. Greenwood*, Case No. 17 Cr. 630 (ER) (S.D.N.Y. Sept. 12, 2023) (ECF No. 581) (defendant and coconspirators made misrepresentations about cryptocurrency investment "opportunity" that led millions of victims – whom the defendant described as "idiots" and "easy marks" – to lose over $4 billion).

[122]  *E.g., United States v. Holmes*, Case No. 18-CR-00258 (EJD) (N.D. Cal. Nov. 18, 2022) (ECF No. 1660) (imposing sentence of 135 months incarceration following defendant's conviction on wire fraud and conspiracy charges arising from defendant's false statements about blood-testing technology that she knew to be unreliable, thus putting human beings at medical risk).

[123]  Credit Suisse Group Special Committee of the Board of Directors Report on Archegos Capital Management, *available at* https://www.credit-suisse.com/media/assets/corporate/docs/about-us/investor-relations/financialdisclosures/results/csg-special-committee-bod-report-archegos.pdf.

4926-5272-2960.1

investment decision at or on behalf of Archegos.[124] There was not only no evidence that Patrick knew or suspected any market manipulation at Archegos. In fact, resolving whether such manipulation had been proven required days of testimony from a handful of experts who relied on scholarship and training that Patrick does not have, and mountains of data that he never saw.[125] Given Patrick's relative culpability, the government agrees that the proposed sentence is just as to Patrick under the Section 3553(a) factors.

*Fourth*, Patrick's lesser relative role in the charged conduct is nowhere more evident than in the week of Archegos's collapse. During this week, the evidence showed that Patrick repeatedly issued notes of caution and alarm about Archegos's increasingly precarious financial situation, as well as the pace of the trading activity that was putting further pressure on the firm's finances.[126] While Patrick was saying, in substance, "STOP TRADING," the trading nonetheless continued.

In sum, the nature and circumstances of the offenses here support the imposition of the sentence that is consistent with the parties' joint proposal.

## C.   The Proposed Sentence Justly Reflects the Seriousness of the Offense [18 U.S.C. § 3553(a)(2)(A)]

The parties' joint proposal, if adopted by the Court, would impose a serious sentence that reflects the seriousness of the offense. An eight-year term of imprisonment would

---

[124]  *E.g.*, Tr. 354:7-8 (Martz); 815:22-23 (Becker); *see also* Tr. 816:4-8 (Becker) (Mr. Hwang "would be involved in all decisions"); Tr. 819:5-6 (Becker) ("I'm not aware of any decisions that Mr. Hwang didn't make at Archegos.").

[125]  This includes, for examples, the voluminous data produced from Bloomberg. *See* ECF No. 110 (explaining that the data consisted of "14 gigabytes and contains over 27 million rows of trading data and 63 columns, for a total of over 1.7 billion data points").

[126]  *E.g.*, GX-3730-R (Patrick to Tomita: "you keep buying – so it gets worse"); *id.* (Patrick to Tomita: "I can't believe you guys just put in for [i.e., bought] more stuff"); id. (Patrick to Tomita: "***Get capacity out of your head*** . . .") (emphasis added); *id.* (Patrick to Tomita: "Is there a plan over there? ***All we see are more orders***.") (emphasis added).

be just punishment under the circumstances, even while the letters from Patrick's family illustrate just how devastating this term will be.[127] As Gavin explains, the conviction and his father's prospective sentencing and incarceration have "turned our family life upside down."[128]

The Court may also consider that Patrick's punishment has already begun. It has been meted out since the day he was arrested in April 2022, when he had to find a way to comfort his children after they watched their beloved father's arrest.[129] It has been meted out through the public humiliation and reputational harm that Patrick has experienced over the life of this case, again beginning on the day of his arrest when the U.S. Attorney's Office convened a press conference with the Deputy Attorney General to announce the charges.[130] And while we respect the public's interest in this prosecution, at times the media exposed members of Patrick's family to painful public scrutiny.[131] It is entirely proper for the Court to consider the heightened harms of a high-profile prosecution to inform the determination of a "just punishment."[132]

---

[127] *E.g.*, Ltrs. from V███ Halligan (Ex. F), Gavin Halligan (Ex. C), and Honey Halligan-Seguerra (Ex. A).

[128] Ltr. from Gavin Halligan (Ex. C).

[129] *See* PSR ¶ 154.

[130] *See* USAO Southern District of New York, "United States Attorney Announces Charges In Connection With Collapse Of Archegos Capital Management," *available at* https://www.youtube.com/watch?v=DZIWvpDmhc8.

[131] For example, the New York Times ran a picture of Patrick with his three children on July 8, 2024. *See* Matthew Goldstein, "Multibillion-Dollar Fraud Trial Against Archegos Founder Nears Its End," THE NEW YORK TIMES (July 8, 2024), *available at* https://www.nytimes.com/2024/07/08/business/archegos-closing-arguments-bill-hwang.html.

[132] *See, e.g.*, *United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (taking into account "incalculable damage to [defendant's] personal and professional reputation as a result of tremendous media coverage of his case," including his "unflattering [] portray[al] as the face of public corruption"), *aff'd*, 523 F.3d 1258 (10th Cir. 2008); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming below-Guidelines sentence where defendant "was punished by the reputational harm he suffered as a result of the criminal action").

Patrick has of course suffered professionally and financially. Professionally, he has lost his job, and understands he will never work in the financial services industry again.[133]

Financially, the Halligan family's challenging situation is evident in Honey's letter, where she describes how she has started a full-time job outside the home for the first time in two decades "so that at least [the children] do not have to worry about how we will pay for groceries or ████████████████████████████████████████, and to reassure them that we will continue to have a roof over our heads."[134] ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████[135] Under the proposed sentence, Patrick would face restitution and forfeiture obligations, both in the amount equal to his total Archegos compensation in 2020 and 2021, meaning that Patrick will forfeit the income he received for the entirety of the relevant period, and then pay restitution in that same amount post-release as forth in the Schedule of Payments on page 77 of the PSR. These obligations account for a substantial majority of the Halligan's family net worth, without even accounting

---

[133] *See, e.g., United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming a below-Guidelines sentence while taking into consideration that defendant lost his job and income); *United States v. Samaras*, 390 F. Supp. 2d 805, 809 (E.D. Wis. 2005) (imposing below-Guideline sentence where "as a consequence of his conviction and sentence, defendant lost a good public-sector job, a factor not considered by the Guidelines."); *Vigil*, 476 F.Supp.2d at 1315 (in considering justness of sentence, "it is important to consider all other forms of punishment [defendant] has already suffered," including loss of job); *United States v. Olis*, Cr. No. H-03-217-01, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (finding below Guidelines sentence warranted where "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct").

[134] Ltr. from Honey Seguerra-Halligan (Ex. A).

[135] *See* ████████████████████████████████████ (Exs. E & V).

for any allowance for necessary living expenses,[136] and they are sufficient but not greater than necessary to meet the aims of sentencing. The proposed sentence is severe but just, and no end of justice would be served by a harsher sentence.[137]

We respectfully submit that, as the Second Circuit explained in *United States v. Stewart*, "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral consequences of a particular sentence."[138] For Patrick, the collateral consequences have been, and will remain, crippling.

**D.     The Proposed Sentence Is Sufficient to Achieve
          Specific and General Deterrence [18 U.S.C. § 3553(a)(2)(B)]**

The proposed sentence, together with all of the other circumstances present here, are sufficient to achieve specific and general deterrence.

We respectfully submit that specific deterrence has been achieved, and Patrick is "unlikely to repeat his [offense]" in light of the punishment that he has already received since his arrest in 2022 and would still be left to receive under the terms of the parties' joint proposed sentence.[139] In fact, Patrick will likely be left *incapable* of recidivism, as the prospects of a

---

[136]  See PSR ¶ 191; if the value of the family's home is excluded from the net worth, then the forfeiture and restitution obligations substantially exceed the family's net worth.

[137]  *See, e.g., United States v. Jasen*,  15-CR-00214 (M.D. Fla. Jan. 28, 2016), Sentencing Tr., ECF No. 86, at 53-54 (imposing below Guidelines sentence because, in part, "one who makes a mistake in judgment...should be, in my judgment, absent other aggravating  circumstances, be able to go on with their life and suffer the humiliating and devastating effects of being prosecuted...which will... harm your reputation, your social status..."); *cf. United States v. Dominguez*, 296 F.3d 192, 198 (3d Cir. 2002) ("It is appropriate - indeed, essential - that the District Court consider the impact of a defendant's family circumstances on the purposes underlying sentencing. Particular family circumstances can be relevant to sentencing considerations not only because the potential harm to third-party family members may constitute a mitigating factor (thus permitting a downward departure as long as the traditional purposes of sentencing remain satisfied by the ultimate sentence), but also because they have a direct impact on the defendant in ways that directly implicate the purposes of sentencing.") (cleaned up).

[138]  *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009).

[139]  *Gupta*, 904 F. Supp. 2d at 355.

future career in the financial services sector are highly unlikely.[140] In addition, Patrick's strong and stable network of community support – as evidenced by the many family members and friends who have written letters pledging to help support him as he moves forward from this conviction – will meaningfully mitigate against any risk of recidivism.[141] And the PSR does not suggest that Probation has any concern that Patrick will commit future crimes.

As for general deterrence, this prosecution – and Patrick himself – have already served as a very public message of deterrence. From the day of Patrick's arrest through to the day of his conviction, this case and the allegations against Patrick have been prominent headlines in the financial and popular press.[142] This alone has accomplished any possible goal of sending a deterrent message to the markets and market participants. Given the publicity that this case has engendered, it is difficult to see how market participants around the world could remain unaware of the fate that awaits them if they repeat the conduct at issue in this prosecution. Moreover, the substantial sentence embodied by the parties' joint sentencing proposal will only reinforce the powerful deterrent message that has already been sent.

---

[140] *E.g., Stewart*, 590 F.3d at 171 (deterrence achieved where the conviction removed the "occasion for offenses").

[141] *See* U.S. Department of Justice, "Prison Reform: Reducing Recidivism by Strengthening the Federal Bureau of Prisons (updated Nov. 29, 2023), *available at* https://www.justice.gov/archives/prison-reform ("Research shows that close and positive family relationships during incarceration reduce recidivism, improve an individual's likelihood of finding and keeping a job after prison, and ease the harm to family members separated from their loved ones.").

[142] *See, e.g.,* Erik Schatzker, Sridhar Natarajan, and Katherine Burton, "Bill Hwang Had $20 Billion, Then Lost It All in Two Days," BLOOMBERG (April 8, 2021), *available at* https://www.bloomberg.com/news/features/2021-04-08/how-bill-hwang-of-archegos-capital-lost-20-billion-in-two-days; Lydia Moynihan, Archegos Founder Bill Hwang Charged with Fraud that Rocked Wall Street," NEW YORK POST (April 27, 2022), *available at* https://nypost.com/2022/04/27/archegos-founder-bill-hwang-arrested-charged-with-fraud/ ("Archegos Capital Management founder Bill Hwang and the fund's chief financial officer Patrick Halligan were arrested Wednesday by federal agents on criminal charges including securities fraud, wire fraud and racketeering.").

**E.    There Is No Need to Protect the Public from Patrick, And He Does Not Require Training or Treatment [18 U.S.C. § 3553(a)(2)(C) and (D)]**

We respectfully submit that there is no need whatsoever to protect the public from Patrick or to provide him with training or treatment. This said, we expect that during any period of incarceration, Patrick will thoughtfully take advantage of whatever educational, training, and service opportunities are available to him.

**F.    The Proposed Sentence is Appropriate and Just To Avoid Unwarranted Sentencing Disparities [18 U.S.C. § 3553(a)(6)]**

As discussed above, courts routinely impose sentences below the advisory Guidelines range in high-dollar fraud cases. Courts find that below-Guidelines sentences are just and fair in order to avoid the unduly harsh consequences of the 2B1.1 loss enhancements. The parties' joint sentencing proposal takes such precedents into account by fashioning a proposal that reflects the seriousness of the offense, but rejects a rote application of the Guidelines that would place "inordinate emphasis . . . on the amount of actual or intended financial loss."[143]

For one example of a comparator case, we refer the Court to *United States v. Sushovan Hussain*, No. 16-cr-00462 (N.D. Cal.). The defendant in Hussain was the CFO of Autonomy. Following what the trial court characterized as a "fiercely litigated" trial, Hussain was convicted on sixteen counts of wire fraud and securities fraud, related to Hewlett-Packard's $11 billion acquisition of Autonomy. Evidence presented at trial demonstrated, among other things, that "Hussain repeatedly misrepresented transactions to" Autonomy's auditors; "made misrepresentations to HP representatives during the course of HP's due diligence" (including "misrepresent[ing] the sources of Autonomy's revenue" and "provid[ing] a false list of Autonomy's top customers"); "made concerted efforts to cover up Autonomy's fraudulent

---

[143]  *Adelson*, 441 F. Supp. 2d at 509. *See also* above at Pt. IV.A and cited cases.

practices"; and "retaliated against an employee . . . who had made whistleblower allegations against Autonomy."[144]  In sum, Hussain's role in the relevant offense conduct at Autonomy was far more substantial than Patrick's role at Archegos.

This said, the court also explained that Hussain did not appear to be the "main driver behind the conspiracy":  "The government's evidence did not tend to paint Hussain as the main driver behind the conspiracy. This role instead seems to have been played by Lynch, Autonomy's CEO—an extremely ambitious, magnetic boss who exerted a great deal of pressure on other executives at the company, including Hussain, to meet financial goals."[145] We believe that it is not disputed that Mr. Halligan was not the "main driver" of the Archegos offense conduct.

The amount of loss that the government asserted as to Hussain was substantial. These were the first words of the U.S. Attorney's Office for the Northern District of California's sentencing submission: "Defendant Sushovan Hussain has been convicted of an $11.7 billion wire fraud. ***It is the largest fraud in the history of the Northern District of California. It is one of the largest frauds ever prosecuted by the United States Department of Justice***."[146]

---

[144]  *United States v. Hussain*, Case No. 16-cr-00462-CRB, ECF No. 419, (N.D. Cal. Jul. 30, 2018) (order denying post-trial motions) ("Hussain Order").

[145]  Hussain Order, at *15. As the Court is no doubt aware, Mike Lynch was later acquitted in a separate trial held after Hussain's sentencing and tragically died in August 2024 along with his daughter Hannah Lynch, Judy and Jonathan Bloomer, and Neda and Chris Morvillo.

[146]  *United States v. Hussain*, Case No. 16-cr-00462-CRB, ECF No. 535, at 1 (N.D. Cal. May 1, 2019) (emphasis added).

Notwithstanding the seriousness of the conduct and the substantial financial implications of the offense, the court found that a below-Guidelines sentence was warranted and sentenced Hussain to five years' imprisonment (60 months).[147]

In order to ensure that Patrick's sentence is not disparate to those imposed in *Hussain* and the many other cases where courts have found that the advisory Guideline loss enhancements result in unduly harsh sentencing ranges for economic crimes involving high-dollar losses, a below-Guidelines sentence is warranted as reflected by the parties' joint sentencing proposal.

## VI.
### THE RESTITUTION AND FORFEITURE OBLIGATIONS PROPOSED BY THE PARTIES ARE SUFFICIENT TO ACHIEVE THE GOALS OF SENTENCING AND COMPLY WITH THE RESTITUTION AND FORFEITURE STATUTES [18 U.S.C. §§ 3553(A)(7), 3664, AND 1963]

The parties' joint proposal, if adopted by the Court, will require Patrick to make substantial restitution and forfeiture payments pursuant to an agreed-upon payment schedule.[148] Consistent with 18 U.S.C. § 3664(h), the restitution obligation has been negotiated by the parties "to reflect the level of contribution to the victim's loss *and economic circumstances of each defendant*."[149] And consistent with 18 U.S.C. § 1963, the forfeiture obligation will result in the

---

[147] *United States v. Hussain*, Case No. 16-cr-00462-CRB, ECF No. 562, at 50-54 (N.D. Cal. May 13, 2019) (sentencing transcript).

[148] As to forfeiture, the parties have agreed that Patrick will make a payment of $500,000 within fourteen (14) days of the entry of the forfeiture order, and another $500,000 payment within one year of the entry of the forfeiture order.

As to restitution, the parties have agreed that Patrick will make payments pursuant to the Schedule of Payments set forth in the PSR (see page 77). The Schedule of Payments, developed upon consideration of the factors in 18 U.S.C. § 3664(f)(2) – including "the financial resources and other assets of the defendant, including whether any of these assets are jointly controlled; projected earnings and other income of the defendant; and any financial obligations of the defendant; including obligations to dependents" – requires monthly payments in an amount equal to 15 percent (15%) of Patrick's gross income, with payments commencing upon his release from prison. PSR at p. 77.

[149] 18 U.S.C. § 3664(h) (emphasis added).

4926-5272-2960.1

forfeiture of all property that Patrick received as the result of the charged conduct – that is, the

entirety of his Archegos compensation during the period of the conspiracy. The two financial

obligations, in combination, will require Patrick to pay fully *double* the amount of compensation

that he received at Archegos during the relevant period – an amount that represents the majority

of the Halligan family's net worth, and substantially more than the value of their assets after

excluding the family home at ████████████████████████.[150]

       The parties will file proposed restitution and forfeiture orders for the Court's

consideration, reflecting the terms of the parties' joint proposal.

## VII.
## PATRICK SHOULD BE GRANTED BAIL PENDING APPEAL

       This Court has separately granted bail pending appeal in favor of Mr. Hwang, and

Patrick respectfully requests bail pending appeal as well. Mr. Hwang's submissions highlight the

substantial appellate issues raised in this case, which easily satisfy 18 U.S.C. § 3143(b)(2), and in

recognition of the Court's ruling as to Mr. Hwang we do not repeat those issues here.[151] We do

note, however, that even insofar as appellate issues relate to the market manipulation conduct,

any error would require vacatur of all counts charged against Patrick, because (a) the

racketeering conspiracy conviction may rest only on the jury's finding of market manipulation,

and (b) the government's theory of the securities fraud and wire fraud counts inextricably tied

guilt on market manipulation conduct with guilt to misrepresentation conduct.

---

[150]  PSR ¶ 191; the parties have agreed that they will propose a forfeiture order that will not be
enforceable against the Halligan family home, and that Halligan family home will not be a substitute
asset.

[151]  *See* ECF No. 344.

The government does not oppose Patrick's request for bail pending appeal, and we believe that there is no dispute that Patrick is neither a flight risk nor a danger to the community, and thus satisfies 18 U.S.C. § 3143(b)(1).[152]

## **CONCLUSION**

For the foregoing reasons, we respectfully request that the Court adopt the parties' joint sentencing proposal, and impose sentence upon Patrick consistent with that proposal, including:

- Eight years' imprisonment (96 months);

- Restitution ordered in the amount of $2,085,000, subject to the terms set forth in a proposed order to be provided to the Court;

- Forfeiture ordered in the amount of $2,085,000, subject to the terms set forth in a proposed order to be provided to the Court; and

- Bail pending appeal.

Dated:   New York, New York
         January 17, 2025

                            Respectfully Submitted,

                            FRIEDMAN KAPLAN SEILER
                             ADELMAN & ROBBINS LLP


                            s/ Mary E. Mulligan
                            Mary E. Mulligan
                            Timothy M. Haggerty
                            7 Times Square
                            New York, New York  10036-6516
                            (212) 833-1100

                            *Attorneys for Patrick Halligan*

---

[152]  PSR page 79 (Patrick "is not viewed as a flight risk or a danger to the community").

4926-5272-2960.1

# APPENDIX A

Patrick Halligan withdraws objections to the following paragraphs of the PSR:

- Paragraph 28
- Paragraph 29
- Paragraph 30
- Paragraphs 32
- Paragraphs 33
- Paragraphs 35
- Paragraph 36
- Paragraph 37
- Paragraph 39
- Paragraph 47
- Paragraph 49
- Paragraph 73
- Paragraphs 78
- Paragraph 79
- Paragraph 82(a)
- Paragraph 97
- Paragraph 108
- Paragraph 134
- Paragraph 179
- Paragraph 184

4926-5272-2960.1